**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,

*Petitioners*

v.

Federal Energy Regulatory Commission,

*Respondent*

Case No. 25-1150

**PETITION FOR REVIEW**

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Rule 15, Central Maine Power Company, New England Power Company d/b/a National Grid, New

Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC,[1] Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy (collectively, the NETOs) hereby petition the Court for review of the following orders issued by the Federal Energy Regulatory Commission (FERC): *Coakley, et al. v. Bangor Hydro-Elec. Co., et al.*, Opinion No. 594, 194 FERC ¶ 61,208 (Mar. 19, 2026) (Opinion No. 594), *on reh'g*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 195 FERC ¶ 62,112 (May 21, 2026) (Denial Notice). A copy of Opinion No. 594 is attached as Exhibit A to this Petition. A copy of the Denial Notice is attached as Exhibit B to this Petition.

---

[1] In addition to filing a request for rehearing jointly with the other NETOs in the underlying FERC proceedings, Vermont Transco filed with FERC a motion for reconsideration and supplemental request for rehearing raising additional issues specific to Vermont Transco. Vermont Transco intends to file a separate petition for review with this Court regarding the specific issues raised in its supplemental request for rehearing. To the extent Vermont Transco's separate petition for review is consolidated with the instant proceeding, Vermont Transco intends to file in this docket a supplemental statement of issues and to seek leave to file a separate brief, subject to a separate word count, concerning the specific issues raised in its supplemental request for rehearing.

The NETOs are a group of utilities that own the vast majority of electric transmission facilities over which the ISO New England Inc. (ISO-NE) provides electric transmission service. ISO-NE is a FERC-approved regional transmission organization overseeing the operation of the electric transmission system and associated energy markets across most of the six New England states.

This case concerns the NETOs' FERC-regulated return on equity (ROE). In April 2017, this Court vacated several FERC orders that attempted to change the NETOs' ROE. *Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017). In Opinion No. 594, issued on remand from *Emera Maine*, FERC again purports to lower the NETOs' ROE and to backdate that new return to October 16, 2014. Each of the NETOs is thereby aggrieved by FERC's rulings in the above-referenced orders.

On April 20, 2026, the NETOs timely sought rehearing, pursuant to 16 U.S.C. § 825*l*(a). On May 21, 2026, FERC issued the Denial Notice, which did not address the substance of the NETOs' request for rehearing but deemed the request denied by operation of law. Under 16 U.S.C. § 825*l*, the NETOs may thus seek immediate review of Opinion No. 594. *Allegheny Def. Project v. FERC*, 964 F.3d 1, 15 (D.C. Cir. 2020) (en banc).

The NETOs hereby seek review of Opinion No. 594 and the Denial Notice in this Court on the grounds that they are arbitrary, capricious, and an abuse of

discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and are otherwise contrary to law. Venue is proper under 16 U.S.C. § 825*l*(b).

The NETOs respectfully request that the Court set aside the orders and grant such other relief as may be appropriate.

Dated: June 5, 2026

Respectfully submitted,

*/s/ Michelle S. Kallen*
Michelle S. Kallen
Karen Bruni
Shaun Boedicker
Michael Zschokke
Steptoe LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-6415
mkallen@steptoe.com
kbruni@steptoe.com
sboedicker@steptoe.com
mzschokke@steptoe.com

Mary E. Grover
Colin Francis
Eversource Energy Service Company
247 Station Drive, SE100
Westwood, MA 02090
(781) 441-8696
mary.grover@eversource.com
colin.francis@eversource.com

*Counsel for Eversource Energy Service Company on behalf of The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire*

Sean A. Atkins
David M. Gossett
Nicholas J. Cicale
Shannon E. O'Neil
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
seanatkins@dwt.com
davidgossett@dwt.com
nicholascicale@dwt.com
shannononeil@dwt.com

*Counsel for New England Power Company d/b/a National Grid*

Patrick H. Taylor*
Unitil Service Corp.
6 Liberty Lane West
Hampton, NH 03842
(603) 773-6544
taylorp@unitil.com

*Counsel for Unitil Energy Systems, Inc. and Fitchburg Gas and Electric Light Company*

Jeffrey M. Jakubiak
Melinda J. Warner
Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
(212) 237-0000
jjakubiak@velaw.com
mwarner@velaw.com

*Counsel for Versant Power*

Thomas C. Orvald
Senior FERC Counsel
New Hampshire Transmission, LLC
801 Pennsylvania Avenue, NW
Suite 220
Washington, D.C. 20004
Tel.: (202) 349-3497
Email: thomas.orvald@fpl.com

*Counsel for New Hampshire Transmission, LLC*

Steven M. Nadel
PPL Services Corp.
645 Hamilton Street, Suite 601
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com

William M. Keyser
Steptoe LLP
1330 Connecticut Avenue NW
Washington, D.C. 20036
(202) 429-8186
wkeyser@steptoe.com

*Counsel for The Narragansett Electric Company d/b/a Rhode Island Energy*

* Mr. Taylor intends to seek admission to the Court by June 22, 2026, as directed by the Court's letter of May 21, 2026, in Case No. 26-1123.

S. Mark Sciarrotta
Vermont Electric Power Company, Inc., as Manager of Vermont Transco LLC
366 Pinnacle Ridge Road
Rutland, VT 05701
(802) 282-3812
msciarrotta@velco.com

Lamiya Rahman
Emily Childress
Blank Rome LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2662
lamiya.rahman@blankrome.com
emily.childress@blankrome.com

*Counsel for Vermont Electric Power Company, Inc. and Vermont Transco, LLC*

Catherine McCarthy
Bracewell LLP
2001 M Street, NW
Washington, DC 20036
(202) 828-5839
cathy.mccarthy@bracewell.com

*Counsel for Central Maine Power Company and The United Illuminating Company*

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,<br><br>*Petitioners*<br><br>v.<br><br>Federal Energy Regulatory Commission,<br><br>*Respondent* | Case No. ____________ |

**<u>Corporate Disclosure Statement of Eversource Energy Service Company</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Eversource Energy Service Company ("Eversource Service"), on behalf of The Connecticut Light and Power Company, NSTAR

Electric Company, and Public Service Company of New Hampshire, discloses the following:

Eversource Service is a wholly owned service company subsidiary of Eversource Energy ("Eversource"), a registered holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C § 79a, *et seq*. The common shares of Eversource are publicly held. Eversource, through its named subsidiaries, provides electric transmission and distribution services and engages in wholesale and retail sales of electric energy.

Eversource Service provides management and professional services to the subsidiaries of Eversource. In this proceeding, Eversource Service is acting on behalf of its electric utility company affiliates, which are: The Connecticut Light and Power Company, Public Service Company of New Hampshire, and NSTAR Electric Company (the "Eversource Companies").

The Eversource Companies are electric transmission owners in New England and provide electric transmission services pursuant to the rates, terms and conditions of the ISO New England Inc. Transmission, Markets and Services Tariff. The Eversource Companies are wholly owned subsidiaries of Eversource. Two of the Eversource Companies, The Connecticut Light and Power Company and NSTAR Electric Company, have issued preferred stock to the public. The common shares of Eversource are traded on the New York Stock Exchange under the symbol "ES."

Mutual funds managed by The Vanguard Group, Inc. and BlackRock, Inc. own greater than 10% of Eversource's common shares.

Respectfully submitted,

*/s/ Mary E. Grover*
Mary E. Grover
Eversource Energy Service Company
247 Station Drive, SE100
Westwood, MA 02090
(781) 441-8696
mary.grover@eversource.com

*Attorney for Eversource Energy Service Company on behalf of The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire*

Dated: June 5, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,

*Petitioners*

v.

Federal Energy Regulatory Commission,

*Respondent*

Case No. ____________

**Corporate Disclosure Statement of New England Power Company**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, New England Power Company d/b/a National Grid discloses the following:

All of the outstanding shares of common stock of New England Power Company are owned by National Grid USA. Relevant to this proceeding, National Grid USA, through its subsidiaries, provides transmission, distribution, and generation services and engages in wholesale and retail sales of electric energy. National Grid USA, through its subsidiaries, is a transmission owner in New England and provides electric transmission service pursuant to the rates, terms and conditions of the ISO New England Transmission, Markets and Services Tariff.

All of the outstanding shares of common stock of National Grid USA are owned by National Grid North America Inc. All of the outstanding shares of common stock of National Grid North America Inc. are owned by National Grid (US) Partner 1 Limited. All of the outstanding ordinary shares of National Grid (US) Partner 1 Limited are owned by National Grid (US) Investments 4 Limited. All of the outstanding ordinary shares of National Grid (US) Investments 4 Limited are owned by National Grid (US) Holdings Limited. All of the outstanding ordinary shares of National Grid (US) Holdings Limited are owned by National Grid plc. National Grid plc is a public limited company organized under the laws of England and Wales, with ordinary shares listed on the London Stock Exchange, and American Depositary Shares listed on the New York Stock Exchange.

Respectfully submitted,

*/s/ Sean A. Atkins*
Sean A. Atkins
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
seanatkins@dwt.com

*Counsel for New England Power Company*

Dated: June 5, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,<br><br>*Petitioners*<br><br>v.<br><br>Federal Energy Regulatory Commission,<br><br>*Respondent* | Case No. ____________ |

**<u>Corporate Disclosure Statement of Central Maine Power Company and The United Illuminating Company</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Central Maine Power Company ("CMP") and The United Illuminating Company ("UI") disclose the following:

CMP is a Maine corporation primarily engaged in the transmission and distribution of electricity generated by others to approximately 664,000 customers in central and southern Maine. CMP is a transmission owner in New England and provides electric transmission service pursuant to the rates, terms and conditions of the ISO New England Inc. Open Access Transmission Tariff (ISO-NE OATT).

UI is a specially chartered Connecticut corporation. UI is engaged in the purchase, transmission, distribution and sale of electricity and related services to approximately 345,000 residential, commercial, and industrial customers in the greater New Haven and Bridgeport areas of Connecticut. In addition, UI owns a 50% interest in an entity which indirectly owns two peaking generating plants. UI is a transmission owner in New England and provides electric transmission service pursuant to the rates, terms and conditions of the ISO-NE OATT.

CMP is a direct and wholly owned subsidiary of CMP Group, Inc., a Maine corporation, which, in turn, is a direct and wholly owned subsidiary of Avangrid Networks, Inc. ("Avangrid Networks"). Avangrid Networks, a Maine corporation, is a direct and wholly owned subsidiary of Avangrid, Inc., ("Avangrid") a New York corporation. UI is a wholly owned subsidiary of UIL Holdings Corporation, a Connecticut corporation, which, in turn, is a direct and wholly owned subsidiary of Avangrid Networks. Avangrid is wholly owned subsidiary of Iberdrola, S.A.

("Iberdrola"). Iberdrola is publicly traded on the Madrid Stock Exchange. No publicly held company has a ten percent or greater ownership interest in Iberdrola.

Respectfully submitted,

*/s/ Catherine McCarthy*
Catherine McCarthy
Bracewell LLP
2001 M Street, NW
Washington, DC 20036
(202) 828-5839
cathy.mccarthy@bracewell

*Counsel for Central Maine Power Company and The United Illuminating Company*

Dated: June 5, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,

*Petitioners*

v.

Federal Energy Regulatory Commission,

*Respondent*

Case No. ____________

**Corporate Disclosure Statement of The Narragansett Electric Company**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, The Narragansett Electric Company d/b/a Rhode Island Energy ("RIE") discloses the following:

RIE provides electric transmission and distribution service and natural gas distribution service to more than 770,000 customers throughout the State of Rhode Island. RIE is a transmission owning member of ISO New England Inc. ("ISO New England") and provides electric transmission service pursuant to the rates, terms and conditions of the ISO New England Transmission, Markets and Services Tariff.

RIE is an indirect wholly owned subsidiary of PPL Corporation, whose shares are publicly traded. The Vanguard Group has a 10% or greater ownership interest in PPL Corporation. No other publicly held company has a 10% or greater ownership interest in RIE or PPL Corporation.

Respectfully submitted,

*/s/ Steven M. Nadel*

Steven M. Nadel
PPL Services Corp.
645 Hamilton Street, Suite 601
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com

*Attorney for The Narragansett Electric Company d/b/a Rhode Island Energy*

Dated: June 5, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,

*Petitioners*

v.

Federal Energy Regulatory Commission,

*Respondent*

Case No. ____________

**<u>Corporate Disclosure Statement of Versant Power</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Versant Power (f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company) discloses the following:

Versant Power, a Maine corporation, is a direct subsidiary of BHE Holdings Inc., which holds all of its issued and outstanding common stock.[2] BHE Holdings Inc., in turn, is a direct wholly-owned subsidiary of ENMAX US Holdco Inc., which is a direct wholly-owned subsidiary of ENMAX Utility Holdco Inc., which is a directly wholly-owned subsidiary of ENMAX Corporation, a Calgary-based utility holding company that is wholly-owned by the City of Calgary, Alberta.

Versant Power provides electric transmission and distribution services in the State of Maine. In addition, Versant Power purchases limited amounts of electric energy from unaffiliated generating facilities that it resells into the markets operated by ISO New England Inc. (ISO New England). Versant Power is a transmission-owning member of ISO New England and provides electric transmission service pursuant to the rates, terms and conditions of the ISO New England Transmission, Markets and Services Tariff.

Respectfully submitted,

*/s/ Jeffrey M. Jakubiak*
Jeffrey M. Jakubiak
Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
(212) 237-0000
jjakubiak@velaw.com

Dated: June 5, 2026

*Counsel for Versant Power*

---

[2] A small amount of preferred shares of Versant Power, which convey voting rights, are held by unaffiliated third parties. These preferred shares constitute approximately 0.45 percent of the outstanding voting interests in Versant Power.

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,<br><br>*Petitioners*<br><br>v.<br><br>Federal Energy Regulatory Commission,<br><br>*Respondent* | Case No. ____________ |

**<u>Corporate Disclosure Statement of Vermont Transco LLC</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, LLC ("Vermont Transco") and Vermont Electric Power Company, Inc. ("VELCO") disclose:

Vermont Transco owns Vermont's high-voltage electric transmission system. Vermont Transco is a transmission owner in New England and provides electric transmission service pursuant to the rates, terms and conditions of the ISO New England Transmission, Markets and Services Tariff. VELCO manages the Vermont Transco system, and in that capacity, operates and maintains Vermont's electric transmission system.

Vermont Transco is owned by VELCO and various Vermont utilities, including Green Mountain Power ("GMP"), which holds 77% of the membership units in Vermont Transco. No other entity holds more than 10% of the membership interests in Vermont Transco. VELCO is owned by the Vermont Low Income Trust for Electricity, Inc. ("VLITE") and various Vermont utilities. GMP owns 40% of VELCO's Class B common stock, 25% of its Class C common stock, and 80% of its Class C preferred stock. VLITE owns 38% of VELCO's Class B common stock and 32% of its Class C common stock. No other entity holds more than 10% of membership units in VELCO.

Vermont Transco LLC and VELCO are not publicly traded, and no publicly held company owns more than 10 percent of either company.

Respectfully submitted,

*/s/ S. Mark Sciarrotta*
S. Mark Sciarrotta
Vermont Electric Power Company, Inc., as
Manager of Vermont Transco LLC
366 Pinnacle Ridge Road
Rutland, VT 05701
(802) 282-3812
msciarrotta@velco.com

*Attorney for Vermont Transco LLC*

Date: June 5, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,

*Petitioners*

v.

Federal Energy Regulatory Commission,

*Respondent*

Case No. ____________

**Corporate Disclosure Statement of Unitil Energy Systems, Inc. and Fitchburg Gas and Electric Light Company**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Fitchburg Gas and Electric Light Company ("Fitchburg") and Unitil Energy Systems, Inc. ("UES") disclose the following:

Fitchburg is a Massachusetts corporation which provides retail natural gas and electric service in the Fitchburg area of north central Massachusetts. Fitchburg is a transmission owner in New England and provides electric transmission services pursuant to the rates, terms and conditions of the ISO New England Transmission, Markets and Services Tariff. UES is a New Hampshire corporation which provides electric service in the southeastern seacoast and capital regions of New Hampshire. UES provides electric transmission services pursuant to the rates, terms and conditions of the ISO New England Transmission, Markets and Services Tariff.

Fitchburg and UES are wholly owned subsidiaries of Unitil Corporation. Unitil Corporation is a registered holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C § 79a, *et seq.*, incorporated under the laws of the State of New Hampshire. The common shares of Unitil Corporation are publicly held and listed on the New York Stock Exchange. There are no parent corporations or publicly-held companies that own a ten percent or greater ownership in Unitil Corporation.

Respectfully submitted,

*/s/ Patrick H. Taylor*

Patrick H. Taylor*
Unitil Service Corp.
6 Liberty Lane West
Hampton, NH 03842

* Mr. Taylor intends to seek admission to this Court by June 22, 2026, as directed by the Court's letter of May 21, 2026, in Case No. 26-1123.

(603) 773-6544
taylorp@unitil.com

*Attorney for Unitil Energy Systems, Inc. and Fitchburg Gas & Electric Light Company*

Dated: June 5, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Central Maine Power Company, New England Power Company d/b/a National Grid, New Hampshire Transmission, LLC, Eversource Energy Service Company (on behalf of its affiliates: The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire), The United Illuminating Company, Unitil Energy Systems, Inc., Fitchburg Gas and Electric Light Company, Vermont Electric Power Company, Inc., Vermont Transco, LLC, Versant Power f/k/a Emera Maine f/k/a Bangor Hydro-Electric Company, and The Narragansett Electric Company d/b/a Rhode Island Energy,

*Petitioners*

v.

Federal Energy Regulatory Commission,

*Respondent*

Case No. ____________

## <u>Corporate Disclosure Statement of New Hampshire Transmission, LLC</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, New Hampshire Transmission, LLC ("NHT") discloses the following:

New Hampshire Transmission, LLC ("NHT") is a public utility located in Seabrook, New Hampshire. NHT owns regional transmission facilities that are under the operational control of ISO New England Inc. NHT is a direct, wholly-owned subsidiary of NextEra Energy Transmission, LLC, which in turn is a direct, wholly-owned subsidiary of NextEra Infrastructure, LLC, which is a direct, wholly-owned subsidiary of NextEra Energy Capital Holdings, Inc. NextEra Energy Capital Holdings, Inc. is a wholly-owned subsidiary of NextEra Energy, Inc. ("NextEra"). NextEra is a publicly-held company with shares listed on the New York Stock Exchange.

While not publicly held, The Vanguard Group, Inc. ("Vanguard") reported that, as of the end of Q1 2026, its family of funds held 10.59% of NextEra's outstanding voting securities, making it NHT's ultimate upstream affiliate. *See The Vanguard Group, Inc.*, Quarterly Compliance Filing for Q1 2026, Docket No. EC19-57 (May 14, 2026).

Respectfully submitted,

*/s/ Thomas C. Orvald*
Thomas C. Orvald
Senior FERC Counsel
New Hampshire Transmission, LLC
801 Pennsylvania Avenue, NW
Suite 220
Washington, D.C. 20004
Tel.: (202) 349-3497
Email: thomas.orvald@fpl.com

Dated: June 5, 2026

*Counsel for New Hampshire Transmission, LLC*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 15(c), I hereby certify that I have this June 5, 2026, caused to be served copies of the foregoing Petition for Review by first-class mail and electronic mail to:

Debbie-Anne A. Reese, Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, D.C. 20426

Robert H. Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426
Robert.solomon@ferc.gov

and by electronic mail on all parties on FERC's service list in the underlying proceeding, Docket Nos. EL11-66 et al., attached hereto.

*/s/ Michelle S. Kallen*
Michelle S. Kallen
Steptoe LLP
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-6415
mkallen@steptoe.com

*Counsel for Eversource Energy Service Company on behalf of The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire*

**Parties In the Underlying Administrative Proceedings**

Acadia Center
aboyd@acadiacenter.org

American Electric Power Service Corporation
arconner@aep.com
djrogier@aep.com
ckduffy@aep.com

American Public Power Association
dpatterson@publicpower.org

Atlantic City Electric Company
alejandro.bautista@exeloncorp.com

American Municipal Power, Inc.
ghull@amppartners.org
lmcalister@amppartners.org

Associated Industries of Massachusetts
david.pomper@spiegelmcd.com
eService@spiegelmcd.com
Scott.Strauss@spiegelmcd.com

Baltimore Gas and Electric Company
alejandro.bautista@exeloncorp.com

Brookfield Energy Marketing LP
nicolas.bosse@brookfieldrenewable.com

Belmont Municipal Light Department
jpc@duncanallen.com

Braintree Electric Light Department
jpc@duncanallen.com

Coalition of Midwest Transmission Customers
vkarandrikas@mcneeslaw.com

Commonwealth Edison Company
alejandro.bautista@exeloncorp.com

Concord Municipal Light Plant
jpc@duncanallen.com

Connecticut Business and Industry Association
Chris.DiPentima@cbia.com
Peter.myers@cbia.com

Connecticut Industrial Energy Consumers
smaurer@couchwhite.com
jgoodman@couchwhite.com

Connecticut Office of Attorney General
john.wright@ct.gov
caroline.mccormack@ct.gov
seth.hollander@ct.gov

Connecticut Office of Consumer Counsel
andrew.minikowski@ct.gov
james.talbert-slagle@ct.gov

Connecticut Public Utilities Regulatory Authority
Scott.Strauss@spiegelmcd.com
david.pomper@spiegelmcd.com
caroline.mccormack@ct.gov
seth.hollander@ct.gov
eService@spiegelmcd.com

Cooperative Energy
mrudolphi@thompsoncoburn.com
nbellville@cooperativeenergy.com

Delmarva Power & Light Company
alejandro.bautista@exeloncorp.com

Eastern Massachusetts Consumer-Owned Systems Group
jpc@duncanallen.com
amb@duncanallen.com
kh@duncanallen.com
aem@duncanallen.com
mikehorrigan@tmlp.com

Environment Northeast
aboyd@acadiacenter.org

Edison Electric Institute
abenshoff@eei.org

Exelon Corporation
alejandro.bautista@exeloncorp.com

George Jepsen, Attorney General for the State of Connecticut
john.wright@ct.gov
caroline.mccormack@ct.gov

Georgetown Municipal Light Department
jpc@duncanallen.com

Greater Boston Real Estate Board
david.pomper@spiegelmcd.com
eService@spiegelmcd.com
Scott.Strauss@spiegelmcd.com

Groveland Electric Light Department
jpc@duncanallen.com

Hingham Municipal Lighting Plant
jpc@duncanallen.com

Hoosier Energy Rural Electric Cooperative
cgoffinet@hepn.com
bcohen@mccarter.com
sbeeny@mccarter.com
pkimmel@pgklawoffice.com

Industrial Energy Consumer Group
Anthonybuxton1964@gmail.com

ISO New England, Inc.
mgonzalez@iso-ne.com
lmailesmith@iso-ne.com
LMorrison@iso-ne.com

Joint Consumer Advocates
jennifer.easler@oca.iowa.gov
larry.cook@ky.gov
john@liskeypllc.com
nancy.campbell@state.mn.us

Littleton Electric Light & Water Department
jpc@duncanallen.com

Louisiana Public Service Commission
dshelton@fishmanhaygood.com
jswaim@fishmanhaygood.com
kathryn.bowman@la.gov

Maine Public Utilities Commission
eric.j.bryant@maine.gov

Maine Public Advocate Office
Andrew.Landry@maine.gov

Massachusetts Department of Public Utilities
greggory.wade@mass.gov
krista.hawley@mass.gov

Massachusetts Municipal Wholesale Electric Company
Scott.Strauss@spiegelmcd.com
jeffrey.schwarz@spiegelmcd.com
eService@spiegelmcd.com

Massachusetts Office of Attorney General
chris.modlish@mass.gov
jacquelyn.bihrle@mass.gov

Merrimac Municipal Light Department
jpc@duncanallen.com

Middleton Electric Light Department
jpc@duncanallen.com

National Consumer Law Center
charak@nclc.org

National Rural Electric Cooperative Association
paul.breakman@nreca.coop

NEPOOL Industrial Customer Coalition
vkarandrikas@mcneeslaw.com

New England Power Pool Participant Committee
ekrunge@daypitney.com
pmgerity@daypitney.com
dtdoot@daypitney.com
sbrowning@daypitney.com
jfagan@daypitney.com

New England States Committee on Electricity
shannonbeale@nescoe.com
nathanforster@nescoe.com

New Hampshire Electric Cooperative, Inc.
Scott.Strauss@spiegelmcd.com
jeffrey.schwarz@spiegelmcd.com
eService@spiegelmcd.com
nscobbo@ferriterscobbo.com

New Hampshire Office of the Consumer Advocate
matthew.j.fossum@oca.nh.gov
donald.kreis@oca.nh.gov

New Hampshire Public Utilities Commission
george.mccluskey@puc.nh.gov
f.anne.ross@puc.nh.gov

PECO Energy Company
alejandro.bautista@exeloncorp.com

Potomac Electric Power Company
alejandro.bautista@exeloncorp.com

Power Options, Inc.
carcate@poweroptions.org

Public Service Electric and Gas Company
Matthew.Weissman@PSEG.com
Jodi.Moskowitz@PSEG.com

Reading Municipal Light Department
jpc@duncanallen.com

Rhode Island Department of Attorney General and Division of Public Utilities and Carriers
david.pomper@spiegelmcd.com
eService@spiegelmcd.com
Scott.Strauss@spiegelmcd.com
Christy.Hetherington@dpuc.ri.gov
Gregory.Schultz@dpuc.ri.gov

Rowley Municipal Lighting Plant
jpc@duncanallen.com

Southern California Edison Company
matthew.dwyer@sce.com
ferccaseadmin@sce.com
jeff.nelson@sce.com

Taunton Municipal Lighting Plant
jpc@duncanallen.com

Van Ness Feldman LLP

Frank.Kelly@ferc.gov
Alexandra.Ward@ferc.gov
Debora.Lyon@ferc.gov

Vermont Department of Public Service
ed.mcnamara@vermont.gov
james.porter@vermont.gov
harvey.reiter@stinson.com
john.mccaffrey@stinson.com

Wellesley Municipal Light Plant
jpc@duncanallen.com

WIRES
lgasteiger@exec.wiresgroup.com
pfoley@wiresgroup.com

# Exhibit A

\

194 FERC ¶ 61,208
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Laura V. Swett, Chairman;
David Rosner, Lindsay S. See,
Judy W. Chang, and David LaCerte.

| | |
|---|---|
| Martha Coakley, Attorney General of the Commonwealth of Massachusetts<br>Connecticut Public Utilities Regulatory Authority<br>Massachusetts Department of Public Utilities<br>New Hampshire Public Utilities Commission<br>George Jepsen, Attorney General of the State of Connecticut<br>Connecticut Office of Consumer Counsel<br>Maine Office of the Public Advocate<br>New Hampshire Office of the Consumer Advocate<br>Rhode Island Division of Public Utilities and Carriers<br>Vermont Department of Public Service<br>Massachusetts Municipal Wholesale Electric Company<br>Associated Industries of Massachusetts<br>The Energy Consortium<br>Power Options, Inc.<br>Industrial Energy Consumer Group<br><br>v.<br><br>Bangor Hydro-Electric Company<br>Central Maine Power Company<br>New England Power Company<br>New Hampshire Transmission LLC<br>Northeast Utilities Service Company, on behalf of its operating company affiliates: The Connecticut Light and Power Company, Western Massachusetts Electric Company, and Public Service Company of New Hampshire<br>NSTAR Electric & Gas Corporation<br>The United Illuminating Company | Docket Nos. EL11-66-001<br>EL11-66-004<br>EL11-66-005 |

Unitil Energy Systems, Inc.
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC
ISO New England Inc.

ENE (Environment Northeast) Docket Nos. EL13-33-000
Greater Boston Real Estate Board EL13-33-002
National Consumer Law Center
NEPOOL Industrial Customer Coalition

v.

Bangor Hydro-Electric Company
Central Maine Power Company
New England Power Company
New Hampshire Transmission LLC
NSTAR Electric Company
Northeast Utilities Service Company
The United Illuminating Company
Unitil Energy Systems, Inc.
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC

Attorney General of the Commonwealth of Massachusetts Docket No. EL14-86-000
Connecticut Public Utilities Regulatory Authority
Massachusetts Municipal Wholesale Electric Company
New Hampshire Electric Cooperative, Inc.
Massachusetts Department of Public Utilities
New Hampshire Public Utilities Commission
George Jepsen, Attorney General of the State of Connecticut
Connecticut Office of Consumer Counsel
Maine Office of the Public Advocate
New Hampshire Office of the Consumer Advocate
Rhode Island Division of Public Utilities and Carriers
Vermont Department of Public Service
Associated Industries of Massachusetts
The Energy Consortium
Power Options, Inc.
Western Massachusetts Industrial Group

Environment Northeast
National Consumer Law Center
Greater Boston Real Estate Board
Industrial Energy Consumer Group

v.

Bangor Hydro-Electric Company
Central Maine Power Company
New England Power Company
New Hampshire Transmission LLC
Northeast Utilities Service Company, on behalf of its operating company affiliates: The Connecticut Light and Power Company, Western Massachusetts Electric Company, and Public Service Company of New Hampshire
NSTAR Electric Company
The United Illuminating Company
Unitil Energy Systems, Inc.
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC

Belmont Municipal Light Department — Docket Nos. EL16-64-000, EL16-64-002
Braintree Electric Light Department
Concord Municipal Light Plant
Georgetown Municipal Light Department
Groveland Electric Light Department
Hingham Municipal Lighting Plant
Littleton Electric Light & Water Department
Middleborough Gas & Electric Department
Middleton Electric Light Department
Reading Municipal Light Department
Rowley Municipal Lighting Plant
Taunton Municipal Lighting Plant
Wellesley Municipal Light Plant

v.

Central Maine Power Company
Emera Maine (formerly known as Bangor Hydro-Electric Company)
Eversource Energy Service Company and its operating company affiliates: The Connecticut

Light and Power Company, Western Massachusetts Electric Company, Public Service Company of New Hampshire, and NSTAR Electric Company
New England Power Company
New Hampshire Transmission LLC
The United Illuminating Company
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC

ISO New England Inc. Docket No. ER15-414-004

OPINION NO. 594

ORDER ON REMAND, BRIEFS, AND INITIAL DECISIONS

(Issued March 19, 2026)

TABLE OF CONTENTS

Paragraph Numbers

I. Background ........ 8.
A. Opinion No. 531 *et seq*. ........ 8.
B. Subsequent Complaints against NETOs' ROE ........ 12.
C. *Emera Maine* ........ 15.
D. Briefing Orders ........ 19.
E. Opinion No. 569 ........ 26.
F. Opinion No. 569-A ........ 30.
G. Opinion No. 569-B ........ 32.
H. Current Status ........ 41.

II. Overview ........ 42.

III. Procedural Matters ........ 48.

IV. Use of Multiple Models Generally ........ 52.
A. Background ........ 53.
B. Briefs ........ 60.
C. Commission Determination ........ 69.

V. Presumptively Just and Reasonable ROE Ranges for Determining if an Existing ROE is Unjust and Unreasonable ........ 79.
A. Background ........ 79.
B. Briefs ........ 88.
C. Commission Determination ........ 96.

VI. DCF ........ 101.

A. Background ........ 101.
B. Dividend Yield ........ 104.
1. Background ........ 104.
2. Briefs ........ 106.
3. Commission Determination ........ 115.
C. Short-Term Growth Rate ........ 120.
1. Background ........ 120.
2. Briefs ........ 125.
3. Commission Determination ........ 130.
D. Long-Term Growth Projection ........ 133.
1. Background ........ 133.
2. Briefs ........ 136.
3. Commission Determination ........ 140.

VII. Expected Earnings Model ........ 162.
A. Background ........ 162.
B. Briefs ........ 176.
C. Commission Determination ........ 190.

VIII. CAPM ........ 213.
A. Background ........ 214.
B. Calculation of Market Risk Premium ........ 218.
1. One-Step versus Two-Step Analysis ........ 218.
a. Background ........ 218.
b. Briefs ........ 220.
c. Commission Determination ........ 232.
2. Betas and Size Premium ........ 239.
a. Background ........ 239.
b. Briefs ........ 244.
c. Commission Determination ........ 255.
C. CAPM S&P 500 screens ........ 262.
1. Background ........ 262.
2. Briefs ........ 263.
3. Commission Determination ........ 268.
D. CAPM *Value Line* ........ 270.
1. Background ........ 270.
2. Briefs ........ 275.
3. Commission Determination ........ 283.

IX. Risk Premium Model ........ 285.
A. Background ........ 285.
B. Briefs ........ 296.
C. Commission Determination ........ 320.

X. Proxy Group Construction ........ 324.

A. High-End Outlier Test ... 326.
1. Background ... 326.
2. Briefs ... 330.
3. Commission Determination ... 336.
B. Low End Outlier Test ... 340.
1. Background ... 340.
2. Briefs ... 343.
3. Commission Determination ... 349.
C. Natural Break Analysis ... 352.
1. Background ... 352.
2. Briefs ... 354.
3. Commission Determination ... 359.

XI. Use of Midpoint or Median as Measure of Central Tendency ... 363.
A. Background ... 363.
B. Briefs ... 367.
C. Commission Determination ... 378.

XII. Weighting of Models ... 383.
A. Background ... 383.
B. Briefs ... 385.
C. Commission Determination ... 390.

XIII. Sequencing of Calculations in Determining Composite Zone ... 391.
A. Background ... 391.
B. Briefs ... 394.
C. Commission Determination ... 396.

XIV. ROE Incentives Cap ... 399.
A. Background ... 399.
B. Briefs ... 400.
C. Commission Determination ... 430.

XV. Applicable Risk-Based Presumptively Just and Reasonable Range ... 436.
A. Background ... 436.
B. Briefs ... 438.
C. Commission Determination ... 443.

XVI. Complaint Specific Results: First Complaint ... 445.
A. Composition of Starting Proxy Group ... 447.
B. DCF Analysis ... 454.
C. CAPM Analysis ... 460.
E. Composite Zone of Reasonableness and FPA Section 206 Findings ... 464.
F. Other Issues ... 469.

XVII. Complaint Specific Results: Second Complaint ... 477.
A. Existing ROE for Purposes of Second Complaint ... 477.

B. Composition of Starting Proxy Group .......... 478.
C. DCF Analysis .......... 538.
D. CAPM Analysis .......... 544.
F. Composite Zone of Reasonableness and FPA Section 206 Findings .......... 548.

XVIII. Complaint Specific Results: Third Complaint .......... 551.
A. Existing ROE for Purposes of Third Complaint .......... 551.
B. Composition of Starting Proxy Group .......... 552.
C. DCF Analysis .......... 627.
D. CAPM Analysis .......... 631.
F. Composite Zone of Reasonableness and FPA Section 206 Findings .......... 635.

XIX. Complaint Specific Results: Fourth Complaint .......... 638.
A. Existing ROE for Purposes of Second Complaint .......... 638.
B. Composition of Starting Proxy Group .......... 639.
C. DCF Analysis .......... 715.
D. CAPM Analysis .......... 720.
F. Composite Zone of Reasonableness and FPA Section 206 Findings .......... 724.
G. Other Issues .......... 727.

XX. Refunds in the Second through Fourth Complaint Proceedings .......... 728.

1. In *Emera Maine v. FERC*,[1] the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacated and remanded Opinion No. 531,[2] which addressed the New England Transmission Owners' (NETO)[3] base return on equity (ROE). The remand in that proceeding and three other proceedings involving NETOs' ROE are currently pending before the Commission. On October 16, 2018, the Commission issued an Order Directing Briefs in those above-captioned proceedings.[4] The Briefing Order directed the participants to the above-captioned proceedings to submit briefs regarding: (1) a proposed framework for determining whether an existing base ROE is unjust and unreasonable under the first prong of Federal Power Act (FPA) section 206[5] and (2) a revised methodology for determining just and reasonable base ROEs under the second prong of FPA section 206.[6] On November 15, 2018, the Commission issued a substantially similar Order Directing Briefs in two complaint proceedings involving the base ROEs of Midcontinent Independent System Operator, Inc. (MISO) transmission owners (MISO TO).[7] Subsequently, the Commission issued

---

[1] 854 F.3d 9 (D.C. Cir. 2017).

[2] *Coakley Mass. Attorney Gen. v. Bangor Hydro-Elec. Co*., Opinion No. 531, 147 FERC ¶ 61,234 (2014), *order on paper hearing*, 149 FERC ¶ 61,032 (2014) (Opinion No. 531-A), *order on reh'g*, Opinion No. 531-B, 150 FERC ¶ 61,165 (2015).

[3] NETOs are Emera Maine (f/k/a Bangor Hydro Electric Company); Central Maine Power Company; Eversource Energy Service Company (f/k/a Northeast Utilities Service Company) on behalf of: The Connecticut Light and Power Company, NSTAR Electric Company, Western Massachusetts Electric Company, and Public Service Company of New Hampshire; New England Power Company d/b/a National Grid; New Hampshire Transmission LLC; The United Illuminating Company; Unitil Energy Systems, Inc. and Fitchburg Gas and Electric Light Company; and Vermont Transco LLC.

[4] *Coakley v. Bangor Hydro-Elec. Co.*, 165 FERC ¶ 61,030 (2018) (Briefing Order).

[5] 16 U.S.C. § 824e.

[6] *See, e.g.*, Briefing Order, 165 FERC ¶ 61,030 at PP 1, 15.

[7] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 165 FERC ¶ 61,118 (2018) (MISO Briefing Order).

Opinion Nos. 569,[8] 569-A,[9] and 569-B,[10] in which the Commission made multiple revisions to its methodology for analyzing the base ROE component of public utility rates under FPA section 206.

2. On August 9, 2022, the D.C. Circuit vacated and remanded Opinion No. 569 *et seq*. on one issue, the Commission's decision to include the risk premium (Risk Premium) model in that methodology. The court explained that the Commission failed to offer a reasoned explanation for its decision to include the Risk Premium model after initially rejecting it.[11] On October 17, 2024, the Commission responded to the remand, reversing the portions of Opinion Nos. 569-A and 569-B that included the Risk Premium model and maintaining the other modifications to the Commission's ROE methodology set forth in Opinion No. 569, as modified by Opinion Nos. 569-A and 569-B.[12] On March 25, 2025, the Commission addressed requests for rehearing of the MISO Remand Order and continued to reach the same result.[13]

3. As discussed further below, on reexamination of the record and by reference to the court's directions on remand, in these proceedings we will adopt the proposal in the Briefing Order, with certain revisions. Principally, we will not adopt the use of the expected earnings (Expected Earnings) and risk premium (Risk Premium) models in our ROE analyses under the first and second prongs of section 206, and instead will use only the discounted cash flow (DCF) model and capital-asset pricing model (CAPM) in our ROE analyses under both prongs of section 206.

4. Applying this revised methodology to the facts of the September 30, 2011, complaint filed in Docket No. EL11-66-000 pursuant to section 206 (First Complaint),

---

[8] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 569, 169 FERC ¶ 61,129 (2019).

[9] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 569-A, 171 FERC ¶ 61,154 (2020).

[10] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 569-B, 173 FERC ¶ 61,159 (2020).

[11] *MISO Transmission Owners v. FERC*, 45 F.4th 248, at 264 (D.C. Cir. 2022) (*MISO TOs v. FERC*).

[12] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 189 FERC ¶ 61,036 (2024) (MISO Remand Order).

[13] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 190 FERC ¶ 61,184 (2025) (MISO Remand Rehearing Order).

we review NETO's 11.14% base ROE that was the existing ROE reviewed in Opinion No. 531, and we continue to find that this base ROE is unjust and unreasonable. Having found that NETO's 11.14% ROE is unjust and unreasonable, we then find that a just and reasonable replacement ROE for the NETOs in the First Complaint proceeding is 9.57%. We therefore require NETOs to adopt a 9.57% ROE effective October 16, 2014, the date of Opinion No. 531-A, and to provide refunds, with interest, for the First Complaint's October 1, 2011, to December 31, 2012 refund period.

5. As discussed further below, in the December 27, 2012 second section 206 complaint (Second Complaint) proceeding in Docket No. EL13-33-000, the ROE to be reviewed is the 9.57% base ROE established in the First Complaint proceeding that is effective prospectively from October 16, 2014—the date of Opinion No. 531-A. Under the revised base ROE methodology applied in this order, the 9.57% base ROE that the Commission is reviewing for purposes of the Second Complaint proceeding falls within the applicable range of presumptively just and reasonable base ROEs; therefore, the Commission presumes it to be just and reasonable. As discussed below, we find that this presumption has not been rebutted by the evidence in the Second Complaint proceeding. Accordingly, we dismiss the Second Complaint and find that no refunds should be issued as a result of the resolution of that complaint.

6. In the July 31, 2014 third section 206 complaint (Third Complaint) proceeding in Docket No. Docket No. EL14-86-000, the ROE to be reviewed is the 9.57% base ROE established in the First Complaint proceeding that is effective prospectively from October 16, 2014—the date of Opinion No. 531-A—because the Second Complaint was dismissed and no replacement rate was set pursuant to section 206. Under the revised base ROE methodology applied in this order, the 9.57% base ROE that the Commission is reviewing for purposes of the Third Complaint proceeding falls within the applicable range of presumptively just and reasonable base ROEs; therefore, the Commission presumes it to be just and reasonable. As discussed below, we find that this presumption has not been rebutted by the evidence in the Third Complaint proceeding. Accordingly, we dismiss the Third Complaint and find that no refunds should be issued as a result of the resolution of that complaint.

7. In the April 29, 2016 fourth section 206 complaint (Fourth Complaint) proceeding in Docket No. Docket No. EL16-64-000, the ROE to be reviewed is the 9.57% base ROE established in the First Complaint proceeding that is effective prospectively from October 16, 2014—the date of Opinion No. 531-A—because the Third Complaint was dismissed and no replacement rate was set pursuant to section 206. Under the revised base ROE methodology applied in this order, the 9.57% base ROE that the Commission is reviewing for purposes of the Fourth Complaint proceeding falls within the applicable range of presumptively just and reasonable base ROEs; therefore, the Commission presumes it to be just and reasonable. As discussed below, we find that this presumption has not been rebutted by the evidence in the Fourth Complaint

proceeding. Accordingly, we dismiss the Fourth Complaint and find that no refunds should be issued as a result of the resolution of that complaint.

## I. Background

### A. Opinion No. 531 *et seq.*

8. On September 30, 2011, a group of transmission customers in New England (Complainants)[14] filed the First Complaint[15] under FPA section 206[16] alleging that the ROE of the NETOs was unjust and unreasonable. At the time of the First Complaint, NETOs had a base ROE of 11.14% and their total ROE—i.e., the base ROE plus any ROE adders approved by the Commission—was not permitted to exceed 13.5%. The Commission established NETOs' preexisting 11.14% base ROE in Opinion No. 489.[17] That ROE was based on a DCF analysis using financial data for the period July to December 2004, with an update based on the monthly yields of ten-year constant maturity U.S. Treasury bonds for the period March through August 2006.

---

[14] Complainants include the state utility commissions of Connecticut, Massachusetts, New Hampshire, and Rhode Island; the Attorneys General of the State of Connecticut and of the Commonwealth of Massachusetts; Connecticut Office of Consumer Counsel; Maine Office of the Public Advocate; New Hampshire Office of Consumer Advocate; Massachusetts Municipal Wholesale Electric Utility Company; New Hampshire Electric Cooperative; Associated Industries of Massachusetts; and the Industrial Energy Consumer Group. After the complaint was filed, a group of municipal utilities—the Eastern Massachusetts Consumer-Owned Systems (EMCOS)—intervened in support. The EMCOS are Belmont Municipal Light Department; Braintree Electric Light Department; Concord Municipal Light Plant; Georgetown Municipal Light Department; Groveland Electric Light Department; Hingham Municipal Lighting Plant; Littleton Electric Light & Water Department; Middleborough Gas & Electric Department; Middleton Electric Light Department; Reading Municipal Light Department; Rowley Municipal Lighting Plant; Taunton Municipal Lighting Plant; and Wellesley Municipal Light Plant.

[15] Docket No. EL11-66-000.

[16] 16 U.S.C. § 824e.

[17] *Bangor Hydro-Elec. Co.*, Opinion No. 489, 117 FERC ¶ 61,129 (2006, *order on reh'g*, 122 FERC ¶ 61,265 (2008), *order granting clarification*, 124 FERC ¶ 61,136 (2008), *aff'd sub nom. Conn. Dep't of Pub. Util. Control v. FERC*, 593 F.3d 30 (D.C. Cir. 2010).

9. On May 3, 2012, the Commission issued an order setting the First Complaint for hearing before an administrative law judge (Presiding Judge) and established a refund effective date of October 1, 2011.[18] Following the hearing, the Commission issued Opinion No. 531. As an initial matter, the Commission adopted certain changes to its use of the DCF model for evaluating and setting the Commission-allowed ROE. In particular, the Commission elected to replace the "one-step" DCF model, which considers only short-term growth projections for a public utility, with a "two-step" DCF model that considers both short- and long-term growth projections by providing 33% weighting to long-term gross domestic product (GDP) growth.[19] Applying the two-step DCF model and using financial data from the period October 2012 through March 2013, the Commission tentatively adopted a zone of reasonableness of 7.03% to 11.74%, subject to additional briefing regarding the appropriate long-term growth rate.[20]

10. The Commission, however, departed from its typical practice of setting the just and reasonable ROE for a group of utilities at the midpoint of the zone of reasonableness. The Commission explained that evidence of "anomalous" capital market conditions, including "bond yields [that were] at historic lows," made the Commission "less confiden[t] that the midpoint of the zone of reasonableness . . . accurately reflects the [ROE] necessary to meet the *Hope* and *Bluefield* capital attraction standards."[21] The Commission therefore looked to four alternative benchmark models: three financial

---

[18] *Coakley, Mass. Attorney Gen. v. Bangor Hydro-Elec. Co.*, 139 FERC ¶ 61,090 (2012) (Coakley Hearing Order). "Under Section 206 of the Federal Power Act, if FERC finds that any 'rate, charge, or classification' is 'unjust, unreasonable, unduly discriminatory or preferential,' the Commission is authorized to 'order refunds of any amounts paid' for a fifteen-month period following the 'refund effective date.'" *Braintree Elec. Light Dep't v. FERC*, 667 F.3d 1284, 1291 (D.C. Cir. 2012) (quoting 16 U.S.C. § 824e)).

[19] *See generally* Opinion No. 531, 147 FERC ¶ 61,234, at PP 8, 32-41, Opinion No. 531-A, 149 FERC ¶ 61,032, *order on reh'g*, Opinion No. 531-B, 150 FERC ¶ 61,165, *rev'd*, *Emera Me. v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) (*Emera Maine*).

[20] Opinion No. 531, 147 FERC ¶ 61,234 at PP 9-10.

[21] *Id.* PP 144-45 & n.285. *Hope* and *Bluefield* refer to a pair of Supreme Court cases that require the Commission "to set a rate of return commensurate with other enterprises of comparable risk and sufficient to assure that enough capital is attracted to the utility to enable it to meet the public's needs." *Boroughs of Ellwood City, Grove City, New Wilmington, Wampum, & Zelienople, Pa. v. FERC*, 731 F.2d 959, 967 (D.C. Cir. 1984) (citing *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944) (*Hope*) and *Bluefield Waterworks v. Pub. Serv. Comm'n of W.V.*, 262 U.S. 679 (1923) (*Bluefield*)).

models—the Risk Premium model, the CAPM, and the Expected Earnings model—as well as a comparison with the ROEs approved by state public utility commissions.[22] In considering those methodologies, the Commission emphasized that it was not departing from its long-standing reliance on the DCF model, but rather relying on those methodologies only to "inform the just and reasonable placement of the ROE within the zone of reasonableness established . . . by the DCF methodology."[23]

11. Based on these alternative methodologies, the Commission determined that an ROE of 10.57%, the midpoint of the upper half of the zone of reasonableness produced by the DCF model, would be just and reasonable. Because that figure differed from NETOs' existing 11.14% base ROE, the Commission concluded that the existing base ROE had become unjust and unreasonable and it therefore set NETOs' base ROE at 10.57%, pending a paper hearing concerning the long-term growth projection to use in the DCF analysis. Following that hearing, in Opinion No. 531-A the Commission reaffirmed its conclusion that 10.57% was the just and reasonable ROE and that NETOs' existing ROE was unjust and unreasonable. In addition, the Commission explained that NETOs' total ROE—i.e., the base ROE plus any transmission incentive ROE adders—could not exceed 11.74%, the top of the zone of reasonableness.[24] The Commission required NETOs to submit a compliance filing to implement their new ROEs effective October 16, 2014—the date of Opinion No. 531-A.

### B. <u>Subsequent Complaints against NETOs' ROE</u>

12. Three additional complaints were filed regarding NETOs' ROE. First, on December 27, 2012, while the hearing procedures regarding the First Complaint remained in progress, a different group of transmission customers filed the Second Complaint alleging that NETOs' 11.14% base ROE was unjust and unreasonable.[25] On June 19, 2014, the Commission issued an order setting the Second Complaint for hearing before an administrative law judge and establishing a refund effective date of

---

[22] Opinion No. 531, 147 FERC ¶ 61,234 at PP 147-49.

[23] *Id.* P 146.

[24] Opinion No. 531-A, 149 FERC ¶ 61,032 at P 11.

[25] Docket No. EL13-33-000. The complainants in the Second Complaint are ENE (Environment Northeast), the Greater Boston Real Estate Board, the National Consumer Law Center, and the NEPOOL Industrial Customer Coalition. Several of the parties to the First Complaint subsequently intervened in the Second Complaint proceeding. Although the parties to the Second Complaint differed from the First Complaint, we refer to them simply as Complainants in this section because those differences are not relevant for the purposes of this section.

December 27, 2012.[26] Second, on July 31, 2014, Complainants filed the Third Complaint contending that NETOs' 11.14%[27] base ROE was unjust and unreasonable.[28] On November 24, 2014, the Commission issued an order setting the Third Complaint for hearing, consolidating the hearings on the Second Complaint and the Third Complaint, and establishing a refund effective date of July 31, 2014.[29]

13. On March 22, 2016, the Presiding Judge issued an initial decision in the consolidated proceedings on the Second Complaint and the Third Complaint.[30] Regarding the Second Complaint, the Presiding Judge adopted a zone of reasonableness of 7.12% to 10.42% based on financial data for the period September 2013 through February 2014.[31] The Presiding Judge also determined that the anomalous market conditions identified in Opinion No. 531 persisted and, after considering the alternative benchmark methodologies, that the just and reasonable ROE was 9.59%—halfway between the midpoint and the upper bound of the zone of reasonableness.[32] Regarding the Third Complaint, the Presiding Judge adopted a zone of reasonableness of 7.04% to 12.19% based on financial data for the period November 2014 through April 2015. After again finding the capital market conditions to be anomalous, the Presiding Judge found that the alternative benchmark methodologies indicated that the just and reasonable ROE was 10.90%—halfway between the midpoint and the upper bound of the zone of reasonableness.[33] Participants in these Second Complaint and Third Complaint

---

[26] *ENE (Env't Ne) v. Bangor Hydro-Elec. Co.*, 147 FERC ¶ 61,235 (2014).

[27] Although Complainants filed the Third Complaint after the Commission issued Opinion No. 531, the Commission had not yet issued Opinion No. 531-A, which set the effective date for NETOs' 10.57% base ROE, meaning that the 11.14% figure remained in effect.

[28] Docket No. EL14-86-000. The parties to the Third Complaint included, among others, the parties to the First and Second Complaints. Once again, we refer to them simply as Complainants in this section.

[29] *Attorney Gen. of the Commonwealth of Mass. v. Bangor Hydro-Elec. Co.*, 149 FERC ¶ 61,156 (2016) (Third Complaint Hearing Order).

[30] *ENE (Env't Ne) v. Bangor Hydro-Elec. Co.*, 154 FERC ¶ 63,024 (2016) (Initial Decision (II, III)).

[31] *Id.* P 629.

[32] *Id.* PP 824-25.

[33] *Id.* PP 930, 937.

proceedings have filed briefs on exception with the Commission, which has not yet issued an opinion on the initial decision.

14. Finally, on April 29, 2016, Complainants filed the Fourth Complaint contending that NETOs' base ROE, which had by then been reduced to 10.57% in Opinion No. 531-A, was unjust and unreasonable.[34] On September 20, 2016, the Commission again set the complaint for hearing before an administrative law judge and also established a refund effective date of April 29, 2016.[35] On March 27, 2018, the Presiding Judge issued an initial decision on the Fourth Complaint.[36] The Presiding Judge found that NETOs' base ROE of 10.57%, was not unjust and unreasonable and, therefore, that it was unnecessary to reach the issue of what would be a just and reasonable alternative base ROE.[37] The Presiding Judge found that neither EMCOS nor Commission Trial Staff (Trial Staff) had met their burden of producing a properly specified DCF analysis because, among other things, they improperly excluded a certain entity from their proxy groups and excluded proxy companies for which the Institutional Brokers Estimate System (IBES) reported no data, but failed to include those companies in their updates after IBES reported the data later.[38] The Presiding Judge found that, because of the defects and deficiencies in the DCF analyses presented by EMCOS and Trial Staff, they had failed to meet their burden of proof under the first prong of *Emera Maine* to show that the existing ROE was unjust and unreasonable by means of a DCF analysis that they properly specified and applied to the facts of the case. The Presiding Judge therefore found it unnecessary to reach the issue of whether the existing 10.57% base ROE fell within the statutory zone of just and reasonable rates envisioned by the FPA.[39] The Presiding Judge also noted that it was unnecessary to delve further into the parties' evidence of "anomalous capital market conditions" and "alternative methodologies" to the DCF analyses because EMCOS and Trial Staff did not rely on that evidence to satisfy their burden of proof under the first prong.[40] The parties to this proceeding have filed

---

[34] Docket No. EL16-64-000. The Fourth Complaint was filed by EMCOS, whom we, again, refer to simply as Complainants in this section.

[35] *Belmont Mun. Light Dep't v. Cent. Me. Power Co.*, 156 FERC ¶ 61,198 (2016).

[36] *Belmont Mun. Light Dep't v. Cent. Me. Power Co.*, 162 FERC ¶ 63,026 (2018) (Initial Decision (IV)).

[37] *Id.* PP 2-3.

[38] *See id.* PP 207-21.

[39] *Id.* P 227.

[40] *Id.* P 226.

briefs on exception with the Commission, which has not yet issued an opinion on Initial Decision (IV).

### C. *Emera Maine*

15. Both NETOs and Complainants petitioned for review of Opinion No. 531 *et seq.* before the D.C. Circuit. NETOs and Complainants advanced several arguments. As relevant here, NETOs argued that the Commission did not satisfy the first prong of the FPA section 206 inquiry because it did not adequately demonstrate that NETOs' existing 11.14% base ROE was unjust and unreasonable. Complainants argued that the Commission did not satisfy the second prong of the FPA section 206 inquiry because the Commission had not adequately shown that the 10.57% base ROE that it set in Opinion No. 531 was just and reasonable.

16. In *Emera Maine*, the D.C. Circuit agreed with both NETOs and Complainants and vacated and remanded Opinion No. 531 *et seq*. As an initial matter, the D.C. Circuit rejected NETOs' argument that an ROE within the DCF-produced zone of reasonableness could not be deemed unjust and unreasonable. The D.C. Circuit explained that the zone of reasonableness established by the DCF model is not "coextensive" with the "statutory" zone of reasonableness envisioned by the FPA.[41] Accordingly, the D.C. Circuit concluded that the fact that NETOs' existing ROE fell within the zone of reasonableness produced by the DCF model did not necessarily indicate that it was just and reasonable for the purposes of the FPA.[42]

17. Nevertheless, the D.C. Circuit found that the Commission had not adequately shown that NETOs' existing ROE was unjust and unreasonable. The D.C. Circuit explained that the FPA's statutory "zone of reasonableness creates a broad range of potentially lawful ROEs rather than a single just and reasonable ROE" and that whether a particular ROE is unjust and unreasonable depends on the "particular circumstances of the case."[43] Thus, the fact that NETOs' existing ROE did not equal the just and reasonable ROE that the Commission would have set using the current DCF analysis inputs did not necessarily indicate that NETOs' existing ROE fell outside the statutory

---

[41] *Emera Maine*, 854 F.3d at 22-23.

[42] *Id.* at 23.

[43] *Id.* at 23, 26.

zone of reasonableness.[44] As such, the D.C. Circuit concluded that Opinion No. 531 "failed to include an actual finding as to the lawfulness of [NETOs'] existing base ROE" and that the Commission's conclusion that NETOs' existing ROE was unjust and unreasonable was itself arbitrary and capricious.[45]

18. The D.C. Circuit also agreed with Complainants that the Commission had not adequately shown that the 10.57% ROE that it set was just and reasonable. Although recognizing that the Commission has the authority "to make 'pragmatic adjustments' to a utility's ROE based on the 'particular circumstances' of a case," the D.C. Circuit nevertheless concluded that the Commission had not explained why setting the ROE at the upper midpoint was just and reasonable.[46] The D.C. Circuit noted, in particular, that the Commission relied on the alternative models and state-regulated ROEs to support a base ROE *above* the midpoint, but that it did not rely on that evidence to support an ROE *at* the upper midpoint.[47] Similarly, the D.C. Circuit noted that the Commission had concluded that a base ROE of 9.39%—the midpoint of the zone of reasonableness—might not be sufficient to satisfy *Hope* and *Bluefield* or to allow the utility to attract capital, but that the Commission had not similarly explained how a 10.57% base ROE was sufficient to meet either of those conditions. Because the D.C. Circuit found that the Commission had not pointed to record evidence supporting the specific point at which it set NETOs' ROE, the D.C. Circuit held that the Commission had not articulated the "rational connection" between the evidence and the rate that the FPA demands.[48]

### D. <u>Briefing Order</u>

19. On October 16, 2018, the Commission issued an order proposing a methodology for addressing the issues that were remanded to the Commission in *Emera Maine* and establishing a paper hearing on whether and how this methodology should apply to the

---

[44] *Id.* at 27 ("To satisfy its dual burden under section 206, FERC was required to do more than show that its single ROE analysis generated a new just and reasonable ROE and conclusively declare that, consequently, the existing ROE was per se unjust and unreasonable.").

[45] *Id.*

[46] *Id.* (quoting *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942)).

[47] *Id.* at 29 ("FERC's reasoning is unclear. On the one hand, it argued that the alternative analyses supported its decision to place the base ROE above the midpoint, but on the other hand, it stressed that none of these analyses were used to select the 10.57% base ROE.").

[48] *Id.* at 28-30.

above-captioned proceedings.[49] In the Briefing Order, the Commission sought comment on a proposal to change its approach to determining base ROE by giving equal weight to four financial models, instead of primarily relying on the DCF model. The Commission stated that evidence indicates that investors do not rely on any one model to the exclusion of others. Therefore, relying on multiple financial models makes it more likely that the ROE determination will accurately reflect how investors make their investment decisions.

20. Specifically, the Commission proposed to rely on three financial models that produce zones of reasonableness—DCF, CAPM, and Expected Earnings —to establish a composite zone of reasonableness. The zone of reasonableness produced by each model would be given equal weight and averaged to determine the composite zone of reasonableness.[50]

21. The Commission also proposed a framework for using the composite zone of reasonableness in evaluating whether an existing base ROE remains just and reasonable. The Commission proposed that, in order to find a utility's existing ROE unjust and unreasonable under the first prong of FPA section 206, its ROE must be outside a range of presumptively just and reasonable ROEs for a utility of its risk profile, absent additional evidence to the contrary. In other words, the Commission would dismiss an ROE complaint if the targeted utility's existing ROE falls within the range of presumptively just and reasonable ROEs for a utility of its risk profile unless that presumption is sufficiently rebutted. The Commission stated that a finding that the existing ROE of a utility falls outside that range would support a holding that the ROE has become unjust and unreasonable, absent additional evidence to the contrary.[51]

22. The Commission explained that it is appropriate to calculate the applicable ranges of presumptively just and reasonable ROEs based on a utility's risk profile because a utility's risk profile remains the "particular circumstance[]" most relevant to determining whether a point within a zone of reasonableness is a just and reasonable ROE for that utility.[52] The Commission further concluded that the "principal consideration for determining whether an existing ROE within the overall zone of reasonableness has

---

[49] *See* Briefing Order, 165 FERC ¶ 61,030.

[50] *See id.* PP 16, 30.

[51] *See id.* PP 16, 28.

[52] *Id.* P 24 (quoting *Emera Maine*, 854 F.3d at 23).

become unjust and unreasonable is the risk profile of the utility or utilities for which the Commission is setting the ROE."[53]

23. The Commission proposed that the applicable range of presumptively just and reasonable ROEs for average risk utilities would be the quartile of the zone of reasonableness centered on the central tendency of the composite zone of reasonableness. For below average risk utilities, the Commission proposed that range would be the quartile of the zone of reasonableness centered on the central tendency of the lower half of the zone of reasonableness. For above average risk utilities, the Commission proposed that range would be the quartile of the zone of reasonableness centered on the central tendency of the upper half of the zone of reasonableness.[54]

24. For purposes of establishing a new just and reasonable base ROE when the existing base ROE has been shown to be unjust and unreasonable, the Commission proposed using the above three models, plus the Risk Premium model. The Risk Premium model produces a single numerical point rather than a range; the Commission explained that, therefore, it could not be used in establishing a composite zone of reasonableness. The Commission proposed to determine a new just and reasonable ROE for average risk utilities by determining the midpoint/medians of each zone of reasonableness produced by the DCF, CAPM, and Expected Earnings models and averaging those ROEs with the Risk Premium ROE, giving equal weight to each of the four figures. The Commission proposed to use the midpoint/medians of the lower and upper halves of the zones of reasonableness to determine ROEs for below average and above average risk utilities, respectively, and average those ROEs with the Risk Premium ROE.[55]

25. In the 2018 Briefing Order, the Commission established a paper hearing and directed the participants in the above-captioned four complaint proceedings concerning NETOs to submit briefs regarding this proposed new approach and how to apply it to those four proceedings.[56] Initial briefs were due by January 11, 2019, and reply briefs were due by March 8, 2019.

---

[53] *Id.* P 28.

[54] *Id.*

[55] *Id.* P 17.

[56] Briefing Order, 165 FERC ¶ 61,030 at P 61.

## E. Opinion No. 569

26. In two other section 206 complaint proceedings, complainants in MISO challenged the base ROE of the MISO TOs as unjust and unreasonable. The Commission issued Opinion No. 551[57] in the first complaint proceeding and Opinion No. 551 relied extensively on the determinations in Opinion No. 531, applying the same methodology used in Opinion No. 531.[58] While requests for rehearing of Opinion No. 551 were pending, the D.C. Circuit issued *Emera Maine*, vacating the determinations in Opinion No. 531 upon which Opinion No. 551 relied. Accordingly, on November 15, 2018, the Commission issued an order substantially similar to the Briefing Order, the MISO Briefing Order, in the proceedings involving the base ROE of the MISO TOs, proposing to address the issues in the MISO proceedings that were remanded to the Commission in *Emera Maine*.[59] In the MISO Briefing Order, the Commission similarly established a paper hearing on whether and how the methodology proposed in the MISO Briefing Order should apply to the two proceedings pending before the Commission involving MISO TOs' ROE.[60]

27. On November 21, 2019, the Commission issued Opinion No. 569, which addressed the MISO Briefing Order and the two proceedings pending before the Commission involving MISO TOs' ROE. In Opinion No. 569, the Commission adopted a revised methodology for determining whether an existing base ROE is unjust and unreasonable under the first prong of section 206, and for determining a new just and reasonable replacement base ROE under the second prong of section 206 when an existing ROE has been shown to be unjust and unreasonable. The revised methodology adopted the proposal in the Briefing Order and MISO Briefing Order, with certain revisions. In particular, the revised methodology did not use the Expected Earnings model or Risk Premium model, and instead used only the DCF model and CAPM in the Commission's determinations under the first and second prongs of section 206.

28. In Opinion No. 569, the Commission also made other, more specific findings regarding the implementation of these models in its revised base ROE methodology. In particular, in the DCF model, the Commission chose to use a two-step DCF analysis that incorporates a long-term growth rate, use the short-term growth rate to calculate the (1+.5g) adjustment to dividend yield, and use only IBES as the source of short-term

---

[57] *Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 551, 156 FERC ¶ 61,234 (2016).

[58] *See, e.g.,* MISO Remand Order, 189 FERC ¶ 61,036 at PP 4, 10.

[59] MISO Briefing Order, 165 FERC ¶ 61,118.

[60] *See id.* P 1.

earnings growth estimates. In the CAPM, the Commission chose to: (1) estimate the CAPM expected market return using a forward-looking approach; (2) use a one-step DCF model without any long-term growth projection for the DCF analysis within the CAPM; (3) use only IBES as the source of short-term earnings growth estimates in the DCF analysis within the CAPM; (4) screen from the CAPM analysis Standard & Poor's (S&P) 500 companies with growth rates that are less than or equal to zero or that are greater than or equal to 20%; and (5) include a size premium adjustment. In addition, the Commission also adopted a revised low-end outlier test that eliminates DCF and CAPM proxy group ROE results that are less than the yields of generic corporate Baa bonds plus 20% of the CAPM risk premium.[61]

29. In applying that revised methodology to the two proceedings pending before the Commission involving MISO TOs' ROE, the Commission found that the MISO TOs' 12.38% ROE, which was the existing ROE reviewed in the first MISO TOs complaint proceeding, was unjust and unreasonable. The Commission found that a 9.88% ROE was a just and reasonable replacement ROE.[62] The Commission dismissed the second complaint proceeding regarding MISO TOs' base ROE, finding that the 9.88% ROE fell within the range of presumptively just and reasonable base ROEs and that evidence in the proceeding had not rebutted that presumption.[63]

### F. <u>Opinion No. 569-A</u>

30. On May 20, 2020, the Commission issued Opinion No. 569-A, which set aside in part and modified in part, Opinion No. 569[64] and made certain revisions to the methodology established in Opinion No. 569. Primarily, the order set aside Opinion No. 569 to use the Risk Premium model, DCF model, and CAPM under both prongs of the FPA section 206 analysis instead of relying on only the DCF model and CAPM. Opinion No. 569-A also set aside Opinion No. 569 to give the short-term growth rate 80% weighting and the long-term growth rate 20% weighting in the two-step DCF model. The Commission also clarified that it will consider the use of *Value Line* growth rates in future proceedings' CAPM analyses. Additionally, Opinion No. 569-A increased the high-end outlier test threshold from 150% to 200% of the median result of all the potential proxy group members in CAPM and DCF models, subject to a natural break analysis. Opinion No. 569-A also revised the Commission's ROE methodology to calculate the ranges of presumptively just and reasonable base ROEs by dividing the

---

[61] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 19.

[62] *Id.* PP 20, 522-23.

[63] *Id.* PP 21, 558.

[64] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 1-3.

overall composite zone of reasonableness into thirds, instead of using the quartile approach adopted in Opinion No. 569.[65] The Commission illustrated how these presumptively just and reasonable ranges would be divided as follows:[66]

Figure 1: Ranges of Presumptively Just and Reasonable Base ROEs




31. In applying that revised methodology, the Commission found that MISO TOs' ROE that was at issue in the first complaint proceeding was unjust and unreasonable and that a 10.02% ROE was a just and reasonable replacement ROE.[67] The Commission dismissed the second complaint proceeding regarding MISO TOs' base ROE, finding that the 10.02% ROE fell within the range of presumptively just and reasonable base ROEs and that no evidence in the proceeding rebutted that presumption.[68]

### G. Opinion No. 569-B

32. On November 19, 2020, the Commission issued Opinion No. 569-B, which set aside in part and modified in part, Opinion 569-A.[69] Specifically, the Commission continued to reach the same result that the Commission reached in Opinion No. 569-A, but corrected certain typographical errors in the Risk Premium model inputs, included a case that had been inadvertently excluded from the Risk Premium model, and clarified

---

[65] *See id.*

[66] *See id.* P 194.

[67] *See id.* P 167.

[68] *See id.* P 3.

[69] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 3.

that the Risk Premium model should employ historical and not forward-looking bond yields.[70]

### H. D.C. Circuit Remand

33. On August 9, 2022, the D.C. Circuit vacated and remanded Opinion No. 569 *et seq*.[71] The court explained that the opinions were challenged on the following five grounds: (1) the change to the long-term and short-term growth rates in the DCF model; (2) aspects of the Commission's application of the CAPM; (3) the creation of presumptively just and reasonable ranges at step one of the FPA section 206 analysis; (4) use of the midpoint, as opposed to median, as the measure of central tendency for groups of utilities; and (5) inclusion of the Risk Premium model.

34. The court found "the first four of those arguments unpersuasive."[72] However, it agreed with the final challenge and found that the Commission failed to offer a reasoned explanation for its decision to include the Risk Premium model after initially rejecting it in Opinion No. 569.[73] The court observed that, in Opinion No. 569, the Commission found the Risk Premium model to be defective and described its deficiencies.[74] The court explained that the Commission is entitled to change its mind, as it did in Opinion No. 569-A, but that to do so it must "provide a 'reasoned explanation' for its decision to disregard 'facts and circumstances' that justified its prior choice."[75]

35. The court provided four reasons for finding that the Commission failed to provide a reasoned explanation for its decision to change course with regard to the Risk Premium model. First, the Commission did not explain how adding the Risk Premium model aligned with "general financial logic" after having stated that the Risk Premium, at least as applied in this case, "defies general financial logic."[76] Second, the Commission did not explain why investors not using the model no longer mattered and, instead, simply

---

[70] *See id.* PP 3, 121, 127-128.

[71] *MISO TOs v. FERC*, 45 F.4th at 264.

[72] *Id.* at 258.

[73] *Id.* at 264.

[74] *Id.* at 263-64.

[75] *Id.* at 264 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009)).

[76] *Id.*

noted that investors expect a premium on a stock investment over a bond investment and that investors track the ROEs the Commission allows.[77] Third, despite the Commission having stated that the Risk Premium presents "particularly direct and acute" circularity problems, the Commission, in reincorporating the Risk Premium model, simply stated that "all of the models contain some circularity" and that averaging the Risk Premium model with the other models would mitigate the circularity.[78] Finally, the Commission had expressed concerns about overweighting Risk Premium theory-based models, since both the CAPM and Risk Premium models were based on this theory, yet then adopted the Risk Premium model with no explanation beyond the fact that the two models use different inputs.

36. The court upheld the Commission's determinations to act on the first complaint and second complaint in those proceedings in one order, and to treat the ROE to be analyzed under the first prong of section 206 in the second complaint as the ROE that the Commission fixed as the replacement rate in the first complaint, rather than the ROE in effect at the time the second complaint was filed.[79] The court also declined to opine on customers' challenges to the Commission's decision not to order a refund for the second complaint's refund period, because it had already granted their petition to vacate the Commission's orders.[80]

### I. **MISO Remand Order**

37. On October 17, 2024, the Commission found that, on reexamination of the record and by reference to the court's directions on remand, there was insufficient record evidence to include the Risk Premium model in the Commission's ROE methodology for analyzing the base ROE component of public utility rates under FPA section 206.[81] Accordingly, the Commission reversed the portions of Opinion Nos. 569-A and 569-B that included the Risk Premium model and maintained the other modifications to the Commission's ROE methodology set forth in Opinion No. 569, as modified by Opinion Nos. 569-A and 569-B.[82]

---

[77] *Id.*

[78] *Id.*

[79] *Id.* at 262.

[80] *Id.* at 264-65.

[81] MISO Remand Order, 189 FERC ¶ 61,036 at P 1.

[82] *Id.*

38. The Commission explained that the record does not contain evidence suggesting that investors use the Risk Premium model adopted in Opinion No. 569-A.[83] In addition, the Commission found that the record does not contain any evidence that would resolve the circularity concerns inherent in the Risk Premium model that was adopted in Opinion No. 569-A.[84]

39. In applying this revised methodology, the Commission found that MISO TOs' ROE that was at issue in the first complaint proceeding was unjust and unreasonable and that a 9.98% ROE was a just and reasonable replacement ROE.[85] As it had in Opinion Nos. 569,[86] 569-A[87] and 569-B,[88] the Commission continued to require the MISO TOs to adopt the replacement ROE for the first complaint, effective September 28, 2016, the date the Commission issued Opinion No. 551 and required MISO TOs to provide refunds based on the 9.98% replacement base ROE, with interest, for the First Complaint proceeding's 15-month refund period from November 12, 2013, through February 11, 2015, and for the period from September 28, 2016, to the date of the MISO Remand Order.[89] In addition, the Commission continued to reach the same determination that it did in Opinion Nos. 569, 569-A, and 569-B to not require refunds for the Second Complaint refund period under FPA section 206.[90]

40. On March 25, 2025, the Commission addressed requests for rehearing of the MISO Remand Order and continued to reach the same result.[91]

---

[83] *Id.* P 23 (citing Opinion No. 569, 169 FERC ¶ 61,129 at P 345).

[84] *Id.* (citing Opinion No. 569, 169 FERC ¶ 61,129 at P 343).

[85] *Id.* P 25.

[86] *See* Opinion No. 569, 169 FERC ¶ 61,129 at ordering para. (C).

[87] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 245-249.

[88] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 183.

[89] MISO Remand Order, 189 FERC ¶ 61,036 at P 33.

[90] *Id.* P 41.

[91] MISO Remand Rehearing Order, 190 FERC ¶ 61,184.

### J. **Current Status**

41. Based on the two findings from the D.C. Circuit—that the Commission had not met its burden either under the first or the second prong of FPA section 206—the court vacated and remanded Opinion No. 531 *et seq.*[92] Thus, there are currently four pending complaints against NETOs' ROE, all of which have been fully litigated before a presiding judge. The D.C. Circuit vacated the Commission's determinations in its order on the First Complaint (i.e., Opinion No. 531), meaning that they are no longer precedential,[93] even though the Commission remains free to re-adopt those determinations on remand as long as it provides a reasoned basis for doing so.[94] In the meantime, NETOs are continuing to collect their 10.57% base ROE, although the Commission has indicated that it will exercise its "broad remedial authority" to correct its legal error in order to make whatever ROE it sets on remand effective as of October 16, 2014—the date of Opinion No. 531-A.[95]

## II. **Overview**

42. The six-month test periods for the four complaints are as follows:

First Complaint: October 2012 to March 2013

Second Complaint: September 2013 to February 2014

Third Complaint: November 2014 to April 2015

Fourth Complaint: May 2017 to October 2017.[96]

43. As discussed below, in the above-captioned proceedings, we apply a base ROE methodology with the same modifications to the methodology proposed in the Briefing Order that were applied in the MISO Remand Order. We find that the record demonstrates that applying a base ROE methodology with these modifications is appropriate for the facts and circumstances of these proceedings. Applying this revised base ROE methodology to the facts of the First Complaint proceeding, we review NETOs' 11.14% ROE that was the existing ROE reviewed in Opinion No. 531, which is

---

[92] *Id.* P 30.

[93] *ISO New Eng. Inc.*, 161 FERC ¶ 61,031, at P 28 (2017) (October 2017 Order).

[94] *Emera Maine*, 854 F.3d at 30.

[95] October 2017 Order, 161 FERC ¶ 61,031 at PP 24, 34.

[96] Briefing Order, 165 FERC ¶ 61,030 at P 42.

pending on remand before us here. Under the revised base ROE methodology, the composite zone of reasonableness in the First Complaint proceeding is from 7.04% to 12.09%.[97] As discussed below, we find that NETOs are of average risk, therefore the applicable range of presumptively just and reasonable ROEs for NETOs in the First Complaint proceeding is from 8.72% to 10.41%.[98] Accordingly, NETOs' 11.14% ROE is treated as presumptively unjust and unreasonable. As discussed below, in light of this and the other circumstances of the case, we find that NETOs' 11.14% base ROE is unjust and unreasonable.

44. Having found that NETOs' existing 11.14% ROE is unjust and unreasonable, we then find that the just and reasonable replacement ROE for NETOs in the First Complaint proceeding is 9.57% because NETOs are of average risk and the midpoint of the composite zone of reasonableness is 9.57%.[99] Accordingly, on remand, we require NETOs to adopt a 9.57% ROE effective October 16, 2014, the date of Opinion No. 531-A, and provide refunds, with interest for the applicable refund period, as discussed below.

45. As discussed further below, in the Second Complaint proceeding, the ROE to be reviewed is the 9.57% ROE established in the First Complaint proceeding that is effective prospectively from October 16, 2014. Under the revised base ROE methodology, the composite zone of reasonableness in the Second Complaint proceeding is from 7.90% to 11.98%.[100] As discussed below, we continue to find that NETOs are of average risk in the Second Complaint proceeding; therefore the applicable range of presumptively just and reasonable ROEs for NETOs in that proceeding is from 9.26% to 10.62%.[101] The 9.57% ROE that the Commission is reviewing for purposes of the Second Complaint proceeding falls within that range; therefore, the Commission presumes it to be just and reasonable. As discussed below, we find that this presumption has not been rebutted by the evidence in the Second Complaint proceeding. Accordingly, we affirm in part and reverse in part the Initial Decision (II, III) in the Second Complaint proceeding, dismiss the Second Complaint, and find that no refunds should be issued as a result of the resolution of that complaint.

46. In the Third Complaint proceeding, the ROE to be reviewed is the 9.57% ROE established in the First Complaint proceeding that is effective prospectively from October

---

[97] *See* app. A.

[98] *See id.*

[99] *See id.*

[100] *See* Appendix B.

[101] *Id.*

16, 2014, and which was not revised in the Second Complaint proceeding. Under the revised base ROE methodology, the composite zone of reasonableness in the Third Complaint proceeding is from 7.30% to 12.03%.[102] As discussed below, we continue to find that NETOs are of average risk in the Third Complaint proceeding; therefore the applicable range of presumptively just and reasonable ROEs for NETOs in that proceeding is from 9.19% to 11.09%.[103] The 9.57% ROE that the Commission is reviewing for purposes of the Third Complaint proceeding falls within that range; therefore, the Commission presumes it to be just and reasonable. As discussed below, we find that this presumption has not been rebutted by the evidence in the Third Complaint proceeding. Accordingly, we affirm in part and reverse in part the Initial Decision (II, III) in the Third Complaint proceeding, dismiss the Third Complaint, and find that no refunds should be issued as a result of the resolution of that complaint.

47. In the Fourth Complaint proceeding, the ROE to be reviewed is the 9.57% ROE established in the First Complaint proceeding that is effective prospectively from October 16, 2014, and which was not revised in the Second Complaint or Third Complaint proceedings. Under the revised base ROE methodology, the composite zone of reasonableness in the Fourth Complaint proceeding is from 6.54% to 12.43%.[104] As discussed below, we continue to find that NETOs are of average risk in the Fourth Complaint proceeding; therefore the applicable range of presumptively just and reasonable ROEs for NETOs in that proceeding is from 8.50% to 10.46%.[105] The 9.57% ROE that the Commission is reviewing for purposes of the Fourth Complaint proceeding falls within that range; therefore, the Commission presumes it to be just and reasonable. As discussed below, we find that this presumption has not been rebutted by the evidence in the Fourth Complaint proceeding. Accordingly, we affirm in part and reverse in part the Initial Decision (IV) in the Fourth Complaint proceeding, dismiss the Fourth Complaint, and find that no refunds should be issued as a result of the resolution of that complaint.

## III. <u>Procedural Matters</u>

48. On January 11, 2019, Southern California Edison Company (SCE), American Electric Power Service Corporation (AEP) and the Louisiana Public Service Commission (Louisiana Commission) filed motions to intervene out-of-time in the above-captioned proceedings and briefs in response to the Briefing Order. We deny the motions to

---

[102] *See* Appendix C.

[103] *See id.*

[104] *See id.*

[105] *See* Appendix D.

intervene out-of-time, the briefs included with those motions to intervene out-of-time, and the subsequent filings by those parties. In ruling on a motion to intervene out-of-time, we apply the criteria set forth in Rule 214(d) of the Commission's Rules of Practice and Procedure.[106] None of the entities that filed motions to intervene out-of-time have met their burden to justify granting late intervention, and we therefore deny their motions to intervene. We find that granting these late interventions at this stage of the proceedings would disrupt the proceedings,[107] as well as prejudice and place additional burdens on the existing parties to these proceedings.[108] The entities seeking late intervention have not demonstrated good cause that would justify granting late intervention despite these negative consequences. This is particularly true in light of the fact that parties will have an opportunity to argue that the base ROE methodology applied in any of these proceedings should be modified or applied differently because of the specific facts and circumstances of the proceeding involving that party.[109]

49. On December 23, 2019, NETOs filed a motion to file and supplemental paper hearing brief and motion to supplement the record to address the consequences of the Commission's issuance of Opinion No. 569. NETOs also requested that the Commission reopen the record to permit additional testimony addressing the impacts of Opinion No. 569.[110] NETOs argue that they did not have a chance to address the methodology used in Opinion No. 569 in their briefs in these proceedings and that they have a due process right to supplement the record to address the methodology used in Opinion No. 569.[111] On January 21, 2020, EMCOS and Complaint-Aligned Parties (CAP)[112] filed answers

---

[106] 18 C.F.R. § 385.214(d) (2025).

[107] *See id.* § 385.214(d)(1)(ii).

[108] *Id.* § 385.214(d)(1)(iv).

[109] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 205. We note that the Louisiana Commission already participated as a party in the proceedings in which Opinion Nos. 569 and 569-A were issued.

[110] *See* NETOs Motion to Supplement the Record at 2.

[111] *See id.* at 8-11.

[112] CAPs are the following entities: Acadia Center; Associated Industries of Massachusetts; Attorney General of the Commonwealth of Massachusetts, Maura Healey; Connecticut Public Utilities Regulatory Authority; William Tong, the Attorney General of the State of Connecticut; Connecticut Office of Consumer Counsel; Greater Boston Real Estate Board; Industrial Energy Consumer Group; Maine Office of the Public Advocate; Massachusetts Department of Public Utilities; Massachusetts Municipal Wholesale Electric Company; National Consumer Law Center; New Hampshire Electric

opposing NETOs' motion and supplemental brief. EMCOS state that the Commission's Briefing Order permitted initial and reply briefs in these proceedings and explicitly state that "no answers or additional briefs [would] be permitted."[113] EMCOS assert that the Commission already reopened the record in these proceedings once and, in the briefs NETOs filed after that reopening, NETOs were able to advocate zealously on behalf of their proposed ROE methodology, including addressing many of the elements of Opinion No. 569 with which NETOs take issue.[114] EMCOS further argue that NETOs will have the opportunity to challenge the Commission's eventual decision in these proceedings both before the Commission and before the Court of Appeals, which is all that due process requires.[115] CAPs argue that, if and when the Commission applies the Opinion No. 569 methodology to these proceedings, NETOs will be free to seek rehearing and raise whatever arguments are appropriate.[116] CAPs assert that NETOs were afforded, and utilized at considerable length, their own opportunity to submit evidence and arguments in the briefs that were directed by the Briefing Order in these proceedings, and that NETOs had clear notice that the outcome of the paper hearing process initiated by the Briefing Order could include changes to the methodology proposed therein such as those adopted in Opinion No. 569.[117]

50. We deny NETOs' December 23, 2019 motion to file and supplemental paper hearing brief and motion to supplement the record. "A determination to reopen the record is discretionary,"[118] and in order to meet the Commission's high threshold[119] for a

---

Cooperative, Inc.; New Hampshire Office of Consumer Advocate; PowerOptions; Rhode Island Department of Attorney General and Division of Public Utilities and Carriers; Vermont Department of Public Service. The Acadia Center was formerly known as "ENE" or "Environment Northeast," as reflected in the caption of Docket No. EL13-33, wherein it is a Complainant.

[113] EMCOS Answer to Motion to Supplement the Record at 3 (quoting Briefing Order, 165 FERC ¶ 61,030 at P 61).

[114] *Id.* at 3, 5.

[115] *Id.* at 4.

[116] CAPs Reply to Motion to Supplement the Record at 2.

[117] *Id.* at 5-7.

[118] *Cent. Me. Power Co.*, 55 FERC ¶ 61,060, at 61,170 (1991).

[119] *See Sw. Power Pool, Inc.*, 163 FERC ¶ 61,109, at P 220 (2018).

motion to reopen the record under Rule 716,[120] the requesting party must demonstrate the existence of "extraordinary circumstances" and "must demonstrate a change in circumstances that is more than just material—it must be a change that goes to the very heart of the case."[121] We find that NETOs' motion does not meet this standard. First, as EMCOS note, the Commission's Briefing Order in these proceedings explicitly stated that "no answers or additional briefs will be permitted"[122] after the initial and reply briefs provided for in that Briefing Order. Accordingly, NETOs had notice that the initial and reply briefs were their opportunity to address the methodology proposed in the Briefing Order, including potential changes to it like those in Opinion No. 569 *et seq.*, which NETOs cite as the reason for permitting their additional brief. Second, we agree with EMCOS and CAPs that the Commission's Briefing Order clarified that the methodology proposed in that order was a proposal subject to change, which could include changes such as those applied by the Commission in Opinion No. 569. NETOs received notice that the methodology proposed in the Briefing Order was subject to change,[123] and they were given an opportunity to address all issues raised by the Briefing Order's proposal, including any potential changes to that proposal.[124] The fact that, in a separate proceeding, the Commission did apply certain changes to that proposal is not a sufficient reason to allow NETOs' additional brief. The Commission gave NETOs sufficient opportunity to address all aspects of the methodology proposed in the Briefing Order, including any potential changes such as those applied in Opinion No. 569. For example, in their initial and reply briefs filed in response to the Briefing Order, NETOs had an opportunity to address the merits of all the models that the Commission applied in

---

[120] 18 C.F.R. § 385.716 (2025).

[121] *E. Tex. Elec. Coop. v. Cent. & S. W. Servs. Inc.*, 94 FERC ¶ 61,218, at 61,800 (2001) (*East Texas*) (quoting *CMS Midland, Inc.*, 56 FERC ¶ 61,177, at 61,624, *order on reh'g*, 56 FERC ¶ 61,361 (1991)).

[122] EMCOS Answer to Motion to Supplement the Record at 3 (quoting Briefing Order, 165 FERC ¶ 61,030 at P 61).

[123] *Coakley v. Bangor Hydro-Elec. Co.*, 166 FERC ¶ 61,013, at P 11 (2019) ("[T]he Commission did not reach any final conclusions or make any final determinations with respect to the proposed new ROE methodology in the Briefing Order."); Briefing Order, 165 FERC ¶ 61,030 at PP 1, 61.

[124] *See id.* P 12 ("The Commission established a paper hearing in the Briefing Order in order to give all participants in these proceedings an opportunity to present evidence concerning the issues addressed in the Briefing Order. Therefore, participants may present evidence either in support of, or opposing, the Commission's Briefing Order.").

Opinion No. 569 and that are applied in this order. Moreover, NETOs did in fact argue their position with respect to many of the changes in Opinion No. 569 that NETOs allege they have not had a sufficient opportunity to address. For example, NETOs thoroughly argued for the inclusion of the Expected Earnings model in the Commission's ROE methodology and responded to arguments against its inclusion,[125] and the Commission's decision to exclude the Expected Earnings model was one of the changes from the Briefing Order proposal that was adopted in Opinion No. 569. NETOs also argued for changes to the low-end outlier test,[126] including for "an adjustment to the baseline spread of 100 basis points to recognize that risk premiums have widened (bond yields have declined) since it was initially judged to provide a useful benchmark,"[127] which is one of the changes from the Briefing Order that the Commission adopted in Opinion No. 569.[128] On balance, we find that NETOs have not "demonstrated the existence of extraordinary circumstances that outweigh the need for finality in the administrative process,"[129] and we therefore deny their motion to file and supplemental paper hearing brief and motion to supplement the record.

51. On November 13, 2024, NETOs filed a motion to file a supplemental brief and a supplemental brief. On December 13, 2024, CAPs filed an answer in opposition to NETOs motion. WIRES and EEI filed comments in support of NETO's motion. We deny the November 13, 2024, motion to file a supplemental brief. The supplemental brief provides arguments that the Commission has already been presented with in other pleadings by NETOs in these proceedings. NETOs also provide new data "to reflect capital market conditions"[130] from a period spanning April-September 2024[131] that it alleges the Commission must use in its ROE analysis in this proceeding. We find no extraordinary circumstances to allow this new data. The Commission has consistently applied the relevant test periods in this proceeding and there is no basis in Commission or court precedent to substitute a new test period based on data from multiple years later,

---

[125] *See, e.g.*, NETOs Reply Br. (I) at 52-63, 80-101.

[126] *See, e.g.*, NETOs Initial Br. (I) at 42-49; NETOs Reply Br. (I), attach. A. (Reply Affidavit of Adrien M. McKenzie) at 117, 119-28 (McKenzie Reply Aff.).

[127] NETOs Reply Br. (I), McKenzie Reply Aff. (I) at 117 (internal citations omitted).

[128] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 387-89.

[129] *East Texas*, 94 FERC ¶ at 61,801.

[130] NETOs November 2024 Supplemental Brief at 5.

[131] *Id.*, attach. 1 (McKenzie Affidavit) at 17.

and to which other parties have not had a chance to respond, simply because time has passed. While we are denying these supplemental briefs in the interest of "finality in the administrative process,"[132] we nonetheless address the substantive arguments contained therein at length in this order because they have been raised in other pleadings.

## IV. Use of Multiple Models Generally

52. This section addresses the use of multiple models to analyze base ROEs under FPA section 206 rather than either using only the DCF model or using all four models proposed in the Briefing Order. It does not address the specific merits of the individual models, which we discuss in subsequent sections.

### A. Background

53. In both Opinion Nos. 531 and 551, the Commission found that, because of unusual capital market conditions, the Commission had "less confidence" that the midpoint of the zone of reasonableness determined by the DCF analysis satisfied the *Hope* and *Bluefield* capital attraction standards.[133] For example, in Opinion No. 531, the Commission stated that bond yields remained at historically low levels during the October 2012 to March 2013 study period in the First Complaint proceeding. The yield on 10-year U.S. Treasury bonds was below two percent in that case and had not been below three percent since the 1950s.[134]

54. Opinion No. 531 then considered alternative cost of equity models to corroborate the Commission's determination to set NETOs' ROE "at a point above the midpoint" of the DCF analysis' zone of reasonableness, i.e., the midpoint of the upper half of the zone.[135] However, the Commission emphasized that it was not departing from the use of the DCF model to determine the zone of reasonableness.[136]

55. As noted above, in the Briefing Order, the Commission proposed to change its methodology for analyzing base ROEs under FPA section 206 to rely on multiple

---

[132] *East Texas*, 94 FERC at 61,801.

[133] Opinion No. 531, 147 FERC ¶ 61,234 at P 145; *Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 551, 156 FERC ¶ 61,234, at P 119 (2016).

[134] Opinion No. 531, 147 FERC ¶ 61,234 at P 145 n.285.

[135] *Id.* PP 146-47, 151-52.

[136] *Id.* P 146.

financial models instead of primarily relying on only the DCF model. Specifically, the Commission proposed to rely on the three financial models that produce zones of reasonableness—the DCF, CAPM, and Expected Earnings models—in its ROE analysis under the first prong of section 206, and to rely on four financial models—the Risk Premium model, in addition to those used in the first prong analysis—in its ROE analysis under the second prong of section 206 to establish the replacement base ROE.[137]

56. The Commission explained that proposing to change its base ROE methodology to rely on these multiple financial models was appropriate because investors do not rely on any single financial model to make their investment decisions, but instead rely on these models and other methods to varying degrees. The Commission reasoned that, therefore, a more accurate estimate of what ROE is needed to induce investors to invest in a utility—i.e., what ROE a utility must offer in order to attract capital—would be provided by relying on multiple financial models because that is what investors do when making investment decisions.[138] The Commission further explained that relying on multiple financial models is appropriate because any one model has the potential for errors or inaccuracies, and relying on multiple models together reduces the risks that errors or inaccuracies in any one model will produce an inaccurate cost of equity estimate.[139]

57. The Commission proposed that, under this multiple financial model approach, it would average the cost of equity results produced by the DCF model with the results produced by the other proposed models, using the midpoint/medians of the models that produce zones of reasonableness, to get one average figure for the cost of equity. Therefore, the Commission would not be making an adjustment above the midpoint/median as it did in Opinion No. 531. The Commission stated that, as a result, there was no need to find that low-interest rate capital market conditions distort the results of a DCF analysis and use it to justify adjusting the ROE for average risk utilities above the midpoint. To the contrary, the Commission's primary reason for proposing to average the results of the DCF analysis with the results of other models is that investors use those models, in addition to the DCF model, to inform their investment decisions. The Commission concluded that, under this approach, whether a change in the capital market conditions is anomalous or persistent is of less importance, because relying on multiple financial models makes it more likely that the Commission's decision would accurately reflect how investors are making their investment decisions.[140]

---

[137] *See* Briefing Order, 165 FERC ¶ 61,030 at PP 16-17.

[138] *See id.* PP 34-48.

[139] *See id.* P 38.

[140] *Id.* P 44.

58. Nevertheless, the Commission noted that, in recent years, utility stock prices appear to have performed in a manner inconsistent with the theory underlying the DCF model.[141] The Commission stated that, under that theory, increases in a company's actual earnings or projected growth in earnings would ordinarily be required to justify an increase in the company's stock price. However, the Commission stated that, although the Dow Jones Utility Average increased by almost 70% from October 1, 2012 through December 1, 2017, there was not an increase in either utility earnings or projected earnings during that period that would justify the substantial increase in stock prices. The Commission stated that this is an example of what NETOs have described as "model risk" —the risk that in some circumstances a model will produce results that do not reflect real world experience.[142] The Commission concluded that this suggests that the ROE estimated by that model may be correspondingly inaccurate.

59. In Opinion No. 569, the Commission found that the averaging of multiple models reflected how investors made investment decisions and reduced model risk to the greatest extent possible. The Commission cited MISO TOs' witness, Mr. McKenzie, who explained that "when conditions associated with a model are outside of the normal range, there is a risk . . . that the theoretical model will fail to predict or represent the real phenomenon that is being modeled."[143] The Commission also cited Dr. Morin, who found that "[r]eliance on any single method or preset formula is inappropriate when dealing with investor expectations because of possible measurement difficulties and vagaries in individual companies' market data."[144] The Commission, for reasons specific to the Risk Premium and Expected Earnings models, determined that they were not appropriate to use for determination of ROEs, for either the first or second prong of section 206 analyses. In Opinion No. 569-A, the Commission determined that the Risk Premium model also should be included in its ROE analysis under FPA section 206.[145] In Opinion No. 569-B, the Commission continued to find that the Risk Premium model should be included in its

---

[141] *Id.* P 45.

[142] *Id.* P 46 (citing Ex. NET-2500 (IV) at 20; Ex. NET-1600 (II, III) at 23) ("Like all valuation models, the DCF model is subject to 'model risk' . . . 'Model risk' is the risk that a model or algorithm used to predict values in real-world situations will fail to predict or represent the real phenomenon that is being modeled . . . there has been increasing recognition that the concept applies very broadly to models.").

[143] Opinion No. 569, 169 FERC ¶ 61,129 at PP 38-39 (citing Ex. MTO-22, Docket No. EL14-12-001, at 18-19).

[144] *Id.* (citing Roger A. Morin, *New Regulatory Finance* 428 (Public Utilities Reports, Inc. 2006) (Morin)).

[145] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 2.

section 206 ROE analysis.[146] In *MISO TOs v. FERC*, the D.C. Circuit vacated and remanded the Commission's orders because the Commission did not provide a reasoned explanation for its decision to reintroduce the Risk Premium model.[147] In the MISO Remand Order, the Commission reversed the portions of Opinion Nos. 569-A and 569-B that included the Risk Premium model and maintained the other modifications to the Commission's ROE methodology set forth in Opinion No. 569, as modified by Opinion Nos. 569-A and 569-B.[148] On March 25, 2025, the Commission addressed requests for rehearing of the MISO Remand Order and continued to reach the same result.[149]

### B. <u>Briefs</u>

60. CAPs argue that the Briefing Order's proposed approach incorrectly assumes that NETOs' proffered versions of non-DCF studies accurately capture returns required by investors. CAPs argue that the Briefing Order's illustrative results assumed that NETOs' methods produce the correct study-period cost of equity for every proxy, and at most tinker with NETOs' results only by adding or dropping certain results at the edges of NETOs' distributions.[150]

61. CAPs contend that the CAPM, Expected Earnings, and Risk Premium models, as applied by the Briefing Order, are ill-designed to identify the cost of equity without CAPs' proposed changes to those models, which CAPs argue would substantially improve their accuracy.[151] By contrast, CAPs argue that the Briefing Order's proposed application of the DCF model follows well-established rules. However, CAPs take substantive issue with the general use of the other proposed models as applied to NETOs.

62. CAPs argue that the Commission's application of the methodology proposed in the Briefing Order, to the First Complaint study period, which results in a base ROE of 10.41%, demonstrates that the proposed methodology is unjust and unreasonable.[152] CAPs state that NETOs' base ROE was first set by the Commission in Opinion No. 489

---

[146] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 113.

[147] *MISO TOs v.* FERC, 45 F.4th at 264.

[148] MISO Remand Order, 189 FERC ¶ 61,036 at P 1.

[149] MISO Remand Rehearing Order, 190 FERC ¶ 61,184.

[150] CAPs Principal Initial Br. at 26-27.

[151] *Id.* at 27.

[152] CAPs Principal Initial Br. at 3-4.

at 10.4%, and this result was based on a study period of July-December 2004. CAPs assert that, between that time and the First Complaint study period, relevant financial indicators declined by an average of about 160 basis points. CAPs argue that this indicates that the proposed new methodology's result of a 10.41% ROE is unjust and unreasonable because it is slightly higher than the ROE that was set in Opinion No. 489, even though relevant financial indicators have substantially declined.[153]

63. CAPs assert that, when DCF and non-DCF cost-of-equity studies are applied and combined in the manner that CAPs recommend with the revisions described in the sections below, the indicated cost of equity for the First Complaint period is 8.91%, which is in line with the trend of declining financial indicators. CAPs note that the result of subtracting 160 basis points from 10.41% is 8.81%.[154]

64. Trial Staff proposes various adjustments to the DCF, CAPM, and Risk Premium models, but does not generally oppose the Commission using them in its ROE methodology.[155] Trial Staff states that the new base ROE for NETOs should be the average of the DCF and CAPM midpoints, while the Expected Earnings model's results should be excluded from the estimate.[156]

65. EMCOS contend that the Briefing Order implies that one market-based model, the DCF, is somehow uniquely disabled, while other market-based models, the CAPM and the Risk Premium, are not. EMCOS argue that this is fundamentally inconsistent with the Efficient Market Hypothesis and simply untenable.[157] Moreover, EMCOS argue that, because DCF results are either input values for, or share inputs with, the CAPM and Risk Premium analyses, whatever impacts the DCF have will impact those models as well. They state that the Commission may well supplement the DCF with other market-based models for the estimation of the market cost of equity capital, assuming *arguendo* sufficient reason for that supplementation. However, EMCOS argue that the

---

[153] *Id.*

[154] *Id.* at 4-5.

[155] Trial Staff Initial Br. (I, II, III) at 2; Trial Staff Initial Br. (IV) at 2-3.

[156] Trial Staff Initial Br. (I, II, IV) at 19; Trial Staff Initial Br. (III) at 18.

[157] EMCOS Initial Br. (I, IV) at 5 (citing *Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1210-11 (D.C. Cir. 1991)); EMCOS Initial Br. (II, III) at 6 (citing *Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d at 1210-11).

Commission needs to acknowledge that it has not developed its guidance on the use of either of these models to the level of maturity that it has attained with the DCF.[158]

66. EMCOS disagree with the Briefing Order's statement that "utility stock prices appear to have performed in a manner inconsistent with the theory underlying the DCF methodology."[159] EMCOS argue that the Briefing Order erred in assuming a direct relationship between utility earnings and utility stock prices. EMCOS state that, because all three market-based models depend on the Efficient Market Hypothesis, it is implausible that market phenomena can affect one model but not others. EMCOS maintain that there is no economic theory that price-to-earnings ratio volatility is inconsistent with DCF theory. EMCOS state that, after the 2008 financial crisis, the U.S. Federal Reserve program of quantitative easing increased the supply of money, which lowered the resulting market price of money, as reflected in lower interest rates. In turn, EMCOS argue, this also lowered the cost of equity, causing utility stocks to become more attractive to equity investors, which increased share prices as well as price-to-earnings ratios.[160] EMCOS conclude that any argument that higher price-to-earnings ratios imply model risk in the DCF model is incorrect.[161]

67. NETOs argue that the Commission's approach satisfies the requirements for addressing FPA section 206 complaints by relying on a broader range of evidence and considering a sufficiently broad range of ROEs that it will presume to be just and reasonable under the statute.[162] NETOs contend that this approach avoids the fallacy of relying on a single point estimate from a single methodology to dictate the only acceptable ROE for a particular time period. NETOs believe that, with the limited modifications that they suggest, the Briefing Order's approach satisfies the two steps of FPA section 206 and the two holdings of the Court's *Emera Maine* decision.

68. NETOs argue that the Commission's proposed approach in the Briefing Order addresses the court's mandate regarding the first step of a complaint under FPA section 206 by using three financial models, CAPM, DCF, and Expected Earnings models, to establish a range of presumptively just and reasonable ROEs for utilities with

---

[158] EMCOS Initial Br. (I, IV) at 5-6; EMCOS Initial Br. (II, III) at 6.

[159] EMCOS Initial Br. (I) at 34 (citing Briefing Order, 165 FERC ¶ 61,030 at P 46).

[160] *Id.* at 45-46.

[161] *Id.* at 46 (citing Briefing Order, 165 FERC ¶ 61,030 at P 46).

[162] NETOs Initial Br. (I, II, III, IV) at 3 (citing Briefing Order, 165 FERC ¶ 61,030 at PP 15-18).

low, average, and high risk profiles.[163] NETOs argue that, to satisfy the court's mandate regarding the second step of placing the base ROE, the Commission averages the results of the CAPM, DCF, and Expected Earnings models as well as the result of a fourth model, the Risk Premium analysis, to arrive at a base ROE. Thus, NETOs argue that the Commission's approach, by relying on additional models, aligns more closely with "how investors analyze and compare their investment opportunities."[164]

## C. Commission Determination

69. We find that it is appropriate to use the DCF model and CAPM in our ROE methodology in these proceedings, but not the Expected Earnings or Risk Premium models.[165] Use of multiple models should result in our ROE analyses producing cost of equity estimates that more accurately reflect what ROE a utility must offer in order to attract capital. As discussed in sections VII and IX below, we find that, on balance, using the Expected Earnings and Risk Premium models would not improve our ROE determinations sufficiently to justify using those models, in light of the flaws that it could introduce into our ROE analyses.

70. As an initial matter, the D.C. Circuit has repeatedly observed that the Commission is not required to rely upon the DCF model alone or even at all.[166] The Commission may

---

[163] *Id.* at 4 (citing Briefing Order, 165 FERC ¶ 61,030 at P 16).

[164] *Id.* (citing Briefing Order, 165 FERC ¶ 61,030 at P 33).

[165] Opinion No. 569, 169 FERC ¶ 61,129 at P 31 ("[W]e find that expanding our methodology to use the CAPM model in addition to the DCF model will better reflect how investors make their investment decisions. This should result in our ROE analyses producing cost of equity estimates that more accurately reflect what ROE a utility must offer in order to attract capital."); Opinion No. 569-A, 171 FERC ¶ 61,154 at P 43 ("We continue to find that ROE determinations should consider multiple models, both to capture the variety of models used by investors and to mitigate model risk.")).

[166] *Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d at 1211 (explaining that the Commission is free to reject the DCF methodology, provided that it adequately explains its reasons for doing so); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 n.6 (D.C. Cir. 1984) ("[N]either statutes nor decisions of this court require that the Commission utilize a particular formula or a combination of formulae to determine whether rates are just and reasonable."); *NEPCO Mun. Comm. v. FERC*, 668 F.2d 1327, 1345 (D.C. Cir. 1981) (quoting *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. at 586) ("FERC is not bound 'to the service of any single formula or combination of formulas.'"); *see also Emera Maine*, 854 F.3d at 27 (quoting *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. at 586) (noting that the Commission has authority to make "'pragmatic adjustments' to a utility's

"change its past practices," such as relying exclusively on the DCF model, "with advances in knowledge in its given field or as its relevant experience and expertise expands," provided that it supplies "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."[167] Investors have varying preferences as to which of the various methods for determining cost of equity they may use to inform their investment decisions. As Dr. Roger Morin states, "Investors do not necessarily subscribe to any one method, nor does the stock price reflect the application of any one single method by the price-setting investor. There is no monopoly as to which method is used by investors."[168] The record in this proceeding demonstrates that the CAPM is one of the primary methods investors use to measure the cost of equity, along with the DCF model.[169] We find that cost of equity estimates based on these two models will provide a more reasonable measure of investor expectations, since they are among the information that investors rely upon when making investment decisions. Accordingly, we find that, in light of our expanded experience with ROE determinations under various market conditions and the court's guidance in *Emera Maine*, expanding our ROE methodology to include the CAPM, as well as the DCF model, will better reflect how investors make their investment decisions and result in more accurate cost of equity estimates.[170]

71. We also find that the expansion of our ROE methodology to use the CAPM in addition to the DCF model will help address the issues that led the court to remand Opinion No. 531 in *Emera Maine*. In that proceeding, the Commission found that it had "less confidence that the midpoint of the zone of reasonableness" produced by the DCF model "accurately reflect[ed] the equity returns necessary to meet the *Hope* and *Bluefield* capital attraction standards."[171] Because of this concern, the Commission considered

---

ROE" based on the facts of the particular case)

[167] *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1296 (D.C. Cir. 2004) (per curiam) (internal citations and quotation marks omitted).

[168] Morin at 429.

[169] *See, e.g.*, Trial Staff Initial Br. (I), Keyton Aff. at 8 ("[T]he DCF [and] CAPM . . . are widely used by investors."); Trial Staff Initial Br. (I), Keyton Aff. at 2, 10-11 (stating same); MICHAEL C. EHRHARDT & EUGENE F. BRIGHAM, FINANCIAL MANAGEMENT: THEORY AND PRACTICE 253 (13th ed. 2011) ("[T]he basic CAPM is still the most widely used method for thinking about required rates of return on stocks.").

[170] Opinion No. 569, 169 FERC ¶ 61,129 at P 32.

[171] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 49 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at P 145).

"'additional record evidence, including evidence of alternative benchmark methodologies" to inform the placement of ROE within the DCF-produced zone of reasonableness.[172] The Commission found that evidence "supported a finding that an upward adjustment from the midpoint was warranted."[173] The Commission then set NETOs' ROE at the 10.57% midpoint of the upper half of the DCF zone of reasonableness. In taking this action, the Commission emphasized that it was "not depart[ing] from [its] use of the DCF methodology."[174]

72. In *Emera Maine*, the court held that the Commission "failed to explain how any evidence demonstrated that 10.57% was a just and reasonable base ROE."[175] The court found that this omission was particularly troublesome in light of the Commission's concerns over the reliability of the DCF zone of reasonableness. The court also stated that "FERC never explained how 10.57% was just and reasonable when the alternative benchmarks and additional record evidence it used to justify a departure merely pointed to a base ROE somewhere above 9.39%." The court stated that "[o]n the one hand, [the Commission] argued that the alternative analyses supported its decision to place the base ROE above the midpoint, but on the other hand, it stressed that none of these analyses were used to select the 10.57% base ROE."[176]

73. We find that if the most useful type of additional record evidence that the Commission relied upon in Opinion No. 531, namely CAPM, is directly incorporated into the formal ROE methodology and construction of the zone of reasonableness, then that evidence will be directly "used to select" a just and reasonable ROE. We will not make ROE decisions because evidence "merely point[s] to a base ROE somewhere" that is different than a given base ROE, but because that evidence will be directly used to calculate a specific cost of equity estimate. This will help ensure that our ROE determinations are directly connected to and supported by justifications in the record evidence. Our new ROE methodology does this by averaging the top and bottom of the DCF and CAPM zones of reasonableness to produce a composite zone of reasonableness and then setting the ROE of average risk utilities at the central tendency midpoint of that zone.

---

[172] Opinion No. 531, 147 FERC ¶ 61,234 at P 145.

[173] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 37.

[174] Opinion No. 531, 147 FERC ¶ 61,234 at P 146.

[175] *Emera Maine*, 854 F.3d at 28.

[176] *Id.* at 28-29.

74. We disagree with CAPs' contention that the record does not support our finding of model risk no longer justifying relying solely on the DCF model. Model risk includes the broad conceptual issue of models being imperfect and not always working well in all situations. We continue to find that ROE determinations should consider multiple models, both to capture the variety of models used by investors and to mitigate model risk. With respect to the latter, Dr. Morin speaks of the type of potential model errors that comprise "model risk" and why the use of additional models is warranted:

> In the absence of any hard evidence as to which method outdoes the other, all relevant evidence should be used and weighted equally, in order to minimize judgmental error, measurement error, and conceptual infirmities. A regulator should rely on the results of a variety of methods applied to a variety of comparable groups, and not on one particular method. There is no guarantee that a single DCF result is necessarily the ideal predictor of the stock price and of the cost of equity reflected in that price, just as there is no guarantee that a single CAPM or Risk Premium result constitutes the perfect explanation of that stock price.[177]

75. Moreover, any methodology has the potential for errors or inaccuracies. Therefore, relying exclusively on any single methodology increases the risk that the Commission could authorize an unjust and unreasonable ROE. There is significant evidence indicating that combining estimates from different models is more accurate than relying on a single model.[178]

76. Similarly, NETOs' witness Mr. Quackenbush explains that "[a]ll financial models are subject to model risk,"[179] which he describes as "the risk that a model used to evaluate

---

[177] Morin at 429.

[178] *See, e.g.*, *In re. Connect Am. Fund*, 28 FCC Rcd. 7123, 7147 (2013) ("As the cost of equity reflects the uncertain expectations of investors, there is potential for introducing significant errors into the estimates, and no single model can be counted on exclusively to provide a precise estimate of the cost of equity."); *Use of a Multi-Stage Discounted Cash Flow Model in Determining the Railroad Industry's Cost of Capital*, STB Ex Parte No. 664 (Sub-No. 1), 2009 WL 197991, *11 (S.T.B. Jan. 23, 2009) ("As the Federal Reserve Board noted in its testimony in STB Ex Parte No. 664, academic studies had demonstrated that using multiple models will improve estimation techniques when each model provides new information. In addition, there is robust economic literature confirming that, in many cases, combining forecasts from different models is more accurate than relying on a single model.") (citations omitted).

[179] NETOs Reply Br. (I), attach. B. (Reply Affidavit of John D. Quackenbush) at 8 (Quakenbush Reply Aff.).

real-world situations will fail to predict or to represent the real phenomenon that is being modeled."[180] He then states that "the use of multiple models was desirable because overreliance on any one model would expose our results to model risk and render our cost of equity estimates less useful"[181] and asserts that "the use of multiple methods reduces exposure to model risk."[182] Likewise, NETOs' witness Mr. McKenzie stated that "the Commission should continue to consider alternative methods and ROE benchmarks in all conditions and in all cases, because the DCF model—like any model—faces model risk and is not infallible."[183] Moreover, even EMCOS' witness Dr. Lesser acknowledges the existence of model risk, noting that "[t]he Commission's alternative methodologies are themselves subject to model risk."[184] Accordingly, we find that the record demonstrates that model risk supports the Commission's decision to use multiple models in our ROE analysis under FPA section 206 instead of only the DCF model.

77. As described below, we find that the flaws of the Expected Earnings and Risk Premium models are significant enough to render use of those models unreasonable. As the Commission explained in Opinion No. 569 and Opinion No. 569-A, and later in the MISO Remand Order, the Commission considered the disadvantages and advantages of each model and concluded that, on balance, the disadvantages of the Expected Earnings and Risk Premium models outweigh their advantages.[185] Simply because other models also have disadvantages does not mean that they have the same level of disadvantages or advantages as those of the Expected Earnings and Risk Premium models. The Commission may exercise its discretion, supported by reasoned decision-making, to determine which flaws in various models render the models unreasonable, and thus unusable, and which do not.

78. Regarding NETOs' arguments that the Commission should include all four models to satisfy the court's mandate regarding the second prong of the FPA section 206 analysis—i.e., determining a just and reasonable replacement ROE—we disagree. First, the Commission need not adopt every financial model used by investors.[186] Second, it

---

[180] *Id.*

[181] *Id.* at 10.

[182] *Id.* at 13.

[183] Ex. NET-2200 (IV) at 143.

[184] Ex. EMC-018 (IV) at 9.

[185] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 209; MISO Remand Order, 189 FERC ¶ 61,036 at PP 23-24.

[186] *See Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d at 1211 (explaining that the

may not adopt models, such as the Expected Earnings and Risk Premium models, that it concludes are methodologically or legally unsound. As described below, we conclude that the Expected Earnings and Risk Premium models are not sound for use in our revised ROE methodology. We are not persuaded by arguments that all four models should be included simply because they broaden the zone of reasonableness. Such assertions, without support, suggest adopting a zone of reasonableness that is wider than what the Commission has historically determined would be just and reasonable without sufficient justification as to why such a broader zone of reasonableness is appropriate. Furthermore, our decision to adopt the DCF and CAPM models while not adopting the Expected Earnings and Risk Premium models reasonably balances the benefits of multiple models with the need to exclude models that are methodologically unsound.

## V. Presumptively Just and Reasonable ROE Ranges for Determining if an Existing ROE is Unjust and Unreasonable

### A. Background

79. As noted above, in the Briefing Order, the Commission proposed to use ranges of presumptively just and reasonable ROEs in determining whether an existing ROE is unjust and unreasonable under the first prong of section 206.[187] As described below, CAPs and EMCOS oppose the Commission's proposed approach of using ranges of presumptively just and reasonable ROEs, while NETOs support the proposal.

80. In *Emera Maine*, the court found that the Commission's prior practice of using "a single ROE analysis" to demonstrate both (1) that an existing ROE is unjust and unreasonable under the first prong of FPA section 206 and (2) that a new ROE is just and reasonable under the second prong, is contrary to the FPA.[188]

81. In Opinion No. 569, the Commission held the following in order to address the effects of that holding in *Emera Maine*: for average risk utilities, the presumptively just and reasonable range is the quartile of the overall composite zone of reasonableness

---

Commission is free to reject the DCF methodology, provided that it adequately explains its reasons for doing so); *Elec. Consumers Res. Council v. FERC*, 747 F.2d at 1514 n.6 ("[N]either statutes nor decisions of this court require that the Commission utilize a particular formula or a combination of formulae to determine whether rates are just and reasonable."); *NEPCO Mun. Comm. v. FERC*, 668 F.2d at 1345 (quoting *FPC v. Natural Gas Pipeline Co.*, 315 U.S. at 586) ("FERC is not bound 'to the service of any single formula or combination of formulas.'").

[187] *See* MISO Briefing Order, 165 FERC ¶ 61,118 at PP 24, 28-30.

[188] *Emera Maine*, 854 F.3d at 27.

centered on the central tendency of the overall zone of reasonableness; for below average risk utilities, that range is the quartile of the zone of reasonableness centered on the central tendency of the lower half of the zone of reasonableness; and for above average risk utilities, that range is the quartile of the zone of reasonableness centered on the central tendency of the upper half of the zone of reasonableness.[189]

82. In constructing the ranges of presumptively just and reasonable base ROEs, the Commission noted its precedent that the midpoint of the overall zone of reasonableness is a good starting place for the placement of an ROE and found that the measure of central tendency for the entire zone of reasonableness should be the starting point for identifying the range of presumptively just and reasonable base ROEs for utilities with an average risk profile.[190] The Commission then found that, similarly, the starting points for identifying the ranges of presumptively just and reasonable base ROEs for utilities with above or below average risk profiles should be the historic measures of central tendency of the upper and lower halves of the zone of reasonableness, respectively – their respective midpoints.[191]

83. The Commission explained that adopting the use of ranges of presumptively just and reasonable base ROEs was necessary to satisfy the requirements of the *Emera Maine* decision, which found that the Commission's decision that "a single ROE analysis generating a new just and reasonable ROE necessarily proved that the Transmission Owners' existing ROE was unjust and unreasonable" is contrary to the FPA.[192] Such ranges were also necessary, the Commission reasoned, because, according to the *Emera Maine* decision, "the zone of reasonableness creates a broad range of potentially lawful ROEs rather than a single just and reasonable ROE," and thus a finding that a particular ROE is just and reasonable, "standing alone, 'does not amount to a finding that every other rate of return'" is not just and reasonable.[193] In light of these findings, the

---

[189] Opinion No. 569, 169 FERC ¶ 61,129 at P 57.

[190] *Id.* P 63 (citing *Emera Maine*, 854 F.3d at 27 (quoting *Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d at 1213) ("We have noted that the midpoint is a good 'starting place' for the placement of the ROE.")).

[191] *Id.* (citing *Emera Maine*, 854 F.3d at 30 (quoting *Tenn. Gas Pipeline*, 926 F.2d at 1213) ("[Where] the utility at issue was riskier than the proxy group . . . the midpoint of the upper half was 'an obvious place to begin.'"); *Potomac-Appalachian Transmission Highline, LLC*, 158 FERC ¶ 61,050, at PP 270, 273 (2017) (setting ROE at the "measure of central tendency of the lower half of the zone of reasonableness . . . [g]iven [the utility's] low level of risk as compared to the proxy group")).

[192] *Id.* P 57 (citing *Emera Maine*, 854 F.3d at 26).

[193] *Id.* (citing *Emera Maine*, 854 F.3d at 26 (quoting *Papago Tribal Util. Auth. v.*

Commission's explanation of the particular circumstances that support an explicit finding that the existing ROE has become unjust and unreasonable must include a showing that the existing ROE is now outside some range of potentially just and reasonable ROEs within the zone of reasonableness for the public utility or utilities at issue, in light of our estimate of the current market cost of equity. Alternatively, the Commission stated that it could find other evidence convincingly demonstrates that the existing ROE is unjust and unreasonable despite it falling within that range.[194]

84. The Commission also explained that the base ROEs that fall within the applicable range of presumptively just and reasonable base ROEs will be presumed to be just and reasonable, and those that fall outside of the applicable range will be presumed to be unjust and unreasonable.[195] The Commission further found that those presumptions would only be rebuttable presumptions because the ultimate determination of whether an existing ROE is unjust and unreasonable still "depends on the particular circumstances of the case."[196] The Commission noted that other evidence regarding the particular circumstances of the case could rebut a presumption that applies, such as evidence regarding non-utility stock prices, investor expectations for non-utility stocks, various types of bond yields and their relation to stock prices, investor and other expert testimony, and testimony regarding the effects of rates on customers.[197]

85. On rehearing in Opinion No. 569-A, the Commission revised its use of presumptively just and reasonable ROE ranges.[198] The Commission stated that the ranges of presumptively just and reasonable base ROEs will be calculated by dividing the overall composite zone of reasonableness into thirds.[199] The Commission explained that excluding the bottom eighth and top eighth of the overall zone of reasonableness is inappropriate and, instead, the ranges of presumptively just and reasonable ROEs should include all potentially lawful ROEs.[200] The Commission further stated that the traditional

---

*FERC*, 723 F.2d 950, 857 (D.C. Cir. 1983))).

[194] *Id.* PP 61-62.

[195] *Id.* P 85.

[196] *Id.* P 68 (citing *Emera Maine*, 854 F.3d at 23).

[197] *Id.*

[198] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 190-99.

[199] *Id.* P 190.

[200] *Id.* P 191.

starting points for below-average and above-average risk utilities will be the midpoint of the lower and upper thirds, respectively.[201] Below is an illustration of the overall composite zone of reasonableness divided into three equal ranges of presumptively just and reasonable base ROEs.

Figure 1: Ranges of Presumptively Just and Reasonable Base ROEs




86. In Opinion No. 569-B, the Commission continued to find that it is appropriate to use the presumptively just and reasonable ROE ranges that were applied in Opinion No. 569-A.[202] In *MISO TOs v. FERC*, the D.C. Circuit considered and affirmed the Commission's use of presumptively just and reasonable ranges. The court explained that "the customers level an array of challenges to [the Commission's] creation of presumptively just and reasonable ranges at step one of the Section 206 analysis."[203] The court addressed these arguments at length[204] and ultimately found them "unpersuasive."[205] In particular, the court rejected arguments that the presumptively just and reasonable ranges were not permitted because the D.C. Circuit did not require that exact change on remand.[206] The court also disagreed that "presumption scheme unlawfully heightens the burden of proof that [customers] must carry."[207] The court also

[201] *Id.* P 194.

[202] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 60.

[203] *MISO TOs v. FERC*, 45 F.4th at 261.

[204] *Id.* at 261-263.

[205] *Id.* at 258.

[206] *Id.* at 261.

[207] *Id.*

rejected arguments that the presumptively just and reasonable ranges "created an irrebuttable presumption"[208] and that "the presumption unlawfully creates a difference between Section 205 proceedings and Section 206 proceedings."[209] The court explained that "[the Commission] developed this new framework to more effectively verify that an existing rate is in fact unjust and unreasonable. The customers have provided no persuasive reason to think that doing so was arbitrary and capricious."[210]

87. On March 25, 2025, the Commission addressed a request for rehearing of the Commission's decision to use ranges of presumptively just and reasonable ROEs to evaluate complaints under section 206 of the FPA and continued to reach the same result.[211]

## B. Briefs

### 1. Whether Precedent Supports the Use of Presumptively Just and Reasonable ROE Ranges

88. CAPs assert that, according to precedent, the just and reasonable standard is meant to protect consumers from excessive rates and charges and does not permit even a little unlawfulness.[212] CAPs state that FPA section 206 empowers the Commission to reduce any rate that is not the "lowest reasonable rate," even if the existing rate is within a "zone of reasonableness."[213] CAPs argue that such precedent, and the Commission's policy that base ROEs should track the cost of equity, cannot be squared with a policy under which complaints would be dismissed unless the existing ROE, having been shown to exceed the cost of equity, must further be shown to exceed it by an arbitrarily wide margin.[214]

89. CAPs also contend that the Commission's proposed approach of establishing a range of presumptively just and reasonable ROEs is inconsistent with the D.C. Circuit's

---

[208] *Id.*

[209] *Id.* at 262.

[210] *Id.* at 261.

[211] MISO Remand Rehearing Order, 190 FERC ¶ 61,184 at P 80.

[212] CAPs Principal Initial Br. at 6 (citing *Consumers Fed'n of Am.*, 515 F.2d 347, 358 n.64 (D.C. Cir. 1975) (quoting *FPC v. Texaco, Inc.*, 417 U.S. 380, 399 (1974))).

[213] *Id.* (citing *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. at 585-86).

[214] *Id.* at 7.

holding in *Emera Maine*. CAPs argue that the Briefing Order presents that proposed approach as responding to the D.C. Circuit's observation in *Emera Maine* that there exists a "broad range of potentially lawful ROEs."[215] However, CAPs assert that *Emera Maine* does not require the Commission to create a presumption that a range of ROEs is just and reasonable. CAPs argue that *Emera Maine* presented the "broad range" observation as a way of explaining that the identification of a new and lower cost of equity, standing alone, was insufficient to explain why a prior, higher ROE was necessarily unreasonable. CAPs contend that the policy that the Commission seeks to set the base ROE at its best estimate of the cost of equity was left implicit, not stated clearly in Opinion No. 531-A. If the Commission explains that this is its policy, CAPs contend that a finding that the rationally identified cost of equity is less than the existing base ROE compels the conclusion that the existing base ROE is no longer just and reasonable.[216]

90. NETOs state that the Commission in the Briefing Order appropriately implemented the D.C. Circuit's conclusion "that the FPA's statutory 'zone of reasonableness creates a broad range of potentially lawful ROEs rather than just a single just and reasonable ROE.'"[217] NETOs support the Commission's use of a methodology that identifies all potentially lawful ROEs within the overall zone of reasonableness by calculating a range of presumptively just and reasonable base ROEs that correspond to the risk profiles of the utilities at issue.

**2. <u>Whether an Unfair Asymmetry Exists between FPA Section 205 and FPA Section 206 Filings</u>**

91. CAPs argue that the Commission's proposed presumption would introduce an unfair asymmetry between FPA section 205 and FPA section 206. They state that, under this methodology, regulated utilities filing under section 205 can continue to obtain approval of a proposed ROE increase if they show that the cost of equity exceeds the existing ROE by any amount. By contrast, customers filing complaints under section 206 would have to show that cost of equity is so far below the existing ROE that it falls outside of the presumptively just and reasonable range of base ROEs.[218] CAPs assert that

---

[215] *Id.* at 10 (citing Briefing Order, 165 FERC ¶ 61,030 at P 27).

[216] *Id.* at 10-12.

[217] NETOs Reply Br. (I) at 8; *see* NETOs Initial Br. (I) at 8-9.

[218] *Id.*

this divergent treatment is contrary to the *Mobile*[219] and *Sierra*[220] cases and the 1988 Regulatory Fairness Act, both of which indicate that section 205 rate increase filings and section 206 complaints seeking rate decreases should be treated similarly.[221]

92. CAPs further assert that the proposed approach of a range of presumptively just and reasonable ROEs would have the effect of presumptively barring small ROE reductions until the difference between the indicated cost of equity and the allowed ROE became so large as to fall outside the applicable range. CAPs argue that this creates a bias toward investors and upward departure from cost-based ROEs that is inconsistent with *Hope*, *Bluefield*, and the FPA.[222]

93. NETOs dispute any contention that identifying a range of potentially just and reasonable ROEs provides to transmission owners any impermissible "statutory protection" or unwarranted "shield level."[223] NETOs state that, in fact, the D.C. Circuit recognized in *Emera Maine* that FPA section 206 is meant to provide such "statutory protection," and NETOs further state that such protection is meant to protect transmission owners from frivolous or unsupported complaints. NETOs go on to explain that the "statutory protection" under FPA section 206 and a Commission determination of the broad range of potentially just and reasonable ROEs under the FPA constitute a fundamental step before evaluating what is lawful.

### 3. <u>Whether and How the Presumption may be Rebutted for ROEs that Fall Within the Range of Presumptively Just and Reasonable ROEs</u>

94. CAPs contend that the Briefing Order provides only scant and self-contradictory guidance as to what showing could rebut the presumption that a base ROE which falls within the applicable range of presumptively just and reasonable base ROEs is just and reasonable. CAPs note the Commission's language that the presumption could be rebutted by "changes in the returns on investments in other enterprises having corresponding risks"[224] but argue that well-conducted DCF and CAPM studies of

---

[219] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956).

[220] *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

[221] CAPs Principal Initial Br. at 9.

[222] *Id.* at 14.

[223] NETOs Reply Br. (I) at 12.

[224] *Id.* at 7 (citing Briefing Order, 165 FERC ¶ 61,030 at P 29).

corresponding-risk proxy groups are evidence of those returns; thus, the same evidence used to quantify the presumption inherently rebuts it, making the presumption logically self-defeating.[225] CAPs further contend that the Briefing Order suggests that any rebuttal would have to involve "additional evidence"[226] but does not state what such additional evidence might be.[227]

95. EMCOS state that statutory reasonableness is an abstract quality represented by an area, not a pinpoint.[228] EMCOS note that this concept—the zone of reasonableness—appropriately balances the financial interests of the regulated company and the public interest. EMCOS state that rates within a broad range of potentially lawful ROEs are not per se just and reasonable.[229] EMCOS argue that the Commission has previously held that a presumptive zone of just and reasonable rates would nullify the Commission's role in reducing the abstract quality of reasonableness to concrete dollars and cents. EMCOS contend that whether an existing rate that falls within a zone of reasonableness remains just and reasonable depends on the facts in that particular case. EMCOS state that non-cost factors may warrant a departure from cost-based analysis.

### C. **Commission Determination**

96. We adopt the framework as established in Opinion Nos. 569-A and 569-B and the MISO Remand Order for using ranges of presumptively just and reasonable ROEs in evaluating whether an existing ROE remains just and reasonable for purposes of the first prong of FPA section 206.[230]

97. As an initial matter, the D.C. Circuit explicitly considered the Commission's use of the presumptively just and reasonable ranges that we adopt in our analysis in these proceedings and found that it was not arbitrary and capricious.[231] We disagree with

---

[225] *Id.* at 7-8.

[226] *Id.* at 8 (citing Briefing Order, 165 FERC ¶ 61,030 at P 28).

[227] *Id.*

[228] EMCOS Initial Br. at 58 (citing *Mont.-Dakota Util. Co., v. Nw. Pub. Serv. Co.*, 341 U.S. 246 (1951)).

[229] *Id.* (citing *Emera Maine*, 854 F.3d at 27).

[230] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 190-99; Opinion No. 569-B, 173 FERC ¶ 61,159 at P 60.

[231] *MISO TOs v. FERC*, 45 F.4th at 261-263.

CAPs' contention that use of presumptively just and reasonable ROE ranges would violate precedent set by the Commission and the D.C. Circuit in *Emera Maine*. As the Commission explained in Opinion Nos. 569 and 569-A and as NETOs state, the use of ranges of presumptively just and reasonable ROEs in our ROE methodology ensures that our determinations satisfy the requirements of the *Emera Maine* decision.[232] The court in *Emera Maine* found that the Commission must "explain what circumstances" support its "actual finding as to the lawfulness" of an existing base ROE in a section 206 proceeding, and the use of ranges of presumptively just and reasonable base ROEs allows us to do so in a structured manner. Using such ranges produces a specific result from our risk profile determination—a rebuttable presumption—from which we make an explicit finding as to whether the other evidence presented by the parties in the case has rebutted that presumption. Therefore, this analysis requires us to "explain what circumstances" support our "actual finding as to the lawfulness" of an existing base ROE. Moreover, because the risk profile is the particular circumstance most relevant to determining whether an existing ROE is unjust and unreasonable, using ranges of presumptively just and reasonable ROEs based on a utility's risk profile ensures that the risk profile determination has a clear and significant connection to our ultimate finding relating to lawfulness. In addition, in *MISO TOs v. FERC*, the D.C. Circuit considered the Commission's determination to use presumptive ranges in the context of the *Emera Maine* decision and affirmed the Commission's determination.[233] Accordingly, we continue to find that the use of ranges of presumptively just and reasonable ROEs in our ROE methodology ensures that our determinations satisfy the requirements of the *Emera Maine* decision.

98. We disagree with CAPs' contention that the use of ranges of presumptively just and reasonable ROEs is inconsistent with precedent because the just and reasonable standard is meant to protect consumers from excessive rates and charges. Using ranges of presumptively just and reasonable ROEs does not hinder the Commission's ability to protect customers from excessive rates or necessarily require a showing that the relevant ROE falls entirely outside of the applicable range. As the Commission has explained, we use the range of presumptively just and reasonable ROEs as an additional tool to help inform our ROE analyses.[234] The range of presumptively just and reasonable ROEs provides an initial indication of whether an existing ROE may be unjust and unreasonable which we consider along with all of the other evidence in the applicable record, including evidence addressing the particular circumstances of the case. The presumption of

---

[232] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 196; *see* Opinion No. 569, 169 FERC ¶ 61,129 at PP 70-71.

[233] *MISO TOs v. FERC*, 45 F.4th at 261.

[234] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 72.

whether an existing ROE falls within the applicable range of presumptively just and reasonable ROEs is rebuttable. Accordingly, the Commission could still find that the ROE is unjust and unreasonable based upon the preponderance of the evidence, even if it falls within the applicable range of presumptively just and reasonable ROEs. Moreover, as the court held in *Emera Maine*, the mere fact that the financial models now produce a cost of equity that is somewhat lower than the existing ROE is, "without any further explanation," insufficient to satisfy our burden under FPA section 206 to "prove that Transmission Owners' existing base ROE was unlawful."[235] Thus, contrary to CAPs' assertion, even if the evidence indicates that an ROE exceeds the cost of equity, this alone "without any further explanation" is insufficient to support a finding that the existing ROE is unjust and unreasonable.

99. We are not persuaded by CAPs' argument that the Commission's proposed presumption would introduce impermissible asymmetry between FPA section 205 and FPA section 206.[236] We disagree and continue to find that the use of presumptively just and reasonable ranges does not create any such unlawful asymmetry.[237] As the Commission explained, the showing that is required under section 206 differs from the showing that is required under section 205. The D.C. Circuit explained that "[t]he purpose of section 206 is 'quite different' from that of section 205,"[238] "[s]ection 206's procedures are 'entirely different' and 'stricter' than those of section 205," and that, while "[a] utility filing a rate adjustment under section 205 must show that the adjustment is *lawful* . . . [t]he proponent of a rate change under section 206 . . . bears 'the burden of proving that the existing rate is *unlawful*.'"[239] The Commission does not have the authority to change those standards, and our modification of the Commission's ROE methodology to use ranges of presumptively just and reasonable ROEs adheres to those standards. Moreover, in *MISO TOs v. FERC*, the court considered and rejected this argument, explaining that "customers' final step-one challenge says that the presumption unlawfully creates a difference between Section 205 proceedings and Section 206

---

[235] *Emera Maine*, 854 F.3d at 26.

[236] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 198.

[237] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 74.

[238] *Emera Maine*, 854 F.3d at 24 (quoting *City of Winnfield, La. v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984)).

[239] *Id.* (emphases in original) (quoting *Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993)).

proceedings. But Congress required that difference. 'Section 206's procedures are entirely different and stricter than those of Section 205.'"[240]

100. CAPs and EMCOS raise concerns regarding how a party may rebut the justness and reasonableness of a base ROE falling within the presumptively just and reasonable range. The Commission has indeed recognized that whether an existing ROE is unjust and unreasonable, even one that falls within the applicable range of presumptively just and reasonable ROEs, still "depends on the particular circumstances of the case."[241] The Commission has stated that particular circumstances relevant to rebutting a base ROE that falls within the presumptively just and reasonable range include, for example, the following: evidence regarding non-utility stock prices, investor expectations for non-utility stocks, various types of bond yields and their relation to stock prices, investor and other expert testimony, and testimony regarding the effects of rates on customers.[242] We believe that employing a rebuttable presumption will provide additional certainty and transparency to parties while also not restricting the Commission's ability to consider the particular circumstances of the case, as required by applicable precedent. Moreover, the court in *MISO TOs v. FERC* considered and rejected arguments that the presumption "unlawfully heightens the burden of proof"[243] and that "[the Commission] created an irrebuttable presumption."[244]

## VI. DCF

### A. Background

101. The DCF model is based on the premise that an investment in common stock is worth the present value of the infinite stream of dividends discounted at a market rate commensurate with the investment's risk. With simplifying assumptions, the DCF model results in the investor using the following formula to determine share price:

$$P = D/(k-g)$$

---

[240] *MISO TOs v. FERC*, 45 F.4th at 262.

[241] *Id.*

[242] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 199.

[243] *MISO TOs v. FERC*, 45 F.4th at 261.

[244] *Id.*

where "P" is the price of the common stock, "D" is the current dividend, "k" is the discount rate (or investors' required rate of return), and "g" is the expected growth rate in dividends.

102. Unlike investors, the Commission uses the DCF model to determine the ROE (the "k" component) to be included in the utility's rates, rather than to estimate a stock's value. Therefore, the Commission rearranges the DCF formula to solve for "k," the discount rate, which represents the rate of return that investors require to invest in a company's common stock. The Commission also multiplies the dividend yield by the expression (1+.5g) to account for the fact that dividends are paid on a quarterly basis. Multiplying the dividend yield by (1+.5g) increases the dividend yield by one-half of the growth rate and produces what the Commission refers to as the "adjusted dividend yield." Under the resulting formula, ROE equals the adjusted dividend yield plus the expected future growth rate of dividends and can be expressed as follows:

$$k = {}^{D}/_{P}\,(1 + .5g) + g$$

103. In Opinion Nos. 531 and 531-A, the Commission changed its approach on the DCF model to be applied in public utility rate cases by adopting the two-step DCF model in place of the one-step DCF model the Commission had historically used.[245] Under the Commission's two-step DCF model, the input for the expected future growth rate of dividends, "g," is calculated using both short-term and long-term growth projections. Those two growth rate estimates are averaged, with the short-term growth rate estimate receiving two-thirds weighting and the long-term growth rate estimate receiving one-third weighting, to create a composite growth rate.[246]

### B. Dividend Yield

#### 1. Background

104. In Opinion No. 531, the Commission used a composite growth rate, including both short- and long-term growth rates, for the (1+.5g) adjustment the Commission uses for the expected future growth rate of dividends.[247] In Initial Decision (II, III), the Presiding Judge also used a composite growth rate, which the parties submitted consistent with the

---

[245] Opinion No. 531, 147 FERC ¶ 61,234 at PP 15-17, 36-40; Opinion No. 531-A, 149 FERC ¶ 61,032 at P 10.

[246] Opinion No. 531, 147 FERC ¶ 61,234 at PP 17, 39.

[247] *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 6; Opinion No. 531, 147 FERC ¶ 61,234 at PP 15, 17, 39; Ex. NET-1300 (II, III) at 19.

Commission's approach in Opinion No. 531.[248] In Initial Decision (IV), the Presiding Judge also used such a composite growth rate.[249]

105. In Opinion No. 569, the Commission found that only the short-term growth rate, rather than the two-stage composite growth rate, should be used to calculate the adjustment to the dividend yield. The Commission noted that the appropriate dividend figure to use in the DCF equation is the amount which is expected to be received by the investor during the twelve months following the purchase of the stock. Accordingly, the Commission found that, because the first dividend is necessarily paid within the time period covered by the IBES short-term growth projection, that rate is the more appropriate growth rate for calculating the (1+.5g) adjustment to the dividend yield. The Commission found that the adjusted dividend yield methodology used in Opinion No. 546 should be applied to both electric utilities and pipeline companies.[250] In Opinion No. 569-A,[251] the Commission affirmed this finding by noting that the Commission had already found in Opinion No. 546 that the short-term growth rate should adjust the dividend yield, whether calculating dividend yields for electric utilities or pipeline companies.[252]

### 2. Briefs

#### a. Growth Rate for Adjustment to Dividend Yield

106. NETOs state that the Presiding Judge erred in using the long-term growth rate to adjust the DCF analysis dividend yields in the Second Complaint and Third Complaint proceedings. NETOs state that their witness Dr. William E. Avera testified that the logic and assumptions of the Commission's two-step methodology dictates that the short-term growth rate alone should be used to reflect growth over the coming year, but the Commission, without explanation, used the weighted average of the short-term and long-term growth rates in developing its DCF estimates in Opinion No. 531.[253] NETOs contend that Dr. Avera stated that, while he did not agree with that methodology, he

---

[248] *See* NETOs Br. on Exceptions (II, III) at 51-52; Initial Decision (II, III), 154 FERC ¶ 63,024 at PP 46, 116.

[249] *See* Initial Decision (IV), 162 FERC ¶ 63,026 at PP 174-80.

[250] Opinion No. 569, 169 FERC ¶ 61,129 at PP 98-100.

[251] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 208.

[252] Opinion No. 569, 169 FERC ¶ 61,129 at PP 98-100.

[253] NETOs Br. on Exceptions (II, III) at 51.

followed the approach set forth in the calculations contained in Opinion No. 531 in his testimony in this case, but estimated that using his preferred methodology would increase the midpoint of his DCF results by about two basis points.

107. NETOs state that, in Opinion No. 546, the Commission reversed its position on this issue and adopted Dr. Avera's position.[254] According to NETOs, the Commission found that the short-term IBES growth rate is far more representative of the growth investors expect over the coming year than is the two-stage growth rate and that the Commission's composite, two-step growth rate serves a different purpose: estimating the growth rate of "an infinite stream of expected dividends" by using the short-term growth rate (weighted at two-thirds) for the first five years and the long-term growth rate (weighted at one-third) for year six and thereafter.[255] NETOs assert that the use of the short-term growth rates is most appropriate to adjust dividend yields as the period in question is one year, and can be readily accomplished by using the short-term growth rates in the DCF analyses in lieu of the weighted growth rates.

108. CAPs assert that the dividend yield calculation methodology set forth in Opinion No. 531 was properly adhered to. CAPs conclude that the long-term composite growth rate is a better predictor of near-term dividend yield increases than is the first-stage growth rate, and that Dr. Woolridge showed that the actual dividend increases seen in this record followed this expected pattern.[256]

109. CAPs state that the Briefing Order appendix correctly expresses the DCF formula utilized by the Commission under Opinion No. 531. CAPs contend that NETOs, by contrast, have argued that the Commission's decision in Opinion No. 546 supports the use of two different "g" values in the same DCF equation, with the 1+g/2 adjustment based only on the short-term growth rate.[257] CAPs argue that Opinion No. 546 concerned the calculation of dividend yields for an oil pipeline Master Limited Partnership (MLP), and applied a DCF proxy group consisting entirely of oil pipeline MLPs, and this specific expectation does not apply to electric utilities.[258] Dr. Woolridge declares that NETOs sometimes use only first-stage earnings growth rather than sustainable composite growth

---

[254] *Id.* at 52 (citing *Seaway Crude Pipeline Co. LLC,* Opinion No. 546, 154 FERC ¶ 61,070, at PP 198-200 (2016)).

[255] *Id.* (citing Opinion No. 546, 154 FERC ¶ 61,070 at P 198).

[256] CAPs Br. Opposing Exceptions (II, III) at 42.

[257] CAPs Principal Initial Br. at 31 (citing Opinion No. 546, 154 FERC ¶ 61,070 at P 198).

[258] *Id.* at 31-32.

to estimate the growth factor that adjusts for the fact that dividends are paid quarterly rather than continuously.[259]

110. Trial Staff contends that the Presiding Judge in Initial Decision (II, III) correctly adhered to and applied the Commission's two-step DCF model to adjust dividend yields.[260] Trial Staff states that no party sought rehearing of the formula for adjustment to the dividend yields reflecting this weighting in Opinion No. 531, but NETOs' Brief on Exceptions now seeks to change the dividend yield calculation by removing the long-term growth component. According to Trial Staff, NETOs' witness disagreed with adjusting dividend yields to reflect the long-term growth rate component, but did not say anything else and his calculations included the composite growth rate adjustment and did not reflect his suggestion to use only the short-term growth rate.[261] Trial Staff states that the Commission should reject NETOs' eleventh hour proposal to change the dividend yield adjustment factor, and NETOs attempt to introduce new evidence after the record was closed. Trial Staff also argues that NETOs' proposal fails to comply with Opinion No. 531, where the Commission clearly used the composite growth rate and gave explicit and detailed instruction on the appropriate application of the two-step DCF model, including the adjusted dividend yield using the composite growth rate.[262]

**b. Other Dividend Yield Issues**

111. CAPs contend that there is a small error in the dividend yield computation underlying the Opinion No. 531 appendix, which surfaced in proceedings post-dating Opinion No. 531.[263] CAPs state that, as Opinion No. 551 affirmed, the Opinion No. 531 appendix specifically departed from the text of Opinion No. 531 by utilizing the annualized dividend associated with the study period's last month as if it had been paid throughout the study period.[264] CAPs assert that this error should be corrected before using the Opinion No. 531 computations as a template for the other complaints,

---

[259] *Id.*, Ex. CAP-600, Reply Aff. of Dr. Randall Woolridge at 1-2.

[260] Trial Staff Br. Opposing Exceptions (II, III) at 35.

[261] *Id.* at 37 (citing NETOs Br. on Exceptions (II, III) at 51).

[262] *Id.* at 38 (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 77).

[263] CAPs Principal Initial Br. at 30 (citing Briefing Order, 165 FERC ¶ 61,030 at P 56 & n.112; Opinion No. 531, 147 FERC ¶ 61,234 at PP 9, 143).

[264] *Id.* (citing *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 153 FERC ¶ 63,027, at PP 38-42 (2015) (MISO Initial Decision (I)), *aff'd in relevant part*, Opinion No. 551, 156 FERC ¶ 61,234).

particularly as the error bears on other issues such as CAPs' proposed methodology for forming a composite distribution.[265]

112. In calculating dividend yields, Dr. Woolridge states that NETOs have adopted a variety of approaches that depart from the Commission's well-founded policies. Dr. Woolridge contends that NETOs sometimes divide the study period's final-month dividend by earlier-month stock prices. Dr. Woolridge states that Mr. McKenzie has provided no new reasons for using his versions of the proxy dividend yields, and the effect of NETOs' variations is small.[266]

113. Trial Staff states that the Presiding Judge reopened the record in order to allow Dr. Avera to recalculate his dividend yield calculations in accordance with Opinion No. 531 because Dr. Avera's earlier proposals had used an incorrect formulation using the most recent dividends rather than monthly dividends.[267] Trial Staff opposes the Presiding Judge's rejection of Trial Staff witnesses Ms. Sabina Joe's and Mr. Douglas Green's "alternative DCF analyses," which, they state, present the most recent IBES growth rate data rather than data synchronized with dividend yields. Trial Staff asserts that, even if the Commission does not determine that growth rate and dividend yield data should be synchronized, the Commission should nonetheless consider these alternative analyses. Additionally, Trial Staff reiterates its support for the use of synchronized data.[268]

114. NETOs oppose Trial Staff's and CAPs' exceptions to using the growth rate available on the last day of the dividend yield period, rather than the most current growth rate at the time the ROE analyst performs the calculations. NETOs support the inclusion of Dr. Avera's DCF inputs in Opinion No. 531, which, they argue, properly synchronizes the dividend yield and growth rate data.[269]

---

[265] *Id.* at 31.

[266] CAPs Principal Reply Br., Ex. CAP-600, Reply Aff. of Dr. Randall Woolridge at 1-2.

[267] Trial Staff Br. Opposing Exceptions (II, III) at 35-36 (citing NETOs Br. on Exceptions at 51).

[268] Trial Staff Br. on Exceptions (II, III) at 70-72.

[269] NETOs Br. Opposing Exceptions (II, III) at 91-93.

### 3. Commission Determination

115. We adopt the methodology to calculate the (1+.5g) adjustment to the dividend yield, consistent with the Commission's approach in Opinion No. 569.[270] We agree with NETOs that the use of the short-term growth rates is most appropriate to adjust dividend yields. As noted in Opinion No. 305-A,

> The appropriate dividend figure to use in the DCF equation is that amount which is expected to be received by the investor during the twelve months following the purchase of the stock. To estimate that amount, we generally make the following two simplifying assumptions: (a) that the dividend rate will be increased annually (this has been the recent practice for electric utilities); and (b) that the next increase will occur, on average, six months after the stock purchase.[271]

Because this first dividend is necessarily paid within the time period covered by the IBES short-term growth projection, that rate is the more appropriate growth rate for calculating the (1+.5g) adjustment to the dividend yield.

116. NETOs oppose Trial Staff's and CAPs' exceptions to using the short-term growth rate rather than the composite growth rate . NETOs support the inclusion of Dr. Avera's DCF inputs in Opinion No. 531, which, they argue, properly synchronizes the dividend yield and growth rate. We are not persuaded by the contention that the Commission should not apply the dividend yield calculation approach in Opinion No. 546 to electric public utilities because it involved the calculation of dividend yields for oil pipeline MLPs and applied a DCF proxy group consisting entirely of oil pipeline MLPs. Opinion No. 546 approved use of the short-term IBES growth projection to calculate the (1+.5g) adjustment to dividend yield on the ground that "the short-term IBES growth rate is far more representative of the growth investors expect over the coming year than is the two-stage growth rate."[272] That rationale applies equally to public utilities as to oil pipelines. It does not turn on any unique feature of oil pipeline MLPs, such as their slower expected long-term growth because of the fact MLPs distribute most available cash to investors. Furthermore, we do not agree that using different growth rates would distort the DCF's results. The adjusted dividend yield, which concerns only the dividend received in the

---

[270] Opinion No. 569, 169 FERC ¶ 61,129 at PP 98-100.

[271] *Conn. Light & Power Co.*, Opinion No. 305-A, 45 FERC ¶ 61,370, at 62,168-69 (1988).

[272] Opinion No. 546, 154 FERC ¶ 61,070 at P 198.

first year after a stock's purchase, is logically distinct from the stream of dividends received from holding the stock in perpetuity.

117. Parties argue that the Commission, in Opinion No. 531, required the use of the composite growth rate for the adjustment to the dividend yield. However, subsequent to Opinion No. 531, which has been vacated by the D.C. Circuit, the Commission clarified its policy of using a single-step growth rate for the dividend yield adjustment in Opinion No. 569. In any event, the Commission stated in Opinion No. 546 that using only the IBES short-term growth projection to make the (1+.5g) adjustment to dividend yield has a *de minimis* effect on the outcome of the DCF analysis, increasing proxy company ROEs by only one or two basis points. Accordingly, we find that short-term growth rates should be used to adjust dividend yields in the above-captioned proceedings and we therefore reverse the Presiding Judge's use of a composite growth rate for calculating the (1+.5g) adjustment to the dividend yield in Initial Decision (II, III), and Initial Decision (IV).

118. CAPs argue that the data cited in Opinion No. 531 incorrectly uses the last month's dividend, rather than the dividend for each of the averaged six months when calculating the dividend yield. They argue that the Commission should correct this error. NETOs do not contest CAPs' assertion. We find that the dividend yield should be based on the average of the dividend yield over a six-month period, requiring use of both the price and dividend information for each of those six months and not solely using information from the last month.[273] Accordingly, we include this correction in our calculations in Appendix A. Applying the data that CAPs provide in Appendix A, the dividend yield for the lowest company in the DCF proxy group, Consolidated Edison, falls by four basis points, reducing the overall DCF for the First Complaint by approximately two basis points. By addressing the inconsistency of using dividend yields

---

[273] *See, e.g.*, *Portland Nat. Gas Transmission Co.*, Opinion No. 510, 134 FERC ¶ 61,129 at P 234 (2011) ("the Commission approves the use of Trial Staff's methodology . . . this methodology matches each average monthly stock price with the actual dividend paid for that month to calculate the actual dividend yields for each of the preceding six months . . . Using only the dividend declared in the final month results in a mismatch between the stock prices and the dividends used to calculate a firm's dividend yield."); *El Paso Nat. Gas Co.*, Opinion No. 528, 145 FERC ¶ 61,040 at P 658 (2013) ("the use of a six-month average dividend yield is a longstanding Commission policy that represents a reasonable measurement period to properly implement the DCF methodology."); Opinion No. 531, 147 FERC ¶ 61,234 at P 78 ("[T]his method is preferable to calculating the estimated dividend yield for each proxy group member based only on the dividend declared in the final month of the period. Using only the dividend declared in the final month results in a mismatch between the stock prices and the dividends used to calculate a firm's dividend yield. This can result in overstated dividend yields.").

for a six-month period but only the most recent dividend payment, this correction obviates the need for Trial Staff's alternative approach of using the most recent month's dividend yield. Moreover, Trial Staff's approach contravenes the Commission's convention of using the average of six months of dividend yields,[274] which reduces volatility.

### C. Short-Term Growth Rate

#### 1. Background

119. As noted above, in Opinion No. 531, the Commission elected to replace the "one-step" DCF methodology, which considers only short-term growth projections for a public utility, with a "two-step" or "composite" DCF methodology that considers both short- and long-term growth projections.[275] The "one-step" DCF methodology determines separate high and low estimates for each proxy company instead of determining a single cost of equity estimate for each proxy company, and two estimates of dividend growth are used. One estimate is based on the same IBES analyst five-year growth forecasts used for the short-term growth projection in the two-step DCF methodology. The other estimate is based on the "br + sv" sustainable growth formula, where "b" represents the percentage of earnings expected to be retained (after the payment of dividends), "r" represents the expected rate of return on book equity, "s" represents the percent of common equity expected to be issued annually as new common stock, and "v" is the equity accretion rate. The "br" component of this formula projects a utility's growth from the investment of retained earnings, and the "sv" component estimates growth from external capital raised by the sale of additional stock.[276]

120. In Opinion No. 531, the Commission held that "in future public utility cases, the Commission will adopt the same two-step DCF methodology it used in natural gas and oil pipeline cases."[277] The Commission further held that "[t]he short-term growth estimate will be based on the five-year projections reported by IBES (or a comparable

---

[274] *See, e.g.*, Opinion No. 528, 145 FERC ¶ 61,040 at P 658 ("the use of a six-month average dividend yield is a longstanding Commission policy that represents a reasonable measurement period to properly implement the DCF methodology."); Opinion No. 531, 147 FERC ¶ 61,234 at PP 77-78.

[275] *See generally* Opinion No. 531, 147 FERC ¶ 61,234 at PP 8, 32-41.

[276] *Id.* PP 24-25.

[277] Opinion No. 531, 147 FERC ¶ 61,234 at P 39.

source)."[278] The Commission similarly noted that "[t]he two-step DCF methodology uses the same IBES short-term growth projections as the one-step DCF methodology."[279] In Opinion No. 531-B, the Commission explained that "the 'br+sv' growth formula . . . seeks to estimate a company's 'sustainable growth rate.' For that reason . . . the Commission finds the formula unreasonable for use as the short-term growth projection in the two-step DCF methodology."[280]

121. In disagreeing with arguments regarding using IBES short-term growth projections under the specific facts of the case, the Commission held that "if a proxy company has a growth rate estimate from IBES . . . that growth rate is acceptable for purposes of the Commission's DCF analysis, regardless of the number of analysts' growth projections on which it was based."[281] The Commission also was not persuaded by arguments that a certain proxy group company's IBES short-term growth projection should be compared against other growth rate data in the record. In doing so, the Commission found that "the purpose of not using multiple sources of growth rate data is to ensure that the cost of equity for each company in the proxy group is estimated using the same protocols."[282] In *Emera Maine*, the court did not address the issue of using IBES short-term growth projections as the source of the short-term growth rate component of the two-step DCF model.

122. In Initial Decision (II, III), the Presiding Judge rejected NETOs' alternative DCF analysis based on *Value Line* growth rates.[283] The Presiding Judge explained that, in Opinion No. 531, the Commission found that the short-term growth estimate should be based on five-year projections reported by IBES (or a comparable source) and that, in Opinion No. 531-B, the "the Commission rejected the argument that the first-stage growth rate should be blended with or compared to one derived from *Value Line* data."[284] The Presiding Judge found that "[t]he Commission neither proposed nor addressed use of these [NETOs *Value Line*] growth rates in Opinion No. 531. NETOs have not made a persuasive argument to support their proposal to deviate from the Commission's

---

[278] *Id.*

[279] *Id.* P 155.

[280] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 77.

[281] *Id.* P 72.

[282] *Id.* P 76.

[283] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 621.

[284] *Id.*

methodology issued in Opinion No. 531."[285] In the discussion of DCF specification controversies in Initial Decision (IV), the Presiding Judge found that Commission precedent shows a preference for IBES data, and consequently, DCF analyses based solely or partly on IBES data were sufficient for the purposes of the Initial Decision.[286]

123. In the Briefing Order, the Commission stated that, while IBES growth projections represented a consensus in the past, they may no longer reflect as robust of a consensus.[287] The Commission stated that this concern stems from the fact that most investment analysts that make and publish quarterly and annual earnings estimates no longer make and publish three-to-five year short-term projections of earnings growth and that in recent years, the IBES data for many proxy companies have reflected between one and three analysts' short-term growth projections.[288] The Commission further stated that the reduced number of short-term growth projections means that a significant change in a single analyst's growth projection for a particular proxy company can significantly affect that company's DCF analysis result.[289]

124. In Opinion No. 569, the Commission found that the DCF model should employ IBES short-term growth rates. In the context of the DCF, the Commission explained that IBES was preferable because the IBES growth projections generally represent consensus growth estimates by a number of analysts while *Value Line* growth estimates represent the growth projection of a single analyst. The Commission explained that, while many investors use both IBES and *Value Line* growth rates, only IBES growth rates reflect the analysis of a diverse group of persons in the investment community. The Commission cited academic research that supported the use of IBES because of its use of multiple analysts' growth projections instead of a single analyst. In addition, the Commission noted that IBES growth projections are generally timelier than the *Value Line* projections because IBES updates its database on a daily basis as participating analysts revise their forecasts, whereas *Value Line* publishes its projections on a rolling quarterly basis.[290] In

---

[285] *Id.* P 622.

[286] Initial Decision (IV), 162 FERC ¶ 63,026 at PP 172-73.

[287] MISO Briefing Order, 165 FERC ¶ 61,118 at P 47.

[288] *Id.*

[289] *See e.g.*, *id.* P 48 (noting, for example, that one analyst's error involving the growth projection for Portland General Electric Company (Portland General) reduced the overall Reuters consensus projected short-term percentage growth in earnings for Portland General from 10.96% to 7.8%).

[290] Opinion No. 569, 169 FERC ¶ 61,129 at PP 120-128.

Opinion No. 569-A, the Commission maintained that IBES short-term growth rates should be used for the DCF model.[291]

### 2. **Briefs**

125. CAPs contend that the Presiding Judge in Initial Decision (II, III) properly rejected NETOs' proposed use of *Value Line* growth rates, arguing that Opinion Nos. 531 and 531-B make clear that only IBES growth forecasts should be used, and should not be combined with other growth rate forecasts.[292] CAPs assert that *Value Line* growth rates do not represent consensus expectations, and that NETOs have not shown that investors rely on these estimates in particular. Furthermore, CAPs argue that *Value Line* growth estimates exhibit other flaws, including, *inter alia*, that (i) *Value Line* estimates do not normalize non-recurring events, (ii) *Value Line* estimates are less timely and well-sourced than IBES estimates, and (iii) *Value Line* estimates produce an overly disparate, less statistically coherent spread of results.[293]

126. EMCOS disagree with the Briefing Order's finding that "the decreased number of short-term [IBES] growth projections necessary to perform a DCF analysis of the proxy companies reduces our confidence in the results of that analysis."[294] EMCOS contend that this conclusion is at odds with the Briefing Order's proposal to include a non-market-based methodology—the Expected Earnings model—that relies on *Value Line* projections prepared by a single analyst. EMCOS state that any shortage of IBES growth forecasts can be addressed by using a high-end outlier screen.[295] EMCOS state that the Presiding Judge in Initial Decision (II, III) correctly rejects NETOs' use of *Value Line* growth rates, and argue that the Commission invited use of alternative growth rate figures only when IBES growth rates are not available.[296]

127. NETOs state that the Presiding Judge in Initial Decision (II, III) erred in rejecting use of *Value Line* growth rates provided by Dr. Avera. NETOs assert that the Commission found in Opinion No. 531-B that it is inappropriate to use a "br + sv" short-

---

[291] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 55.

[292] CAPs Br. Opposing Exceptions (II, III) at 23-26.

[293] *Id.* at 26-36.

[294] EMCOS Initial Br. (I) at 35 (citing Briefing Order, 165 FERC ¶ 61,030 at P 48).

[295] *Id.* at 35.

[296] EMCOS Br. Opposing Exceptions (II, III) at 29-30.

term growth rate derived from *Value Line* data, not that it is inappropriate to use the *Value Line* earnings per share growth rate data. NETOs assert that Opinion No. 531-B is not relevant to the use of *Value Line* data here. Furthermore, NETOs state that the *Value Line* and IBES estimates are both short-term estimates and that no investor resource is more widely followed than *Value Line*.[297]

128. Trial Staff agrees with the Presiding Judge's exclusion of the *Value Line* growth rates in Initial Decision (II, III) but disagree with the Presiding Judge's reasoning. Trial Staff asserts that the rates offered by Dr. Avera are *Value Line* earnings per share growth rates, not "br + sv" growth rates. Trial Staff states that, nonetheless, *Value Line* growth rates are inappropriate as inputs in the Commission's DCF model because they are backward-looking and produce unreliable results, and are, furthermore, unnecessary when IBES growth rates are available. Trial Staff opposes NETOs' exception to this exclusion and characterize NETOs' assertion that the Commission has used these same *Value Line* growth rates in the past as inapposite, noting that the precedent NETOs cite is discussing "br + sv" growth rates based on *Value Line* data and not the earnings per share growth rates.[298]

129. Trial Staff states that there is substantial evidence documenting stale and inaccurate IBES growth projections, and therefore except to the Presiding Judge's rejection in Initial Decision (II, III) of their proposed criterion that companies that lack IBES growth rates less than 180 days old be excluded from the proxy group.[299] NETOs oppose Trial Staff's proposed test for stale IBES growth rates, contending that Opinion No. 531 conclusively rejected such tests for IBES data.[300] NETOs argue that, in Opinion No. 531, the Commission found that it is appropriate to use the most recent growth rate inputs available at the time of the analysis.[301]

### 3. <u>Commission Determination</u>

130. We affirm the Presiding Judge's use of IBES short-term growth rates in the DCF model, as well as the Presiding Judge's rejection of *Value Line* growth rates in Initial Decision (II, III). We maintain the longstanding practice of using IBES short-term growth rates for the DCF model, absent compelling reasons to use an alternative

---

[297] NETOs Br. on Exceptions (II, III) at 48-51.

[298] Trial Staff Br. Opposing Exceptions (II, III) at 28-34.

[299] *Id.* at 67-69.

[300] NETOs Br. Opposing Exceptions (II, III) at 97-98.

[301] *Id.* at 91-93.

source.[302] The record in this and numerous other prior proceedings illustrates that the IBES growth rates appropriately inform the DCF analysis.[303] As maintained in Opinion No. 569[304] and Opinion No. 569-A,[305] we continue to find that IBES is a reliable source of short-term growth rate data for the DCF model and that it is appropriate to continue to rely on IBES short-term growth rates in the DCF model given the Commission's longstanding practice of relying on those IBES short-term growth rates in the DCF model and the experience that entities coming before the Commission have gained in using IBES in the DCF model in light of that practice.

131. We agree with Trial Staff that the Presiding Judge's reason for excluding Dr. Avera's proposed *Value Line* growth rates was mistaken, even though the exclusion was correct. The rates that Dr. Avera included in his analysis are not based on the "br + sv" methodology, but rather are earnings per share growth rates that *Value Line* reports separately. Though we reject the use of such *Value Line* growth projections for the DCF in this proceeding, this finding is separate from past Commission determinations regarding the "br + sv" methodology.

132. Additionally, we reject Trial Staff's proposed test for stale IBES data. In Opinion No. 531, the Commission found that "it is appropriate to look to the most recent record evidence of the growth rates actually expected by the investment community."[306] We do not find that lack of growth rate updates in the last 180 days justifies removal of companies from the proxy group, so long as they are still followed by IBES.

## D. Long-Term Growth Projection

### 1. Background

133. In Opinion No. 531,[307] the Commission modified its policy to require that the DCF analysis used to determine public utility ROEs include a projection of the long-term

---

[302] *See, e.g.*, Opinion No. 569, 169 FERC ¶ 61,129 at P 133 ("[A]bsent compelling reasons why, we will continue to rely exclusively on IBES as the preferred source for short-term growth projections for the purpose of performing the DCF analysis.").

[303] *See, e.g.*, *id.* PP 120-33.

[304] Opinion No. 569, 169 FERC ¶ 61,129 at P 124.

[305] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 55.

[306] Opinion No. 531, 147 FERC ¶ 61,234 at P 88.

[307] *Id.* PP 32-40.

growth in dividends. The Commission also reopened the record in order to give participants an opportunity to present evidence concerning the appropriate long-term growth projection to be used for public utilities under the two-step DCF model.[308] In response, all participants agreed that estimated long-term growth in GDP is the appropriate growth rate to use as the long-term growth component of the two-step DCF model for public utilities, although NETOs suggested that a GDP growth estimate underestimates investors' expectations of growth for the public utility industry. In Opinion No. 531-A,[309] the Commission determined that the long-term growth projection should be based on the growth in GDP. The long-term growth projection was given one-third weight, with a short-term growth projection given two-thirds weight. No party sought rehearing of these holdings.

134. The Commission applied the 33% weighting of the long-term growth rate in Opinion No. 569 based on the rationale of Opinion No. 531.[310] In Opinion No. 569-A, the Commission set aside Opinion No. 569 to give the short-term growth rate 80% weighting and the long-term growth rate 20% weighting. The Commission explained that, since the Commission established its one-third weighting policy of the GDP in the long-term growth rate, short-term growth rate projections for electric utilities have declined and are now closer to the current GDP growth projection than those from the 1990s when the Commission adopted the two-step DCF using one-third weighting for GDP in the long-term growth rate for natural gas and oil pipelines that was subsequently adopted for public utilities.[311] The Commission noted that "average electric utility IBES growth projections are only marginally higher than GDP growth projections. . .[and] investors are likely to view electric utility IBES growth projections as more sustainable than the substantially higher natural gas pipeline IBES growth projections when the Commission established its two-thirds/one-third weighting policy.[312] In light of this, the Commission found that it is appropriate to consider the long-term growth rate to some extent, but that it is appropriate to now afford less influence to the long-term growth rate.[313] In Opinion No. 569-B, the Commission continued to find that it is appropriate to use 20% long-term growth rate weighting and 80% short-term growth rate weighting in

---

[308] *Id.* P 43.

[309] Opinion No. 531-A, 149 FERC ¶ 61,032 at P 10.

[310] Opinion No. 569, 169 FERC ¶ 61,129 at PP 151-59.

[311] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 57.

[312] *Id.* PP 57-58.

[313] *Id.* P 59.

the DCF analysis.[314] In *MISO TOs v. FERC*, the D.C. Circuit upheld this approach, explaining that "[i]n this proceeding, [the Commission] changed to a four-fifths-short-term versus one-fifth-long-term split . . . That was not arbitrary and capricious."[315]

135. In the Second, Third, and Fourth Complaint proceedings, the participants, including NETOs, all presented DCF studies that included long-term growth projections based on growth in GDP, and the Presiding Judges approved use of long-term growth projections based on growth in GDP. No party filed an exception to the Presiding Judges' findings on this issue.

### 2. <u>Briefs</u>

136. NETOs contend that the use of projected growth in GDP as the long-term growth projection in the two-step DCF model underestimates the long-term growth of electric utility earnings.[316] NETOs accordingly state that, in the future, the Commission should consider a long-term growth estimate other than GDP for the second step of the two-step DCF analysis. However, NETOs assert that they are not proposing that the Commission alter this aspect of its two-step DCF model in these four complaint proceedings.[317]

137. NETOs assert that long-term GDP growth rates understate investor expectations for electric utilities. NETOs contend that investors do not reference long-term GDP growth in evaluating expectations for individual utility industry stocks.[318] Instead, NETOs assert, investors tend to consider three-to-five-year earnings per share estimates.[319] NETOs argue that, for example, Value Line reports are routinely relied on as an important guide to apply the DCF model to utilities, but Value Line does not even mention trends in GDP in its evaluation of individual common stocks, indicating that long-term GDP growth rates are not discussed within the context of establishing investors' expectations for individual firms.[320] NETOs also contend that there is no

---

[314] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 80.

[315] *MISO TOs v. FERC*, 45 F.4th at 258.

[316] NETOs Initial Br. (I) at 49-52.

[317] *Id.* at 50 n.182.

[318] *Id.* at 50 n.185.

[319] *Id.* at 50-51.

[320] NETOs Reply Br. (I), McKenzie Reply Aff. at 23, 1:10; *see also* Ex. NET-900 at 14, 8:15 ("Value Line's singleness of purpose is to inform investors of the pertinent factors that impact future expectations specific to each of the common stocks it covers.

evidence in the record that electric utilities have reached a mature stage where their growth rates can be expected to converge with that of GDP.[321] In fact, NETOs argue, historical evidence in the record contradicts the presumption that electric utility growth rates converge to the GDP growth rate over the long run. Rather, NETOs argue, utilities can and do achieve long-term growth rates in excess of GDP.[322]

138. EMCOS' witness, Dr. Lesser, opposes NETOs' contention that the Commission should consider modifying the long-term growth projection used in the two-step DCF model. Dr. Lesser contends that no company can grow faster than the overall economy forever because, if it did, it would eventually become larger than the economy as a whole. Dr. Lesser states that that is an impossibility.[323] Dr. Lesser also points out that Dr. Morin states in his textbook, *New Regulatory Finance*, "It is useful to remember that eventually all company growth rates, especially utility service growth rates, converge to a level consistent with the growth rate of the aggregate economy."[324]

139. CAPs state that the Commission has a well-established method—two-stage application of the constant growth DCF model—for estimating the cost of equity for regulated utilities and has been applying that methodology for decades. CAPs argue that even NETOs agree that the DCF model has produced ROEs that were sufficient to attract capital for transmission investments.[325] CAPs contend that, as this proceeding is not a rulemaking, NETOs' request that the Commission should consider an "alternative proxy for estimated long-term growth that could be used in lieu of GDP forecasts," should not be entertained here. CAPs add that Dr. Woolridge shows that investors expect growth for all companies, including utilities, to converge to the GDP growth rate. According to CAPs, the Briefing Order recognizes that the constant-growth form of the DCF model encompasses blending near-term earnings per share growth and long-term estimates of GDP growth to arrive at a sustainable composite rate of dividend growth. CAPs argue

---

But despite the assumptions underlying the DCF model, Value Line does not mention 20-50 year trends in its evaluation of the firms in the electric utility industry. If the trajectory of GDP growth out to the year 2069 had direct relevance in investors' evaluation of electric utility common stocks, it would be logical to assume that Value Line or other securities analysts would routinely mention this fact.").

[321] *Id.* at 51.

[322] *Id.*

[323] EMCOS Initial Br. (II, III), Ex. EMC-0338 at 12, 55.

[324] *Id.* at 35, 36 (citing Morin at 308).

[325] CAPs Principal Reply Br. at 15.

that, consistent with the two-step, constant-growth formula, and contrary to NETOs' characterization, Dr. Woolridge has never supported using "unalloyed analyst estimates as a constant growth rate,"[326] and that Opinion No. 531 addressed the unsustainability of near-term analyst forecasts by blending analyst forecast growth with GDP-based sustainable growth to yield one growth estimate and implied equity cost per proxy company.[327] CAPs contend that the result continues to apply a constant growth form of the DCF model, but one in which the constant growth rate represents a weighted average of analyst-forecast near-term earnings growth and long-term GDP growth. CAPs assert that this blending is consistent with the DCF model's use of earnings growth projections to infer dividend growth, as from the outset, dividend growth blends near-term earnings growth with longer-term constraints.[328]

### 3. Commission Determination

140. For the reasons discussed below, we continue to require a long-term growth projection in the DCF analysis. We also adopt the 20% long-term growth rate weighting used in Opinion Nos. 569-A and 569-B[329] and affirmed in *MISO TOs v. FERC*.[330] Additionally, we find that NETOs have not provided a persuasive basis to modify our policy of using projected growth in GDP as the long-term growth projection in the two-step DCF model, although we do not foreclose parties in future proceedings from proposing alternative long-term growth projections.

141. As the Commission held in Opinion No. 531,

> The DCF model is based on the premise that an investment in common stock is worth the present value of the infinite stream of future dividends discounted at a market rate

---

[326] *Id.* at 17.

[327] *Id.* (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 77 ("The Commission adopted the two-step DCF methodology because, among other reasons, its incorporation of a long-term growth projection in the cost of equity calculation would have the effect of ascribing sustainable long-term growth to all members of a proxy group. Thus, the Commission's adoption of the two-step DCF methodology accomplishes what the use of the 'br + sv' formula was intended to accomplish.")) (internal citations omitted).

[328] *Id.* at 18 (citing CAPs Principal Initial Br. at 31-32).

[329] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 57; Opinion No. 569-B, 173 FERC ¶ 61,159 at P 80.

[330] *MISO TOs v. FERC*, 45 F.4th at 258.

> commensurate with the investment's risk.[331] Corporations have indefinite lives and therefore will pay dividends for an indefinite period. For that reason, the Commission stated as long ago as 1983, when it first adopted the constant growth DCF model for gas pipeline cases, that 'projections by investment advisory services of growth for relatively short periods of years into the future' cannot be relied on 'without further consideration.' Thus, as the Commission held in *Ozark*, the constant growth DCF model requires consideration of long-term growth projections.[332]

142. In Opinion No. 569-A, the Commission observed that short-term growth rate projections for electric utilities were closer to GDP growth projections than those from the 1990s when the Commission adopted the two-step DCF using one-third weighting for GDP in the long-term growth rate. Additionally, the Commission noted that, when IBES growth projections are only marginally higher than GDP projections, investors are likely to view those rates as more sustainable than the substantially higher natural gas pipeline IBES growth projections when the Commission established its two-thirds/one-third weighting policy. Therefore, the Commission found it was reasonable to reduce the long-term growth rate's weighting from one-third to 20%.[333] The same reasoning applies here. As the court held in *CAPP v. FERC*,[334] the Commission has broad discretion in its weighting choice.[335] Since the Commission established its one-third weighting policy of the GDP in the long-term growth rate, short-term growth rate projections for electric utilities have declined and are now closer to the current GDP growth projection than those from the 1990s when the Commission adopted the two-step DCF using one-third weighting for GDP in the long-term growth rate for natural gas and oil pipelines[336] that

---

[331] As the Commission explained, "[t]he DCF model assumes growth for an infinite period of time. This can be approximated as 50 years because the present value of a one-dollar dividend received 50 years in the future, discounted at 12%, is less than one cent." *Ozark Gas Transmission Sys.*, 68 FERC ¶ at 61,032, 61,105 n.32 (1994) (citing MICHAEL C. EHRHARDT & EUGENE F. BRIGHAM, FINANCIAL MANAGEMENT: THEORY AND PRACTICE 291 (13th ed. 2011)).

[332] Opinion No. 531, 147 FERC ¶ 61,234 at P 33 (quoting *Consol. Gas Supply Corp.*, 24 FERC ¶ 61,046, at 61,105 (1983)) (footnotes omitted).

[333] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 57-58.

[334] 254 F.3d 289 (D.C. Cir. 2001).

[335] *Id.* at 297.

[336] For example, *N.Y. State Elec. & Gas Corp.*, 85 FERC ¶ 63,002 (1998). In

was subsequently adopted for public utilities.[337] Therefore, it is reasonable to give the IBES growth projection more weight and give the GDP growth projection less weight. As Opinion No. 569-A noted, this is consistent with Opinion No. 414-A's findings that "long-term projections are inherently more difficult to make, and thus are less reliable than short-term projections."[338] The court in *MISO TOs v. FERC* further explained that "the normalizing value of long-term rates has declined as the short-term and long-term projections have converged. So as the importance of long-term rates has declined, [the Commission] decided that their role in the [DCF] analysis should too. That was not arbitrary and capricious."[339] We make the same finding here.

143. NETOs do not oppose the Commission's policy of requiring a long-term growth projection as part of the two-step DCF model. Nor do they oppose use of projected growth in GDP as the long-term growth projection in these proceedings. Nevertheless, citing testimony provided by their witnesses during the paper hearing established by Opinion No. 531 on the appropriate long-term growth projection and during the hearings in the Second, Third, and Fourth Complaint proceedings, NETOs suggest that long-term GDP growth rates understate investor expectations for electric utilities. Accordingly, they ask the Commission to consider alternative long-term growth projections in future proceedings.

144. We will not foreclose any participant in a future proceeding concerning public utility ROEs from proposing a long-term growth projection not based on GDP. However, NETOs have not provided sufficient evidence in these proceedings that would support a finding that the long-term growth projection used in the two-step DCF analysis of public utilities should be something other than estimated long-term growth in GDP. NETOs first argue that "investors do not reference long-term GDP growth in evaluating expectations for individual electric utility industry common stocks."[340] In support of this assertion, they cite testimony by their witnesses that the financial media, including *Value Line*, contain many forecasts of earnings per share over the next three-to-five years, but

---

Footnote 22, the Initial Order references a GDP growth rate of 5.08%, which was an average of three estimates: 5.1% from Data Resources Inc., 4.95% from Wharton Econometric Forecasting Associates, Inc., and 5.2% from the Energy Information Administration.

[337] *See* Opinion No. 531, 147 FERC ¶ 61,234 at PP 17-23, 32.

[338] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 58 (citing *Transcon. Gas Pipe Line Corp.*, Opinion No. 414-A, 84 FERC ¶ 61,084, at 61,423 (1998)).

[339] *MISO TOs v. FERC*, 45 F.4th at 258.

[340] NETOs Initial Br. (I) at 50.

very few references to long-term GDP forecasts; nor are there any long-term growth forecasts for individual companies or the electric utility industry generally.[341] NETOs suggest that, if the trajectory of long-term GDP growth had direct relevance to investors' evaluation of electric utility common stocks, it would be logical to assume that *Value Line* or other securities analysts would routinely mention long-term GDP forecasts, but they do not.[342]

145. We do not find NETOs' assertions concerning the type of information reported in publications such as *Value Line* to provide persuasive support for modifying our policy of using estimated long-term growth in GDP for the long-term growth estimate in the two-step DCF analysis. Additionally, we note that GDP estimates are readily available from public sources, such as the Social Security Administration. The lack of such information published by IBES or *Value Line* thus is not indicative of whether investors use such information. That is because those assertions do not directly address how those investors who use DCF analyses to inform their investment decisions actually conduct their DCF analyses and what long-term growth projection such investors use. In Opinion No. 569, the Commission explained that, in order to determine what ROE a utility must offer in order to induce investors to invest in the utility, "we must look to the *methods investors actually use* to analyze and compare their investment opportunities."[343] It follows that the DCF analysis we use in making our ROE decisions should reflect the type of DCF analysis that sophisticated investors, such as major investment houses, actually use to inform their investment decisions.[344] The mere fact that investors who do not rely on a DCF analysis when making investment decisions may consider growth only over the next three to five years is not probative for the purpose of showing what growth projection should be used in a DCF analysis. For that purpose, the most relevant evidence is what type of long-term growth projection those investors who do conduct DCF analyses use in their DCF analyses.

146. In fact, when the Commission first established its policy of using projected growth in GDP as the long-term growth projection in the two-step DCF model, the Commission relied heavily on evidence as to how two major investment houses, Merrill Lynch and Prudential-Bache, conducted DCF analyses. The Commission originally adopted GDP as the long-term growth projection in two natural gas pipeline rate cases involving

---

[341] *See e.g.*, Ex. NETO-900 (I) at 13-14; Ex. NETO-2200 (IV) at 128-29.

[342] Ex. NET-900 (I) at 14.

[343] Opinion No. 569, 169 FERC ¶ 61,129 at P 171 (emphasis added).

[344] *See id.* P 153 ("MISO TOs fail to counter evidence that sophisticated investors do in fact consider long-term economic trends, including long-term growth in GDP, when estimating the future growth in earnings or dividends.").

Northwest Pipeline Corp.[345] and Williston Basin Interstate Pipeline.[346] In both those cases, the record showed that Merrill Lynch and Prudential-Bache used a three-stage DCF analysis, where Stage 1 is a five-year near term estimate, Stage 2 is the transition to maturity, and Stage 3 is the steady state or long-term growth rate of the economy as a whole. With regard to the Stage 3 long-term growth projection, the record showed that,

> Merrill Lynch and Prudential-Bache do not attempt to make long-term growth projections for specific industries or companies in doing DCF analyses. Instead they use the long-term growth of the United States economy as a whole as the long-term growth figure for all firms, including regulated firms in the gas business.[347]

147. In relying on this evidence to require use of projected growth in GDP in the two-step DCF model, the Commission recognized that its two-step constant growth DCF model differs from the multi-stage DCF analysis used by the investment houses.[348] However, the Commission determined not to use the investment house approach because the calculations are far more involved, requiring the exercise of subjective judgment on such issues as how long the Stage 2 transition to maturity will last. The Commission explained that an investment analyst attempting to predict the future course of a firm's business has an incentive to make the best assessment possible so that its clients will make a wise investment decision. However, the Commission stated,

> such predictions of the future are not well-suited to litigation where the witness for each party is likely to choose from among reasonable alternatives, those data and methodologies that most favor his or her client's financial interest, and there are not objective criteria for the Commission to make distinctions between what will be the equally well reasoned

---

[345] *Nw. Pipeline Corp.*, Order No. 396, 71 FERC ¶ 61,253 (1995), *order on reh'g remanding issue*, Opinion No. 396-A, 76 FERC ¶ 61,068 (1996), Opinion No. 396-B, 79 FERC ¶ 61,309, *reh'g denied*, Opinion No. 396-C, 81 FERC ¶ 61,306 (1997).

[346] *Williston Basin Interstate Pipeline Co.*, 72 FERC ¶ 61,074 (1995), *order on reh'g remanding issue*, 76 FERC ¶ 61,066 (1996); 79 FERC ¶ 61,311 (*Williston*), *reh'g denied*, 81 FERC ¶ 61,033 (1997).

[347] Opinion No. 396-B, 79 FERC at 62,382; *Williston*, 79 FERC at 62,389.

[348] Opinion No. 396-B, 79 FERC at 62,383; *Williston*, 79 FERC at 62,390.

> and well-supported judgments of the equally well credentialed experts.[349]

The D.C. Circuit affirmed the Commission's decision in *Williston* to require a long-term growth projection based on growth in GDP, noting among other things that "the testimony adduced at the hearing demonstrated that major investment houses used an economy-wide approach in projecting long-term growth."[350]

148. In subsequent cases reaffirming the Commission's policy of requiring a long-term growth projection based on GDP, the Commission continued to emphasize the major investment houses' use of an economy-wide approach.[351] Moreover, when the Commission held that the long-term growth projection to be used in a DCF analysis of natural gas and oil pipeline MLPs should be one-half the projected growth in GDP, the Commission similarly relied on evidence concerning how three investment houses, Wachovia, Merrill Lynch, and Citigroup, conducted DCF analyses of MLPs.[352] Further, in rejecting a later proposal by a pipeline to use a higher growth rate in the DCF analysis of an MLP, the Commission pointed out that the pipeline had not submitted any new reports by investment houses or other investor advisory services projecting higher long-term growth rates for MLPs than the Commission used, despite being afforded the opportunity to do so.[353]

---

[349] Opinion No. 396-B, 79 FERC at 62,384; *Williston*, 79 FERC at 62,390.

[350] *Williston Basin Interstate Pipeline v. FERC*, 165 F.3d 54, 64 (D.C. Cir. 1999). The court remanded several other issues, including whether to modify the weighting of the short and long-term growth projections from 50/50 to two-thirds/one-third and what estimate of GDP to use.

[351] *Transcontinental Gas Pipe Line*, 90 FERC ¶ 61,279, at 61,933-34 (2000); *Williston Basin Interstate Pipeline Co.*, 87 FERC ¶ 61,264, at 62,003-05 (1999); Opinion No. 414-A, 84 FERC at 61,425; *Mojave Pipeline Co.*, 81 FERC ¶ 61,150, at 61,686-87 (1997).

[352] *Kern River Gas Transmission Co.*, Opinion No. 486-B, 126 FERC ¶ 61,034, at PP 125-28 (2009); *Composition of Proxy Grps. for Determining Gas & Oil Pipeline Return on Equity Proxy Grp. Pol'y Statement*, 123 FERC ¶ 61,048, at PP 88-91 (2008) (*Proxy Group Policy Statement*) ("[I]t is appropriate for the Commission to use growth estimates that reflect the investment houses' view of what investors should realistically expect from an investment in an MLP.").

[353] *El Paso Nat. Gas Co.*, 154 FERC ¶ 61,120, at P 282 (2016).

149. Accordingly, if a participant in a future proceeding proposes to use a long-term growth projection based on something other than GDP, we would expect it to provide evidence that at least some investment houses or other investment advisory services at that time use a similar long-term growth projection in their DCF analyses of public utilities.[354] NETOs have not presented evidence in any of the four complaint proceedings concerning the long-term growth projections that investment houses or other investor advisory services currently use in their DCF analyses. We note that NETOs' witness, Mr. John Quackenbush, who worked at UBS Global Asset Management (UBS) from 2001 to 2011, stated in his affidavit in support of NETOs' reply brief that "all UBS analysts covering different industries used a specific type of multi-stage DCF model."[355] As described above, a multi-stage DCF model by definition includes a long-term growth projection. Thus, although Mr. Quackenbush did not specify what long-term growth projection UBS used for the terminal growth stage of its multi-stage DCF analysis, it does appear that UBS includes a long-term growth projection in its DCF analysis. Mr. Quackenbush also did not provide evidence as to what long-term growth rate any other investment advisory firm uses in its DCF analyses.

150. NETOs' various other contentions do not provide a persuasive basis for us to depart from our policy of requiring that a DCF analysis include a long-term growth projection based on GDP. For example, NETOs cite a 1974 article by Myron Gordon arguing that analysts' short-term growth projections may be used without reference to a longer-term projection,[356] However, more recent academic works support inclusion of a long-term growth projection based on GDP. For example, in *New Regulatory Finance*, Dr. Morin recognizes that there is a growing consensus that security analysts' growth projections are "the best place to start" in projecting growth in dividends. Nevertheless, Dr. Morin continues,

> The problem is that from the standpoint of the DCF model that extends into perpetuity, analysts' horizons are too short, typically five years. It is often unrealistic for such growth to continue into perpetuity. A transition must occur between the first stage of growth forecast by analysts for the first five years and the company's long-term sustainable growth rate. . . . *It is useful to remember that eventually all company*

---

[354] We also note that the Commission has stated that it places greater weight on publications issued by investment houses in order to provide advice to investors, than on publications that appear more in the nature of advocacy concerning the outcome of a Commission proceeding. *Id.* P 281.

[355] NETOs Reply Br. (I), Quackenbush Reply Aff. at 10.

[356] Ex. NET-2200 (IV) at 137-38.

> *growth rates, especially utility service growth rates, converge to a level consistent with the growth rate of the aggregate economy.*[357]

Dr. Morin goes on to state that one way to account for the two stages of growth is to adopt a blended growth rate as the Commission does.[358]

151. Despite recognizing that the underlying theory of the DCF model requires a long-term growth projection, NETOs assert that, as a practical matter, investors rely solely on short-term growth projections, such as the IBES three-to-five-year growth projections, and that investors do not expect utility growth rates to ultimately converge to a level around the long-term growth in GDP. However, sophisticated investors, including investment houses, do in fact consider long-term economic trends, including long-term growth in GDP, when estimating future growth in earnings or dividends. For example, Warren Buffet has made clear that he expects firms' long-term earnings growth to be limited by GDP growth, stating,

> You know, someone once told me that New York has more lawyers than people. I think that's the same fellow who thinks profits will become larger than GDP. When you begin to expect the growth of a component factor to forever outpace that of the aggregate, you get into certain mathematical problems.[359]

152. NETOs also point to certain historical data concerning public utilities which they argue show that projections of GDP growth fall below investors' long-term expectations for electric utilities. First, NETOs assert that the actual historical growth rates for certain individual firms which Opinion No. 531 included in the proxy group in the first complaint proceeding demonstrate that GDP does not constrain the growth in earnings of electric utilities. NETOs state *Value Line* reports from May and June 2014 showed that six proxy group companies had earnings per share growth rates over the previous

---

[357] Morin at 308 (emphasis added).

[358] *Id.* at 309. In MICHAEL C. EHARDT, ET AL., CORPORATE FINANCE, A FOCUSED APPROACH 279 (4th ed. 2010), Ehrhardt and Brigham also state that "dividend growth for most mature firms is generally expected to continue in the future at about the same rate as nominal gross domestic product (real GDP plus inflation)," and discuss a blended approach for determining the growth projection for the constant growth DCF model when the short-term growth projection is unsustainable. *Id.* at 324.

[359] Carol Loomis, *Mr. Buffet on the Stock Market*, Fortune (Nov. 22, 1999).

10 years of 6.5% to 11%.[360] NETOs also asserted in the Fourth Complaint proceeding that *Value Line* reports from February and December 2017 showed that three electric utilities had earnings per share growth rate over the previous 10 years of 7.5% to 9.5%.[361] NETOs state that these growth rates indicate that utilities can and do achieve growth over extended periods in excess of GDP growth. NETOs point to the proxy group companies featuring the highest growth rates, while the growth rates of the overall proxy group contradict their position.

153. In any event, the fact that some electric utilities may maintain earnings growth in excess of GDP growth for periods of 10 years or more is consistent with the Commission's two-step DCF model. As the Commission has previously explained, our two-step DCF model does not assume that an electric utility's growth rate will immediately drop to the GDP growth rate following the period of the IBES short-term growth projection. While we find that it is appropriate to continue to include a long-term growth projection based on GDP in the DCF analysis, as described in this order and Opinion No. 569-A, we recognize that changes since the Commission adopted the two-step DCF using one-third weighting for GDP in the long-term growth rate warrant giving the short-term growth rate projections a greater weight—80%—and the long-term growth projection less weight—20%. The 80% short-term growth rate weighting and 20% long-term growth rate weighting used here and in Opinion No. 569-A is the equivalent in a 50-year model of averaging 40 years at the higher short-term growth rate and 10 years at the lower long-term growth rate. Therefore, some electric utilities may have earnings growth in excess of the growth in GDP for periods of 10 years or more is consistent with our holding that GDP is appropriate as a long-term growth rate given 20% weight.

154. Second, NETOs cite data concerning the average *Value Line* projected earnings per share growth rates for the firms in *Value Line*'s electric utility industry groups in 1984, 1994, 2004 and 2014.[362] Those growth rates averaged 5.14% in 1984, 3.57% in 1994, 3.45% in 2004, and 5.37% in 2014. NETOs point out that average electric utility projected earnings per share were higher in 2014 than in either 1994 or 2004. They also state that the 5.37% average earnings per share growth rate in 2014 exceeds the 4.39% GDP growth estimate that the Commission adopted in the First Complaint proceeding for the fourth quarter of 2012. NETOs argue that these facts show that electric utility earnings per share have not trended towards GDP growth, contrary to the assumption underlying the two-step DCF model that over the long-term company earnings per share will decline to the level of GDP growth.

---

[360] Ex. NET-900 (I) at 14-15.

[361] Ex. NET-2200 (IV) at 133-34.

[362] Ex. NET-900 (I) at 15-17.

155. NETOs' reliance on the 1984, 1994, 2004, and 2014 average *Value Line* projected earnings per share growth rate figures does not undermine our policy of requiring a long-term growth projection based on GDP in the two-step DCF model. We first observe that the projected earnings per share growth rates cited by NETOs for 1994 and 2004 are in fact below the contemporaneous long-term projected GDP growth rates. For example, in the Opinion No. 396-B proceeding, the Commission adopted a long-term GDP growth projection of 6.39% based on evidence submitted in August 1996,[363] and, in the *Williston* rate case, the Commission adopted a long-term GDP growth projection of 5.85% also based on evidence submitted in August 1996.[364] These GDP growth projections from the mid-1990s are substantially higher than the 1994 *Value Line* average projection of 3.57% earnings per share growth for electric utilities. Similarly, in Opinion No. 486-B, the Commission adopted a long-term GDP growth projection of 5.36% for the year 2004.[365] Again, this GDP growth percentage is substantially higher than the contemporaneous 2004 *Value Line* average projection of 3.45% earnings per share growth for electric utilities. That *Value Line* projected that the average earnings growth rate for electric utilities in 1994 and 2004 would be *less than* the contemporaneous projections of growth in GDP hardly supports a finding that investors would project that over a long-term period of 30 to 50 years electric utilities should be expected to have earnings per share growth substantially in excess of GDP growth.

156. We recognize that *Value Line's* 2014 projection of average electric utility earnings per share growth of 5.37% exceeds the 4.39% GDP growth estimate the Commission adopted in the First Complaint for the fourth quarter of 2012. However, we reject NETOs' contention that this fact undermines the Commission's policy of requiring a long-term growth projection based on growth in GDP. NETOs allege that our policy is based on an assumption that, once a company reaches a mature state, its growth will decline to the average growth of the economy as a whole and continue to grow at precisely that rate indefinitely into the future. From that assumption, NETOs argue that the fact the 2014 average *Value Line* projection of growth in electric utility earnings is higher than the similar average electric utility growth projections for 1984, 1994, and 2004 demonstrates that the Commission is wrong to require a long-term growth projection based on GDP growth.

157. However, we do not assume that mature companies will grow at precisely the same rate as the economy as a whole, without any variation for short-term business developments unique to a particular industry or company. Rather, our policy is based on the assumption that, over the long-term, mature companies will have *average* growth

---

[363] Opinion No. 396-B, 79 FERC at 62,385.

[364] *Williston*, 79 FERC at 62,390.

[365] Opinion No. 486-B, 126 FERC ¶ 61,034 at P 126.

rates roughly equal to the growth of the economy as a whole, taking into account periods of growth both somewhat above and somewhat below the growth of the economy as a whole. As the Commission stated in Opinion No. 531, "*Over the long-run*, a regulated firm may reasonably be expected to grow at the rate of the average firm in the economy; growth either significantly above or below the growth of the economy as a whole is unlikely to continue indefinitely."[366] The fact that short term growth rates are approximately equal to GDP growth projections in a given period does not disprove the need to include a long-term growth projection in the DCF methodology.

158. NETOs also argue that investors can reasonably expect public utilities to have earnings and dividend growth in excess of GDP because of their increased need to make capital investments, pointing to several reports that public utility capital expenditures are expected to increase.[367] NETOs' reliance on these reports is unavailing. These reports

---

[366] Opinion No. 531, 147 FERC ¶ 61,234 at P 40 (emphasis added). Though NETOs note that certain short-term growth rates in the First Complaint proceeding are near the GDP growth estimate of that proceeding, we do not believe that this disproves the need for including a GDP estimate in the DCF methodology. Ex. NET-2903 (IV) at 2.

[367] For example, in the First Complaint proceeding, NETOs cite a 2011 S&P report, stating that electric transmission providers "plan to spend more than $75 billion over the next several years." Ex. NET-900 (I) at 18 (citing Standard & Poor's Corporation, *Federal Policies are Buoying Transmission Spending for U.S. Electric Utilities*, RatingsXpress, May 10, 2011). NETOs also cite a 2012 S&P report, stating among other things, "[o]ver the past five years, the transmission sector's compound annual growth rate for capital investment has exceeded 10% and we expect transmission capital investments for 2012 to exceed $13 billion." *Id.* (citing Standard & Poor's Corporation, *U.S. Utilities' Capital Spending is Rising, and Cost Recovery is Vital*, RatingsDirect, May 14, 2012). In addition, NETOs cite a 2014 forecast by the Edison Electric Institute regarding members' new transmission investments, showing increasing investments during the previous six years (2007-2012) and a further increase from $14.768 billion in 2012 to $17.464 billion in 2013, followed by a slow decline from 2014 to 2016. Ex. NET-900 (I) at 19-20 (citing Edison Electric Institute, *Transmission Capital Budget & Forecast Survey*, Edison Electric Institute (May 2014)). Similarly, in the Fourth Complaint proceeding, NETOs cite a letter by the President of EEI stating, "[t]he improved credit quality greatly supports the continued surge in capital expenditures, which rose by $7.2 billion, or 7.5%, to a new record high of $103.3 billion in 2015." Ex. NET-2200 (IV) at 134 (citing Thomas R. Kuhn, *President's Letter*, Edison Electric Institute 2015 Financial Review (March 2016)). NETOs also cite an S&P report, stating that "S&P Global Market Intelligence foresees continued high levels of capital spending by the industry, both on regulated and unregulated investment. Regulated capital spending includes spending on infrastructure replacement, new transmission and

relate to the public utilities' capital spending in the relatively near future, a time frame during which, as discussed in the preceding paragraph, the two-step DCF model assumes growth consistent with the IBES growth projection. Therefore, these reports do not undercut the underlying rationale of the two-step DCF model that firms cannot grow faster than GDP over the indefinite long-term.

159. NETOs also seek to distinguish electric utilities from natural gas pipelines with respect to the need for a long-term growth projection. They assert that, when the Commission adopted the two-step DCF model for natural gas pipelines in the mid-1990s, the Commission was concerned that the IBES growth projections for natural gas pipelines were at a very high level, because the natural gas pipeline industry was recovering from a deterioration in earnings resulting from the collapse in oil prices and changes in the regulatory framework.[368] NETOs argue that, by contrast, the electric utility industry is relatively stable and mature and the IBES short-term growth projections of electric utilities are not atypically high. Opinion No. 531 recognized that the IBES growth projections of electric utilities reflect a different pattern from those of natural gas and oil pipelines. Although pipeline IBES growth projections are consistently higher than the long-term growth of GDP, that is not true of electric utilities.[369]

160. We agree that there is a distinction to be made between electric utilities and natural gas pipelines with respect to the need for a long-term growth projection. As the Commission explained in Opinion No. 569-A, since the Commission established its one-third weighting policy of the GDP in the long-term growth rate, short-term growth rate projections for electric utilities have declined and are now closer to the current GDP growth projection than those from the 1990s when the Commission adopted the two-step DCF using one-third weighting for GDP in the long-term growth rate for natural gas and oil pipelines that was subsequently adopted for public utilities.[370] The Commission further stated that average electric utility IBES growth projections are only marginally higher than GDP growth projections and found that, under these circumstances, investors are likely to view electric utility IBES growth projections as more sustainable than the

---

distribution facilities and lines, and regulated power plants, including new nuclear units currently under construction." *Id.* at 135 (citing Standard & Poor's Corporation, *Industry Surveys, Electric Utilities* (Feb. 2016)).

[368] *Id.* at 130-31 (citing Opinion No. 396-C, 81 FERC at 61,197).

[369] Opinion No. 531, 147 FERC ¶ 61,234 at P 30 (citing *S. Cal. Edison Co.*, Opinion No. 445, 92 FERC ¶ 61,070, at 61,261 (2000)).

[370] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 57.

substantially higher natural gas pipeline IBES growth projections when the Commission established its two-thirds/one-third weighting policy.

161. Under these circumstances, investors are likely to view electric utility IBES growth projections as more sustainable than the substantially higher natural gas pipeline IBES growth projections when the Commission established its two-thirds/one-third weighting policy. Therefore, it is reasonable to give the IBES growth projection more weight and give the GDP growth projection less weight. This finding is consistent with Opinion No. 414-A's findings that "long-term projections are inherently more difficult to make, and thus are less reliable than short-term projections,"[371] and that, accordingly, it is appropriate to reduce the weighting of the long-term growth rate to 20% and increase the weighting of the short-term growth rate to 80%.[372] We find that this is also appropriate in these proceedings and therefore, we still consider the long-term growth rate but give it a reduced weighting of 20% in the two-step DCF analysis. We note that the court in *CAPP v. FERC*[373] held that the Commission has broad discretion in its weighting choice, which the Commission supported in Opinion No. 569-A and applied here as well. Moreover, the court in *MISO TOs v. FERC* affirmed the Commission's decision to give the short-term growth rate 80% weighting and the long-term growth rate 20% weighting, explaining that "the normalizing value of long-term rates has declined as the short-term and long-term projections have converged. So as the importance of long-term rates has declined, [the Commission] decided that their role in the [DCF] analysis should too. That was not arbitrary and capricious."[374]

---

[371] Opinion No. 414-A, 84 FERC at 61,423.

[372] *See Inquiry Regarding the Comm'n's Pol'y for Determining Return on Equity*, 171 FERC ¶ 61,155, at P 31 (2020) ("The D.C. Circuit has recognized that the Commission has discretion regarding its growth projection weighting choices. Although the Commission is reducing the weighting of the long-term growth projection in public utility proceedings to one-fifth, we find that distinctions between public utilities and natural gas and oil pipelines support exercising this discretion to continue affording one-third weighting to the long-term growth projections in our analyses of pipeline ROEs." (citations omitted)).

[373] 254 F.3d 289 (D.C. Cir. 2001).

[374] *MISO TOs v. FERC*, 45 F.4th at 258.

## VII. Expected Earnings Model

### A. Background

162. A comparable earnings analysis is a methodology of calculating the earnings that an investor expects to receive on the book value of a particular stock. The analysis can be either backward looking using the company's historical earnings on book value, as reflected on the company's accounting statements, or forward-looking using estimates of earnings on book value, as reflected in analysts' earnings forecasts for the company. The latter approach is often referred to as an "Expected Earnings analysis." The Expected Earnings model provides an accounting-based approach that uses investment analyst estimates of return (net earnings) on book value (the equity portion of a company's overall capital, excluding long-term debt).

163. In Opinion No. 531, the Commission found that the results of NETOs' Expected Earnings analysis, in addition to other alternative models, corroborated its determination that NETOs should be awarded an ROE above the midpoint of the zone of reasonableness produced by the DCF analysis.[375]

164. The Commission stated that the Expected Earnings model is closely related to the comparable earnings standard in *Hope* and is used by investors to estimate future earnings. Thus, the Commission concluded the Expected Earnings model can be used to validate ROEs and found that the record evidence affirmed the setting of the ROE above the midpoint.[376]

165. In Opinion No. 531-B, the Commission reaffirmed the appropriateness of the Expected Earnings model. It stated that returns on book equity help investors determine the opportunity cost of investing in that particular utility instead of other companies of comparable risk. As a result, it found that an Expected Earnings analysis can be useful for corroborating whether the results produced by the DCF model may have been skewed by the anomalous capital market conditions.[377]

---

[375] Opinion No. 531, 147 FERC ¶ 61,234 at P 146.

[376] *Id*. P 147.

[377] Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 128-29.

166. In the Briefing Order, the Commission included the Expected Earnings model in the list of alternative models to the DCF whose composite zones of reasonableness could be averaged with the DCF to determine the ROE.[378]

167. On November 21, 2019, the Commission issued Opinion No. 569 in which it applied a revised methodology for analyzing existing base ROEs under FPA section 206. The revised methodology applied in Opinion No. 569 did not use the Expected Earnings or Risk Premium models, as proposed in the Briefing Order, and instead used only the two-step DCF model and CAPM (where both were equally weighted) in the Commission's determinations under the first and second prongs of section 206.[379] The Commission determined that it was not appropriate to use the Expected Earnings model for determination of ROEs, for either the first or second prong of section 206 analyses.[380]

168. In Opinion No. 569, the Commission found that the record did not support departing from the traditional use of market-based approaches to determine base ROE. It found that investors typically do not have the opportunity to invest in an enterprise at its book value. Accordingly, the Commission deemed it appropriate to exclude the Expected Earnings model, which relies on an enterprise's book value instead of the market value.[381]

169. The Commission explained that the return on book value is not indicative of the return that an *investor* requires to invest in the utility's equity or what return an investor receives on the equity investment, because those returns are determined with respect to the current market price that an investor must pay in order to invest in the equity.[382] Specifically, the Commission found that the Expected Earnings model measures returns on book value, without consideration of what market price an investor would have to pay to invest in the relevant company, so it does not accurately measure the investor's expected returns on its investment, and, therefore, has been "thoroughly discredited."[383] In other words, the return on book value does not reflect "the return to the equity owner" that we must ensure is "commensurate with returns on investments in other enterprises," as *Hope* requires; therefore, the Commission found that this model is not useful in

---

[378] Briefing Order, 165 FERC ¶ 61,030 at P 30.

[379] Opinion No. 569, 169 FERC ¶ 61,129 at P 201

[380] *Id*. P 33.

[381] *See id.* PP 200-03.

[382] Opinion No. 569, 169 FERC ¶ 61,129 at P 202.

[383] *Id.* PP 205, 221.

ensuring that these standards are satisfied.[384] Furthermore, the Commission found that there was insufficient record evidence to conclude that investors rely on the Expected Earnings analysis to estimate the opportunity cost of investing in a particular utility.[385]

170. In addition, the Commission stated that, while the Expected Earnings model does not involve the same complexities as market-based approaches, this is because it does not reflect a utility's cost of equity. The Commission explained that the Expected Earnings model is simpler because it does not consider the market price that an investor must pay to make its investment and other factors such as projected growth rates for the subject utility.[386] The Commission also noted that applying the Expected Earnings model in the cost-of-service context would lead to illogical results because a company in such a context would receive a higher overall return when it features a higher equity ratio, despite this indicating a lower risk (and thereby indicating a lower required rate of return by investors) than a company featuring a lower equity ratio. Similarly, the Commission explained that, even though companies with more depreciated assets are generally of lower risk and therefore would merit a lower return, the Expected Earnings model would instead provide higher returns to such companies.[387]

171. The Commission considered the disadvantages and advantages of the Expected Earnings model and concluded that, on balance, the disadvantages of that approach outweigh its advantages.[388]

172. In Opinion No. 569-A, the Commission continued to find that it was appropriate to exclude the Expected Earnings model from its base ROE analysis.[389] The Commission continued to find a lack of evidence that supports investors' use of earnings per book value data to directly value equities, determine the cost of equity, or make investment decisions without consideration of the market price of the relevant equities. The Commission found that, as it concluded in Opinion No. 569, investors cannot use the Expected Earnings model to directly determine the return they would earn from purchasing a company's stock because the return estimated by that model is a return on the company's book value, not a return on the current stock price that the investor must

---

[384] *Id.* PP 202, 221-22.

[385] *Id.* P 210.

[386] *Id.* PP 203-04.

[387] *Id*. PP 223-24.

[388] *See, e.g.*, *id.* PP 200, 209.

[389] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 125-26.

pay in order to invest in the company. The Commission explained that, therefore, the returns estimated by the Expected Earnings model are divorced from the returns required by investors because investors cannot purchase a company's stock at its book value (except in the very rare instance where a utility's market capitalization happens to exactly equal its book value).[390] The Commission further stated that the decision to exclude the Expected Earnings model from the base ROE analysis is consistent with the Commission's prior consideration of the Expected Earnings model because there, the Expected Earnings model was considered only as corroborative evidence and not used as a direct input in the Commission's ROE calculations. The Commission noted that more convincing evidence is required to justify using the Expected Earnings model as such a direct input.[391]

173. The Commission also reaffirmed the decision in Opinion No. 569 that the Expected Earnings model does not measure returns required by investors. Specifically, since the 1980s, the Commission has rejected the use of returns on book value in determining the cost of equity and has emphasized the importance of incorporating the market cost of equity when estimating ROEs because the market price is what investors must pay when making an investment and therefore is the basis on which investors measure the return on their investment.[392]

174. The Commission also maintained that, just because the Expected Earnings model avoids the complexities, controversies, and limitations of market-based methods as well as provides a unique, non-market-based perspective and increases model diversity, it is not appropriate to include the Expected Earnings model in the base ROE calculation when the model is fatally flawed. The Commission found that the returns on investment received depend on the market price that investors must pay to make their investment, which the accounting-based Expected Earnings model does not consider.[393]

175. Finally, the Commission reaffirmed its decision in Opinion No. 569 to exclude the Expected Earnings model as a direct input in the calculation of the base ROE because this scenario is significantly different from using the Expected Earnings model as corroborative evidence. Furthermore, the Commission noted that Opinion No. 531, whose logic and methodology the Commission adopted in Opinion No. 551, was vacated

---

[390] *Id.* PP 125-27.

[391] *Id.* P 131.

[392] *Id.* P 128.

[393] *Id.* P 129.

by the court, such that neither constitutes binding precedent.[394] However, the Commission did not necessarily foreclose its use in future proceedings if parties can demonstrate that the concerns discussed above have been addressed.[395]

### B. Briefs

176. CAPs contend that the Expected Earnings model does not measure the cost of equity and references expected accounting returns on book value equity. CAPs argue that the Briefing Order's reference to investors' opportunity costs is divorced from any actual opportunity that is available to investors and there is no substantial evidence for the Briefing Order's conclusory assertion that investors rely on analyses of earnings per book equity. CAPs contend that the expected earnings to book equity ratio does not reflect markets' dynamic response to changing interest rate conditions.[396] CAPs state that the relationship between risk and expected earnings is the inverse of the market relationship between risk and reward, which they contend is a further indication that Expected Earnings model is not well correlated to the cost of equity.[397] CAPs agree with Commission Opinion No. 429 that a methodology based on earnings divided by book value equity is not a market-oriented methodology and that no direct market-determined cost rate can be derived from this approach because the nature of the analysis is related to book values. CAPs assert that the expected return on book equity substantially overshoots that return.[398]

177. EMCOS state that the Expected Earnings analysis, which is not market-based and does not provide useful information concerning the market cost of equity capital, should be excluded from the ROE determination ROEs.[399] EMCOS argue that the Expected Earnings analysis differs from the market cost of equity capital.[400] EMCOS state that the relationship between risk and accounting rates of return is not clear because companies and industries can earn book returns that are much higher or lower than their apparent risk would seem to dictate. Additionally, EMCOS state that the Commission has held

---

[394] *Id.* P 131.

[395] *Id.* P 132.

[396] CAPs Principal Initial Br. at 41-43; CAPs Br. on Exceptions (II, III) at 85-86.

[397] CAPs Principal Initial Br. at 44-45.

[398] *Id.* at 43-44; CAPs Principal Reply Br. at 19.

[399] EMCOS Reply Br. (I, II, III, IV) at 7.

[400] *Id.* at 36.

that accounting rates of return are not reliable measures of the current market cost of capital, since they do not reflect the current market prices that are determined in competitive capital markets. EMCOS contend that these threshold deficiencies should have been disqualified by the Commission from consideration in the first place.[401]

178. Trial Staff argues that the Commission should not include the Expected Earnings model because it is not widely used by investors. Trial Staff avers that the Briefing Order did not provide support for the Expected Earnings model like other ROE models, such as CAPM and Risk Premium. Moreover, Trial Staff notes that Roger Morin's book does not reference "expected earnings" nor the Expected Earnings methodology used by NETOs. Furthermore, Dr. Morin does not include the Expected Earnings model it his multi-model approach. Trial Staff notes that the Federal Communications Commission found that the Expected Earnings model is not widely utilized, and Professor Brigham stated that the Expected Earnings model has been discredited. Trial Staff argues that, as an accounting-based measure, the Expected Earnings model is not a reliable indicator of the cost of equity. Finally, Trial Staff contends that the fact that the Expected Earnings model is based on a single analyst's estimate also makes the approach unreliable as a measure of the cost of equity.[402]

179. CAPs claim that investors do not typically receive earnings on book value. They aver that, without a market-to-book ratio of 1.0, expected earnings on book value will not determine the investors' required return on equity.[403] CAPs contend that the methodology is divorced from the return required by study-period investors, who had no opportunity to purchase equities at book value.[404]

180. CAPs disagree with the assertion in Opinion No. 531-B that an investor is more likely to invest in a utility that it expects will have the opportunity to earn a comparable amount on its book equity as other enterprises of comparable risk are expected to earn. CAPs assert that market-to-book ratios vary, which makes the assertion meaningless as a justification for considering per-book earnings rather than earnings on market price. CAPs contend that reference to expected earnings on book equity distorts and inflates the estimation of investors' required return on market-priced equity. Consequently, CAPs

---

[401] EMCOS Br. on Exceptions at 40.

[402] Trial Staff Initial Br. (I, II, III, IV) at 6-10; Trial Staff Reply Br. (I, II, III, IV) at 6-7.

[403] CAPs Principal Reply Br. at 19.

[404] *Id.*

argue that the Commission should disregard or give reduced weight to the Expected Earnings model.[405]

181. EMCOS suggest the Commission could incorporate additional, market-based analyses into its evaluation of ROEs instead of the Expected Earnings model.[406] EMCOS argue against any reliance on the Expected Earnings model analysis, which EMCOS argue is not market-based and provides no useful information concerning the market cost of equity capital.[407] EMCOS argue the Expected Earnings analysis is indifferent to the market cost of equity capital to the point of imperviousness, and simply perpetuates historical regulated returns, and should thus be rejected.[408]

182. CAPs recommend that, if the expected earnings per book equity is used, it should reflect multiple years' expected earnings to book value ratios rather than rely solely on *Value Line*'s estimate of per-book earnings five years ahead. CAPs argue that any such study should be based on the proxies' representative return over the longest readily available period including historic and projected periods.[409] CAPs argue that the proxy companies' expected earnings cannot be considered a meaningful indicator of NETOs' expected earnings without adjusting for the difference between those companies' equity ratios and those of NETOs. With this adjustment, CAPs state that the Expected Earnings model results align much more closely with the DCF results. CAPs assert that accounting for the equity ratio difference between the proxies and NETOs is essential to a meaningful application of Expected Earnings to benefit ratios because equity ratio differences do not take account of the proxy stocks' market price. CAPs contend that less-risky proxies generally have lower DCF results due to investors bidding up the market price of equities that offer a favorable reward for a given level of risk, reducing proxies' dividend yields and DCF results. CAPs argue that no such effect reduces the Expected Earnings to book value ratio of proxy companies whose equity ratio is not comparable to that of the subject utilities. CAPs assert the difference between proxy and subject utility equity ratios must be accounted for after identifying the proxies' Expected Earnings to book value ratios.[410]

---

[405] CAPs Principal Initial Br. at 47.

[406] EMCOS Reply Br. (I, II, III, IV) at 7.

[407] *Id.* at 6-7.

[408] *Id.* at 15.

[409] CAPs Principal Initial Br. at 48.

[410] *Id.* at 50; CAPs Principal Reply Br. at 20-21.

183. CAPs also suggest that NETOs' study should consider the expected return on net plant, rather than on book equity. CAPs state that this approach would put numbers to the basis on which NETOs' witness rationalized reference to return on book equity. CAPs state that Dr. Morin notes that return on book equity is not analogous to return on book assets because depreciation reduces the latter but not the former. CAPs disagree with Dr. Avera's assertion that earnings on book equity are analogous to return on original cost rate base because depreciation reduces return on book assets, not return on book equity.[411]

184. CAPs contend that NETOs provide no evidence that the expected value to book value ratios help investors determine the opportunity cost of investing in a particular utility instead of in other companies of comparable risk. Furthermore, CAPs assert that NETOs do not address Dr. Woolridge's proof that expected earnings to book value ratios correlate to market-to-book ratios and debt-to-equity ratios, not to risk or cost.[412] Moreover, CAPs argue that, if the Expected Earnings methodology is considered, the expected earnings of publicly traded proxy companies must be comparable to those of NETOs.[413] CAPs allege that the market-to-book ratios and the capital structure equity ratios of the proxies used in NETOs' expected earnings study were screened for comparability to NETOs, and they are not comparable, especially for companies that cause upward skewing in the high end of the study array. Thus, CAPs state the proxies' expected earnings are not comparable to the expected earnings of NETOs.[414] CAPs argue that Mr. McKenzie's Expected Earnings analysis produced skewed results, a concern also raised by Trial Staff. Therefore, CAPs assert that Mr. McKenzie's Expected Earnings study should be given no weight in determining NETOs' ROE.[415]

185. Trial Staff argues that the Initial Decision (II, III) in the Second and Third Complaints should have rejected Dr. Avera's Expected Earnings analysis because it was biased, unreliable, and uninformative.[416] Moreover, Trial Staff avers that the Expected Earnings approach fails to use an appropriate proxy group, is an improper circular

---

[411] CAPs Br. on Exceptions (II, III) at 87-88.

[412] CAPs Principal Reply Br. at 20.

[413] CAPs Br. on Exceptions (IV) at 6.

[414] *Id.* at 61.

[415] *Id.* at 62-63; Trial Staff Br. on Exceptions (IV) at 56-57.

[416] Trial Staff Br. on Exceptions (II, III) at 20.

measure of projected returns, and produces illogical results.[417] Trial Staff states that Dr. Avera's approach is flawed because his analysis relies on regulated entities with previously authorized returns; using unregulated firms is essential because unregulated firms' earnings reflect the free forces of market competition.[418] CAPs suggest avoiding the circular reliance on utilities' expected profits by considering the expected accounting profits of comparable risk, competitive sector companies that have utility-like market-to-book ratios. CAPs state that no study presented in the record followed that approach. CAPs state that, if the available studies of electric utility expected accounting returns are considered, they should be adjusted to avoid counting toward the base return the portion of expected accounting returns that constitutes incentive adders.[419]

186. EMCOS argue that because the Expected Earnings analysis is forward-looking and based on value, the approach mitigates the circularity issue. Instead, EMCOS argue that *Value Line* expected return estimates are determined by the companies' historically regulated returns, as noted by Dr. Lesser. EMCOS aver that the historic rates of return set by regulators, in turn, cause the forecast of expected earnings based on currently-allowed returns to be inherently circular. Lastly, EMCOS argue that the Expected Earnings model is incompatible with the justness and reasonableness of returns on common equity.[420]

187. NETOs state that inclusion of the Expected Earnings model is warranted to determine the zone of reasonableness. NETOs note that the Commission, in Opinion No. 531, concluded that relying on the midpoint of the DCF results was no longer tenable and violated *Hope* and *Bluefield*. Moreover, NETOs maintain that the Commission gave substantial credibility and weight to the results of the Expected Earnings methodology and other models, and it relied on them to support a revised ROE methodology.[421] NETOs note that the Commission found the Expected Earnings model to have merit and

---

[417] *Id.*

[418] Trial Staff Br. on Exceptions (II, III) at 20, 43-44; Trial Staff Br. on Exceptions (IV) at 56-57; Trial Staff Br. Opposing Exceptions (II, III) at 26-27.

[419] CAPs Br. on Exceptions (II, III) at 92.

[420] EMCOS Initial Br. (I) at 23-25; EMCOS Initial Br. (II, III) at 29-31; EMCOS Initial Br. (IV) at 23-25; EMCOS Br. on Exceptions (II, III) at 41.

[421] NETOs Initial Br. (I) at 4, 8, 28; NETOs Initial Br. (III) at 4, 30; NETOs Initial Br. (IV) at 4, 8.

to be sound, as it is forward-looking, based on a reliable source of earnings data, and appropriately converts the proxy companies' earnings to reflect average returns.[422]

188. In their reply brief, NETOs contend that the fact that the Expected Earnings approach uses different considerations beyond market data than the other approaches is a reason why the Commission appropriately relies on it. NETOs aver that, by using the Expected Earnings model, the Commission achieves more robust and defensible decisions by employing diverse methodologies. NETOs contend that the Commission corroborates NETOs' conclusion that investors use return on book equity analyses, such as the Expected Earnings analysis, to estimate the expected return from an investment in a company. Moreover, the use of the Expected Earnings model is consistent with the requirements of *Hope* and *Bluefield*. [423]

189. NETOs disagree with CAPs', EMCOS', and Trial Staff's request to disregard the Expected Earnings model because it estimates the expected earnings on book value equity, not the expected earnings on market value equity. NETOs point out that the Commission determined that all of the ROE models yield imperfect estimates and thus should be combined and given equal weight in order to more accurately capture the returns that investors expect.[424] NETOs request that the Commission adopt Mr. McKenzie's Expected Earnings analysis, which shows that the return needed to assure confidence in the financial integrity of a firm is similar to what other utilities of comparable risk will earn on invested capital. According to NETOs, its Expected Earnings approach allows for fair rate of return, and it avoids the complexities and limitations of capital market methods, instead focusing on the returns earned on book equity, which are readily available to investors.[425]

## C. <u>Commission Determination</u>

190. Consistent with the Commission's findings in Opinion Nos. 569 and 569-A,[426] we find that, in light of the record as supplemented after issuance of the Briefing Order, it is

---

[422] NETOs Initial Br. (I) at 33-34; NETOs Initial Br. (II) at 45; NETOs Initial Br. (III) at 35; NETOs Initial Br. (IV) at 38.

[423] *See* NETOs Reply Br. (I) at 81.

[424] *See id.* at 28-29.

[425] NETOs Br. Opposing Exceptions (IV) at 88-89.

[426] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 200-35; Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 125-32.

not appropriate to use the Expected Earnings model in our methodology for analyzing base ROEs under FPA section 206 in these proceedings.

191. In particular, we find that the record does not support departing from our traditional use of market-based approaches to determine base ROE.[427] Under the market-based approach, the Commission sets a utility's ROE to equal the estimated return that investors would require in order to purchase stock in the utility at its current market price. In *Hope*, the Supreme Court explained that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks."[428] In order to determine this, we must analyze the returns that are earned on "investments in other enterprises having corresponding risks," but investors cannot invest in an enterprise at book value and must instead pay the prevailing market price for an enterprise's equity. As a result, the expected return on a utility's book value does not reflect "returns on investments in other enterprises" because book value does not reflect the value of any investment that is available to an investor in the market, outside of the unlikely situation in which market value and book value are exactly equal. Accordingly, we find that relying on the Expected Earnings model would not satisfy the requirements of *Hope*.

192. The return on book value is also not indicative of the return that an investor requires to invest in the utility's equity or the return that an investor receives on the equity investment, because those returns are determined with respect to the current market price that an investor must pay in order to invest in the equity. Accordingly, return on book value does not reflect "the return to the equity owner" that we must ensure is "commensurate with returns on investments in other enterprises." Therefore, we find that this model is not useful in ensuring that the standards of *Hope* are satisfied.

193. NETOs argue that the fact that the Expected Earnings model does not rely on market data is a sound reason for the Commission to include the model in its ROE determinations. NETOs assert that the Expected Earnings model avoids the complexities and opportunities for controversy that are implicated by the market-based models. NETOs contend that the Expected Earnings model relies on the straightforward concept that, when evaluating two investments of comparable risk, investors will choose the

---

[427] *Generic Determination of Rate of Return on Common Equity for Pub. Utils.*, Order No. 489, FERC Stats. & Regs. ¶ 30,795 at 30,993, *reh'g denied*, Order No. 489-A, 42 FERC ¶ 61,390 (1988) ("There is compelling economic justification for relying on the market cost of capital as the standard for rate of return decisions. Furthermore, a market cost of capital approach addresses both the comparable earnings and attraction of capital standards of the *Hope* decision.").

[428] *Hope*, 320 U.S. at 603.

alternative with the higher expected return.[429] To make a similar point, NETOs' witness Mr. McKenzie points to a textbook prepared for the Society of Utility and Regulatory Financial Analysts which, according to Mr. McKenzie, notes "that the amount of subjective judgment required to implement this method is 'minimal,' particularly when compared to the DCF and CAPM methods."[430]

194. As the Commission found in Opinion No. 569,[431] while it may be true that the Expected Earnings model does not involve the same complexities as the market-based approaches, we find that this is because it does not reflect a utility's cost of equity. It is simpler because it does not consider the market price that an investor must pay to make its investment and other factors such as projected growth rates for the subject utility. Factors such as these—in particular the market price that an investor must pay for an investment, which is the basis for determining the return on that investment—are critical to determining a utility's cost of equity. While it may be simpler to use a model that does not consider such factors, doing so renders that model unable to effectively estimate the rate of return that investors require to invest in the market-priced common equity capital of a utility, which is the utility's cost of equity capital. We find that it is not appropriate to use a model that does not accurately measure the "return to the equity owner" as required by *Hope* merely because it may be simpler to administer. We are cognizant of the administrative burden that is placed on parties to evaluate models that are used in analyzing ROEs, but the mere simplicity of one model as compared to others does not justify using that model if it does not assist us in ensuring that returns to equity owners are just and reasonable.

195. Moreover, we find that the record demonstrates that the Expected Earnings model does not identify investments of comparable risk and which alternatives will have a higher expected return, as NETOs' witness Mr. McKenzie indicates.[432] In particular, because the Expected Earnings model measures returns on book value, without consideration of what market price an investor would have to pay to invest in the relevant company, it does not accurately measure the investor's expected returns on its investment. In order to assess what return investors will receive, they must know the market price of the equity that they are purchasing. For example, if two companies each have book value of $100 and expected returns on that book value of 10%, or $10, over the next year, then they would appear to be equally attractive investments to an investor

---

[429] *See* NETOs Reply Br. (I), McKenzie Reply Aff. at 81-83.

[430] *Id.* at 86 (citing David C. Parcell, *The Cost of Capital: A Practitioner's Guide* 115-16 (1997)).

[431] Opinion No. 569, 169 FERC ¶ 61,129 at P 204.

[432] *See* NETOs Reply Br. (I) at 62; McKenzie Reply Aff. at 83.

based on the Expected Earnings model. However, if the market price to purchase the first company's stock is $150 and the market price to purchase the second company's stock is $200, then the first company would obviously be a more attractive investment, all else being equal. Thus, contrary to Mr. McKenzie's characterization, investors in such a situation would not be able to determine what "the alternative with the higher expected return"[433] is with the Expected Earnings model.

196. NETOs also argue that the fact that the majority of stocks, including utility stocks, sell substantially above the company's book value supports the use of the Expected Earnings Model. NETOs' witness, Mr. McKenzie, points out that *Value Line* reports that approximately 1500 of the roughly 1700 stocks it follows have market-to-book ratios above one, and he cited evidence that utility stocks have an average market-to-book ratio of 1.78.[434] Mr. McKenzie asserts that, in these circumstances, an ROE equal to the current market cost of equity as determined under the DCF model will not produce sufficient earnings to support the utility's current stock price. Mr. McKenzie points out that the Commission calculates the dollar return included in a utility's rate base by multiplying the book value of the rate base by the percentage ROE determined by the Commission. He then provides a numerical example that purports to show that, when a utility's market-to-book ratio is above one, this calculation will not produce a sufficient dollar return to allow the utility to continue to pay the same level of dividends and retain the same level of earnings to fund growth as the investor assumed in performing its DCF analysis and evaluating whether to purchase the stock. Mr. McKenzie asserts that, by contrast, the Expected Earnings model calculates the projected returns on the utility's book equity that support the investors' expectations underlying the current market price of the stock. Mr. McKenzie contends that the Expected Earnings model provides a direct guide to ensure that the ROE allowed by the Commission is similar to the returns that investors expect other utilities of comparable risk will earn on the book value of their invested capital.[435]

197. NETOs' concerns about market-to-book ratios in excess of one and maintaining the current stock values of public utilities do not justify use of the Expected Earnings model. The Commission is not obligated to set ROEs to maintain current stock values.[436]

---

[433] *Id.*

[434] *See* NETOs Reply Br. (I), McKenzie Reply Aff. at 103.

[435] *See id.* at 106.

[436] *Ill. Bell Tele. Co. v. FCC*, 988 F.2d 1254 (D.C. Cir. 1993) (*Illinois Bell*) (affirming the FCC's rejection of the same contention concerning use of the DCF model when market-to-book ratios are above one as NETOs assert here, and stating that the FCC "has no obligation to maintain the current market value on investors' property").

As the Supreme Court held in *Hope*, the "fair value" of a regulated enterprise "is the end product of the process of ratemaking, not the starting point . . . The heart of the matter is that rates cannot be made to depend on 'fair value' when the value of the going enterprise depends upon earnings under whatever rates are anticipated."[437] Consistent with the Court's holding in *Hope*, the Commission has stated, "[t]he market value of an enterprise or its common stock depends upon its earnings or anticipated earnings, which in turn depend upon the rates allowed. Thus, market value is the result of the ratemaking process and may not properly be the beginning of that process as well."[438]

198. In any event, there is no evidence that the Commission's use of the DCF model to determine ROEs based on the current market cost of capital has provided insufficient returns to support proxy company stock values or had a tendency to drive market-to-book ratios down to one. In fact, market-to-book ratios of the proxy companies have been consistently above one since the 1980s, a period during which the Commission solely used the DCF model to determine ROEs.[439] Moreover, the public utility companies for which the Commission sets rates are not publicly traded and thus do not have any market-determined stock values. Hence, there is no observable market-to-book ratio specifically applicable to the electric transmission business for which we are establishing an ROE. As the Commission found in Opinion No. 569, the publicly-traded companies in the proxy group are generally holding companies, which not only have regulated electric transmission business but also other businesses that are not subject to cost-based regulation.[440] Therefore, the proxy company market-to-book ratios may exceed one primarily because of the value investors see in their non-electric transmission businesses.[441] We recognize that, in an environment where the market-to-book ratios of publicly-traded companies are generally above one, it would be unreasonable to adopt an ROE policy that resulted in capital losses for investors in order to drive market-to-book

---

[437] *Hope*, 320 U.S. at 601.

[438] Order No. 489, FERC Stats. & Regs. ¶ 30,795 at 30,994; *see also Orange & Rockland Utils., Inc.*, Opinion No. 314, 44 FERC ¶ 61,253, at 61,952*, order on reh'g*, Opinion No. 314-A, 45 FERC ¶ 61,252 (1988).

[439] Morin at 377.

[440] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 208 (citing CAPs Initial Br. (I), Ex. JCI-100 at 36; CAPs Initial Br. (II), Ex. JCI-200 at 35).

[441] *See Illinois Bell*, 988 F.2d at 1261 (stating that the telephone companies there at issue also had unregulated assets, and appreciations in the value of the unregulated assets could account for the market-to-book ratios above one).

ratios that are currently above one down to one.[442] However, the record before us does not contain evidence that our longstanding policy of determining ROE based on the current market cost of equity is having this effect. In these circumstances, we see no basis to change that policy in order to use the Expected Earnings model.

199. We agree with NETOs that the Commission is not necessarily required to rely on only market-based methods to determine ROEs merely because it previously found that such an approach was appropriate.[443] The mere fact that the Commission can depart from precedent such as Order No. 461 and Opinion No. 429 does not necessarily mean that it should, and while we are not precluded from using an accounting-based method, that does not mean that we must use such a method. Here, we find that the record evidence in these proceedings demonstrates that the Expected Earnings approach is not appropriate to use in our ROE analysis.

200. In the Briefing Order, the Commission noted that the returns on book equity that investors expect to receive "are relevant to determining that utility's cost of equity, because those returns on book equity help investors determine the opportunity cost of investing in that particular utility instead of other companies of comparable risk."[444] The Commission further stated that "[b]ecause investors rely on Expected Earnings analyses to help estimate the opportunity cost of investing in a particular utility, we find this type of analysis useful in determining a utility's ROE."[445] In light of the record in these proceedings as supplemented after issuance of the Briefing Order, we find that there is not sufficient record evidence to conclude that investors rely on the Expected Earnings analysis to estimate the opportunity cost of investing in a particular utility as compared to other companies. As parties have noted, investors cannot purchase equity at book value;[446] therefore, although book value and returns on book equity may be useful data points for investors, they do not reflect an opportunity for investment that can be characterized as an opportunity cost. Additionally, Dr. Morin states "[a]ccounting rates of return are not opportunity costs in the economic sense, but reflect the average returns earned on past investments and hence reflect past regulatory actions . . . Investors can only purchase new shares of common stock at current market prices and not at book

---

[442] *See* Morin at 376-78.

[443] *See* NETOs Reply Br. (I), McKenzie Reply Aff. at 84-85.

[444] MISO Briefing Order, 165 FERC ¶ 61,118 at app.

[445] *Id.*

[446] *See, e.g.*, CAPs Principal Initial Br. 42; EMCOS Reply Br. (I), Ex. EMC-0244 at 5; EMCOS Reply Br. (II, III), Ex. EMC-0344 at 5; EMCOS Reply Br. (IV), Ex. EMC-0433 at 5.

value."[447] Moreover, as we discuss further below, there is insufficient record evidence to demonstrate that investors rely on the Expected Earnings model.

201. Record evidence also provides an example of how returns on book equity fail to reflect the returns that investors require to invest in a given company and thus, fail to reflect the opportunity costs of investing in one company as opposed to others. As the Commission found in Opinion No. 569, when the market value of a company's equity exceeds its book value—i.e., when its market-to-book ratio exceeds 1.0—this means that investors' required rate of return for investing in the equity is less than the expected earnings on book value for that company.[448] CAPs' witness Mr. Woolridge details the market-to-book ratios for the proxy groups used by Dr. Avera in the First Complaint, finding that the ratios ranged from 0.990 to 2.255 for the proxy groups in both proceedings, with 27 of the 44 companies in the First Complaint proxy group having ratios at or above 1.25.[449] Accordingly, the record demonstrates that investors' required rate of return for investing in the equity of all of the proxy group companies in both of these proceedings is less than the return on the book value of the equity of those companies. Therefore, the return on the book value measured by the Expected Earnings model overstates the investors' required rate of return for investing in the proxy group companies and as a result it does not reflect investors' opportunity cost of investing in one proxy group company as opposed to another.

202. In the Briefing Order, the Commission stated that a primary reason for proposing to average the results of the DCF analysis with the results of the CAPM, Expected Earnings, and Risk Premium analyses is that investors use those models, in addition to the DCF methodology, to inform their investment decisions.[450] Upon review of the record, as supplemented after issuance of the Briefing Order, we find that this statement may not be true with respect to the Expected Earnings model. NETOs state that Dr. Avera's, Mr. Quackenbush's, and Mr. McKenzie's testimony in the record indicates that such analyses are used and cite numerous pieces of evidence of "investment advisories and other publications that provide estimates of utilities' returns on equity, including

---

[447] Morin at 393.

[448] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 211; *see also* Opinion No. 314, 44 FERC at 61,952 ("[W]hen the price-to-book ratio is greater than one, the rate of return investors expect O&R to earn on common equity is greater than the rate of return investors require from their investment in O&R's common stock.").

[449] CAPs Principal Initial Br., Ex. CAP-500 at 55 (citing Ex. NET-703 and NET-709).

[450] MISO Briefing Order, 165 FERC ¶ 61,118 at P 40.

returns on book value of utilities' assets."[451] This evidence cited by NETOs shows that investors examine expected earnings (future profits). However, looking at the future earnings of a company is not the same as determining a company's cost of capital or making investment decisions based on the earnings per book value calculations in the Expected Earnings model. Additionally, there is no evidence that such information is useful to investors in determining their required return from an investment in a particular company independent of the stock price, which the Expected Earnings model ignores. Below we examine the specific evidence that NETOs' claim demonstrates that investors use the Expected Earnings model.

203. Exhibit NET-300 at pages 70-72 offers no specific evidence that investors use the Expected Earnings methodology to determine the cost of capital other than general assertions by its author, Dr. Avera. The same can be said of Exhibit NET-1300, in which both Dr. Avera and Mr. McKenzie make general statements and calculate their Expected Earnings Model results. Similarly, Exhibit NET-02200 merely contains commentary by Mr. McKenzie on the Expected Earnings model and the results of his calculations.

204. Attachment 2 to Mr. Quackenbush's Reply Affidavit, the Evercore ISI Utilities Comp Model, includes both the price to book ratio and the expected earnings per share. Although Mr. Quackenbush avers that any investor who wishes to determine the book value per share could do so with that data, he provides no evidence that investors are using this information to form the basis for an Expected Earnings model to determine the cost of capital or to make investment decisions independently of share price. Indeed, the first numeric column in the table is the share price, illustrating its centrality to investor decision-making. Attachment 3 to Mr. Quackenbush's Reply Affidavit, a Wolf Research report, suffers from similar infirmities. Though the data could be used to determine the expected earnings, there is no evidence that it has been used so, much less independently of share price, which is in the first page of the Attachment.

205. NETOs witness Mr. McKenzie asserts in his testimony that an S&P Global report indicates that the earned return on book value may provide better insight into the financial health of the utility because it reflects the end result of regulation, not the theoretical outcome implied by an authorized ROE.[452] Mr. McKenzie also maintains that Moody's recognizes the relevance of returns on book value when it explains that earned

---

[451] NETOs Reply Br. (I) at 82-83 (citing Ex. NET-300 (I) at 70-72; Ex. NET-1300 (II, III) at 36-39; Ex. NET-02200 (IV) at 152-54; and Quackenbush Reply Aff. at 15-26).

[452] *See* NETOs Reply Br. (I), McKenzie Reply Aff. at 86-87 (citing S&P Global, *Utilities: Key Credit Factors for The Regulated Utilities Industry*, Criteria Corporates (Nov. 19, 2013), https://www.standardandpoors.com/en_US/web/guest/article/-/view/type/HTML/id/2189281)).

ROEs, rather than authorized ROEs, are a "key gauge of financial performance."[453] However, we agree with Trial Staff that the record lacks evidence that investors widely use this information to estimate the cost of equity independently of share price.[454] First, we disagree with NETOs that S&P's statement that "different factors [other than ROEs] such as variances in costs and usage may influence the return a utility is actually able to earn, and consequently our analysis of profitability for cost-of-service –based utilities centers on the utility's ability to consistently earn the authorized ROE"[455] indicates that S&P examines earnings per book value independently of share price. In fact, the only mention of book value in the S&P article is, when explaining the usefulness of earnings before interest, tax, depreciation and amortization, the statement that "the book value of capital does not always reflect true earning potential." Similarly, the Moody's reference to the stability of "earned ROEs" as reported by utilities does not clearly indicate that it is earned returns on book value.

206. Even if Mr. McKenzie's inferences regarding the usefulness of earnings as related to book value to assess the financial health of a utility are correct, that fact is not indicative that such information is used by investors independently of price to determine their required returns. As discussed above, the Commission relies on the market cost of capital as the standard for its rate of return decisions. This approach requires us to estimate the return that investors would require in order to purchase stock in the utility at its current market price. We have determined, for this purpose, that we should look to the methods that investors use to determine their required return on an investment in public utilities, including the DCF and CAPM models. However, there is nothing in the S&P and Moody's articles cited by Mr. McKenzie to indicate that investors look to earnings on book value to determine their required return on an investment. Credit rating agencies, who are not investors, may use such information to inform their assessment of utilities' risk or financial strength. As Mr. McKenzie states, S&P uses this metric to assess utilities' "financial health."[456] However, there is no evidence that they use such metrics to determine the cost of capital of utilities or to calculate return on an investment.

---

[453] *See* NETOs Reply Br. (I), McKenzie Reply Aff. at 87.

[454] *See* Trial Staff Reply Br. (I, II, III, IV), Keyton Reply Aff. at 2.

[455] *See* NETOs Reply Br. (I), McKenzie Reply Aff. at 87 (citing S&P Global, *Utilities: Key Credit Factors for The Regulated Utilities Industry*, Criteria Corporates (Nov. 19, 2013), https://www.standardandpoors.com/en_US/web/guest/article/-/view/type/HTML/id/2189281)).

[456] NETOs Reply Br. (I), McKenzie Reply Aff. at 87.

207. Looking at earned return on book value is not the same as conducting an Expected Earnings analysis to determine the applicable cost of capital. Investors observe many financial metrics, including metrics such as price to earnings ratios and free cash flow, which are not independently used for determining an entity's cost of equity or investment decisions. When an investor makes an investment decision, a fundamental consideration is the cost to the investor to make the investment—i.e., the market price that the investor must pay for the investment. The Expected Earnings analysis does not take this fundamental consideration into account and thus it does not reflect how an investor would make an investment decision. NETOs' citations to evidence that merely references book value or earnings on book value among various other financial metrics or in the context of credit rating analyses does not demonstrate that investors would use the earnings on book value results of an Expected Earnings analysis to make investment decisions without considering the market price of the investment.

208. We also find, as the Commission did in Opinion Nos. 569 and 569-A, that the application of the Expected Earnings model in the electric utility cost-of-service context could produce illogical results that render use of the model sub-optimal. The simple math of the equation is that the higher the ratio of earnings to book value a given company features, the higher the resulting return from the model. Much of the earnings from regulated utilities comes from the return earned in their cost-of-service rates. In such rates, the higher the percentage of equity in the capital structure, the higher the overall return, and thus earnings, would be, because the cost of equity is higher than the cost of debt. Consequently, holding all else being equal, if a utility features an equity-rich capital structure, the Expected Earnings model would produce a higher return than if it featured a less equity-rich capital structure. This is illogical because the latter utility would be riskier than the former given its higher amount of leverage. Thus, the model would imply that less risky companies merit higher returns, when investors would require a lower return from those companies.

209. In addition, book value in the expected earnings calculation, if it follows general accounting conventions, would take the initial value of assets and subtract depreciation (and include any subsequent adjustments like write-downs). This leads to higher returns from the model for utilities that feature older, more-depreciated, assets than newer ones. Again, all else being equal, utilities with more depreciated assets are generally lower risk, because they have recovered more of their invested capital, and thus they would generally merit a lower return, than utilities with newer assets.

210. We recognize that, in the First, Second and Third Complaint proceedings, the Commission considered the Expected Earnings model.[457] However, in those

---

[457] *See, e.g.*, Opinion No. 531, 147 FERC ¶ 61,234 at P 146; Initial Decision (II, III), 154 FERC ¶ 63,024 at PP 689-690. In the Fourth Complaint proceeding, the Presiding Judge found it "unnecessary to delve further into the parties' evidence of

proceedings, the Commission only considered the Expected Earnings model as corroborative evidence to "inform the just and reasonable placement of the ROE within the zone of reasonableness established in the record by the DCF methodology."[458] Here, the question before the Commission is whether to adopt the proposal in the Briefing Order to directly use the results of the Expected Earnings model in the ROE estimate calculations that are the foundation of our ROE analysis. We find that stronger evidence is required to support a decision to include the Expected Earnings model as a direct input in our ROE methodology than is required to merely use it as corroborative evidence for placing an ROE within the zone of reasonableness. We directed the parties in these proceedings to address the Briefing Order's proposal to use the Expected Earnings model as a direct input in our ROE methodology, and in light of the evidence that they have provided, we find that there is not sufficient support to use the Expected Earnings model as a direct input in our ROE methodology. The question in this proceeding regarding the Expected Earnings model differs from the question that was considered in the First, Second and Third Complaint proceedings. Accordingly, our decision to exclude the Expected Earnings model from our ROE methodology here is consistent with the decisions in those proceedings.

211. Some parties argue that, if the Expected Earnings model is used, the Commission should implement certain modifications to the model.[459] We find that these arguments are moot and that it is unnecessary to address them because we will not use the Expected Earnings model as part of our ROE methodology in these proceedings.

212. Because we find that it is not appropriate to use the Expected Earnings model in our ROE methodology, we grant exceptions to Initial Decision (II, III) that ask the Commission to exclude the Expected Earnings model from its ROE determinations, to the extent those exceptions are based on our reasoning discussed above for excluding the Expected Earnings model.

---

'anomalous capital market conditions' and 'alternative methodologies' to the DCF analyses." Initial Decision (IV), 162 FERC ¶ 63,026 at P 226.

[458] *See* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 689 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at P 146).

[459] *See, e.g.*, CAPs Principal Initial Br. at 48; CAPs Principal Reply Br. at 20-21; CAPs Br. on Exceptions (II, III) at 87-88, 92; Trial Staff Br. on Exceptions (II, III) at 20, 43-44; Trial Staff Br. on Exceptions (IV) at 56-57; Trial Staff Br. Opposing Exceptions (II, III) at 26-27.

## VIII. CAPM

213. No party generally disputes the use of the CAPM for analyzing base ROEs under FPA section 206. Parties do dispute components of CAPM, as well as the Commission's methodology, which we discuss below.

### A. Background

214. Investors use CAPM analysis as a measure of the cost of equity relative to risk.[460] The CAPM methodology is based on the theory that the market-required rate of return for a security is equal to the risk-free rate, plus a risk premium associated with the specific security. Specifically, the CAPM methodology estimates the cost of equity by taking the "risk-free rate" and adding to it the "market-risk premium multiplied by "beta."[461] The risk-free rate is represented by a proxy, typically the yield on 30-year U.S. Treasury bonds.[462] Betas, which are published by several commercial sources, measure a specific stock's risk relative to the market. The market risk premium is calculated by subtracting the risk-free rate from the expected return. The expected return can be estimated either using a backward-looking approach, a forward-looking approach, or a survey of academics and investment professionals. A CAPM analysis is backward-looking if the expected return is determined based on historical, realized returns. A CAPM analysis is forward-looking if the expected return is based on a DCF analysis of a large segment of the market. Thus, in a forward-looking CAPM analysis, the market risk premium is calculated by subtracting the risk-free rate from the result produced by the DCF analysis.[463]

215. In Opinion No. 531, the Commission found that the CAPM analysis presented by NETOs was informative, but only "to inform the just and reasonable placement of the ROE within the zone of reasonableness established in the record by the DCF methodology."[464] The CAPM risk premium was based on the growth rates and dividend yields of the S&P 500 through a one-step DCF calculation. In Opinion No. 551, the Commission "affirm[ed] the Presiding Judge's acceptance of the CAPM analysis as corroborative evidence in determining whether the midpoint of the zone of

---

[460] Opinion No. 551, 156 FERC ¶ 61,234 at P 138.

[461] *Id*. (citing Morin at 150).

[462] *Id*. P 138.

[463] *See id.* PP 150, 155.

[464] Opinion No. 531, 147 FERC ¶ 61,234 at P 146.

reasonableness produced by the Commission's DCF analysis provides a return that satisfies the requirements of *Hope* and *Bluefield*.[465]

216. In the Briefing Order, the Commission proposed to give the CAPM model equal weight, along with the DCF model and Expected Earnings model, in establishing a composite zone of reasonableness to be used under the first prong of section 206 to determine whether the existing ROE has become unjust and unreasonable.[466]

217. In Opinion No. 569, the Commission adopted the CAPM model for determining a composite zone of reasonableness under both prongs of FPA section 206, weighting it one-half, along with the DCF.[467] In Opinion No. 569-A, the Commission continued its use of the CAPM, giving it one-third weighting under both prongs of FPA section 206, reflecting the adoption of the Risk Premium model.[468] In *MISO TOs v. FERC*, no party challenged the use of the CAPM, but the court was unpersuaded by challenges to three aspects of the Commission's use of the CAPM, specifically "(1) FERC's decision not to include long-term growth rates in its analysis of the S&P 500; (2) its use of *adjusted* betas (as part of the formula) with a size-premium adjustment derived from *unadjusted* betas (applied after running the formula); and (3) its use of betas based on the market risk of the New York Stock Exchange with an expected market return based on the S&P 500."[469]

## B. Calculation of Market Risk Premium

### 1. One-Step versus Two-Step Analysis

#### a. Background

218. In Opinion Nos. 569 and 569-A, the Commission found that estimating the CAPM expected market return using a forward-looking approach, based on applying the DCF model to the dividend paying members of the S&P 500, is reasonable.[470] In Opinion No. 569, the Commission adopted a forward-looking approach based upon a one-step DCF analysis of the dividend paying members of the S&P 500 for the expected market

---

[465] Opinion No. 551, 156 FERC ¶ 61,234 at P 172.

[466] Opinion No. 569, 169 FERC ¶ 61,129 at P 235.

[467] *Id.* P 425.

[468] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 141.

[469] *MISO TOs v. FERC*, 45 F.4th at 259.

[470] *Id.* P 85; Opinion No. 569, 169 FERC ¶ 61,129 at P 260.

return. Specifically, the Commission found that only the IBES short-term growth projection should be used in the one-step DCF analysis of the dividend paying members of the S&P 500, which is consistent with the Presiding Judge's approach in Initial Decision (II, III).[471] The Commission rejected proposals to use a two-step DCF analysis for estimating the CAPM expected market return and found that the rationale for incorporating a long-term growth rate estimate in conducting a two-step DCF analysis of a specific utility or group of utilities for purposes of directly estimating cost of equity does not apply to the DCF analysis of a broad representative market index with a wide variety of companies that is regularly updated to include new companies for purposes of determining the required return to the overall market.[472] Further, the Commission found because the dividend paying members of the S&P 500 constitute a large portfolio of stocks, they included companies at all stages of growth.[473]

219. In *MISO TOs v. FERC*, the court considered the Commission's use of only a short-term growth rate and the application of that to the S&P 500 in the CAPM.[474] The court explained that "[f]or the dividend-paying S&P 500 companies that FERC used to determine the "expected return," no one knows for sure how much they will grow . . . So FERC filled in that blank with five-year growth projections from [IBES]. It rejected the customers' request that it average those five-year projections with longer-term growth projection."[475] The court concluded that the Commission "adequately explained that decision,"[476] noting that the Commission:

> explained that the short-term rates better reflect an investor's expected return on an investment in the S&P 500 as an index. That's because the S&P 500 is regularly updated to include only companies with high market capitalization. Further, FERC explained that the S&P 500 includes companies at all stages of growth, so older companies with lower growth

---

[471] *Id.* P 555 (citing *Ark. Elec. Coop. Corp. v. ALLETE, Inc.*, 155 FERC ¶ 63,030, at P 412 (MISO Initial Decision (II))).

[472] *Id.* P 266; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 85.

[473] Opinion No. 569, 169 FERC ¶ 61,129 at PP 85, 265.

[474] *MISO TOs v. FERC*, 45 F.4th at 259-260.

[475] *Id.* at 259.

[476] *Id.* at 260.

potential will balance out younger companies with higher growth potential.[477]

**b. Briefs**

220. CAPs argue that the version of the CAPM referenced by the Briefing Order is flawed. Specifically, CAPs argue that when the sustainable growth component of the market risk premium in the CAPM formula is less than one percent, the implied equity cost is below the equity market return for any such proxy, which will indicate a cost of equity below 10%.[478] Therefore, CAPs contend that CAPM studies with an equity market return and resulting implied equity cost of more than 10% indicate that NETOs violate a fundamental matching principle.[479]

221. Regarding the argument raised by CAPs that NETOs violate a fundamental matching principle, NETOs posit that the Commission already rejected this matching timeframe in Opinion No. 531-B when it stated that it was "not persuaded that the time period on which NETOs based their CAPM analysis undermines the relevance of that analysis."[480] Further, NETOs argue that CAPs, Trial Staff, and EMCOS do not explain why the time period used to analyze the risk-free rate must match the time that investors focus on when seeking a market return. NETOs add that such a claim is purely hypothetical and bears no relationship to what actually transpires in the capital markets. NETOs assert that there is no "fundamental matching principle" to support CAPs' argument that either the risk-free rate or the market risk premium that the Commission relied upon is in error.[481]

222. Further, CAPs state that NETOs' use of a one-stage DCF to estimate the CAPM's market risk premium is contrary to both economic logic and Commission precedent. CAPs add that, when the Commission adopted a two-stage DCF methodology, it did so as a general rule absent an industry-specific exception, based on a finding that "a projection

---

[477] *Id.*

[478] CAPs Principal Initial Br. at 32-33.

[479] *Id.* at 33 (citing Dr. Woolridge's explanation that, in conducting a CAPM study, the risk-free rate and the market-risk premium must be estimated over the same timeframe); *see* Ex. CAP-500, Sections III.A & III.C.

[480] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 112.

[481] NETOs Reply Br. (I) at 38 (citing MISO Initial Decision (I), 153 FERC ¶ 63,027 at PP 307-10 (finding that the "mismatch" argument did not undermine Dr. Avera's CAPM analysis and stating that "the basis of this assertion is not self-evident")).

limited to five years, with no evidence of what is anticipated beyond that point, is not consistent with the DCF model and cannot be relied on in a DCF analysis."[482] Trial Staff also argues that the one-step or constant growth DCF model relies solely on three-to-five year short-term IBES growth rates and the market return was developed on a subset of 390 dividend paying companies within the S&P 500 index.[483] Trial Staff's witness, Mr. Keyton, reiterates his disagreement with NETOs' witness, Mr. McKenzie's, use of the one-step DCF with no screening criteria in the application of his market return, and believes that the Commission should adjust the CAPM to conventional financial guidance.[484] Trial Staff also disputes NETOs' use of a one-step DCF in its brief, and states that the Commission has supported a long-term growth component in a DCF model in numerous orders.[485]

223. In reply, NETOs state that EMCOS, CAPs, and Trial Staff all argue that the Commission and NETOs have overstated the CAPM methodology by applying "unsustainable" growth rates and a one-stage DCF analysis in calculating the market risk premium.[486] NETOs contend that this argument is flawed because it assumes that the CAPM should mimic the Commission's two-stage DCF analysis. Further, NETOs dispute parties' argument that NETOs' use of a one-step DCF study in their CAPM methodology is flawed by stating that this point: (1) is inconsistent with the Commission's precedents adopting the growth component of the two-step DCF analysis; and (2) assumes that "growth in these firms' earnings per share will continue forever,"[487] NETOs clarify that the precedents were not about the use of the DCF in the CAPM analysis, but about the DCF model itself,[488] and the earning per share growth argument

---

[482] CAPs Principal Initial Br. at 36 (citing *Ozark Gas Transmission Sys.*, 68 FERC at 61,105); *see also, e.g.*, *Williston Basin Interstate Pipeline Co.*, 87 FERC at 62,006 ("[I]n the absence of a reliable, industry-specific long-term growth projection, the best economy-wide approach to projecting long-term growth is to use growth in GDP.")).

[483] Trial Staff Initial Br. (I) at 18.

[484] *Id.* at 12 (citing Keyton Reply Aff. at PP 21-22).

[485] *Id.* at 12.

[486] NETOs Reply Br. (I) at 34 (referencing CAPs Principal Initial Br. at 32-41; EMCOS Initial Br. (I) at 37-39; Trial Staff Initial Br. (I) at 12-17).

[487] *Id.* at 40 (citing CAPs Principal Initial Br. at 34-38; CAPs Initial Br. (I) at 38 ("[T]he S&P 500 would exceed the entire U.S. Gross Domestic Profit in 40 years."); Trial Staff Initial Br. (I) at 12-13).

[488] *Id.* at 36.

misstates the assumption behind applying a one-step DCF to a market index like the S&P 500.[489] NETOs' witness Mr. McKenzie explains that a one-step DCF applied in this context means that some of the firms in the S&P 500 will grow faster than the economy and others will grow slower, rather than assuming that all of these firms will have perpetual growth.[490]

224. In their reply brief, CAPs argue that the Commission has a well-established methodology (two-stage application of the constant growth DCF model), which it has been applying for decades for estimating the cost of equity for regulated utilities. Additionally, CAPs propose an alternative two-stage CAPM, which uses NETOs' risk-free rate and *Value Line* betas. CAPs developed an ex ante market risk premium using a market-weighted two-growth-stage DCF analysis of the dividend-paying members of the S&P 500, using analysts' earnings per share growth rate for each proxy as the first-stage growth rate and projected GDP growth as the second-stage growth rate. CAPs assert that, similar to the Commission's two-growth-stage application of the constant-growth DCF model to electric utilities, this market risk premium reflects a calculation in which the analyst (IBES) earnings per share receives two-thirds weighting and the projected GDP growth rate receives one-third weighting to create a composite growth rate. CAPs conclude that any CAPM study that relies on the Commission's two-growth-stage application should avoid using NETOs' highly unrealistic and excessive one-stage market-risk premium that relies on an aggregated DCF analysis of specific 390 firms.[491]

225. Trial Staff proposes that the Commission utilize the two-step DCF for calculating the market return to align with Commission precedent of considering long-term growth.[492] Trial Staff argues that the two-step DCF is consistent with Commission precedent and Dr. Morin, whom the Commission relies upon in its Briefing Order, also supports the underlying theory of incorporating a long-term growth estimate in the DCF methodology.[493] According to Trial Staff, this adjustment is also supported by Brigham and Ehrhardt, who make numerous statements in support of the use of longer term growth

---

[489] *Id.* at 40.

[490] *Id.* (citing McKenzie Reply Aff. at 27 (stating that "growth expectations for some firms may be extremely anemic (or even negative), while projections for other firms are considerably more optimistic")).

[491] *See* Ex. CAP-600 at 11, 37.

[492] Trial Staff Initial Br. (I) at 11.

[493] *Id.* at 13.

rates. Trial Staff states that in Opinion No. 531 the Commission rejected the one-step or constant growth DCF model in favor of a two-step DCF model.[494]

226. EMCOS argue that their CAPM methodology is consistent with academic literature and corrects the errors contained in NETOs' CAPM analyses.[495] EMCOS' witness, Dr. Lesser performed a two-stage DCF model using the S&P 500 as a proxy for the market as a whole to calculate the estimated return on the entire market. EMCOS assert that the use of the two-stage DCF to calculate the equity risk premium component of the CAPM is more consistent with academic literature and is necessary to recognize that the market itself "cannot grow forever faster than the economy."[496]

227. EMCOS state that NETOs' misapplications of the DCF analysis include, among other things, the use of a simplified single-stage, constant growth DCF "analysis" of the S&P 500, unscreened for unsustainable growth rates, in calculating the market return component of their CAPM analyses and NETOs' failure to use a two-stage DCF while assuming that the growth rates will continue in perpetuity.[497] EMCOS assert that NETOs' misapplication of the DCF analysis overstates the market return component of NETOs' CAPM by between 200 and 400 basis points. EMCOS contend that the use of weighted growth rates in the calculation of the CAPM market return, as proposed by both CAPs and Trial Staff, has not corrected NETOs' misapplication of the CAPM methodology.[498]

228. NETOs assert that, in the Briefing Order, the Commission envisioned that there would be differences between models and these differences are a feature of the new approach. NETOs add that the Commission found "combining estimates from different models is more accurate than relying on a single model" and combining "different approaches to estimating the cost of equity, …, reduces the risk of relying on only one model."[499] NETOs state that the Commission carefully considered the CAPM analysis. NETOs explain that in Opinion No. 531-B, the Commission found that "NETOs' CAPM

---

[494] *Id.* at 12.

[495] EMCOS Initial Br. (I) at 27 (citing Ex. EMC-0200 at PP 91-104).

[496] *Id.* at 29 (Ex. EMC-0200 at P 95) (citing Morin at 308 ("It is useful to remember that eventually all company growth rates, especially utility services growth rates, converge to a level consistent with the growth rate of the aggregate economy.").

[497] *Id.* at 12-13 (citing Lesser Reply Aff. at PP 6-31).

[498] EMCOS Reply Br. (I) at 13.

[499] Briefing Order, 165 FERC ¶ 61,030 at P 38; NETOs Reply Br. (I) at 35.

approach is a generally accepted methodology routinely relied upon by investors and, therefore, one appropriately used to corroborate our own analysis."[500]

229. CAPs also argue that, contrary to NETOs' assertion, investors do expect growth for electric utilities to converge to GDP as described by Dr Woodridge[501] CAPs add that Opinion No. 531 similarly combines analysts' forecast growth with GDP-based sustainable growth to yield one growth estimate and implied equity cost per proxy company.[502]

230. NETOs state that, because the average of forecast GDP growth rates underestimates the long-term growth of electric utility earnings, the Commission should consider, for future application, a long-term growth estimate other than GDP for the second step of the two-step DCF analysis.[503] NETOs add that investors do not reference long-term GDP growth in evaluating expectations for individual electric utility industry common stocks, rather, they tend to consider three- to-five-year earnings per share estimates and the record in this proceeding shows no evidence that electric utilities have reached a mature stage where their growth rates can be expected to converge with that of GDP.[504] In fact, NETOs argue that their expert witnesses Dr. Avera and Mr. McKenzie have stated that "there is very clear evidence that a two-step DCF model which uses GDP

---

[500] NETOs Initial Br. (I) at 33 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 108, 129 (explaining that "[b]ecause investors rely on expected earnings analyses to help estimate the opportunity cost of investing in a particular utility, we find this type of analysis useful in corroborating [the Commission's decision]")).

[501] *See* Ex. CAP-19 at 59-63, 69-75; Ex. CAP-500 at 23; Ex. CAP-600, Sections III and VII.

[502] CAPs Principal Reply Br. at 17 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 77 ("The Commission adopted the two-step DCF methodology because, among other reasons, its incorporation of a long-term growth projection in the cost of equity calculation would have the effect of ascribing sustainable long-term growth to all members of a proxy group. Thus, the Commission's adoption of the two-step DCF methodology accomplishes what the use of the 'br + sv' formula was intended to accomplish.")) (internal citations omitted).

[503] NETOs state that, while they believe that the GDP forecasts used in the present proceedings underestimate their long-term growth, they are *not* proposing or asking that the Commission revise this aspect of its ROE-setting analysis for the *present* proceedings. NETOs Initial Br. (I) at 50 n.182.

[504] NETOs Initial Br. (I) at 50-51.

growth rate in accordance with Opinion No. 531 "results in cost of equity estimates that fall far below investors' expectations . . . "[505]

231. Additionally, NETOs argue that the academic literature supports Mr. McKenzie's conclusion that "the growth rates used in NETOs' CAPM studies are representative of the consensus expectations for the dividend paying firms in the S&P 500 Index as a whole."[506] NETOs contend that this undermines the claims made by CAPs, EMCOS, and Trial Staff that growth patterns must be constrained by GDP, rather than be allowed to reflect the "drastic changes" expected by investors for some securities.[507] Further, with respect to CAPs' assertion that the Commission did not understand that NETOs' study was on the 390 specific large-cap stocks, NETOs argue that the Commission understood NETOs' analysis. In fact, NETOs state that the Commission found that "NETOs developed the market risk premium in their CAPM analysis in exactly this way, by conducting a DCF analysis of the *dividend-paying companies* in the S&P 500 to determine the required return on the overall market."[508]

### c. Commission Determination

232. As NETOs propose and, consistent with Opinion Nos. 569 and 569-A, we find that estimating the CAPM expected market return using a forward-looking approach based on applying the DCF model to the dividend paying members of the S&P 500 is reasonable.[509] No participant opposes the use of a DCF analysis of the dividend-paying members of the S&P 500 to estimate the expected market return. However, CAPs, EMCOS, and Trial Staff disagree with the use of the one-step DCF model for the CAPM without any long-term growth projection based on GDP. As discussed below, we are not persuaded by CAPs' and Trial Staff's arguments in support of a two-step DCF analysis to calculate the CAPM expected market return.

---

[505] *Id.* at 51.

[506] NETOs Reply Br. (I), McKenzie Reply Aff. at 27-28 (quoting Robert S. Harris, *Using Analysts' Growth Forecasts to Estimate Shareholder Required Rates of Return,* 15 Fin. Mgmt., 58-63 (Spring 1986)).

[507] NETOs Reply Br. (I) at 41.

[508] *Id.* at 44 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 113 (emphasis added by NETOs)).

[509] Opinion No. 569, 169 FERC ¶ 61,129 at P 260; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 85.

233. Financial research supports using a one-step DCF analysis of the dividend paying members of the S&P 500 when determining a forward-looking expected market return as part of the CAPM model. For example, in *Estimating Shareholder Risk Premia*, Harris and Marston present estimates of shareholder required rates of return and risk premiums using forward-looking analysts' growth forecasts. They state that "a 'market' required rate of return is calculated using each dividend paying stock in the S&P 500 for which data is available."[510] In describing this process, the authors state, "[t]his expectational approach employs the [DCF model] in which a consensus measure of financial analysts' forecasts . . . of earnings is used as a proxy for investor expectations."[511] They continue that "[t]he mean value of individual analysts' forecasts of five-year growth rate in [earnings per share (EPS)] will be used as a proxy for *g* in the DCF model," and state that the "five-year horizon is the longest horizon over which such forecasts are available from IBES and often is the longest horizon used by analysts."[512] A second study cautions against "the introduction of *ad hoc* assumptions about future growth" beyond the five-year time-frame used by IBES.[513] That study also emphasizes, "[i]mportantly, however, the approach is applied to portfolios of stocks rather than to individual securities, since future growth patterns may be expected to have drastic changes for some specific securities."[514] Thus, these studies support Opinion No. 531-B's holding that a long-term growth projection is not needed when performing a DCF analysis of a portfolio of stocks, despite the fact such a growth projection is needed when doing a DCF analysis of a single utility.[515] We note that the third study also relies solely upon analysts' five-year IBES growth forecasts.[516]

234. Consistent with the Commission's determination in Opinion No. 531-B, we continue to find that the rationale for incorporating a long-term growth rate estimate in conducting a two-step DCF analysis of a specific group of utilities does not apply when

---

[510] Robert S. Harris & Felicia C. Marston, *Estimating Shareholder Risk Premia Using Analysts' Growth Forecasts,* 21 Fin. Mgmt. 63, 65 (Summer 1992).

[511] *Id.* at 2.

[512] *Id.*

[513] Harris, *supra* note 448, at 61.

[514] *Id.*

[515] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 113.

[516] Ex. EMC-0224 at 3-4.

conducting a DCF study of the companies in the S&P 500.[517] The Commission's rationale for incorporating a long-term growth rate estimate in DCF analyses for public utilities is that it is often unrealistic and unsustainable for high short-term growth rates to continue in perpetuity for a particular utility or group of utilities.[518] The purpose of the DCF analysis in the CAPM model differs from the purpose of using the DCF analysis to directly estimate a utility's cost of equity. The purpose of the DCF analysis in the CAPM model is to determine the "required return on the overall market" that will be used to determine the market risk premium—which is based on the difference between the "required return on the overall market" and the risk-free rate.[519]

235. As the Commission found in Opinion No. 569[520] and described above, the required return on the overall market is determined by conducting a DCF study of "a representative market index, such as the Standard & Poor's 500 Index."[521] In Opinion No. 569, the Commission found that there are at least two reasons why it is not necessary to include a long-term growth projection based on GDP in a DCF analysis of dividend paying companies in the S&P 500. First, the S&P 500 is regularly updated to ensure, among other things, that it only includes companies with high market capitalization[522] and that it remains representative of the industries in the economy of the United States. Although the value of the S&P 500 index is held constant when one company is replaced by another, as CAPs state,[523] the updating of the companies in the index has the general effect of substituting companies with declining stock values and market capitalization with companies with growing stock values and market capitalization. As Mr. McKenzie testified for NETOs, "[a]s a result formerly successful firms are supplanted by new firms with potential for high growth."[524] CAPs contest this reasoning on the ground that, although the companies in the S&P 500 are updated, NETOs performed a DCF analysis

---

[517] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 113.

[518] *See* Opinion No. 531, 147 FERC ¶ 61,234 at P 36 n.63.

[519] *See id.* P 113.

[520] Opinion No. 569, 169 FERC ¶ 61,129 at P 264.

[521] Morin at 159.

[522] Currently, in order to be included in the S&P 500, a company must have a market capitalization of at least $2.96 billion, calculated by multiplying outstanding shares of stock by stock price.

[523] CAPs Principal Initial Br. at 37.

[524] NETOs Reply Br. (I), McKenzie Reply Aff. at 27.

of a specific group of about 400 companies, and there is no reason to expect that a group of stocks "can perpetually grow their earnings more rapidly than the economy as a whole."[525] This argument misses the point. Although NETOs applied their DCF analysis to the specific companies who happened to be the dividend paying members of the S&P 500 at that point in time, the purpose of the analysis was to determine a required return on the overall market as represented by an investment in the S&P 500, which is regularly updated. Thus, it is reasonable for the inputs used in the DCF analysis, including the growth projections, to be selected based on the assumption that the subject companies will be updated in the manner described above.

236. Second, in Opinion No. 569, the Commission found that, because the dividend paying members of the S&P 500 constitute a large portfolio of stocks, they include companies at all stages of growth.[526] The Commission explained that some are relatively young companies with new products that have not yet fully penetrated the markets and thus are likely to have quite high IBES growth rates. The Commission stated that, however, other companies are mature companies with limited growth potential which are likely to have quite low IBES growth rates. The Commission explained that the inclusion of the IBES growth rates of such mature companies in the overall average IBES growth rate of all the dividend paying members of the S&P 500 performs the same role as the inclusion of the long-term GDP growth rate in the DCF analysis of a single utility: it reflects the fact that companies cannot maintain indefinitely the high growth rates of their early years. The Commission concluded that, thus, using the IBES growth rates of all dividend paying S&P 500 companies, without using a long-term GDP growth projection can reasonably reflect investors' consensus expectations about the S&P 500 as a whole. We agree with this reasoning, which supports our finding that it is not necessary to include a long-term growth projection based on GDP in a DCF analysis of dividend paying companies in the S&P 500.

237. Consistent with the Commission's determination in Opinion No. 569, we find that, while it may be unreasonable to expect an individual company to sustain high short-term growth rates in perpetuity, the same cannot be said for a broad representative market index that is regularly updated to include new companies. Put differently, a portfolio of companies behaves differently than an individual company. Accordingly, the rationale for incorporating a long-term growth rate estimate in conducting a two-step DCF analysis of a specific utility or group of utilities for purposes of directly estimating cost of equity does not apply to the DCF analysis that is performed as part of the CAPM which analyzes a broad representative market index with a wide variety of companies that is regularly

---

[525] CAPs Principal Initial Br. (I) at 34.

[526] Opinion No. 569, 169 FERC ¶ 61,129 at P 265.

updated to include new companies for purposes of determining the required return to the overall market.

238. Moreover, in *MISO TOs v. FERC*, the court considered the Commission's use of only a short-term growth rate and the application of that to the S&P 500 in the Commission's ROE analysis.[527] The court concluded that the Commission "adequately explained that decision,"[528] noting the Commission's rationale that "short-term rates better reflect an investor's expected return on an investment in the S&P 500 as an index . . .because the S&P 500 is regularly updated to include only companies with high market capitalization"[529] and that "the S&P 500 includes companies at all stages of growth, so older companies with lower growth potential will balance out younger companies with higher growth potential."[530]

### 2. Betas and Size Premium

#### a. Background

239. In Opinion No. 569, the Commission affirmed the approach in Opinion No. 531-B that the size adjustment is "a generally accepted approach to CAPM analyses."[531] The Commission stated that substantial evidence in the record supported the conclusion that investors rely on *Value Line* betas. While the Commission acknowledged that there is an imperfect correspondence between the size premia being developed with different betas, it concluded that the size adjustments improve the accuracy of the CAPM results and cause it to better correspond to the costs of capital estimates employed by investors.[532]

240. The Commission also found that the application of size adjustments based on the New York Stock Exchange (NYSE) to dividend-paying members of the S&P 500 is acceptable, as the use of the NYSE for the size premium adjustment enabled Ibbotson

---

[527] *MISO TOs v. FERC*, 45 F.4th at 259-260.

[528] *Id.* at 260.

[529] *Id.*

[530] *Id.*

[531] *Id.* P 296 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 117).

[532] *Id.* P 297.

Associates to develop a rich data set,[533] and found no evidence that companies in the S&P 500 feature different risk premia than those in the NYSE.[534]

241. The Commission disagreed with intervenors that the utility industry is unique, and that the size premium adjustment would therefore be inapplicable, as the size premium adjustments are supported by a robust data set. The Commission noted that there are variations in the risk profiles of firms of any industry and there was insufficient evidence in the record to conclude that factors specific to the utility industry insulate smaller utilities from risks such that the CAPM betas sufficiently account for any increased risks and corresponding returns demanded by investors.[535]

242. In Opinion No. 569-A, the Commission continued to find that the size adjustment is necessary to correct for the CAPM's inability to fully account for the impact of firm size when determining the cost of equity. The Commission reiterated its finding in Opinion No. 569 that there is substantial evidence indicating that investors rely on *Value Line* betas in making investment decisions.[536] Furthermore, the Commission explained that it was not persuaded by arguments that betas calculated based on the NYSE cannot be used with the S&P 500. The Commission upheld its finding that size adjustments are appropriate for the utility industry and that they improve the overall accuracy of the CAPM results.[537]

243. In Opinion No. 569-A, the Commission acknowledged the imperfect correspondence with applying *Value Line* betas derived from the NYSE to risk premiums developed using the S&P 500. However, the Commission found that it is not reasonable to calculate the risk premium using the full 2800 companies in the NYSE.[538] In *MISO TOs v. FERC*, the court "reject[ed] the challenge to FERC's decision to combine adjusted betas based on the [NYSE] with an expected return based on the S&P 500."[539] The court noted that "FERC concluded that it would not be reasonable to calculate an expected

---

[533] Ibbotson Associates, now under Duff & Phelps, has long published a series quantifying this effect for various sizes of firms, pulling from data going back to 1926.

[534] Opinion No. 569, 169 FERC ¶ 61,129 at P 298.

[535] *Id.* P 303.

[536] *See id.* P 297.

[537] *Id.* PP 297-98, 301, 303; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 75.

[538] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 75.

[539] *MISO TOs v. FERC*, 45 F.4th at 260.

return using all 2,800 companies in the [NYSE]. And no party provided adjusted betas from the appropriate time frame based on the S&P 500."[540]

b. **Briefs**

244. CAPs argue that NETOs' CAPM study referenced in the Briefing Order, and the corresponding studies for the other study periods, all include an upwards "size adjustment" because of the assumption that small companies' betas don't accurately capture their risk relative to the broader market. However, CAPs contend that all of the studies that NETOs cited were based on historical studies of relatively large companies rather than studies applicable to utilities. CAPs add that published academic research rejects the claim that a size adjustment should be applied to utilities and that, the same historical data demonstrates that no size adjustment is appropriate for firms with betas less than one.[541] CAPs also argue that the Commission's assertion that "smaller firms are riskier than larger firms, and therefore experience faster growth"[542] is insufficient to justify a "size adjustment," which is applied on top of the company-specific betas through which the CAPM studies capture risk and growth rate differences.[543]

245. CAPs state that a size adjustment exacerbates a mismatch between the proxy members' betas and the underlying DCF analysis and takes the CAPM even further away from the assumption that, to the limited extent a CAPM equity market return is based on a DCF study of a stock index, "[f]or reasons of consistency, the market index employed should be the same as the market index used in deriving estimates of beta."[544] CAPs contend that, in NETOs' CAPM studies, the short-term growth of specified large, dividend-paying stocks is mismatched with betas derived from a volatility comparison to the NYSE index, which contains more than 2000 stocks and is thus stabilized by diversification effects.[545] Therefore, CAPs argue that the CAPM study should stick to the

---

[540] *Id.*

[541] CAPs Principal Initial Br. at 33 (citing Ex. CAP-19 at 98-103).

[542] *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 117.

[543] CAPs Principal Initial Br. at 40.

[544] *Id.* (citing Morin at 159-60).

[545] *Id.* at 40 (citing NET-1705 at 1; Andrew J. Cueter, Value Line, *Using Beta* (Oct. 2, 2012), http://www.valueline.com/Tools/Educational_Articles/Stocks/Using_Beta.aspx#.VvwHKNIrJaQ ("At Value Line, we derive the Beta coefficient from a regression analysis of the relationship between weekly percentage changes in the price of a stock and weekly

straightforward equity cost formula,[546] and departing from that equation to add an unsupported "size premium" does not advance the accurate estimation of investors' required equity return.[547] CAPs state that the betas used in NETOs' CAPM study are inflated through a comparison of mid-cap proxy companies to a larger and more diverse stocks than are used for the equity Risk Premium and that this inflated result is then increased further by comparing results to historic returns on each year's largest-cap decile of all stocks.[548]

246. CAPs' witness, Dr. Woolridge, argues that the betas used by NETOs are inflated because they are adjusted towards unity over a short, five-year time period, and that size adjustments should not be included in CAPM analysis because they do not apply to electric utilities.[549] Dr. Woolridge adds that there has been no consensus among academic and investment journals on whether a size premium in stock returns exists. Dr. Woolridge states that, for this reason, it cannot be concluded that investors rely on size premiums. Dr. Woolridge argues NETOs application of a size premium adds 40-120 basis points to their CAPM results.[550]

247. Trial Staff supports removing the size premium adjustment for several reasons. First, Trial Staff states that academic experts conclude this approach is questionable, with some experts concluding that the size of a company no longer influences stock returns, that there never was such an effect, or that this effect doesn't apply to most companies.[551] Trial Staff explains further that other experts conclude a size premium could double count risk because forward looking risk premiums do not yield premiums for small capital stocks, and this theory could conclude that there is no need to adjust company size for utility rate regulation. Second, Trial Staff explains that the data used to support a size adjustment contradicts forward-looking methods because it is based on historical data.[552]

---

percentage changes in the NYSE Composite Index over a period of five years.")).

[546] Which is derived as equity cost = risk-free rate + (market risk premium * b) = equity market return – [market risk premium *(1 – b)].

[547] CAPs Principal Initial Br. at 41.

[548] CAPs Br. on Exceptions (II, IIII) at 75-76.

[549] Ex. CAP-600, Woolridge Reply Aff. at PP 12-16.

[550] *Id.* PP 14-16.

[551] Trial Staff Initial Br. (I) at 14.

[552] *Id.* at 14-15.

Trial Staff states that the Commission, in Opinion No. 531, has previously rejected CAPM analysis because of the historical market risk premiums used in that analysis, and the Commission has indicated its interest in forward-looking analyses of rates of return in markets.[553] Third, Trial Staff notes that a regression analysis provided in its Affidavit did not support a meaningful relationship between forward-looking DCF results and current market capitalizations.[554] Trial Staff explains that it would be contradictory to require a size adjustment on a forward-looking basis for the proxy group companies that include many S&P 500 companies, because the market return the Commission found informative in Opinion No. 531 shows no relationship between individual-forward looking ROEs and their relative market capitalizations.[555] Trial Staff also cites academic work by Annie Wong as evidence that the size adjustment does not apply to utilities.[556]

248. In its Reply Brief, Trial Staff disputes NETOs' classification of the size adjustment premium as the least controversial part of CAPM. Trial Staff agrees with arguments from CAPs that the size adjustment premium should be removed, is unsupported, and could result in double counting. Specifically, Trial Staff agrees that there is no empirical evidence to support that the size adjustment is necessary. Additionally, Trial Staff notes that academic research cited in *New Regulatory Finance* casts doubt as to whether the financial industry accepts it as a best practice.[557] Trial Staff states that this adjustment only inflates the ROE if CAPM is used to calculate ROE.[558] In its Brief on Exceptions, Trial Staff argues that NETOs' CAPM analysis does not recognize risk differences between utilities and the rest of the stock market by inappropriately applying Morningstar size premiums. Specifically, Trial Staff states that, according to Duff & Phelps, LLC, NETOs should evaluate a regulated utility's relative risk by its operating margin and variability of operating margin. However, Trial Staff argues that NETOs do not reflect risk characteristics like the variability in operating

---

[553] *Id.* at 15 (citing Opinion No. 531 at P 147 n.292; *Minn. Power & Light Co.*, 3 FERC ¶ 61,045, at 61,132-33 (1978)).

[554] *Id.* at 14-15.

[555] *Id.* at 15 (citing Keyton Aff. at P 41).

[556] Keyton Aff. at 24 (citing Annie Wong, *Utility Stocks and the Size Effect: An Empirical Analysis*, J. of Midwest Fin. Assoc. 95 (1993)).

[557] Trial Staff Reply Br. (I) at 9 (citing Robert F. Bruner, Kenneth M. Eades, Robert S. Harris, and Robert C. Higgins, *Best Practices in Estimating Cost of Capital: Survey and Synthesis*, Fin. Practice and Educ. (1998)).

[558] Trial Staff Reply Br. (I) at 10-11.

margin cash flows of the regulated utility in the cost of capital, which only provides the risks of the typical firm in an asset category.[559]

249. Trial Staff states that estimates from several sources in the investment community support the conclusion that NETOs' CAPM analysis yields unreasonably inflated results by improperly applying size premiums in a way not advised by experts. Specifically, Trial Staff explain estimates from the March 2014 *Value Line* Investment Advice, the *American Appraisal Equity Risk Premium Quarterly*, and Duff & Phelps, LLC all use Risk Premium estimates that are much lower than NETOs' market equity Risk Premium of 8.7% or 7.9% for the Second Complaint period, and the expected market rate of return on equity of 12.5% for the Second Complaint period.[560]

250. EMCOS argue that, consistent with CAPM analyses that the Commission previously accepted,[561] Dr. Lesser added a size premium to the CAPM results for the proxy group companies using the estimates Duff & Phelps publishes, which are broken out for company size by decile.[562] EMCOS state that it is common to use *Value Line* betas in CAPM application[563] and reliance on *Value Line* betas makes it critical that all proxy group members be covered by *Value Line* and that published beta values cannot be "mixed-and-matched" because different financial entities use different methodologies to estimate those beta values.[564]

251. In their Brief on Exceptions, EMCOS argue that Initial Decision (I) errs because it does not respond to the showing that NETOs' CAPM should be rejected. EMCOS argue that they demonstrated that NETOs' witness Dr. Avera did not apply size premiums appropriately to NETOs' CAPM. EMCOS also state that Dr. Avera's size adjustment relied on betas and Risk Premiums from 88 years of data covering three separate stock

---

[559] Trial Staff Br. on Exceptions (II, III) at 39-40; Trial Staff Br. Opposing Exceptions (II, III) at 26.

[560] Trial Staff explain these sources estimate a range of 5% to 6% market equity risk premium and 8.5% to 9% expected market rate of return on equity. Trial Staff Br. on Exceptions (II, III) at 38-39.

[561] *See* Opinion No. 551, 156 FERC ¶ 61,234 at P 166; Opinion No. 531-B, 150 FERC ¶ 61,165 at P 117.

[562] EMCOS Initial Br. (I) at 29; Ex. EMC-0200 at P 103 (citing Duff and Phelps, Cost of Capital Navigator, https://costofcapital.duffandphelps.com/landing).

[563] *See* Ex. EMC-0200 at P 30.

[564] EMCOS Initial Br. (I) at 28; Ex. EMC-0200 at P 54.

markets, and the Commission has concerns with use of betas and Risk Premiums based on extended historical periods.[565] EMCOS argue that Initial Decision (I) does not explain why EMCOS' arguments regarding this historical data were unpersuasive, which is concerning because the data is not current or *ex ante* as required by Opinion No. 531. EMCOS state the Commission should reject Initial Decision (I)'s finding on NETOs' CAPM because it does not address EMCOS' arguments with its rejection of evidence provided by Trial Staff and CAPs and that the Commission should modify Initial Decision (I) to remove NETOs' CAPM from consideration.[566]

252. CAPs argue that using betas sourced from *Value Line,* which adjusts betas to be weighted averages of actual beta and unity, requires a second stage GDP-based component to determine market Risk Premium to which the betas are multiplied.[567] CAPs explain it should be recognized that convergence does not occur quickly, and the one-third weighting of betas adjusted for unity assumes a period longer than the five-year period to derive unadjusted betas, in which the unadjusted betas are combined with second stage betas adjusted for unity.[568] CAPs argue that, given that the Commission recognizes that analyst estimates that represent the views of multiple analysts are more robustly representative of investors' expectations, the Commission could recognize that a larger number of analysts contribute to IBES estimates than to *Value Line's* expected earnings on book equity. According to CAPs, this recognition can be accomplished by weighting those two models differently when combining them.[569]

253. In their Reply Brief, NETOs argue that CAPs demonstrate that betas based on *Value Line* are common in CAPM applications, objective, well-accepted, and relied on by investors. Furthermore, NETOs state the Commission has already accepted *Value Line* as an appropriate source for betas used in the CAPM analysis.[570] NETOs state that the Commission has already rejected the arguments against using a size adjustment raised by

---

[565] EMCOS Br. on Exceptions (II, III) at 38-39 (citing *Generic Determination of Rate of Return on Common Equity for Pub. Utilities*, Order No. 420, FERC Stats. & Regs. ¶ 30,644 at 31,364 (1985)).

[566] *Id.* at 39-40.

[567] CAPs explain that *Value Line* betas are adjusted to assume that over the long term, companies with betas below unit, or one, increase toward unity, the "Blume adjustment." CAPs Principal Initial Br. at 38-39.

[568] *Id.* at 39.

[569] *Id.* at 74.

[570] NETOs Reply Br. (I) at 48.

CAPs, and has explained size adjustments as "generally accepted in CAPM analyses."[571] NETOs argue that none of the claims regarding size adjustments from Trial Staff or CAPs sufficiently dispute this finding. NETOs' witness Mr. McKenzie continues to advocate for a size adjustment, because financial research supports that differences in investors required rates of return based on the size of a company are not totally captured by beta. NETOs explain that their witness, Mr. McKenzie, notes that a study in *Public Utilities Fortnightly* finds that betas for small companies are not totally explained by CAPM, and differences in risk premiums according to firm size are especially distinct for smaller utilities.[572] NETOs state that the Commission rejected arguments against size adjustments in Opinion No. 551, concluding that research supports a company's beta may not capture systemic risk for small companies.[573]

254. Additionally, NETOs argue that, contrary to any contentions that *Value Line* betas overstate utility riskiness, investors rely on *Value Line* betas in evaluating expected returns for utility common stocks.[574] NETOs also add that Dr. Morin in his support for *Value Line* betas, states that "*Value Line* betas are computed on a theoretically sound basis using a broadly-based market index."[575]

### c. <u>Commission Determination</u>

255. Consistent with Opinion No. 569 *et seq.*, we find that the size adjustment is necessary to correct for the CAPM's inability to fully account for the impact of firm size when determining the cost of equity, and that there is substantial evidence indicating that investors rely on *Value Line* betas in making investment decisions.[576] Despite assertions that the academic literature supporting size adjustments is inconclusive, we find sufficient support for their use in the CAPM. Specifically, Dr. Morin supports the "size effect," finding that:

---

[571] *Id.* at 50 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 117).

[572] *Id.* at 50-51.

[573] *Id.* at 51.

[574] *Id.* at 39; Ex. NET-02200 (IV) at 151 (McKenzie Answering Test.).

[575] *Id.* (citing Opinion No. 551, 156 FERC ¶ 61,234 at P 64 n.154 (affirming *Value Line* as a valid source for betas); Morin at 71; Ex. NET-300 (I) at 67 (stating that "in my experience [*Value Line*] is the most widely referenced source for beta in regulatory proceedings")).

[576] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 297.

> Investment risk increases as company size diminishes, all else remaining constant. Small companies have very different returns than large ones, and on average they have been higher. The greater risk of small stocks does not fully account for their higher returns over many historical periods.[577]

256. Dr. Morin also avers that the higher returns required by investors in small companies than the CAPM would project is well documented in the financial literature.[578] Specifically, Dr. Morin cites to work by Rolf Banz showing that, from 1936 to 1975, stocks of small firms earned higher risk-adjusted abnormal returns than those of large firms.[579] Eleswarapu Reinganum found a similar dynamic, looking at the relationship between firm size and price-earnings ratio.[580] Duff & Phelps has long published a series quantifying this effect for various sizes of firms, using data going back to 1926.

257. We also find there to be insufficient reason to conclude that the utility industry is unique in such a way as to render the size adjustment inapplicable, as certain intervenors suggest. The size premium adjustment is supported by a robust data set. Although the variations in the risk profiles of firms in any industry inevitably vary to some degree, we do not see sufficient evidence in the record to conclude that factors specific to the utility industry insulate smaller utilities from risks such that the CAPM betas sufficiently account for any increased risks and corresponding returns demanded by investors.

258. We also disagree with CAPs' concern that the short-term growth rates of specified large, dividend-paying stocks are mismatched with betas derived from a comparison to the NYSE index. By definition, betas compare stock price fluctuations of individual companies or groups of companies with specific risk profiles to the broader market in order to assess their risk. We find that such a "mismatch" is integral to the use of betas, which no party argues should be omitted from the CAPM. Furthermore, we find that CAPs' argument does not convincingly link such a "mismatch" to the inappropriateness of using a size adjustment. Moreover, in *MISO TOs v. FERC*, the court addressed a similar "challenge to FERC's decision to combine adjusted betas based on the [NYSE]

---

[577] Morin at 181.

[578] *Id.* at 181-83.

[579] *Id.* (citing Rolf Banz, *The Relationship between Return and Market Value of Common Stocks*, 9 J. of Fin. Econ. 3 (1981)).

[580] Eleswarapu Reinganum, *Misspecification of Capital Asset Pricing Empirical Anomalies Based on Earnings Yields and Market Values*, 9 J. of Fin. Econ. 19 (1981).

with an expected return based on the S&P 500"[581] and found that the Commission's decision "was not arbitrary and capricious."[582]

259. We also disagree with EMCOS' concerns about the historic nature of the size adjustment. Although the Commission seeks for inputs to be ultimately forward-looking, we do not object to using historic data in this instance. Ibbotson Associates used historic data as the basis for an estimate of the current size adjustment necessary to correct CAPM shortcomings.[583] The 88 years of data underlying the size adjustment enhance its reliability and robustness.

260. We also find unconvincing Mr. Keyton's regression analyses demonstrating that a size premium adjustment is not appropriate for the CAPM. Mr. Keyton's regression analyses examine the relationship between forward-looking DCF results and company size. Although DCF results do reflect the cost of capital required by investors, the DCF model is fundamentally different than the CAPM model, which relies on a distinct set of assumptions, inputs, and calculations. This diversity is part of the reason that we are including the CAPM model. By the same rationale, a regression analysis on the reasonableness of CAPM model inputs using the DCF model is unpersuasive, since that model does not consider betas at all.

261. We continue to find reasonable the use of *Value Line* adjusted betas in the CAPM methodology and disagree with CAPs' assertion that doing so requires using a second-stage GDP-based component. Consistent with our finding in Opinion No. 569, "the rationale for incorporating a long-term growth rate estimate in conducting a two-step DCF analysis of a specific group of utilities does not apply when conducting a DCF study of the companies in the S&P 500."[584] Because the S&P 500 regularly substitutes out constituent companies, it is inappropriate to apply a long-term adjustment to the growth rates, as discussed above. We also continue to find that size adjustments are appropriate for the utility industry and improve the overall accuracy of the CAPM results.[585] Consistent with our findings in Opinion No. 569, we continue to find that the financial

---

[581] *MISO TOs v. FERC*, 45 F.4th at 260.

[582] *Id.* While only Value Line betas are available in this proceeding, we note that the Commission has found that Bloomberg-based betas are more appropriate to develop size premia when available in the record. *Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019, at P 85 (2021).

[583] *See* Morningstar, *2015 Ibbotson SBBI Market Report* (2015).

[584] *Id.* P 263.

[585] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 297-98, 301, 303.

literature arguing against the continued existence of the size premium or its applicability to utilities is unavailing. Specifically, we do not find persuasive the cited article by Professor Annie Wong finding that utilities are less risky than industrial stocks and feature betas that do not decrease with firm size.[586] Even if true, the argument in favor of a size premium adjustment is that there are differences in risk and required returns between small and large companies that are not captured in the betas. Consequently, lack of substantial variance in the betas between large and small companies is not indicative that they feature differences in risk and corresponding returns that are the basis for the size premium adjustment. The subsequent endorsement of this phenomenon, by Dr. Morin, lends credence to the view that Professor Wong's conclusions are no longer valid. Furthermore, an article reconsiders Professor Wong's evidence and concludes that "new information . . . indicates that there is a small firm effect in the utility sector."[587] A more recent article published in *Business Valuation Review* found that "none of the academic papers throughout the last three decades have qualified the [size premium] as a statistical error."[588] Finally, as noted in Opinion No. 569, a 2019 National Association of Certified Valuators and Analysts publication supports the use of the size premium adjustment to the CAPM.[589] We thus find that, based on the evidence of this dynamic and that many investors consider it when evaluating companies, it is appropriate to include it in CAPM determinations.

## C. CAPM S&P 500 Screens

### 1. Background

262. In Opinion No. 569, the Commission accepted Trial Staff's proposal to screen from the CAPM analysis S&P 500 companies with growth rates that are less than or equal to zero or greater than or equal to 20%. The Commission stated that such a screen is consistent with the elimination of outliers elsewhere in the ROE methodology, as such

---

[586] Annie Wong, *Utility Stocks and the Size Effect: An Empirical Analysis*, J. of Midwest Fin. Assoc. 95 (1993).

[587] Thomas M. Zepp, *Utility Stocks and the Size Effect—Revisited*, 43 Quarterly Review of Economics and Finance 578–82 (2003).

[588] Roger A. Grabowski, *The Size Effect Continues to be Relevant When Estimating the Cost of Capital*, 37 Bus. Valuation Rev. 93–109 (Fall 2018).

[589] Opinion No. 569, 169 FERC ¶ 61,129 at P 301 (citing Roger G. Ibbotson & James P. Harrington, *Using a Non-Beta-Adjusted Size Premium in the Context of the CAPM Will Likely Overstate Risk and Understate Value*, Quick Read (Jan. 30, 2019), https://quickreadbuzz.com/2019/01/30/business-valuation-grabowski-harringtonsing-a-nonbeta-adjusted-size-premium/).

high or low growth rates are highly unsustainable and non-representative of the growth rates of the electric utilities in the proxy groups.[590] In Opinion No. 569-A, the Commission continued to find that it was appropriate to screen companies with growth rates that are less than or equal to zero or greater than or equal to 20%. It found that zero or negative and very high growth rates are both unsustainable and should thus be excluded from the determination of the CAPM Risk Premium, even if they enhance the diversity of covered companies.[591]

### 2. <u>Briefs</u>

263. Trial Staff states that the removal of certain growth rates, as in short-term IBES or composite growth rates that are zero or less and short-term growth rates that are 20% or higher, is important for two reasons. First, this screening removes growth rates that the Commission has determined are economically illogical or unsustainable, and that could be inconsistent with the concept of the DCF model.[592] Trial Staff explains the Commission has also found such high short-term growth rates unsustainable and contrary to economic logic.[593] Therefore, Trial Staff concludes screening out these growth rates ensures the market capitalization is normalized.[594] Second, the screening for growth rates provides consistency among methods. Trial Staff argues that the S&P 500 companies are not an index; therefore, screening criteria should be applied to the market return determined by CAPM to support economic rationale, like any other DCF result.[595]

264. In their Reply Brief, NETOs state that other parties' arguments against using NETOs' growth rate screens do not recognize the distinction between using a DCF for a small proxy group and for the entire S&P 500.[596] NETOs argue that Trial Staff's proposed screens would make the CAPM less accurate and less consistent with investor's expectations because the CAPM does not estimate cost of equity for individual companies in S&P 500, but rather only reflects the weighted average growth rate for

---

[590] *Id.* P 267.

[591] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 77.

[592] Trial Staff Initial Br. (I) at 16-17.

[593] *Id.* at 17 (citing *ISO New Eng., Inc., et al.*, 109 FERC ¶ 61,147, at P 205 (2004)).

[594] *Id.*

[595] *Id.*

[596] NETOs Reply Br. (I) at 47.

various constituents. Therefore, NETOs state that Mr. McKenzie demonstrates that the weighted average growth rate recognizes that there are always companies with growth rates that exceed GDP considerably, and companies with much lower growth rates.[597] NETOs also argue that claims that growth screens can provide consistency across models ignore the Commission's intent to use multiple models to reduce the risk of over-relying on one model.[598]

265. In their Brief on Exceptions, CAPs argue that NETOs' CAPM analysis uses unsustainable growth rates, which should at a minimum be deemed unsustainable for utility companies with first-stage growth rates exceeding 13.3%. CAPs argue that NETOs' CAPM study should have excluded companies with IBES growth rates exceeding 13.3%, which is conservative because 13.3% is outdated and too high.[599] CAPs state that many of the companies used to calculate the 8.9% growth rate are electric or pipeline utilities, which is why the growth rate is clearly unsustainable, economically illogical and inconsistent with Opinion No. 531.

266. CAPs argue that the GDP-based growth constraint clearly applies to the 30 regulated electric utilities and interstate pipeline companies included in the CAPM analysis. CAPs state that not applying the constraint attributes high earning growth for utilities that have high near-term earnings, partly because favorable market conditions allow utilities to replace higher-cost long term debt with new, low-cost debt.[600] However, CAPs explain that excluding these growth rates reduces IBES growth rate for the 2015 market DCF from 8.8% to 8.4%. CAPs explain that they exclude companies with 13.3% growth rates for the 2013 market DCF growth rate to 7.7%, providing a midpoint and median of 9.3% and 9.6%, respectively.[601]

267. Trial Staff disagrees with the Presiding Judge's Initial Decision in the Second and Third Complaints that the two-step DCF methodology makes screening for unsustainable growth rates unnecessary if the Commission reverses the Initial Decision, which did not allow use of *Value Line* growth rates.[602] Trial Staff states that the Presiding Judge's decision to not apply screens for unsustainable growth rates if using two-step DCF

---

[597] *Id.* (citing McKenzie Reply Aff. at 44).

[598] *Id.* at 48.

[599] CAPs Br. on Exceptions (II, III) at 65, 67.

[600] *Id.* at 65-66.

[601] *Id.* at 67.

[602] Trial Staff Br. on Exceptions (II, III) at 10.

methodology is consequential if the Commission were to deny the rejection of NETOs' *Value Line* data, because it would distort the DCF results for the Second Complaint period by incorporating companies with unsustainable growth rates.

### 3. **Commission Determination**

268. We continue to find that S&P 500 companies with growth rates that are less than or equal to zero or greater than or equal to 20% should be screened from the CAPM analysis, as Trial Staff has proposed. Consistent with the Commission's findings in Opinion Nos. 569 and 569-A, we find that these screens are consistent with the elimination of outliers elsewhere in the ROE methodology, as such high or low growth rates are highly unsustainable and non-representative of the growth rates of the electric utilities in the proxy groups.

269. NETOs argue that the screens proposed by Trial Staff would make the CAPM both less accurate and less consistent with investor's expectations because the CAPM reflects the weighted average growth rate that recognizes companies with growth rates that exceed GDP considerably, and companies with much lower growth rates. As the Commission found in Opinion 569 and affirmed in Opinion No. 569-A, negative and very high growth rates are both unsustainable and should thus be excluded from the determination of the CAPM risk premium, even if they enhance the diversity of covered companies.[603] Similarly, we dismiss CAPs' argument that NETOs' CAPM analysis should exclude growth rates that are above 13.3% as inconsistent with our finding that companies with growth rates that are negative or in excess of 20% should be screened from the CAPM analysis. We find that 20%, not 13.3%, is the appropriate growth rate screen for the S&P 500 given the high diversity of sustainable growth rates for S&P 500 companies. We also dismiss NETOs' argument that using growth rates increases risk of over-relying on a single model, as the CAPM and DCF methods are distinct enough to reduce this risk.

## D. **CAPM *Value Line***

### 1. **Background**

270. In Opinion No. 531, the Commission adopted NETOs' five-year IBES growth rate data, finding the growth rate used in the DCF model should be the growth rate expected by the market. The Commission noted that growth rate may not necessarily prove to be the correct growth forecast, but the cost of common equity to a regulated enterprise depends upon what the market expects, not upon what ultimately happens. Accordingly,

---

[603] Opinion 569, 169 FERC ¶ 61,129 at PP 267-268. Opinion No. 569-A, 171 FERC ¶ 61,154 at P 77.

the Commission found that it was appropriate to look to the most recent record evidence of the growth rates actually expected by the investment community.[604]

271. The Commission further explained that it has long relied on IBES growth projections as evidence of the growth rates expected by the investment community. The Commission rejected a proposal from Trial Staff to use RED growth projections published by *reuters.com* for some of the proxy companies in place of the *Yahoo! Finance* IBES growth projections. Noting that the Commission has previously stated that "comparable data can be reasonably substituted for the growth rate data reported by [IBES] or *Value Line*" when the IBES growth rate figures are not available, the Commission found that in Opinion No. 531, NETOs provided IBES growth data for all relevant companies. The Commission also stated it never required that there be two (or more) analysts' long-term growth rates for a company in order for it to be included in a proxy group, and thus rejected the use of RED growth estimates proposed by Trial Staff for a few companies for which the IBES growth projection only reflected the view of one analyst.[605]

272. The Commission explained that an alternate source of growth rate data should only be used when that source can be used for the growth projections of all of the proxy group companies. Specifically, the Commission stated that using different sources of growth rate data for different companies in a proxy group could produce skewed results, because those sources may take different approaches to calculating growth rates. Moreover, the Commission explained, while the sources of growth rate data often rely on many of the same analysts in publishing their estimates, the different sources may use slightly different time periods from one another. For this reason, the Commission stated it has consistently used a single investor service such as IBES for the investment analysts' growth rate estimate. The Commission reaffirmed that there may be more than one valid source of growth rate estimates, in order to ensure that growth rate estimates are internally consistent in an ROE analysis, but found it inappropriate to use estimates from different sources for different proxy group companies.[606]

273. In Opinion No. 531-B, the Commission rejected arguments that the "br + sv" growth rate should be used as the short-term growth rate in the two-step DCF methodology. The Commission explained that the "br + sv" growth formula relies on short-term *Value Line* projections of five years or less for the various inputs to the formula to estimate a company's "sustainable growth rate." The Commission concluded for this reason the formula was unreasonable for use as the short-term growth projection

[604] Opinion No. 531, 147 FERC ¶ 61,234 at P 88.

[605] *Id.* PP 89-90

[606] *Id.* P 90.

in the two-step DCF methodology. The Commission explained in order to estimate a sustainable growth rate, the "br + sv" growth formula contains some elements of a long-term growth projection in addition to a short-term growth projection, and thus is inappropriate for use as a purely short-term growth projection in a two-step DCF methodology. The Commission explained that it adopted the two-step DCF methodology because its incorporation of a long-term growth projection in the cost of equity calculation would have the effect of ascribing sustainable long-term growth to all members of a proxy group.[607] Thus, the Commission concluded the two-step DCF methodology accomplishes what the use of the "br + sv" formula was intended to accomplish.[608]

274. In Opinion No. 569, the Commission, citing precedent, required use of IBES short-term growth rate data, without drawing a distinction between its use in DCF or CAPM analyses.[609] In Opinion No. 569-A, the Commission concluded that IBES is a reliable source of short-term growth rate data and thus found it reasonable for IBES growth rates to be used in the CAPM model. However, the Commission clarified that it would consider the use of *Value Line* short-term growth rates for the CAPM model in future proceedings. The Commission explained that *Value Line* is regularly updated, investors use it, and the Commission seeks to diversify its data sources.[610] The Commission found that the record in the MISO proceedings was insufficient to adopt use of *Value Line* growth rates at that time, noting that there was no CAPM analysis in the record that applied the growth rate screen to *Value* Line short-term growth rates.[611] In Opinion No. 569-B, the Commission continued to find that it is appropriate to consider the use of *Value Line* short-term growth rates for the CAPM model in future proceedings.[612]

---

[607] *Id.* PP 38, 40; Opinion No. 531-B, 150 FERC ¶ 61,165 at P 77.

[608] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 77.

[609] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 101-04.

[610] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 78.

[611] *Id.* P 83.

[612] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 90-91.

### 2. Briefs

#### a. *Value Line* Data

275. In its Brief on Exceptions for the Second and Third Complaints, Trial Staff takes exception to the Presiding Judge substantially accepting Dr. Avera's CAPM analysis and finding that Trial Staff's assertion that NETOs used unreliable, erratic *Value Line* growth rate data in their CAPM analysis is unsupported and unsupported by Commission precedent, despite that the Presiding Judge had earlier rejected use of such *Value Line* growth rates in the DCF analysis.[613]

276. In their Brief on Exceptions, CAPs argue that NETOs' witness Dr. Avera improperly relied on a calculation of both IBES and *Value Line* "Annual Rates" for expected market return. CAPs argue that *Value Line* "Annual Rates" should not be used because its baseline is an averaging of three past years' GAAP earnings, which does not represent forward-looking estimate of growth in earnings. CAPs explain that adjusting the market return used by NETOs to rely only on IBES rates is necessary, yet insufficient, to correct overstated CAPM results.[614]

#### b. Arguments Regarding Commission Precedent

277. NETOs state the Commission has recognized *Value Line* as a widely used, independent investor service that the Commission used to review alternative benchmark methodologies in Docket No. EL11-66. NETOs argue that, contrary to findings of the Presiding Judge, the Commission did not reject the use of *Value Line* data to be compared or blended with first-stage growth rates, but that it rejected the "br + sv" calculation based on *Value Line* data as inappropriate for short-term growth projection in DCF analysis. NETOs argue that the *Value Line* earnings per share growth rate is a short-term projection just like short-term projections from IBES, and therefore this finding from the Commission has no bearing on whether these *Value Line* growth rates should be used.[615]

278. NETOs argue that, while the Presiding Judge is correct that the Commission did not propose or address the *Value Line* growth rates specifically, the Commission did invite alternative sources for growth rates to be used if they could be shown as appropriate and applied consistently across all companies. NETOs state that the

---

[613] Trial Staff Br. on Exceptions (II, III) at 11.

[614] CAPs state that making this adjustment reduces cost of equity by eight basis points to 9.98%. CAPs Br. on Exceptions (II, III) at 64-65.

[615] NETOs Br. on Exceptions (II, III) at 49.

Commission is interested in the growth rate that best measures investor expectations, and *Value Line* is one of the most widely followed sources by investors.[616]

279. CAPs state that Initial Decision (I) upholds Opinion No. 531's rejection of growth rates when IBES growth data is available, and the use of *Value Line* "Annual Rates" has been rejected in recent ROE cases outside of these proceedings.[617] CAPs state that the Commission is interested in growth rates that best measure investor expectations, and the multi-analyst IBES provide the best evidence of investor growth expectations. CAPs argue *Value Line* "Annual Rates" forecasts do not present a representative sample of investor expectations because they are a single firm's forecast, not an aggregation of multiple sources.[618] CAPs state NETOs have not shown that investors rely on *Value Line* "Annual Rates" without also relying on information such as dividend growth projection, historical earnings growth rates, and other growth data with *Value Line* estimates. CAPs state NETOs mischaracterize their claims that *Value Line* is the most widely used investment advisory service according to *New Regulatory Finance* because the conclusions from this source relate to *Value Line* betas, not annual rate estimates. CAPs recognize that IBES is not the only source used by investors, as they use other aggregations compiled by *Zacks*, First Call, SNL, but a source cannot be fully comparable to IBES until it represents a consensus aggregation from multiple analyst resources.[619]

280. EMCOS argue that the invitation from the Commission for alternative growth rates sources was not an authorization of growth rates that rely on backwards-looking data, which would be inappropriate. EMCOS argue that *Value Line* "Annual Growth Rates" may be appropriate for screening distortions related to mergers and acquisitions (M&A), but not for forward-looking ROE, and using this data only serves to manipulate the DCF analysis for inflated results. EMCOS state that the Commission should uphold Initial Decision (II, III)'s rejection of NETOs *Value Line* based DCF analysis.[620]

281. Trial Staff argues that NETOs are incorrect that the Commission allows parties to propose alternative sources of growth rates, and that the Presiding Judge addressed the

---

[616] *Id.* at 50.

[617] CAPs Br. Opposing Exceptions (II, III) at 24-25 (citing Opinion No. 546, 154 FERC ¶ 61,070 at P 192; *Entergy Ark., Inc.*, 151 FERC ¶ 63,008 (2015); *Proxy Group Policy Statement*, 123 FERC ¶ 61,048 at PP 83-84).

[618] *Id.* at 26-28.

[619] *Id.* at 27-29.

[620] EMCOS Br. Opposing Exceptions (II, III) at 31.

incorrect basis in NETOs' testimony that the Commission has used *Value Line* as a credible source in its "br + sv" approach. Trial Staff states that NETOs' witness Dr. Avera recognized at the hearing that the Commission neither proposed nor addressed use of *Value Line* "Annual Rates." Trial Staff argues that *Value Line* "Annual Rates" used in NETOs' CAPM analysis are not the same as the Commission's sustainable growth rates from *Value Line*.[621] Trial Staff explains the Commission's "br + sv" calculation is based on forward-looking current baseline and projected earnings, across the middle of the *Value Line* sheets. For example, Trial Staff states that the growth rates NETOs used for Otter Tail for the Second Complaint period were based on a 2010 to 2012 baseline, versus the Commission's growth rate "br + sv" calculation that is based on 2013 for the Second Complaint period.[622] Trial Staff also states that NETOs' *Value Line* "Annual Rates" for the Third Complaint period were based on 2012 – 2014 data for Otter Tail. Trial Staff states notes that NETOs' *Value Line* DCF results for the Third Complaint period are below the *Yahoo! Finance* IBES results, which is opposite of the results for the Second Complaint period, demonstrating that *Value Line* "Annual Rates" are erratic and create distorted results, in addition to being backward-looking.[623]

282. Trial Staff argues that, while NETOs are correct that *Value Line* is an important source of investors' information, no Commission precedent cited by NETOs supports the use of backward-looking *Value Line* "Annual Rates" for growth rates. Trial Staff argues that Commission precedent is actually contrary to this concept because, in Opinion No. 531 the Commission only references the *Value Line* in regards to the inputs in the "br + sv" calculation, and as the starting point for two-step DCF methodology that does not mention growth rates.[624] Trial Staff states that NETOs' citation to Opinion No. 531-B is not persuasive because it only addresses a preference for IBES by the Commission, and that *Value Line* does not use multiple analysts for its growth rate estimates.[625]

### 3. <u>Commission Determination</u>

283. We find that IBES continues to be a reliable source of short-term growth rate data and, therefore, we find it reasonable to use IBES growth rates in both the DCF model and the CAPM. In Opinion Nos. 569-A and 569-B the Commission stated that it would

---

[621] Trial Staff Br. Opposing Exceptions (II, III) at 30-31.

[622] *Id.* at 31-32.

[623] *Id.* at 32.

[624] *Id.*

[625] *Id.* at 32-33.

consider the use of *Value Line* for the CAPM model for future proceedings.[626] Though the Commission explained that allowing for *Value Line* growth rates in the CAPM provides some benefit by diversifying data sources, the Commission has since elected to use IBES growth rates over *Value Line* growth rates, finding that the use of IBES growth rates in both the DCF and CAPM promotes consistency between the models.[627] Moreover, "the Commission has historically relied on IBES as the preferred source for computing short-term growth rates"[628] while *Value Line* was introduced as "a new growth rate data source" that the Commission would consider using for the newly adopted CAPM.[629] Given our subsequent experience implementing the CAPM,[630] and based on the record before us, we find it appropriate to adopt IBES and not *Value Line* growth rates for the CAPM in these proceedings.[631]

284. We also note that multiple parties argue that *Value Line* growth rates should not be used in the CAPM analysis because these rates are based on historical data.[632] For example, Trial Staff contends that this makes *Value Line* growth rates inherently incomparable to IBES rates. Other parties contend that *Value Line* growth rates do not represent consensus expectations because they are produced by a single analyst, even if they are reviewed by a committee composed of peer analysts. Though we do not agree that the use of historical data necessarily renders a growth rate estimate invalid, we do agree that the use of consensus forecasts like IBES is preferable to those conducted by a single analyst like *Value Line*.[633]

---

[626] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 78; Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 90-91.

[627] *Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019, at P 70, *order on reh'g*, 177 FERC ¶ 61,106 (2021), *order on reh'g*, 178 FERC ¶ 61,116 (2022).

[628] Opinion No. 569, 169 FERC ¶ 61,129 at P 132.

[629] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 79.

[630] *Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019 at P 70, *order on reh'g*, 177 FERC ¶ 61,106, *order on reh'g*, 178 FERC ¶ 61,116.

[631] We note that *Value Line* growth rates are not available for the First Complaint proceeding.

[632] *See, e.g.,* EMCOS Br. Opposing Exceptions (II, III) at 30-31; Trial Staff Br. Opposing Exceptions (II, III) at 32.

[633] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 125 ("Both IBES and *Value Line* growth rates are used by large numbers of investors but only IBES growth rates

## IX. Risk Premium Model

### A. Background

285. The Risk Premium methodology, in which interest rates are also a direct input, is "based on the simple idea that since investors in stocks take greater risk than investors in bonds, the former expect to earn a return on a stock investment that reflects a 'premium' over and above the return they expect to earn on a bond investment."[634]

286. Multiple approaches have been advanced to determine the equity Risk Premium for a utility.[635] For example, a Risk Premium can be developed directly, by conducting a Risk Premium analysis for the company at issue, or indirectly by conducting a Risk Premium analysis for the market as a whole and then adjusting that result to reflect the risk of the company at issue.[636] Another approach for the utility context is to "examin[e] the Risk Premiums implied in the returns on equity allowed by regulatory commissions for utilities over some past period relative to the contemporaneous level of the long-term U.S. Treasury bond yield."[637]

287. In Opinion No. 531, the Commission found the Risk Premium model "informative" in determining the placement of the ROE in the upper end of the zone of reasonableness.[638] In Opinion No. 531-B, the Commission clarified that it found NETOs' Risk Premium analysis "sufficiently reliable—not to set the ROE itself—but rather to corroborate our decision to place NETOs' base ROE above the midpoint of the zone of reasonableness produced by the DCF analysis."[639] The Commission rejected assertions that NETOs' Risk Premium model was flawed. With respect to arguments that it assigned arbitrary dates to the regulatory decisions on which it was based, the Commission found that "given the varying duration of regulatory proceedings, it is difficult, if not impossible, to ensure precise contemporaneity between long-term

---

reflect the analysis of a diverse group of persons in the investment community.").

[634] Opinion No. 531, 147 FERC ¶ 61,234 at P 147 (citing Morin at 108).

[635] *See generally* Morin at 107-30.

[636] *Id.* at 110.

[637] *Id.* at 123.

[638] Opinion No. 531, 147 FERC ¶ 61,234 at P 147.

[639] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 98.

Treasury bond yields and the cost of equity allowed by a regulator."[640] It thus accepted NETO's practice of assigning approximate dates to the cost of equity determinations. The Commission also found that ROEs from settlements should be included in the Risk Premium analysis because settling parties rely upon the same market-based methodologies in determining the rates they are willing to accept.[641] Responding to criticisms that NETOs' Risk Premium adjusts the Risk Premium by 93 basis points for every 100 basis point change in interest rates, the Commission found this alleged flaw to be immaterial in this case, noting that the alternative ratio was based on state commission-allowed ROEs, which are distinct from Commission ROEs, while NETOs' analysis was based on conducting empirical observation and regression analysis of bond yields and Commission-allowed ROEs.[642]

288. In the First Complaint, the Presiding Judge, without specifically discussing the Risk Premium model, found that alternative models could be used to adjust the ROE.[643] In the Second and Third Complaints, the Presiding Judge supported use of NETOs' Risk Premium analysis, finding that it relies on the same data as in the First Complaint but refines the data to better accommodate the timing of the Commission's decisions and include more recent findings.[644]

289. In the Briefing Order, the Commission included the Risk Premium in the four models that would be averaged to develop the ROE under the second prong of the section 206 analysis, though it did not include it for use in the first prong because it did not create a zone of reasonableness.[645]

290. In Opinion No. 569, the Commission decided not to use the Risk Premium model, as proposed by the MISO TOs, to determine the ROE, citing redundancy between the Risk Premium and CAPM models and the suboptimalities of using past ROE determinations. Past ROE determinations, the Commission explained, may be problematic if they are from settlements, or orders for which the ROE was not principally

---

[640] *Id.*

[641] *Id.*

[642] *Id.*

[643] *Coakley v. Bangor-Hydro Elec. Co.*, 144 FERC ¶ 63,012, at P 575 (2013) (Initial Decision (I)).

[644] Initial Decision (II, III), 162 FERC ¶ 63,026 at P 741 (citing NETOs Initial Br. at 26-27; Ex. CAP-20 at 68:1-9).

[645] *See* Briefing Order, 165 FERC ¶ 61,030 at PP 31-32.

at issue.[646] The Commission found that the regression analysis resulting in the adjustment for interest rate movements was problematic because it keeps the ROE from meaningfully responding to changes in capital market conditions.[647]

291. In Opinion No. 569, the Commission also cited insufficient evidence to conclude that investors rely on historic regulated ROEs to determine risk premiums to inform investment decisions.[648] Additionally, the Commission found that the Risk Premium model would require numerous judgement calls and potential areas of dispute, increasing costs and reducing predictability for parties.[649] The Commission also noted that the Risk Premium model did not produce a zone of reasonableness, leading to an asymmetry with the determination of whether existing ROEs are just and reasonable.[650]

292. In Opinion No. 569-A, the Commission reversed its decision in Opinion No. 569 on this issue and found that, with the modifications made by the Commission,[651] the defects of the Risk Premium model, do not outweigh the benefits of model diversity and reduced volatility resulting from the averaging of more models.[652] The Commission found that the Risk Premium model is sufficiently distinct from the CAPM to use in its ROE analysis, noting that the Risk Premium relies on corporate utility bonds while the CAPM uses Treasury Bond yields.[653] The Commission further found that, while the Risk Premium model contains some circularity, the averaging of the results with those of the DCF and CAPM models sufficiently mitigates that circularity.[654] In Opinion No. 569-B,

---

[646] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 340-42.

[647] *Id.* P 344.

[648] *Id.* P 345.

[649] *Id.* PP 346-50.

[650] *Id.* P 351.

[651] The Commission adjusted which ROE proceedings the model includes, aligned the timing of bond yields to ROEs, and used individual cases rather than annual averages to address certain implementation suboptimalities that it had cited in Opinion No. 569.

[652] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 104.

[653] *Id.* P 105.

[654] *Id.* P 106.

the Commission continued to find that the Risk Premium model should be used in its analysis of ROEs pursuant to FPA section 206.[655]

293. In *MISO TOs v. FERC*, the court found that the Commission failed to offer a reasoned explanation for its decision to include the Risk Premium model after initially rejecting it in Opinion No. 569.[656] The court observed that, in Opinion No. 569, the Commission found the Risk Premium model to be defective and described its deficiencies.[657] The court explained that the Commission is entitled to change its mind, as it did in Opinion No. 569-A, but that to do so it must "provide a 'reasoned explanation' for its decision to disregard 'facts and circumstances' that justified its prior choice."[658]

294. The court provided four reasons for finding that the Commission failed to provide a reasoned explanation for its decision to change course with regard to the Risk Premium model. First, the court found that the Commission did not explain how adding the Risk Premium model aligned with "general financial logic" after having stated that the Risk Premium, at least as applied in this case, "defies general financial logic."[659] Second, the court found that the Commission did not explain why investors not using the model no longer mattered and, instead, simply noted that investors expect a premium on a stock investment over a bond investment and that investors track the ROEs the Commission allows.[660] Third, the court found that despite the Commission having stated that the Risk Premium presents "particularly direct and acute" circularity problems, the Commission, in reincorporating the Risk Premium model, simply stated that "all of the models contain some circularity" and that averaging the Risk Premium model with the other models would mitigate the circularity.[661] Finally, the court found that the Commission had expressed concerns about overweighting Risk Premium theory-based models, since both the CAPM and Risk Premium models were based on this theory, yet then adopted the

---

[655] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 113-122.

[656] *MISO TOs v. FERC*, 45 F.4th at 264.

[657] *Id.* at 263-64.

[658] *Id.* at 264 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009)).

[659] *Id.*

[660] *Id.*

[661] *Id.*

Risk Premium model with no explanation beyond the fact that the two models use different inputs.

295. In the MISO Remand Order, the Commission found that, upon review of the record and the court's findings, the record failed to support the inclusion of the Risk Premium model in the Commission's ROE methodology, either for determining the justness and reasonableness of existing base ROEs under the first prong of FPA section 206 or for determining new just and reasonable base ROEs under the second prong of FPA section 206.[662] The Commission explained that the record did not contain evidence suggesting that investors use the Risk Premium model adopted in Opinion No. 569-A.[663] The Commission also found that the record did not contain evidence that would resolve the circularity concerns inherent in the Risk Premium model adopted in Opinion No. 569-A.[664] The Commission reversed the portions of Opinion Nos. 569-A and 569-B that included the Risk Premium model in the Commission's ROE methodology, while maintaining the other modifications to the Commission's ROE methodology set forth in Opinion No. 569, as modified by Opinion Nos. 569-A and 569-B.[665] On March 25, 2025, the Commission addressed requests for rehearing of the MISO Remand Order and continued to reach the same result.[666]

## B. Briefs

296. CAPs state that a Risk Premium model "can accentuate erratic market conditions and tends to overemphasize recent market changes."[667] CAPs contend that, by relying on Risk Premium model based on a faulty critique of DCF's reliability, the Briefing Order proposes to increase the relative weight of non-DCF analyses "in precisely the circumstances that it has said require skepticism" about them. Consequently, CAPs state referencing the Risk Premium model does not usefully address "model risk." Moreover, CAPs contend NETOs' sponsored version of Risk Premium models, on which the

---

[662] *See* MISO Remand Order, 189 FERC ¶ 61,036 at P 23.

[663] *Id.*

[664] *Id.*

[665] *Id.*

[666] MISO Remand Rehearing Order, 190 FERC ¶ 61,184.

[667] CAPs Principal Initial Br. at 51 (citing *Tenn. Gas Pipeline Co.*, 926 F.2d at 1212 (quoting *Montaup Elec. Co.*, 38 FERC ¶ 61,252, at 61,869 n.101 (1987))).

Briefing Order relies is riddled with errors and should play no role in setting the ROE in this case, nor should it serve as a model for future analyses.[668]

297. CAPs argue that any Risk Premium model should be based on actual, not forecasted, bond yields and for consistency across Complaints, should use utility bond yields, not treasury yields. CAPs argue that, as investors know, the bond yield forecasts on which NETOs rely have been persistently wrong, projecting much higher yields than were realized. Consistent with Opinion No. 551, CAPs state that its Risk Premium studies are based on actual bond yields. CAPs declare that, although NETOs' "Current Bond Yields" Risk Premium study for the First Complaint referenced both utility bond yields and treasury yields,[669] NETOs' corresponding studies for the Second through Fourth Complaints were based only on utility bonds, as was the Risk Premium study performed by the same witness for MISO TOs and referenced in Opinion No. 551. For consistency with the latter, CAPs state that their Risk Premium studies should be based on Baa utility bond yields, not treasury yields.

298. CAPs state that, in each of the four dockets, NETOs' Risk Premium studies purport to compare the risk premiums implied in FERC-allowed transmission ROEs to supposedly contemporaneous bond yields. In the First Complaint, CAPs state that NETOs compared the allowed ROEs to bond yields over the six months preceding the allowing order. In the Second through Fourth Complaints, CAPs state that NETOs compared the allowed ROEs in each calendar year to that year's bond yields, and did so without taking account of whether the referenced decisions were evenly distributed through the years' months, as would be required to match the assumption made as to bond yields.[670]

299. CAPs contend that a Risk Premium study based on regulatory orders requires that the orders used as its inputs include an explicit determination of the current cost of equity. CAPs assert that the date associated with those orders must be at least roughly contemporaneous with the underlying litigation record or settlement agreement, so that the comparison to bond yields near the order date is meaningful. CAPs argue that the Commission has agreed that "any necessary corrections" to dates associated with cases "should be made" if those corrections would materially affect the results.[671] CAPs argue that, in their Risk Premium studies post-dating Opinion No. 531, NETOs rely on its 10.57% base ROE, which has been vacated and is being re-considered through this

[668] *Id.*

[669] *Id.* at 52.

[670] *Id.*

[671] *Id.* at 53 (citing Opinion No. 551, 156 FERC ¶ 61,234 at P 199).

proceeding. CAPs aver that it would be arbitrary and capricious to rely upon that 10.57% as an input to the ROE to be determined in this case. CAPs argue that a fresh review of NETOs' Risk Premium data set is necessary and demonstrates that NETOs' collection of purported Commission transmission ROE outcomes is overinclusive, under-inclusive, and internally inconsistent. They aver that, for each study period, NETOs' Risk Premium study uses inputs that are demonstrably misdated or do not fairly imply a Risk Premium.[672]

300. CAPs argue that NETOs' Risk Premium Model approach ignores the risk differences between NETOs and the utilities at issue in the dataset cases. CAPs argue that, in the most complete version of that dataset, NETOs' inputs come from 104 Commission case outcomes, 98 of which concerned rates for new entities or requests for rate increases, through incentive adders or the like.[673] CAPs contend that starting point is skewed toward higher risk premiums, because the entities with cause to make such filings are those with major construction programs and associated heightened risk. CAPs contend that, in NETOs' approach, the risk premium is then added to the recent yield on Baa-rated utility bonds, rather than the lower yield on bonds rated like those of the generally higher-rated NETOs. CAPs contend that these problematic design choices produce a Risk Premium study that is ill-matched to NETOs' low risk.[674] CAPs also contend that NETOs' Risk Premium Model approach also turns on fundamental statistical errors by using bond yields on both sides of the regression equation and omits other variables that affect allowed ROEs.[675]

301. CAPs argue that NETOs' state-based Risk Premium studies contain a mismatch in which the bond yield difference between the multi-year baseline period and the six-month study period was derived from average utility bond yields, whereas the calculated equity Risk Premium was added to higher-yield, Baa-rated bond yields.[676] CAPs contend that Dr. Woolridge's methodology avoids that mismatch.

302. CAPs argue that, to the extent the Commission relies on Risk Premium results based on past regulatory outcomes, it should look to ROEs allowed by state commissions for non-generator electric utilities. CAPs state that Dr. Woolridge presents a "state electric delivery" Risk Premium study for each study period. For its past-case inputs,

---

[672] *Id.*

[673] *Id*. at 60 (citing Ex. NET-02904 at 4-6).

[674] *Id.* at 61.

[675] *Id.* (citing Ex. EMC-0018 and EMC-0032).

[676] *Id.* at 64.

CAPs state this study applies the same 2006 starting year as NETOs' corresponding study. CAPs contend that, as the source for those past regulatory outcomes, NETOs look to start cases initially selected by their counsel. CAPs argue that Dr. Woolridge, on the other hand, turns to state commission ROE allowances for delivery electric utilities, as reported quarterly by Regulatory Research Associates (RRA). CAPs state that RRA is the superior source and the source recommended by Morin's New Regulatory Finance, in the same passage on which the Briefing Order relies in describing its contemplated Risk Premium study.[677]

303. CAPs also argue that the Risk Premium model is inherently less accurate than a well-constructed CAPM or DCF model because it relies on results of market-based models from past cases, where the DCF and CAPM model rely on primary data. CAPs aver that the Risk Premium model tends to replicate the regulatory lag and "inertial continuation of past returns" affecting past regulatory decisions.[678]

304. CAPs also contend that NETOs misapplied the Risk Premium model, resulting in high results. First, CAPs aver that NETOs rely on bond yield projections that the Commission has found to be speculative. CAPs state that NETOs presented no reason for use of projected bond yields other than to say that this approach is "[c]onsistent with the Briefing Order's calculations."[679] CAPs argue that, however, the Briefing Order used a Risk Premium model result based on the actual bond yield. CAPs point out that the Initial Decision in Docket No. EL14-12 rejected use of a projected bond yields as "speculative,"[680] a position affirmed in Opinion No. 551.[681] CAPs contend that the sources on which NETOs rely as projections of future bond yields have persistently and significantly erred on the high side for many years and the Commission should not follow their lead.[682]

305. CAPs further argue that NETOs' Risk Premium approach includes ROEs from proceedings for which ROEs were not at issue. Consequently, according to CAPs, ROEs from such proceedings are not a valid basis for comparing the cost of equity and cost of

---

[677] *Id.* at 62-63 (citing Briefing Order, 165 FERC ¶ 61,030 at 42 n.130).

[678] CAPs Principal Reply Br. at 24.

[679] *Id.* (citing NETOs Br. (I) at 23 n.90; NETOs Br. (II) at 23 n.87; NETOs Br. (III, IV) at 22-23 n.86).

[680] *Id.* at 25.

[681] *Id.* (citing Opinion No. 551, 156 FERC ¶ 61,234 at P 194).

[682] *Id.* at 26.

debt. CAPs assert that these included two cases which NETOs recently admitted did not involve base ROEs.[683]

306. EMCOS, in their First Complaint Initial Brief, argue that the Risk Premium model should be adjusted by the average beta for the proxy group, as derived using the CAPM analysis. EMCOS state that the Risk Premium model estimates the additional return equity investors must be provided above those of long-term utility bonds of similar rating. EMCOS argue that this additional equity premium is based on the same expected market return that is used in the CAPM. Further, EMCOS assert that "the difference between the expected market return on equity and the current average long-term yield on utility bonds must then be adjusted to account for the relative financial risk of the proxy group to the market as a whole."[684] They also suggest adding the Risk Premium to the average March 2013 utility bond costs because March was the last month in the applicable six-month study period. Such adjustments lead to an allowed Risk Premium return of 8.18%.[685]

307. EMCOS also make several criticisms of Dr. Avera's Risk Premium models. EMCOS contend that the use of past Commission approved or determined ROEs contravenes Commission precedent that prohibits setting returns based on historical conditions. EMCOS point to Commission precedent stating that "the Commission's findings and conclusions must be based on a record reflecting current conditions, it is neither required nor permitted to give conclusive weight to past return allowances…"[686] EMCOS also allege the use of past ROEs conflicts with Commission precedent expressing concerns about using another proceeding's ROE derived from "a different proxy group [with] separate input values, and other data from a prior, distinguishable period."[687] EMCOS dispute Dr. Avera's use of projected bond yields and of 10-year bonds rather than 30-year bonds, arguing that these adjustments erroneously double-count investors' expectations and inflate the Risk Premium model's results. Additionally, EMCOS question the validity of Dr. Avera's regression analysis, stating that the equation "assumes that the allowed ROE is independent of business and financial risk, contrary to the basic tenets of *Hope.*"

---

[683] *Id.* at 26-27 (citing NETOs Initial Br. (I) at 60 n.222).

[684] EMCOS Initial Br. (I) at 31-32 (citing Morin at 118-20).

[685] *Id.* at 32.

[686] *Id*. at 40-41 (citing *Payne v. Wash. Metro. Area Transit Comm'n*, 415 F.2d 901, 914 (D.C. Cir. 1968)).

[687] *Id*. at 41 (citing Opinion No. 489, 117 FERC ¶ 61,129 at P 74).

308. EMCOS argue that Dr. Avera's analysis fails to consider NETOs' business and financial risk.[688] EMCOS also criticize the data NETOs used in their Risk Premium model. EMCOS find that the 37 of the 66 observations used in NETO's Risk Premium analysis were settlements, while another 15 were based on incentive adders which did not reevaluate the cost of equity capital, instead relying on previously set ROE values.[689]

309. EMCOS also assert that NETOs' Risk Premium analysis inappropriately double-counts investor expectations by using projected bond yields, when such expectations are already accounted for in current bond yields. Additionally, EMCOS argue that use of 10-year, instead of 30-year Treasury bond yields inappropriately boosts the results of the Risk Premium model. EMCOS also criticize the use of the regression between market return calculated using the CAPM and the average utility bond yields as flawed because it assumes that allowed ROEs are independent of business and financial risk.[690] Additionally, EMCOS contend that NETO's Risk Premium analysis ignores the requirement of *Hope and Bluefield* that a return must be comparable to those earned by enterprises facing similar risk by assuming that NETOs' risk was comparable to that used in the Risk Premium study.[691]

310. Trial Staff argues that timely and accurate input data is critical to a meaningful Risk Premium analysis. Trial Staff explains that its witness Mr. Keyton made adjustments to improve the proposed Risk Premium analysis to ensure that the results are more timely and accurate.[692]

311. First, Trial Staff explains that Mr. Keyton removed any Commission-authorized ROE that was not developed using market data contemporaneous with the applicable bond yields, eliminating stale or vintage ROEs. Trial Staff states that, in some cases, the market analysis had taken place years prior to a Commission order assigning an ROE to a utility. Trial Staff notes that, when utilities that joined an RTO, they were simply given the currently-effective RTO-wide ROE. Trial Staff argues that such ROEs do not reflect a cost of equity estimate that is contemporaneous with the bond yields used to calculate the Risk Premium. Trial Staff explains that, consequently, Mr. Keyton removed

---

[688] *Id.* at 42-44.

[689] *Id.* at 41-42.

[690] *Id.* at 43.

[691] *Id.* at 44.

[692] *See* Trial Staff Initial Br. (I) at 19-20.

observations that were merely reapplication of ROEs as well as other "vintage ROEs" from earlier decisions.[693]

312. Second, according to Trial Staff, Mr. Keyton removed the six-month average Moody's Baa bond yields for the months from October to December 2008 and January to August 2009. Trial Staff explains that Mr. Keyton removed the bond yields from October to December 2008 because the yields suddenly rose by 143 basis points, and that he removed the bond yields from January to August 2009 because those yields were in steady decline until they stabilized in September 2009. Trial Staff explains that these removal adjustments were made because a Risk Premium calculated during a time of bond yield spikes will understate the actual Risk Premium required by investors.[694] Mr. Keyton states that Mr. McKenzie acknowledged that there was no indication that a particular Commission-authorized ROE was derived to account for these spikes in bond yields.[695]

313. Finally, Trial Staff notes what it assumes to be the inadvertent use of projected bond yields in the Risk Premium analysis referenced in the Briefing Order. Trial Staff states that Briefing Order paragraph 59, note 115 references a NETOs' Risk Premium analysis that ranged from 10.7% to 10.8%. Trial Staff states that the 10.8% number was approximately based on NETOs' two Risk Premium analyses that relied on projected bond yield. Trial Staff states that these projected bond yield-based results should be removed and that the Commission recently rejected the use of projected bond yields, agreeing with the Presiding Judge that "projected bond yields used in Risk Premium analyses are speculative and less reliable than historical yields."[696] Trial Staff notes that Opinion No. 551 clearly articulated why use of projected risks premiums is inappropriate, finding "projected yields used in Risk Premium analyses are speculative and less reliable than historical yields."[697]

---

[693] *See id.* at 22 (citing Keyton Aff. at PP 56-59).

[694] *See id.* at 22-23 (citing Keyton Aff. at PP 62-65).

[695] *See* Trial Staff Reply Br. (I), Keyton Reply Aff. at 39.

[696] *See* Trial Staff Initial Br. (I) at 23-24; Keyton Reply Aff. at 53, 66 (citing Opinion No. 551, 156 FERC ¶ 61,234 at P 194).

[697] *See id.* at 14-15 (citing Opinion No. 551, 156 FERC ¶ 61,234 at P 194).

314. Trial Staff argues that Dr. Avera's Risk Premium analysis is not market-driven because it relies on past Commission cases, and furthermore is flawed because the base ROE was not at issue in at least 26 of the cases he relies on in his analysis.[698]

315. NETOs contend that the Commission's approach in the Briefing Order appropriately relies on the CAPM, Expected Earnings, and Risk Premium models to determine the ROE.[699] NETOs support the rationales that the Commission used in support of the Risk Premium model and to dispose of criticisms of it in Opinion No. 531-B.[700]

316. In their reply briefs, NETOs cite Opinion No. 531-B, where the Commission generally defended NETO's application of the Risk Premium model. Specifically, they cite Commission statements asserting that application of past ROEs are presumably "based on market-based methodologies available to regulators."[701] Defending use of settlement ROEs, they also note that CAPs' witness, Dr. Wooldridge, had supported use of settlement decisions in state ROE proceedings."[702]

317. NETOs also disagree with criticisms about the 10-year, rather than 30-year, Treasury bond yields in their Risk Premium analysis to be consistent with the CAPM analysis. NETOs aver that such consistency is not needed and use of different data is one of the purposes of employing multiple models. They also defend the use of projected bond yields because of widespread consensus that interest rates would materially increase.[703]

318. NETOs argue that the Commission has already addressed arguments regarding the need for better precision of the dates of ROE determinations and the underlying litigation, finding that such approximation is often unavoidable and "does not undermine the relevance of the Risk Premium analysis."[704] They also cite the Commission's finding in

---

[698] Trial Staff Br. on Exceptions (II, III) at 41-42.

[699] *See* NETOs Initial Br. (I) at 16.

[700] *Id*. at 32 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 98).

[701] NETOs Reply Br. (I) at 65 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 98).

[702] *Id*. at 65-66.

[703] *Id*. at 67-68

[704] *Id*. at 69 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 98).

Opinion No. 531-B that, contrary to intervenor assertions, state ROE determinations should not be included because of the lack of comparability between state regulated entities and interstate-transmission.[705]

319. In response to criticisms of their Risk Premium model's inverse relationship between equity premiums and interest rates, NETOs cite Opinion No. 531, where the Commission found that, just because the relationship differs from past, state-commission derived ones, does not mean it is invalid.[706] They also argue that EMCOS' assertions that, in certain scenarios, the regression analysis would produce illogical results is not valid because those scenarios are implausible. Regarding assertions of circularity, NETOs contend that, even if they were true, such assertions are irrelevant because the Risk Premium model is relevant to investors' expectations. Additionally, they contend that the Commission has found that such circularity concerns are mitigated by the fact that investors presume that regulatory decisions are based on other methods of analysis and market-based information.[707] Finally, NETOs criticize EMCOS' proposed Risk Premium model as improperly merging the CAPM and Risk Premium analysis.[708]

## C. <u>Commission Determination</u>

320. Upon review of the record, and consistent with the court's directions in *MISO TOs v. FERC* and the Commission's findings in the MISO Remand Order, we conclude that the record fails to support the inclusion of the Risk Premium model in the Commission's ROE methodology in these proceedings, either for determining the justness and reasonableness of existing base ROEs under the first prong of FPA section 206 or for determining new just and reasonable base ROEs under the second prong of FPA section 206.[709] The record contains insufficient evidence to conclude that investors rely on risk premium analyses utilizing historical Commission ROE determinations or settlement approvals to determine the cost of capital and make investment decisions.

321. In addition, we agree with CAPs that the Risk Premium model used in these proceedings may be less accurate than a well-constructed CAPM or DCF model because it relies on results of market-based models from past cases, where the DCF and CAPM

---

[705] *Id*. at 70.

[706] *Id*. (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 99).

[707] *Id*. at 71-72 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 98).

[708] *Id*.

[709] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 340-352.

models rely on primary data.[710] We also share CAP's concern that the Risk Premium model tends to replicate the regulatory lag and "inertial continuation of past returns" affecting past regulatory decisions.[711] We find that the record does not contain evidence that would resolve the circularity concerns inherent in the Risk Premium model.[712]

322. The Risk Premium model is also likely to provide a less accurate current cost of equity estimate than the DCF model or CAPM because it relies on previous ROE determinations, whose resulting ROE may not necessarily be directly determined by a market-based method, whereas the DCF and CAPM methods apply a market-based methodology to primary data. For example, previous ROE determinations may not involve an explicit determination as to whether an ROE is just and reasonable but instead focus on whether to allow an ROE incentive adder or to approve a preexisting RTO-wide ROE for a new RTO member. Similarly, previous ROE determinations used in the Risk Premium model could be the product of rate case settlements. Such settlements often involve compromises on a variety of issues present in a rate case, of which the appropriate ROE is only one. Consequently, such settlements could include ROEs that are not representative of the market cost of equity because the ROEs were negotiated above or below that market cost of equity in order to form an overall settlement package, together with negotiated outcomes on other issues, that were acceptable to the parties.

323. For these reasons, we decline to adopt the Risk Premium model in the base ROE methodology applied in this proceeding. While we address some of these implementation issues in the context of discussing our decision to not use the Risk Premium model in this determination, in light of our decision not to use the model, we find that it is unnecessary to reach determinations on how the model should be implemented. However, we do not foreclose the use of a Risk Premium model in future proceedings if parties can demonstrate the concerns discussed above have been addressed. In addition, the Commission could consider the use of a blended historical and forward-looking risk premium in the CAPM in future proceedings as a potential means to mitigate volatility concerns with the Commission's ROE methodology.

---

[710] CAPs Principal Reply Br. at 23-24.

[711] *Id.* at 24.

[712] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 343. *See also* CAPs Principal Reply Br., Ex. CAP-600 at 22 ("There is obvious circularity in using FERC-authorized ROEs in the risk premium study.").

## X. Proxy Group Construction

324. Both the DCF and CAPM models use proxy groups to determine a range of reasonable returns. In the Briefing Order,[713] the Commission stated that it intended to continue to use the same screens for developing a proxy group as the Commission has used in recent cases, including Opinion Nos. 531[714] and 551.[715] Those five screens are: (1) the use of a national group of companies considered electric utilities by *Value Line*;[716] (2) the inclusion of companies with credit ratings no more than one notch above or below the utility or utilities whose ROE is at issue;[717] (3) the inclusion of companies that pay dividends and have neither made nor announced a dividend cut during the six-month study period;[718] (4) the inclusion of companies with no merger activity during the six-month study period that is significant enough to distort the study inputs;[719] and (5) companies whose ROE results pass threshold tests of economic logic, including both a low-end outlier test and a revised high-end outlier test proposed in the Briefing Order.

325. The first four screens listed above evaluate particular characteristics of potential proxy group companies. They do not vary depending upon the results of the DCF or CAPM analyses. Accordingly, those screens may be used to develop a starting group of proxy companies eligible for inclusion in the proxy group to be used for the purposes of both the DCF and CAPM analyses. However, the high-end outlier test part of the last screen—whether the company's cost of equity estimate passes threshold tests of economic logic—depends upon the median cost of equity estimate each of the two models produces. Thus, in determining the zone of reasonableness produced by each of these models, the high-end outlier test must be applied separately to each model. By contrast, the low-end outlier test for both models is derived, in part from, the CAPM's risk premium. Participants in these proceedings raised issues only with the fifth screen. We discuss those issues raised below.

---

[713] Briefing Order, 165 FERC ¶ 61,030 at P 51.

[714] Opinion No. 531, 147 FERC ¶ 61,234 at P 97.

[715] Opinion No. 551, 156 FERC ¶ 61,234 at P 20.

[716] Opinion No. 531, 147 FERC ¶ 61,234 at PP 96, 100-02.

[717] The Commission requires use of both S&P corporate credit ratings and Moody's issuer ratings when both are available. *Id.* P 107.

[718] *Id.* P 112.

[719] *Id.* P 114; Opinion No. 551, 156 FERC ¶ 61,234 at PP 37-43.

## A. High-End Outlier Test

### 1. Background

326. In the Briefing Order, the Commission recognized that the CAPM can produce unsustainably high results for a particular proxy company, because, unlike the two-step DCF analysis, it does not include a long-term growth projection based on GDP that would normalize the ROEs produced by the model. Moreover, the Commission recognized that, in unusual circumstances, the two-step DCF analysis could also produce unsustainably high results. Therefore, the Commission proposed to apply a high-end outlier test to the results of both these models.[720]

327. The Commission proposed to treat as high-end outliers any proxy company whose cost of equity estimated under the model in question is more than 150% of the median result of all of the potential proxy group members in that model before any high or low-end outlier test is applied, subject to a "natural break" analysis similar to the approach the Commission uses for low-end DCF analysis results. The Commission stated that this test should identify those companies whose cost of equity under the model in question is so far above the cost of equity of a typical proxy company as to suggest that it is the result of atypical circumstances that are not representative of the risk profile of a more normal utility.

328. In Opinion No. 569, the Commission adopted the proposed high-end outlier test described above. The Commission found it was necessary to apply a high-end outlier test to the results of the DCF and CAPM models. Additionally, given that the Commission would use the midpoint as the measure of central tendency for region-wide ROEs, the Commission found it appropriate that there be a high-end outlier test to eliminate members of the proxy group whose ROEs were unreasonably high.[721]

329. In Opinion No. 569-A, the Commission found it appropriate to modify the high-end outlier test to treat any proxy company as a high-end outlier if its cost of equity estimated under the model in question was more than 200% of the median, as opposed to 150% of the median. The Commission found that it was appropriate to increase the threshold for the high-end outlier test because doing so would reduce the risk that rational results were inappropriately excluded. The Commission affirmed that it was appropriate to maintain the test as an objective check to help identify observations that were

[720] As noted below, the high-end outlier test only applies to the DCF model and CAPM because they utilize results of the relevant analysis applied to a proxy group, while the Risk Premium model is derived from actual ROEs.

[721] Opinion No. 569, 169 FERC ¶ 61,129 at PP 375-76.

irrationally or anomalously high.[722] The proxy group companies would still be subject to the natural break analysis. In Opinion No. 569-B, the Commission continued to find that it is appropriate to treat any proxy company as a high-end outlier if its cost of equity estimated is more than 200% of the median.[723]

### 2. **Briefs**

330. CAPs state that the high-end outlier test proposed in the Briefing Order is arbitrary and unsupported, and recommend that the Commission adopt the two standard deviations high-end outlier threshold posited by Dr. Lesser.[724] CAPs reject NETOs' assertions that a high-end outlier test is altogether unnecessary while a low-end outlier test is not, noting that there is no basis for such asymmetry.[725] Likewise, CAPs reject Mr. McKenzie's proposal to compare each method's individual results to 150% of the highest of the method-specific medians. CAPs argue that NETOs have provided no good reason to adopt Mr. McKenzie's proposed test and refute Mr. McKenzie's assertion that the proxy group represents a population rather than a sample.[726]

331. NETOs contend that the high-end outlier test should not be applied to the two-step DCF model. NETOs note that, prior to Opinion No. 531, the Commission used a one-step DCF model, and applied a high-end outlier test to screen out growth rates that were considered unsustainable. NETOs argue that the Commission found in Opinion No. 531 that a high-end outlier test is unnecessary because the two-step methodology assumes the long-term growth rate is sustainable, and state that the Commission has failed to provide a reasoned explanation for departing from this finding. Additionally, NETOs argue that the high-end outlier test proposed in the Briefing Order "bears no relationship to the prior test and is not supported by evidence that it properly identifies unsustainable results."[727] NETOs explain that, even if the Commission finds that the CAPM and Expected

---

[722] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 154-55.

[723] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 140-142.

[724] CAPs Principal Initial Br. at 84.

[725] CAPs Principal Reply Br. at 31-32.

[726] *Id.* at 33-34.

[727] NETOs Initial Br. at 38-39; NETOs Reply Br. at 127.

Earnings models require a high-end outlier test, such a finding in no way necessitates applying one to the two-step DCF model.[728]

332. EMCOS state that the proposed high-end outlier threshold level of 150% of the median lacks an economic basis and recommends instead that the Commission adopt the Grubbs Test, which they characterize as a well-known and widely used test for identifying outliers. EMCOS explain that the "Grubbs Test compares the highest or lowest value in a sample, compares it to the average of the sample, and measures the largest absolute deviation from the same mean in units of the sample's standard deviation."[729] EMCOS contend the Grubbs Test is more statistically sound than the proposed 150% of the median threshold.[730]

333. NETOs argue against the Grubbs Test and the two-standard-deviation high-end outlier test proposed by EMCOS and CAPs, respectively, and state that the two proposals are more flawed than the Commission's proposed high-end test. Mr. McKenzie argues that the proxy group is a population, not a sample, and therefore asserts that the dispersion of individual values around the mean is not a valid test.[731]

334. EMCOS reject NETOs' assertion that a high-end outlier test is unnecessary. Specifically, EMCOS note that the two-step DCF model adopted in Opinion No. 531 has been used by the Commission in pipeline cases for years, and that both courts and the Commission have repeatedly found that screening outliers in pipeline cases is necessary.[732] Additionally, EMCOS note an inconsistency between NETOs' brief and Mr. McKenzie's affidavit, stating that, whereas NETOs argue that a high-end outlier test is unnecessary for the DCF model, Mr. McKenzie argues that a high-end outlier test is inappropriate at any level.[733]

335. Trial Staff states that Mr. McKenzie's recommendation to not apply the 150% of the median high-end outlier test to the DCF model has no basis. Trial Staff supports the

---

[728] NETOs Initial Br. at 41.

[729] EMCOS Initial Br. at 48-50.

[730] *Id.* at 48-50; EMCOS Reply Br. at 20.

[731] NETOs Reply Br. at 127-29.

[732] EMCOS Reply Br. at 16-19.

[733] *Id.* at 21-22.

Commission's Briefing Order acknowledgement that the two-step DCF model can produce unsustainably high results.[734]

### 3. Commission Determination

336. In these proceedings, we treat any proxy company as a high-end outlier if its cost of equity estimated under the model in question is more than 200% of the median, consistent with the Commission's findings in Opinion Nos. 569-A and 569-B.[735] Consistent with Opinion No. 569-A, we find that it is appropriate to treat any proxy company as a high-end outlier if its cost of equity estimated under the model in question is more than 200% of the median result of all of the potential proxy group members in that model before any high or low-end outlier test is applied, subject to a "natural break" analysis. The high-end outlier test is the Commission's best attempt to use an objective test to identify proxy group ROEs that are irrationally or anomalously high because, for example, they are the result of atypical circumstances that are unrepresentative of the subject utility's risk profile or otherwise likely to be in error. We recognize that such a test with a bright-line threshold could inappropriately exclude ROEs that are rational and not anomalous for the subject utility. In recognition of this risk, we find that setting the threshold for the high-end outlier test to 200% of the median result of all of the potential proxy group members in the applicable model, as opposed to the 150% of the median threshold applied in the Briefing Order, is appropriate because it will reduce the risk that such rational results are inappropriately excluded. However, the continued application of the natural break analysis will still allow the exclusion of ROEs that are truly irrational or anomalously high, even if they fall under the threshold set by this high-end outlier test. It will also allow the inclusion of ROEs that are appropriate even if they violate the high-end outlier test.

337. While the Commission has modified the high-end outlier test to increase its exclusion threshold, we find that it is still appropriate to maintain the test as an objective check to help identify observations that are irrationally or anomalously high. This is especially true because we will continue to use the midpoint as a baseline to determine region-wide ROEs for groups of utilities and potentially flawed high-end observations from the proxy group play a large role in an ROE analysis that uses the midpoint. Thus, we will continue to apply the high-end outlier test, but with the modification that we described above.

338. We disagree with NETOs' contention that a high-end outlier test should not be applied to the two-step DCF model. As the Commission found in Opinion No. 569, a

---

[734] Trial Staff Reply Br. at 9.

[735] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 154; Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 140-142.

two-step DCF model can produce an illogically high ROE under certain circumstances, and the inclusion of a long-term growth rate does not remove the need to exclude such an illogical ROE from the proxy group.[736]

339. While parties have argued that the Commission should use alternative high-end outlier tests because they have a firmer statistical basis, we do not find these arguments persuasive. Statistical methodologies, like the proposed alternative outlier test methodologies, may be based on assumptions such as the distribution of the underlying population being normal.[737] These underlying assumptions may not always hold for a given proxy group, especially a small proxy group.[738] The high-end outlier test adopted in Opinion No. 569-A has the advantage of being relatively easy to implement and places a well-defined upper bound on the proxy group. In addition, because this test only utilizes a percentage differential compared to the median, it can be used with small proxy groups.

## B. <u>Low End Outlier Test</u>

### 1. <u>Background</u>

340. In Opinion No. 531, in screening the proxy groups for outliers, the Commission affirmed the Presiding Judge's application of the Commission's low-end outlier test in this proceeding, explaining that the "purpose of the low-end outlier test is to exclude from the proxy group those companies whose ROE estimates are below the average bond yield or are above the average bond yield but are sufficiently low that an investor would consider the stock to yield essentially the same return as debt."[739] The Commission explained that "[i]n public utility ROE cases, the Commission has used 100 basis points above the cost of debt as an approximation of this threshold, but has also considered the distribution of the proxy group companies to inform its decision on which companies are outliers."[740]

---

[736] Opinion No. 569, 169 FERC ¶ 61,129 at P 378.

[737] *Id.* P 377.

[738] *See, e.g.*, *Northwest Pipeline Corp.*, 99 FERC ¶ 61,305, at 62,276 (2002) (addressing a case where "the distribution of figures used to calculate Northwest's ROE is negatively skewed").

[739] Opinion No. 531, 147 FERC ¶ 61,234 at PP 121-22.

[740] *Id.*

341. In the Briefing Order, under the Commission's existing low-end outlier test, companies whose ROE fails to exceed the average 10-year bond yield by approximately 100 basis points are excluded from the proxy group on the ground that investors generally cannot be expected to purchase a common stock if debt, which has less risk than a common stock, yields essentially the same expected return.[741] In the Briefing Order, the Commission proposed to continue to use this test for purposes of the CAPM and Expected Earnings analyses as well as the DCF analysis.[742]

342. In Opinion No. 569, the Commission adjusted the low-end outlier test to eliminate from the proxy group ROE results that are less than the yields of generic corporate Baa bonds plus 20% of the CAPM Risk Premium. The Commission found that it was necessary to exclude ROEs whose yield was "essentially the same expected return" as debt in order to determine the low end of the zone of reasonableness. The Commission noted that the Risk Premium that investors demand changes over time and found that using 20% of the CAPM Risk Premium struck an appropriate balance of accounting for the additional risk of equities over bonds while not inappropriately excluding proxy group members whose ROE is distinguishable from debt.[743] In Opinion No. 569-A, the Commission continued to find that the low-end outlier test that was applied in Opinion No. 569 was appropriate.[744]

### 2. <u>Briefs</u>

343. CAPs contend that the Briefing Order correctly accepts that in order to be reasonable, low-end and high-end outlier tests must be applied.[745]

---

[741] *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281, at P 94 (2009) (*Pioneer)*, *reh'g denied*, 130 FERC ¶ 61,044 (2010); *Southern California Edison Co*., 131 FERC ¶ 61,020, at PP 54-56 (2010) (*S. Cal Edison*), *remanded on other grounds sub nom. S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 183-87 (D.C. Cir. 2013) (*S. Cal. Edison v. FERC*). In *S. Cal Edison*, the Commission stated that it also eliminated companies whose ROEs were less than 100 basis points above the Moody's bond yield for that particular rating in *Atl. PATH 15*, 122 FERC ¶ 61,135 (2008) (*Atl. PATH*) and in *Startrans IO. L.L.C.*, 122 FERC ¶ 61,306 (2008) (*Startrans*). *Id.* P 54.

[742] MISO Briefing Order, 165 FERC ¶ 61,118 at P 52.

[743] Opinion No. 569, 169 FERC ¶ 61,129 at PP 184-85.

[744] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 161-62.

[745] CAPs Principal Initial Br. at 83-84.

344. NETOs do not generally object to the use of the Commission's low-end outlier test outlined in the Briefing Order.[746] NETO's witness Mr. McKenzie states that the low-end outlier test applies a static 100 basis point adder to Baa-rated utility bond yields and contends this produces downward-biased results under the capital market conditions present during the four complaint periods. This is because the static approach fails to incorporate the effects of lower bond yields on equity risk premiums.[747] Mr. McKenzie explains that the Commission should consider a "sliding scale" low-end risk premium test that varies with bond yields.[748] According to NETOs, the Commission has routinely excluded as illogical low-end cost of equity estimates that "are below the average bond yield or are above the average bond yield but are sufficiently low that an investor would consider the stock to yield essentially the same return as debt." In applying the low-end results test, the Commission generally has excluded companies from the proxy group whose ROE fails to exceed the average yield on Baa-rated public utility bonds by approximately 100 basis points." Because the Commission noted in Opinion No. 531 that 100 basis points above the cost of utility debt is not a bright line and the exclusionary test for low-end results but is a "flexible test" that approximates the threshold test of economic logic for low-end results, the Commission need not exclude only ROE results that are 100 basis points or less above the cost of debt but may exclude low-end ROE results that are above the 100 basis-point threshold as it did in Opinion No. 531.[749]

345. NETOs criticize EMCOS' proposed low-end outlier test for raising the low-end threshold in their DCF analyses from 100 basis points above bond levels to 168 basis points above bond levels, only to lower it once again in order to keep one low-end DCF result in the proxy group.[750]

346. According to NETOs, in the Fourth Complaint, the Presiding Judge incorrectly found Mr. McKenzie's low-end threshold test for excluding companies from the proxy group to be inconsistent with Commission precedent. Instead, Mr. McKenzie's low-end threshold test is consistent with the Commission's rationale behind its historical 100 basis point threshold as that rationale is applied to current market conditions. NETOs argue

---

[746] NETOs Initial Br. (I) at 44; NETOs Initial Br. (II) at 55; NETOs Initial Br. (III) at 45; NETOs Initial Br. (IV) at 48.

[747] NETOs Reply Br. (I, II, III, IV), McKenzie Reply Aff. at 9, 117.

[748] NETOs Initial Br. (I) at 37; NETOs Initial Br. (II) at 36; NETOs Initial Br. (III) at 38.

[749] NETOs Initial Br. (I) at 43; NETOs Initial Br. (II) at 54-55; NETOs Initial Br. (III) at 43-44; NETOs Initial Br. (IV) at 47-48.

[750] NETOs Initial Br. (IV) at 28.

that the record in this case shows that the 100 basis point Risk Premium used to exclude low-end DCF results should be adjusted to reflect the decline in interest rates, which was changed to 261 basis points.[751]

347. Trial Staff avers that Mr. McKenzie's reliance on the risk premium to inform the low-end outlier test is unwarranted. According to Mr. Keyton, there are numerous problems with using the relationship between equity risk premiums and interest rates to adjust the low-end outlier test. First, Mr. Keyton contends that it is arbitrary to assume that the baseline for the change in interest rates should be constrained to a comparison between the data periods in 2007 and 2008 and the data period in this proceeding. In addition, Mr. Keyton asserts that Mr. McKenzie does not fully address the Commission's policy regarding the particular bond rating to be used.[752] Trial Staff also points out the Commission has previously indicated that the 100-basis points could be added to the bond yield of the individual companies, as opposed to the generic Baa utility bond yield.[753]

348. In a related matter, NETOs argue that Trial Staff improperly set the threshold for each low-end company at 100 basis points over the average yield on Moody's Baa, A, or average public utility bonds corresponding to the rating of the individual company rather than over a single average for "Baa" utility bonds that is consistently applied to all companies. NETOs assert that this methodology is inconsistent with that of the Commission, and Mr. McKenzie states that it defies financial logic and investor requirements.[754] NETOs also criticize Dr. Lesser's alternative CAPM methods in this proceeding because his calculations are unreliable, which include illogical low-end values that negatively affect the result."[755]

### 3. <u>Commission Determination</u>

349. Consistent with the Commission's determinations in Opinion Nos. 569 and 569-A, in these proceedings we apply a low-end outlier test that is adjusted to include a risk premium instead of the generic 100 basis points proposed in the Briefing Order, as discussed below. In particular, we apply a revised low-end outlier test that eliminates

---

[751] NETOs Br. on Exceptions (IV) at 2, 4.

[752] Trial Staff Reply Br. (I, II, III) at 8, Keyton Aff. at 4-5; Trial Staff Reply Br. (IV) at 9, Keyton Aff. at 4-5; Trial Staff Br. Opposing Exceptions (IV) at 2-4.

[753] *Id.* (citing *S. Cal. Edison Co.*, 131 FERC ¶ 61,020 at P 54).

[754] NETOs Br. Opposing Exceptions (IV) at 60.

[755] *Id.* at 83.

proxy group ROE results that are less than the yields of generic corporate Baa bonds plus 20 percent of the CAPM risk premium. The purpose of the low-end outlier test is to eliminate from the proxy group companies with ROEs that are so low that they should not be considered in determining the low end of the zone of reasonableness. Thus, the mere fact that a potential proxy company's ROE may be lower than what would be considered reasonable for an average risk, or even a below average risk, utility is not a sufficient reason to exclude the company from the proxy group. Instead, the Commission's standard has been to exclude companies whose ROEs yield "essentially the same expected return" as debt. The Commission has acknowledged that, as bond yields decline, the ROE that investors would consider to yield "essentially the same expected return" as a bond is increasingly higher than the corresponding bond yield.[756] Thus, to ensure that the low-end outlier test properly excludes companies whose ROE is indistinguishable from debt, an adjustment accounting for this risk premium is necessary.

350. We find that 20% of the risk premium from the CAPM analysis described above is a reasonable risk premium to apply to the low-end outlier test. Because the risk premium that investors demand changes over time, it is imprecise to simply add 100 basis points to the bond yield. The methodology that we are adopting in this order captures such changes because the risk premium from the CAPM analysis reflects investors' required risk premium under the prevailing market conditions, including the inverse relationship between the risk premium and interest rates. We find that the 20% portion of the risk premium strikes a proper balance by being sufficiently large to account for the additional risk of equities over bonds, particularly when interest rates are low, but not so large as to inappropriately exclude proxy group members whose return on equity is distinguishable from debt when interest rates are high.

351. NETOs argue that the low-end outlier test has been and should be based on the average Baa yield, while Trial Staff indicates that the Commission should consider applying the 100-basis point low-end test to the bond yield of individual companies. We note that the Commission has applied this test differently in the past, with the most recent application being to apply the test based on the average Baa yield.[757] We find that basing the low-end outlier test on Baa bond yields is consistent with the Commission seeking the proxy group for a diverse group of utilities to be representative of the cost of capital for all of those utilities. Further, using the specific bond yield for each company, in addition to adding complexity to the calculations, renders them (and the resulting ROE) less

---

[756] *See* Morin at 128-29 (summarizing empirical research showing that as interest rates decline, the risk premium required by equity investors increases and concluding that the gist of this research is that for every 100 basis point decline in government bond yields, the equity risk premium increases by about 50 basis points).

[757] Opinion No. 531, 147 FERC ¶ 61,234 at P 123.

predictable, as the credit ratings for individual companies are likely more volatile than the generic corporate rate Baa credit rating due to company-specific credit rating considerations. Where possible, we seek to provide predictability and transparency to ROE determinations, which is best accomplished by using a single outlier test. We find no reason to adjust the low-end outlier test to be applied to Moody's Public Utility Bond index yield for the same rating category proxy utility under consideration at this time.

## C. Natural Break Analysis

### 1. Background

352. In the Briefing Order, the Commission proposed to apply its low-end and high-end outlier screens, subject to a "natural break" analysis. The natural break analysis determines whether certain proxy group companies screened as outliers, or those almost screened as outliers, truly represent outliers and should thus be removed from the proxy group. Typically, this involves examining the distance between that proxy group company and the next closest proxy group company and comparing that to the dispersion of other proxy group companies.[758] The Commission did not explicitly define how large of a difference constitutes a natural break.

353. In Opinion No. 569, the Commission continued to apply the natural break analysis to outlier screens and declined to enumerate a rigid formula for the application of the natural break analysis. The Commission clarified that it would apply the natural break analysis to both the low-end and high-end outlier tests, and that the natural break analysis may justify inclusion of companies in the proxy group despite their failing either the low or high-end outlier test.[759] In Opinion No. 569-A, the Commission maintained the natural break analysis but clarified that it can be used to both exclude ROEs that pass the either outlier test or include ROEs that fail either outlier test.[760]

### 2. Briefs

354. CAPs support the inclusion of a natural break analysis and contend that, in order to ensure that the natural break analysis is applied even-handedly to low-end and high-end outliers, an objective quantification of the natural break standard is necessary. CAPs contend the Commission has in the past applied its natural break analysis inconsistently.

---

[758] *See, e.g.*, *S. Cal Edison*, 131 FERC ¶ 61,020 at P 56 (applying a natural break analysis to exclude from the proxy group a company whose ROE was 102 basis points above the applicable bond yield).

[759] Opinion No. 569, 169 FERC ¶ 61,129 at PP 395-97.

[760] *Id.* PP 145-46.

Dr. Woolridge supports a two-part test for the natural break analysis, where a proxy value would be excluded if (i) it is inside and close to the threshold level that applies prior to considering natural breaks, and (ii) it is far from the neighboring proxy value that would be retained.[761] NETOs do not support CAPs' recommendation to provide a quantitative test for the natural break standard.[762]

355. NETOs oppose the natural break analysis, stating that it has no economic basis, is unnecessary, and is highly subjective. First, NETOs argue that the relative magnitude of gaps between rank-ordered proxy values is unrelated to whether a particular cost of equity estimate is economically illogical. Second, NETOs aver that the natural break analysis is unnecessary because the low-end and high-end outlier tests already exclude economically illogical results. Third, NETOs claim that, absent objective criteria and guidance on how to apply the natural break analysis, parties in ROE cases will be left to guess how to apply the analysis, creating regulatory uncertainty.[763]

356. NETOs state that, if the Commission includes a natural break analysis, it should permit both the inclusion of companies excluded by the high-end outlier screen and the exclusion of companies not excluded by the high-end outlier screen. NETOs agree that the Commission should have flexibility in evaluating high-end outlier test results based on the record of the proceeding. However, NETOs argue that the Commission should only apply the natural break analysis to the low-end outlier test to exclude an economically illogical value and should not use the natural break analysis to include a value already excluded by the low-end outlier test. NETOs argue that, in Opinion No. 531, the Commission used the natural break standard only to exclude a proxy value, and to use the natural break standard to include values on the low-end would violate the purpose of low-end screens: to remove proxy companies whose stocks have essentially the same return as debt.[764] NETOs also aver that, because the natural break analysis is not tied to the fifth screen, i.e., to include "companies whose ROE results pass threshold tests of economic logic," the Commission should not make the high-end and low-end results tests subject to the natural break analysis, as proposed in the Briefing Order.[765]

---

[761] CAPs Principal Initial Br. at 83-86.

[762] NETOs Reply Br. (I) at 130-31.

[763] NETOs Initial Br. (I) at 42-46.

[764] *Id.* at 48-49.

[765] NETOs Initial Br. (I) at 44; NETOs Initial Br. (II) at 56; NETOs Initial Br. (III) at 45; NETOs Initial Br. (IV) at 47-48.

357. CAPs do not support NETOs' recommendation that the natural break standard be used on low-end outliers only to exclude proxy values, and argue that the standard must be applied equally to both low-end and high-end outliers.[766]

358. Trial Staff disagrees with the assertion that a natural break analysis provides no relevant information, arguing instead that the Commission has repeatedly found that ROE analyses can be distorted by the lowest or highest number, especially when the midpoint is used.[767]

### 3. Commission Determination

359. As described in the Briefing Order, we find that it is appropriate to apply the natural break analysis to our outlier screens. We disagree with NETOs' assertion that the natural break analysis is unnecessary and will continue to apply the natural break analysis to our outlier screens. As we noted in Opinion No. 569, any numerical outlier screen must, of necessity, be somewhat arbitrary given the insignificance of a few basis points difference in ROE. However, the natural break analysis gives the Commission the flexibility to determine whether a given proxy group company is truly an outlier, or whether it contains useful information, in light of the particular array of ROEs presented by the potential proxy group companies. We also disagree with assertions that the low-end outlier test obviates the need for the natural break analysis. The natural break analysis, unlike the mechanistic tests, allows the Commission to use its discretion to either exclude results that appear illogical despite passing the low or high-end test or include results that the outlier tests would exclude if they appear reasonable.

360. We will not adopt NETOs' recommendation to apply the natural break analysis only to low-end outliers. The risk of including an economically illogical result or excluding an economically logical result is present on both the high and low ends of the distribution of proxy group companies. To apply the natural break analysis to only one end of the distribution unnecessarily limits the Commission's ability to make pragmatic adjustments to ROE analyses and increases the risk of producing distorted results. Accordingly, we continue to apply the natural break analysis to both high and low-end outlier tests.

361. Additionally, we clarify that the natural break analysis may be used as evidence for retaining one or more cost-of-equity estimates that might otherwise be excluded because of a high-end or low-end outlier test. Observations that are shown to be rational and not the result of error may still be included, even if they otherwise would fail one of the outlier tests. For instance, a company's ROE could be 202% of the median ROE, but,

---

[766] CAPs Principal Reply Br. at 34-35.

[767] Trial Staff Reply Br. (I) at 9-10.

based on this analysis, the Commission may include it in the proxy group if it were not substantially higher than other companies in the proxy group. By the same logic, the natural break analysis can be used to argue for exclusion of cost-of-equity estimates that do not fail either outlier test but can be shown to be irrational, anomalous, or the result of human error.

362. Model inputs can be flawed, due to incorrect inputs or the result of poor judgement by analysts. Such errors can improperly influence the analysis, especially when they affect estimates at the high and low end of the proxy group. As the Commission noted in the Briefing Order, one analyst's error involving the growth projections for Portland General Electric Company reduced the overall Reuters consensus projected short-term percentage growth in earnings from 10.96% to 7.8%.[768] This case illustrates the fallibility of model inputs and the importance of having a natural break analysis to enable the Commission to use its discretion with respect to high or low values.

## XI. Use of Midpoint or Median as Measure of Central Tendency

### A. Background

363. In determining the central tendency of the zone of reasonableness, the Commission has distinguished between cases involving an RTO-wide ROE and cases involving the ROE of a single utility. In cases involving an RTO-wide ROE, the Commission has held that the midpoint is appropriate. The Commission has reasoned that, because an RTO-wide ROE will apply to a diverse set of companies, the range of results becomes as important as the central value, and the midpoint fully considers that range, because it is derived directly from the endpoints of the range. The Commission established this policy in an order on remand in the proceeding establishing the MISO TOs' 12.38% ROE.[769] By contrast, in cases involving a single utility, the Commission has held that using the median is appropriate, because the median "is the most accurate

[768] MISO Briefing Order, 165 FERC ¶ 61,118 at P 19 n.95 (citing Briefing Order, 165 FERC ¶ 61,030 at P 47).

[769] *Midwest Indep. Transmission Sys. Operator, Inc.*, 106 FERC ¶ 61,302, at PP 9-10 (2004) (2004 Remand Order), *aff'd*, *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004 (D.C. Cir. 2005) (*Public Service Commission of Kentucky v. FERC*).

measure of central tendency for a single utility of average risk."[770] In the Briefing Order, the Commission proposed to continue this policy.[771]

364. In Opinion No. 569, as upheld in Opinion No. 569-A, the Commission held that it will continue to use the midpoint to determine the central tendency of the zone of reasonableness in cases involving an RTO-wide ROE, consistent with the policy set forth in the 2004 Remand Order. The Commission stated that the D.C. Circuit upheld that policy in *Public Service Commission of Kentucky v. FERC*.[772]

365. The Commission, in accordance with *Public Service Commission of Kentucky v. FERC*, determined that MISO TOs are "a diverse set of companies" and thereby concluded that the midpoint would be the most appropriate central tendency metric.[773] The Commission also determined that concerns about use of midpoint skewing data were unwarranted as it related to MISO TOs. The Commission explained that the proxy group of ROEs in that case were no more skewed than in the *Public Service Commission of Kentucky v. FERC* case.[774]

366. In *MISO TOs v. FERC*, the D.C. Circuit affirmed the Commission's use of the midpoint for the MISO TOs in Opinion No. 569 *et seq*.[775] The court explained that "customers argue that [the Commission] should have set aside the midpoint in favor of the median. But we have already held that [the Commission] can reasonably use the midpoint of the zone of reasonableness when setting a Return for 'a diverse group of companies.'"[776] The court noted that *Public Service Commission of Kentucky v. FERC* is not limited to situations where the Commission uses a proxy group made up of companies from within the same region as the transmission owners, because the

---

[770] *See S. Cal Edison*, 131 FERC ¶ 61,020 at P 91, *remanded on other grounds sub nom. S. Cal. Edison v. FERC*, 717 F.3d at 183-87.

[771] MISO Briefing Order, 165 FERC ¶ 61,118 at P 18 n.40.

[772] Opinion No. 569, 169 FERC ¶ 61,129 at P 409 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004).

[773] *Id.* PP 410-11 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1010).

[774] *Id.* P 413 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1011).

[775] *MISO TOs. v. FERC*, 45 F.4th at 262-263.

[776] *Id.* at 262-263 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1011).

Commission's focus was "'the rate's across-the-board applicability'"[777] to the transmission owners.

## B. Briefs

### 1. Whether Median or Midpoint is a More Robust Measure

367. CAPs and EMCOS state that the most statistically robust measure of central tendency is the median because it is not sensitive to extreme values like the midpoint is.[778] CAPs argue that the median, not the midpoint, provides a rational connection between the proxy results' distribution(s) and the indicated cost of equity.[779] CAPs state that the midpoint is a valid option only when there is no other information provided by the distribution of results within that range. CAPs represent, however, that such information is available and therefore use of the median is most appropriate. CAPs state that the median considers all retained proxy results, not just the extreme ones, so that estimation errors cancel out instead of being amplified. CAPs conclude the use of the median leads to more accurate results than the midpoint and is therefore the more appropriate metric.[780]

368. CAPs aver that the characteristics of the CAPM and Expected Earnings require use of the median because NETOs' CAPM analysis' size adjustment and the Expected Earnings calculations' use of proxies disconnect the tops of those ranges from any correspondence to specific NETOs.[781] CAPs also add that, if the Commission insists on using the Expected Earnings model, the Commission should use the median rather than the midpoint, because there is no rational basis to rely on the *range* of Expected Earnings proxy results (as midpoint does) rather than their preponderant result (i.e., the median). CAPs argue that there is no rational basis to rely on the range of Expected Earnings proxy results because no members of NETOs have equity ratios anywhere near the market-to-book ratios that lead to the high end of the earnings/book equity.[782]

---

[777] *Id.* at 263 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1011).

[778] EMCOS Initial Br. at 55.

[779] CAPs Principal Reply Br. at 38; CAPs Br. on Exceptions at 46-48.

[780] CAPs Principal Initial Br. at 76.

[781] *Id.* at 80-81.

[782] CAPs Principal Reply Br. at 21-23; CAPs Br. on Exceptions at 88-92.

369. EMCOS argue that, compared to use of the midpoint, use of the median to set the ROE for both a single utility and for a diverse group of utilities, such as NETOs, increases the stability of results which provides certainty to investors and ratepayers alike. EMCOS state that inclusion of the Expected Earnings model to determine the composite range of the cost of equity would exacerbate the tendency of the use of the midpoint to skew toward the high end of the range of allowable ROEs, compared to the use of the median.[783] EMCOS state that the Commission has repeatedly recognized that the median gives greater consideration to more of the companies in the proxy group than the midpoint.[784]

370. NETOs argue that the midpoint is the most appropriate metric "because it *necessarily* relies on the extreme results at the low and high ends of the proxy group, without regard to the skew of the mean value or the proximity of the plurality of data points to the middle of the group."[785] Trial Staff supports use of the midpoint for regional proxy group, contending that it is consistent with Commission precedent. However, Trial Staff avers that the national proxy group is overly broad and that use of a midpoint therefore creates a skewed result.[786]

371. NETOs dispute CAPs' argument that, because the Commission has historically only used the DCF when applying the midpoint, the Commission has no precedential argument to support its use of the midpoint for the CAPM and Expected Earnings analyses. NETOs argue that, because all three models serve the same purpose—to estimate the range of reasonable returns for subject utilities—the midpoint should be applied to each model. NETOs further state that all three models use a proxy group and all three models use the same screens, so, therefore, it would be natural for the Commission to use the same measure of central tendency for each model.[787]

372. NETOs dispute CAPs' concerns about the need to use the median rather than the midpoint, specifically for CAPM and Expected Earnings results, due to the CAPM's size adjustment and the Expected Earnings calculations' of proxies. NETOs argue that the

---

[783] EMCOS Initial Br. at 52.

[784] *Id.* at 56 (citing *S. Cal. Edison Co.*, 131 FERC ¶ 61,020 at PP 85-86; *Northwest Pipeline Corp.*, 99 FERC ¶ 61,305 at 62,276; *Williston Basin Interstate Pipeline Co.*, 84 FERC ¶ 61,081 at 61,388-89).

[785] *Id.* at 119 (quoting Initial Decision (IV), 162 FERC ¶ 63,026 at P 216 (emphasis in original)).

[786] Trial Staff Initial Br. at 91.

[787] NETOs Reply Br. (I) at 118.

CAPM and Expected Earnings models (however applied) produce independent estimates of the range of returns applicable to the proxy group. NETOs assert that any quarrels over size adjustments and market-to-book ratios are unrelated to a just and reasonable base ROE evaluation, and that considering ranges from multiple methodologies does not support the use of the median as the range ends of independent financial methodologies are no more exposed to model risk than the boundaries of the DCF range.[788]

### 2. Arguments on Whether Precedent Supports the Commission Proposal

373. EMCOS aver that, as a result of the Commission's proposals to use national proxy groups and a "one-notch" credit screen for potential proxy group members, the rationales previously advanced for preferring the midpoint of the range of implied costs of equity over the median as the appropriate measure of central tendency are no longer compelling.[789]

374. CAPs state that the Commission offers three unfounded precedential rationales for using the midpoint rather than the median. First, CAPs argue that pointing to *stare decisis* amounts to inadequate reasoning because the use is statistically invalid anyway. There is no precedent for using the midpoint of the Expected Earnings and CAPM distributions.[790] Second, CAPs argue that—though the Commission rationalized reliance on the midpoint in 2004 by pointing to the fact that, because RTO members would all share a single regional base ROE, the midpoint would better represent the region's least- and most-risky utilities' ROE than the median—here the original rationale for using the midpoint rather than median does not apply.[791] CAPs state that, because the distribution of proxy results here provides useful information on the cost of equity for the operating companies that constitute NETOs, the median should be used rather than the midpoint so as not to imprudently discard such useful information. Third, CAPs argue that, because the Commission is adopting a radically new approach to calculating base ROE, the Commission can no longer defend the use of midpoint as *stare decisis*.[792]

375. NETOs state that the Commission has set a precedent of using the midpoint rather than median for over a decade and has repeatedly rejected arguments opposing the use of

---

[788] *Id.* at 118-19.

[789] EMCOS Initial Br. at 55, 57.

[790] CAPs Principal Initial Br. at 77-78.

[791] *Id.* at 80; CAPs Br. on Exceptions at 49-53.

[792] CAPs Principal Reply Br. at 38.

the midpoint since then. NETOs argue that, contrary to EMCOS' statements, the recent expansion of proxy groups to now include a national, rather than regional, group has no implications for the logic supporting the Commission's proposed midpoint approach. NETOs argue that parties are precluded from relitigating this issue, since the Commission has already decided it in other proceedings.[793]

376. NETOs point out that the D.C. Circuit, in *Emera Maine*, "noted that the midpoint is a good 'starting place' for the placement of the ROE."[794] NETOs argue that the *S. Cal. Edison*[795] decision that EMCOS and CAPs cite to support the use of median rather than midpoint actually supports the continued use of the midpoint, because in the decision the Commission stated that when an ROE applies to a diverse group of companies, rather than to a single company of average risk, it is important to consider the entire range of results yielded by the proxy group.[796]

377. NETOs argue that, though CAPs and EMCOS point to language in the 2004 Remand Order that would seem to distinguish the use of midpoint then with the proposed use of midpoint now, the Commission has affirmed use of midpoint in more recent orders, like Opinion No. 531 and 531-B, in circumstances that are indistinguishable to the instant case.[797]

## C. <u>Commission Determination</u>

378. We continue to use the midpoint to determine the central tendency of the zone of reasonableness in cases involving an RTO-wide ROE, consistent with the policy set forth in the 2004 Remand Order[798] and applied in Opinion Nos. 569 and 569-A. The United States Court of Appeals for the District of Columbia upheld that policy in *Public Service Commission of Kentucky v. FERC* and in *MISO TOs v. FERC*.[799] We find that EMCOS

---

[793] NETOs Reply Br. at 114-15; NETOs Br. Opposing Exceptions at 78-81.

[794] NETOs Reply Br. at 117 (citing *Emera Maine*, 854 F.3d at 27).

[795] 131 FERC ¶ 61,020 at P 90.

[796] NETOs Reply Br. (I) at 116.

[797] *Id.* at 117.

[798] 2004 Remand Order,106 FERC ¶ 61,302, at PP 9-10.

[799] *MISO TOs. v. FERC*, 45 F.4th at 262-263.

and CAPs have not presented a compelling reason why that policy should not be applied in this case.

379. The court described the 2004 Remand Order's rationale for using the midpoint in cases involving an RTO-wide ROE as follows

> The Commission . . . distinguished between 'cases in which a ROE is set for one gas pipeline or electric utility' and cases where 'applicants proposed setting a single ROE for across-the-board application.' In the latter situation, where 'the ROE will apply to a diverse set of companies,' FERC reasoned that the range of results becomes as important as the central value. The midpoint—unlike the other measures of central tendency—'fully considers that range,' because it is derived directly from the endpoints of the range.[800]

380. NETOs continue to be "a diverse set of companies." For example, the NETOs' S&P corporate ratings range from BBB to A-, and their Moody's long-term ratings range from Baa2 to A3.[801] In addition, 42% of the NETOs are not rated S&P or Moody's.[802] This range of credit ratings, and the fact that many of the NETOs are unrated, supports a finding that NETOs is a diverse group with a variety of risk profiles, even though we treat the group as a whole as of average risk, consistent with the 2004 Remand Order.

381. We continue to find that application of the midpoint, as supported in Opinion Nos. 569 and 569-A and affirmed in *MISO TOs v. FERC*, is most appropriate. The Commission has determined that the midpoint is the most appropriate measure of central tendency for groups of utilities when calculating the ROE with the DCF model and CAPM, that it is a sufficiently robust measurement of central tendency, and that precedent supports the Commission proposal.[803] Moreover, as the D.C. Circuit explained, it deemed the Commission's use of the midpoint reasonable in *Public Service Commission of Kentucky v. FERC* because the Commission focused on the "'rate's across-the-board applicability'"[804] to the group of transmission owners. In these

---

[800] *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1010.

[801] Ex. NET-600 at 9.

[802] *Id.*

[803] Opinion No. 569, 169 FERC ¶ 61,129 at PP 409-14; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 171.

[804] *MISO TOs. v. FERC*, 45 F.4th at 263 (quoting *Pub. Serv. Comm'n of Ky. v.*

proceedings, the base ROE that the Commission sets will also apply across-the-board to the NETOs; therefore, we find that using the midpoint is consistent with precedent.

382. Furthermore, we find that, as in Opinion Nos. 569 and 569-A, the record here is sufficient to address this issue adequately. We also find that this proceeding is the appropriate proceeding to address this issue. The matter of the appropriate measure of central tendency for NETOs is at issue in this proceeding, and parties have had ample notice of, and opportunity to address, this proposal. The Briefing Order explains that this proceeding is meant to address the issues following *Emera Maine*, and it directed the parties to brief the Commission on their proposals.[805] Furthermore, the Commission "has substantial discretion to establish rules of general application by adjudication and need not necessarily employ a separate generic proceeding."[806]

---

*FERC*, 397 F.3d at 1011).

[805] Briefing Order, 165 FERC ¶ 61,030 at PP 1, 61.

[806] Opinion No. 569, 169 FERC ¶ 61,129 at 456; *Procedures for Disposition of Contested Audit*, Order No. 675, 114 FERC ¶ 61,178, at P 32 (2006) (Order No. 675); *AEP Power Mktg.*, 107 FERC ¶ 61,018, at P 199 (2004); *see also NLRB v. Bell Aerospace Corp.*, 416 U.S. 267, 294 (1974) ("[A]djudicative cases may and do serve as vehicles for the formulation of agency policies."); *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."); *Michigan-Wisconsin Pipeline Co. v. FPC*, 520 F.2d 84, 89 (D.C. Cir. 1975) ("[T]here is no question that the Commission may attach precedential and even controlling weight to principles developed in one proceeding and then apply them under appropriate circumstances in a stare decisis manner."); *Pacific Gas and Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("[A]gency may establish binding policy through rulemaking procedures . . . or through adjudications which constitute binding precedents."); *AEP Power Mktg., Inc.*, 108 FERC ¶ 61,026, at P 187 (2004) ("Our decision to establish new policy in the context of case-specific proceedings is clearly within our authority."); *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, 103 FERC ¶ 61,349, at P 51 (2003) ("The Commission, moreover, is not limited to notice and comment rulemaking to develop policy. Agencies generally are permitted considerable discretion to choose whether to proceed by rulemaking or by adjudication.").

## XII. Weighting of Models

### A. Background

383. In the Briefing Order, the Commission proposed to give equal weight to the DCF, CAPM, and Expected Earnings models in order to produce the composite zone of reasonableness. In cases where the Commission would establish a new just and reasonable rate under FPA section 206, the Commission proposed to average the measures of central tendency of each of those models with the point estimate produced by the Risk Premium model, with each model being weighted equally.[807]

384. In Opinion No. 569, the Commission gave equal weight to the DCF and CAPM models under both prongs of FPA section 206 by averaging the top and bottom of the DCF and CAPM zones of reasonableness to produce a composite zone of reasonableness; because the Commission chose not to apply the Expected Earnings and Risk Premium models, those were given zero weight.[808] In Opinion No. 569-A, the Commission opted to impute the average width of the zones of reasonableness from the DCF and CAPM models onto the ROE produced by the Risk Premium model in order to enable it to be used in the first prong of the section 206 analysis.[809] The Commission subsequently found that the DCF, CAPM, and Risk Premium models should each be given one-third weighting for both prongs of the section 206 analysis.[810] In Opinion No. 569-B, the Commission continued to find that each of those models should be given one-third weighting.[811] In *MISO TOs v. FERC*, the D.C. Circuit found that the Commission's decision to include the Risk Premium model was arbitrary and capricious.[812] In the MISO Remand Order, the Commission reversed the portions of Opinion Nos. 569-A and 569-B that included the Risk Premium model in the Commission's ROE methodology[813] and gave equal weight to the DCF model and CAPM.[814] On March 25, 2025, the

---

[807] Briefing Order, 165 FERC ¶ 61,030 at PP 15-17.

[808] Opinion No. 569, 169 FERC ¶ 61,129 at P 425.

[809] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 107.

[810] *Id.* P 141.

[811] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 114.

[812] *MISO TOs v. FERC*, 45 F.4th at 264.

[813] *See* MISO Remand Order, 189 FERC ¶ 61,036 at P 23.

[814] *See id.* at P 29.

Commission addressed requests for rehearing of the MISO Remand Order and continued to reach the same result.[815]

### B. Briefs

385. CAPs argue that the other models should be accorded less weight than the DCF.[816] CAPs also argue that NETOs' contention that the DCF, CAPM, Expected Earnings, and Risk Premium models are equally "key evidence" and deserve "equal weight," is inconsistent application of the (evolving) models' results. Therefore, CAPs request that the Commission fairly consider CAPs' evidence that those methods, as applied by NETOs, overstate the cost of equity.[817] CAPs also state that: (1) the CAPM (the market-based model for estimating the cost of equity) should be given more weight than non-market based models; (2) for an Expected Earnings study to receive any weight, it must be performed in accordance with sound economic principles; and (3) the Risk Premium studies should not be given any weight.[818]

386. EMCOS assert that the recognition "to give equal weight to the alternative models along with the DCF methodology raises the issue whether there should be any adjustments in how we implement them" is highly appropriate. However, EMCOS argue that the critical reliance on distorted applications that led the October 16 Order to place the "alternative methodologies" on the same footing as the DCF methodology (that the Commission has refined and relied on for over 30 years) raises important questions about the foundation of the October 16 Order's misgivings about the DCF.[819]

387. NETOs state that the Commission was correct in proposing to give each of the alternative methodologies equal weight.[820] NETOs further state that the Commission's new methodology and its decision to move past exclusive reliance on the two-step DCF model is supported by a rational explanation and substantial evidence.[821] NETOs assert that the Commission's decision to give equal weight to each of the four models produces

---

[815] MISO Remand Rehearing Order, 190 FERC ¶ 61,184.

[816] CAPs Principal Initial Br. at 68-76.

[817] CAPs Principal Reply Br. at 14.

[818] CAPs Br. on Exceptions at 6, 59-61.

[819] *Id.* at 4-5.

[820] NETOs Reply Br. (I) at 5.

[821] NETOs Initial Br. (I) at 18.

a just and reasonable ROE. NETOs also note that the Commission reached a significant conclusion by finding that relying on the midpoint of the DCF results was no longer tenable and would violate *Hope* and *Bluefield*. NETOs assert that the Commission carefully considered all four financial models in Opinion Nos. 531, 531-A and 531-B, and the Court did not disturb the Commission's resolution of these issues in *Emera* Maine.[822]

388. NETOs state that Mr. McKenzie gave all four financial models equal weight in calculating NETOs' new base ROE under step two of FPA Section 206 in accordance with the Briefing Order.[823] NETOs state that the Commission is no longer "unclear" about its reliance on these models because the new approach eliminates the confusion identified by the Court as to the significance of the CAPM, Expected Earnings, and Risk Premium analyses in Opinion No. 531 by using all of these models to estimate the required ROE for utilities, just as investors do.[824] NETOs add that the Commission's new approach addresses the Court's holding by establishing a methodology to directly respond to the record evidence showing that relying exclusively on the two-step DCF model is not a reliable way to establish an ROE that reflects investors' expected return from an investment in NETOs.[825]

389. NETOs further contend that CAPs' argument for weighting the DCF more than the other models rests on a series of false assertions and flawed analyses performed by Dr. Woolridge.[826] Finally, NETOs state that placing equal weight on the results of each model for the presumptive screening in Step 1 and Step 2 analysis through a case-by-case deep dive analysis is appropriate.[827]

---

[822] *Id.* at 28 (stating the Commission affirmed the reasonableness of these models again in Opinion No. 551).

[823] *Id.* at 21 (citing Briefing Order, 165 FERC ¶ 61,030 at PP 15, 17, 32, 59).

[824] *Id.* at 18 (citing *Emera Maine*, 854 F.3d at 29 ("FERC's reasoning is unclear. On the one hand, it argued that [these] analyses supported its decision . . . but, on the other hand, it stressed that none of these analyses were used to select the 10.57% base ROE.")); NETOs Reply Br. (I) at 102.

[825] NETOs Initial Br. (I) at 18.

[826] NETOs Reply Br. (I) at 104.

[827] Quackenbush Reply Aff. at 29.

### C. Commission Determination

390. We will apply one-half equal weighting of each of the DCF and CAPM zones of reasonableness, as used in the MISO Remand Order.[828] We disagree with CAPs that the DCF model should be given more weight than other model. The evidence indicates that neither the DCF nor the CAPM is conclusively superior to the other. Each model has unique aspects, advantages, and disadvantages that make it preferable in some respects but not in other respects. Accordingly, we find that, on balance, the evidence does not indicate that there is a clearly superior model for estimating cost of equity that should be given more weight than the other. Moreover, we find that equally weighting the two models will reduce any risk associated with giving one model greater weight than the other. We find that the risks associated with the potential errors or flaws in either model will be mitigated to the greatest extent by giving each model equal weight.

## XIII. Sequencing of Calculations in Determining Composite Zone

### A. Background

391. In the Briefing Order, the Commission proposed that the calculations for determining the composite zone of reasonableness and applicable range of presumptively just and reasonable ROEs under the first prong of section 206 would be carried out as follows. First, a proxy group would be determined for each model using existing Commission screens. Second, for each model, low and high-end outliers would be removed using applicable tests. Third, the models would apply to the proxy groups for each model, which would produce separate zones of reasonableness from each model. Fourth, the top and bottom of the zone of reasonableness produced by each methodology would be averaged to determine a single composite zone of reasonableness. Fifth, the midpoint/median, lower midpoint/median, and upper midpoint/median of that composite zone would be calculated. Sixth, the quartile ranges constituting the ranges of presumptively just and reasonable ROEs would be calculated, with the average risk quartile centered on the midpoint/median of the composite range, the above-average risk quartile centered on the upper midpoint/median of the composite range, and the below-average risk quartile is centered on the lower midpoint/median of the composite range.

392. The Commission would then determine whether the utility, or group of utilities, at issue are of average risk, above-average in risk, or below-average in risk as compared with the proxy companies in order to determine the applicable range of presumptively just and reasonable ROEs. The Commission would then consider any other record evidence that would be relevant to its determination under the first prong of section 206. If an existing ROE is found to be unjust and unreasonable under the first prong of section 206, then the additional calculations necessary to determine a replacement just and

---

[828] *See* MISO Remand Order, 189 FERC ¶ 61,036 at PP 23-24, 29.

reasonable ROE would be carried out as follows. First, the applicable midpoint/median, or upper or lower midpoint/median, within the zones of reasonableness would be identified for the utility or utilities. Then those applicable midpoint/medians (or upper or lower midpoint/medians) would be given equal weight and averaged to produce a replacement ROE. As proposed in the Briefing Order, the cost of equity estimate produced by the Risk Premium model would also be given equal weight and averaged with the other values.

393. In Opinion No. 569, the Commission largely adopted the sequence of calculations proposed in the Briefing Order, but with revisions to reflect the decision not to adopt the Expected Earnings and Risk Premium models. Specifically, the Commission applied the DCF and CAPM models separately to the applicable proxy group, producing two zones of reasonableness: a DCF zone of reasonableness and a CAPM zone of reasonableness. The Commission stated that then the top of the DCF zone of reasonableness will be averaged with the top of the CAPM zone of reasonableness and the bottom of the DCF zone of reasonableness will be averaged with the bottom of the CAPM zone of reasonableness to determine a single composite zone of reasonableness for use in both the first and second prong analysis under FPA section 206. The Commission found that, if an existing ROE is found to be unjust and unreasonable, the replacement ROE will be set at the central tendency of the composite zone or reasonableness or the central tendency of the upper or lower halves of the composite zone of reasonableness depending upon whether the utility is of average, above average, or below average risk, respectively.[829] In Opinion No. 569-A, the Commission revised this approach to include the Risk Premium's imputed zone of reasonableness when calculating the composite zone of reasonableness and to divide the zone of reasonableness into thirds instead of quartiles of presumptively just and reasonable ROEs for purposes of the first prong of the section 206 analysis.[830] In *MISO TOs v. FERC*, the D.C. Circuit found that the Commission's decision to include the Risk Premium model was arbitrary and capricious.[831] In the MISO Remand Order, the Commission reversed the portions of Opinion Nos. 569-A and 569-B that included the Risk Premium model in the Commission's ROE methodology and gave equal weight to DCF and CAPM in determining the composite zone of reasonableness.[832] On March 25,

---

[829] Opinion No. 569, 169 FERC ¶ 61,129 at P 437.

[830] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 2, 107.

[831] *MISO TOs v. FERC*, 45 F.4th at 264.

[832] *See* MISO Remand Order, 189 FERC ¶ 61,036 at PP 23, 29.

2025, the Commission addressed requests for rehearing of the MISO Remand Order and continued to reach the same result.[833]

## B. Briefs

394. CAPs argue against the Commission's proposal to calculate the composite zone of reasonableness by (i) averaging the low end of each model to produce the composite zone of reasonableness' lower bound, and (ii) averaging the high end of each model to produce the composite zone of reasonableness' upper bound. CAPs state that each model attempts to estimate the same thing: each proxy group member's cost of equity. Therefore, CAPs argue, the Commission should first average together each proxy's results across all models used, and then use those averages to form the composite zone of reasonableness.[834] EMCOS also support this approach, and contend it would reduce the influence of potential anomalies, as well as any data mismatches between models.[835] Specifically, Dr. Lesser recommends averaging the results of individual proxy group company DCF and CAPM values, after excluding any low-end or high-end outliers associated with each methodology.[836]

395. NETOs reject CAPs' and EMCOS' proposal, and state that there is no basis for averaging the results of each proxy group company.[837] Mr. McKenzie explains that CAPs' and EMCOS' proposal only serves to mask anomalies before the results of each individual model can be assessed.[838] Additionally, Mr. Quackenbush asserts that averaging across models will (i) narrow the composite zone of reasonableness, (ii) distort the weighting between models, and (iii) eliminate proxy group companies that lack sufficient data to be used in all models, thereby failing to consider the full range of equity costs for comparable companies. Mr. Quackenbush contends that investors are mainly concerned with the results of a model across the entire proxy group, not the results for a

---

[833] MISO Remand Rehearing Order, 190 FERC ¶ 61,184.

[834] CAPs Principal Br. at 81-83.

[835] EMCOS Initial Br. (I) at 52-53.

[836] EMCOS Initial Br. (I, IV) at 52-53; EMCOS Initial Br. (II, III) at 62-63.

[837] NETOs Reply Br. (I) at 110.

[838] *Id.* at 111 (citing McKenzie Reply Aff. at 130).

particular company, and that the Commission's Briefing Order methodology for averaging across models is logical and reflects investor methodologies.[839]

## C. <u>Commission Determination</u>

396. We will use the sequence of calculations applied in the MISO Remand Order. In particular, we apply the DCF and CAPM models separately to the applicable proxy group, producing two zones of reasonableness: a DCF zone of reasonableness and a CAPM zone of reasonableness. Then, the top of the DCF and CAPM zones of reasonableness will be averaged together and the bottom of the DCF and CAPM zones of reasonableness will be averaged together to determine a single composite zone of reasonableness for use in both the first and second prong analysis under FPA section 206. If an existing ROE is found to be unjust and unreasonable, the replacement ROE will be set at the central tendency of the composite zone of reasonableness or the central tendency of the upper or lower halves of the composite zone of reasonableness depending upon whether the utility is of average, above average, or below average risk, respectively.

397. We will not adopt CAPs' proposed alternative calculation sequence. As noted above, CAPs propose that we determine a cost of equity for each proxy company by averaging the company-specific results from each model and then using those company-specific composite costs of equity to define the composite zone of reasonableness. We find that the record evidence supports that the models that we are using are intended to produce results separately based on the entire applicable proxy group to which the model is applied, without computing averages across multiple methods for a single company, as CAPs propose. There is no record evidence indicating that analysts apply these models in this way or present the results of these models in this way, nor has any party provided an example of these models being applied this way in a comparable regulatory proceeding. There is also nothing in the record to indicate that the assumptions or structures of the DCF and CAPM models contemplate that the result for a specific proxy group company will be isolated and averaged with a company-specific result from a separate model, rather than considered along with the full range of returns for the entire proxy group that the models produce. The sequencing approach that we adopt here allows the models to function as they are designed until they produce their intended result. CAPs' alternative proposal would interfere in the function of the models before they produce their intended end result and instead take inputs from the models and combine them before the inputs were used as the models intended.

398. Moreover, the purpose of the DCF and CAPM models is to produce a range of returns applicable to the entire span of investment risks for a proxy group of utilities. The purpose is not to provide a specific cost of equity estimate for each proxy group company that can be considered in isolation, outside of the parameters of the model, and

---

[839] *Id.* at 111-13 (citing Quackenbush Reply Aff. at 26-29).

then averaged with a company-specific estimate from a separate model. The product of each model is the full range of cost of equity estimates, as calculated within the parameters of the model. There is no evidence to indicate that the DCF and CAPM models would produce superior results if the Commission were to use the individual data points that form each model's range, before looking at the ranges themselves that are the intended product of the models.

## XIV. ROE Incentives Cap

### A. Background

399. In Order No. 679, the Commission found that, in cases where the utility receives one or more ROE adders as an incentive under section 219 of the FPA, the Commission will cap the total ROE the utility may receive at the upper end of the zone of reasonableness.[840] In Opinion No. 569, the Commission continued this approach and clarified that the cap is placed at the top of the composite zone of reasonableness, rather than the zone of reasonableness produced by the DCF model alone.[841]

### B. Briefs

#### 1. Upper Bound for Incentives

400. NETOs state the Commission should clarify that it can still use the wider statutory zone of reasonableness to set a cap on overall ROE, including incentives, under the second prong of FPA section 206. NETOs argue that the new quartile range of presumptively just and reasonable ROEs is not applicable to the second prong of the FPA section 206 finding, and this will not serve as a cap on incentive ROEs.[842] NETOs state that the Briefing Order concludes that incentive ROEs are capped at the high-end of the statutory zone of reasonableness when establishing a new base ROE. Therefore, this

---

840 Order No. 679, 116 FERC ¶ 61,057 at P 93.

841 Opinion No. 569, 169 FERC ¶ 61,129 at P 452. In the pending Notice of Proposed Rulemaking, *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 170 FERC ¶ 61,204 (2020) (Transmission Incentives NOPR), the Commission proposed to allow the ROE incentive adders to exceed the zone of reasonableness when added to the base ROE. The Commission proposed to cap total ROE incentives at 250 basis points. *Id.* P 76.

842 NETOs Initial Br. (I) at 7, 9.

clarification provides consistency to the Commission's rationale for base ROEs and incentive ROEs.[843]

401. NETOs state that establishing the cap in this way would also allow the Commission to apply pragmatic adjustments to a utility's ROE and avoid arbitrary and capricious results. NETOs argue that limiting the upper limit of ROE incentives to the range of presumptively reasonable ROEs limits the Commission's discretion and significantly reduces the size of ROEs available to transmission owners under FPA Section 219. NETOs state this would undermine the purpose of section 219 of the FPA, which Congress enacted to allow the Commission to award these incentives.[844] Further, NETOs argue that this would unduly curtail ROE incentives and undermine the purpose of a broad zone of reasonableness recognized in *Emera Maine.* NETOs state that, under *Emera Maine* a broad zone of reasonableness establishes "boundaries for courts reviewing FERC's ratemaking decisions", and thus does not compel a specific result within that zone of reasonableness.[845]

402. NETOs agree with the Commission's preliminary calculations for the First Complaint, which includes a cap on NETOs total ROE of 13.08%.[846] NETOs state that, while the Commission has calculated a total ROE cap of 13.08% in accordance with the composite zone of reasonableness, the highest permissible total ROE permitted by the Commission for NETOs is 12.41%, well below the high-end of the composite zone of reasonableness.[847]

403. CAPs and EMCOS each argue that the Commission cannot modify a rule and here the limit of total ROE to the upper bound of DCF-based zone of reasonableness is set by Order No. 679, established by a rulemaking unless modified by another rulemaking.[848] CAPs argue that a DCF-based upper bound should continue to apply unless changed through a subsequent rulemaking. CAPs state that a rulemaking regarding prospective changes to transmission incentive ROEs is currently pending, and any change from ROE incentives caps established in Order No. 679 should be determined in this separate

---

[843] *Id.* at 10 (citing Briefing Order, 165 FERC ¶ 61,030 at P 56).

[844] *Id.*

[845] *Id.* at 11 (citing *Emera Maine*, 854 F.3d at 23).

[846] *Id.* at 20.

[847] NETOs explain the maximum ROE incentives the Commission permits is 200 basis points that can be added to NETOs base ROE of 10.41%. *Id.* at 22.

[848] CAPs Principal Initial Br. at 86-87; EMCOS Initial Br. (I) at 65.

proceeding.[849] EMCOS state that the single zone of reasonableness relevant under FPA section 206 is the evidentiary zone of reasonableness applicable to a utility, and that any ROE outside of this evidentiary zone must be found to be unlawful. For this reason, EMCOS argue a cap on any ROE incentives should be set according to this evidentiary zone, which under Order No. 679 must be within the zone of reasonableness to remain just and reasonable.[850]

404. Further, EMCOS argue that the Commission's finding that ROE incentives are capped at the upper end of composite zone of reasonableness cannot protect consumers against excessive rates if it caps ROE incentives at a level higher than the range of rates in the evidentiary zone of reasonableness. EMCOS explain that Commission precedent is clear that the cap on ROE incentives changes if the high-end zone of reasonableness changes.[851] EMCOS state that, therefore, NETOs' incentives must be capped at the high-end of its evidentiary zone of reasonableness, which EMCOS argue is the "broad range of potentially lawful ROEs" established by the Briefing Order.[852]

405. In their Reply Brief, NETOs argue CAPs and EMCOS raise arguments that misstate determinations under Order No. 679 and are inconsistent with the 2005 Energy Policy Act and *Emera Maine*. NETOs state that, under Order No. 679, the Commission never determined the zone of reasonableness must be based on DCF analysis, and provides that the Commission can consider whether a DCF analysis should be modified on a case-by-case basis.[853] NETOs argue that this means the Commission did not limit its ROE incentive determinations to a DCF analysis, especially for case-specific proceedings. Further, NETOs argue that the statutory basis for Order No. 679, the Energy Policy Act of 2005, did not require transmission incentives to be capped at the top of a DCF analysis. NETOs also argue that *Emera Maine* recognizes the Commission had discretion over the methodology to determine a rate is just and reasonable, because it "has principal statutory role in determining" reasonable rates.[854] NETOs state that the Briefing Order appropriately exercises this discretion. NETOs state that CAPs and EMCOS raise arguments contrary to administrative law because agencies can rely on

---

[849] CAPs Initial Br. (I) at 86-87.

[850] EMCOS Initial Br. (I) at 63.

[851] *Id.* at 63-64.

[852] *Id.* at 65 (citing Briefing Order, 165 FERC ¶ 61,030 at P 24).

[853] NETOs Reply Br. (I) at 135-36 (citing Order No. 679, 116 FERC ¶ 61,057 at PP 92, 102).

[854] *Id.* at 138 (citing *Emera Maine*, 854 F.3d at 20).

adjudications to set or change policy, and whether to change policy through adjudication or rulemaking is the agency's discretion.[855]

406. NETOs state that the Briefing Order is unambiguous that the first prong of FPA section 206 is based on only a quarter of the overall zone of reasonableness, and thus EMCOS' argument that ROE incentives must be capped based on the zone of reasonableness under this first prong must be rejected. NETOs argue that, contrary to EMCOS' assertions, it is logical to have more than one zone of potentially lawful ROEs because EMCOS rest this claim on only a quarter of the overall zone of reasonableness as the only lawful range.[856] NETOs state that *Emera Maine* also requires a range of just and reasonable ROEs to be reviewed under the first prong of FPA section 206 that differs from the overall zone of reasonableness. NETOs argue that EMCOS propose an approach that *Emera Maine* rejected, namely that the zone of reasonableness be coextensive with the rage that supports whether a utility's ROE is just and reasonable under the first prong of FPA section 206.[857]

407. In their reply brief, CAPs argue that NETOs recognize that Order No. 679 capped total ROE at the upper bound of DCF-determined zone of reasonableness. However, CAPs state that NETOs interpret the intent of FPA section 219 to keep the ROE incentives cap static, as in based on the DCF range when incentives were authorized, and not to include any update to an upper bound of range of possible reasonable returns. Thus, CAPs assert that NETOs provide no basis that Congress intended to disconnect the ROE incentives cap from changing capital market conditions. CAPs argue that ROE incentives depend on the upper bound of the range of reasonable ROEs, and if that upper bound drops, the cap on ROE incentives should drop accordingly. [858]

408. In their reply brief, EMCOS argue that NETOs are incorrect that the zone of presumptively just and reasonable ROEs should differ from the range of ROEs used to set the ROE and cap the upper end of all return-based incentives because all ROEs outside of the quartile in the presumptive just and reasonable zone of ROEs must be unjust and unreasonable.[859] EMCOS reiterate many of their earlier arguments that the cap on any incentive adders, according to Order No. 679, must be within the zone of reasonableness to remain just and reasonable and avoid excessive rates. EMCOS reiterate that the upper

---

[855] *Id.* at 138-39.

[856] *Id.* at 139-40.

[857] *Id.* at 140-41.

[858] CAPs Principal Reply Br. at 55-56.

[859] EMCOS Reply Br. (I) at 28.

bound of a zone of reasonableness must be determined by DCF analysis, even if Expected Earnings analysis is incorporated, as this is the methodology Order No. 679 established.[860]

409. In their Brief on Exceptions, NETOs state that, in the initial decisions in these four proceedings, the Presiding Judge set the ROE incentives cap for the Second Complaint refund period at 10.42%, the upper bound of the zone of reasonableness established by the Judge. NETOs state, for the Third Complaint refund period, the ROE incentives adders were set at 12.19%, again the upper bound of the zone of reasonableness established by the Presiding Judge. NETOs argue that other intervening parties have not met their burden to demonstrate that NETOs' existing base ROE is unjust and unreasonable for the Second Complaint or Third Complaint periods, and 13.5% should continue to be the upper bound ROE.[861] NETOs argue that, if the Commission instead adopts the upper bound of the zone of reasonableness established by DCF analysis using IBES, the ROE incentives cap should be set to (1) 11.33% for the refund period of the Second Complaint in order to include ITC in the proxy group and (2) 12.22% for the refund period of the Third Complaint to reflect the adjustment to dividend yields NETOs present in its Brief on Exceptions.[862] NETOs state that setting the ROE incentives cap close to the base ROE can substantially reduce ROE incentive adders and eliminate any additional ROE incentive adders approved by the Commission for NETOs. NETOs argue this could occur even though there has been no showing that NETOs' RTO adder is inappropriate or that particular transmission projects no longer qualify for ROE adders under Order No. 679.[863]

410. In their Brief Opposing Exceptions, Trial Staff argues that NETOs' exceptions relating to the maximum rate for ROE incentives should be rejected.[864] Trial Staff asserts that NETOs' arguments that maximum ROE was not set for hearing contradicts the Commission's stated policy that the total ROE including incentive adders cannot exceed the upper bound of the zone of reasonableness. Trial Staff states that NETOs' argument that maximum ROE should not apply to individual incentive projects contradicts

---

[860] *Id.* at 43-45.

[861] NETOs Br. on Exceptions (II, III) at 53.

[862] *Id.* at 53-54.

[863] *Id.* at 56.

[864] Trial Staff Br. Opposing Exceptions (II, III) at 2-3, 39-40.

Commission policy under Opinion No. 531-B, that maximum ROE applies to overall transmission assets and to individual projects.[865]

411. Trial Staff explains that the Presiding Judge established the maximum ROE including incentive adders should be at the top of the zone of reasonableness for each period relevant to the Second and Third Complaint. Trial Staff argues that the record overwhelmingly demonstrates existing base ROE and maximum ROEs are unjust and unreasonable.[866] Trial Staff states that the existing maximum ROE under Docket No. ER04-157 was found unjust and unreasonable in Opinion No. 531-A; therefore it is not the ROE incentives cap and the 13.5% maximum ROE no longer exists.[867] Trial Staff states that the just and reasonable maximum ROE applies to the Second Complaint refund period because it was not reverted to the prior level at the end of the refund, and therefore also applies to the Third Complaint refund period.[868] Trial Staff contends that the Commission should reject, as it did in Opinion No. 531-B, NETOs' arguments that the maximum ROE was not at issue in the Second Complaint or the related hearing order.[869] Finally, Trial Staff states that the Commission should reject NETOs' argument that the Presiding Judge improperly stated ROE incentive caps apply to transmission projects because it is directly inconsistent with Commission findings, and is inconsistent with the record.[870]

412. CAPs dispute NETOs' claim that establishing a cap on ROE that is close to the base ROE can substantially reduce the RTO adder and eliminate any additional ROE incentive adders. CAPs argue this concern is the result of the base ROE being at the top quarter of the DCF range, not due to a cap of base ROE and ROE incentive adders at the upper bound of the DCF range. CAPs explain that, if the base ROE were set at the midpoint or median of the DCF range, there would be significant headroom to accommodate ROE incentive adders. CAPs state that a reasonable base ROE and maximum ROE are compatible, assuming the Commission adopts a moderate placement of base ROE within the DCF range, and NETOs conclusion that the base ROE and ROE

---

[865] *Id.* at 5-6.

[866] *Id.* at 39-40.

[867] *Id.* at 41.

[868] *Id.* at 41-42.

[869] *Id.* at 42 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 145-46).

[870] *Id.*

incentive adders should exceed this range is untenable.[871] CAPs argue that setting the base ROE close the top of the zone of reasonableness does not eliminate any ROE incentive adder, but rather appropriately limits it to the cap of the upper bound of the DCF range. CAPs also note that Initial Decision (II, III) rejected the alternative cap on incentives where the base ROE would be set at the DCF median and the cap would be 275 basis points above that base ROE.[872]

413. In their Brief Opposing Exceptions to the Second and Third Complaint, CAPs state that NETOs exception no. 1 does not have merit because it argues that the zone of reasonableness resulting from DCF analysis provides an immunity from reducing ROE. CAPs state that, if this argument did have merit, NETOs' DCF range in the period for the Third Complaint is 10.42%, the maximum ROE recommended by the Initial Decision, and NETOs' base ROE plus incentive billed for that period exceeds the determined maximum ROE. CAPs argue that NETOs' ROEs, as billed, would not be immunized from refund even if NETOs legal arguments were accepted.[873]

414. CAPs state that the Commission did not determine whether a project-specific ROE (base and incentive), when weighted with allowed ROE applicable to the rest of the utility's rate base, falls within the top of the zone of reasonableness, and NETOs have not shown an instance where the Commission set ROE incentives in this way. CAPs explain instead, ROE incentive adders are determined on a project-specific basis and each project-specific ROE must fall within the zone of reasonableness.[874]

415. CAPs explain that the Commission has previously determined the incentive adder was still applicable but that any ROE incentive adder is limited to the range of reasonableness, not that the incentive adder should be measured by its impact on a utility's overall ROE.[875] CAPs state that this precedent and Opinion No. 531 interpret Order No. 679 to provide that transmission owners can seek ROEs as the upper end of the zone of reasonableness for certain projects, and rejected arguments for project-specific returns above that upper end of the zone. CAPs argue that Order No. 679-A clarified that, if the Commission approved adders that were generally applicable, the Commission would evaluate each proposed adder by establishing a zone of reasonableness based on a DCF analysis to determine whether the ROE for each project would remain within this

---

[871] CAPs Br. Opposing Exceptions (II, III) at 44.

[872] *Id.* at 45.

[873] *Id.* at 7-8.

[874] *Id.* at 47-48.

[875] *Id.* at 46 (citing *Pacific Gas & Electric Co.*, 141 FERC ¶ 61,168 (2012)).

zone of reasonableness. Therefore, CAPs state that accepting NETOs' argument would reverse Order No. 679 and portions of Opinion Nos. 531 *et seq.* to allow incentive adders to be approved without limit, assuming the project-specific ROEs and the utility's entire ROE fall within the zone of reasonableness.[876]

416. In their Brief Opposing Exceptions EMCOS state, contrary to NETOs' arguments, that the Commission has determined the upper bound of the zone of reasonableness is the cap on a project by project basis for any transmission incentive adders.[877] EMCOS state that the determination in Initial Decision (II, III) to cap ROE incentives at 10.42% for the Second Complaint is correct; however, the ROE incentives cap for the Third Complaint should be corrected to be 11.15% by excluding TECO Energy, Inc. (TECO Energy) from the proxy group.[878] EMCOS state that NETOs' claim that their total ROE should be statically capped at 13.5% represents the upper bound of the zone of reasonableness that has been rejected as unjust and unreasonable three times. EMCOS state that the Commission is clear that ROE incentive adders are capped by the upper end of the zone of reasonableness, and the cap changes if that zone changes. [879]

417. In their Brief on Exceptions for the Fourth Complaint, CAPs argue that Initial Decision (IV) does not resolve an open issue in *Emera Maine*, namely the finding that the Commission needs to make to determine a utility's rate is unjust and unreasonable. CAPs state that the Commission can address this question consistent with established precedent, of whether that NETOs' total ROE is unjust and unreasonable if it incorporates a base ROE that exceeds NETOs' actual cost of equity or allows a total ROE that exceeds the DCF range.[880] In their Brief Opposing Exceptions for the Fourth Complaint, CAPs argue that NETOs' existing total ROE exceeds a range of potentially reasonable returns, regardless of which DCF study is used, that permit NETOs to recover up to 11.74% which is an unjust and unreasonable finding sufficient to move into the second prong of a FPA section 206 analysis.[881]

---

[876] *Id.* at 46-47.

[877] EMCOS Br. Opposing Exceptions (II, III) at 9.

[878] EMCOS state the cap is correctly at the upper bound of the zone of reasonableness and only need to correct this error. *Id.* at 11.

[879] *Id.* at 13-14.

[880] CAPs Br. on Exceptions (IV) at 5, 48-49.

[881] CAPs Br. Opposing Exceptions (IV) at 10.

### 2. Arguments on Statutory Limits to Adjust Incentives

418. NETOs argue that the Commission should not reduce any ROE incentive adders in this proceeding, as it would be contrary to Congressional intent and beyond the scope of the First Complaint. NETOs explain that its current total ROE including incentives is 13.08% and would allow NETOs to fully realize ROE incentives previously approved by the Commission.[882] NETOs state that Congress added FPA section 219 as part of the Energy Policy Act of 2005 and specified that any rate under FPA section 219 must meet the statutory just and reasonable standard. NETOs state that, through a rulemaking process, the Commission satisfied this statutory obligation by capping total ROEs resulting from base ROEs and ROE incentives at the upper bound of the zone of reasonableness determined by DCF analysis.[883] NETOs argue that Order No. 679 did not intend to create a process that would perpetually reduce or eliminate incentives once they were approved by the Commission. NETOs state that reducing ROE incentives would have substantial impacts on needed transmission, undermining FPA section 219.[884]

419. Further, NETOs argue that the Commission lacks the authority under FPA section 206 to lower ROE incentives on a project-by-project basis in these proceedings because it cannot change rates under FPA section 206 based on its evaluation of only a certain component of a rate, unless the resulting rates are unjust and unreasonable. NETOs state that prior Commission arguments that ROE incentives should be evaluated against the DCF zone of reasonableness on a project specific basis under FPA section 206 are in error.[885] NETOs explain that rates under the ISO New England Inc. (ISO-NE) Tariff are rolled-in rates that are comprised of formula rates based on the aggregated cost of all transmission assets of a transmission owner, including total ROEs that incorporate incentives. NETOs state that no project-specific rates are at issue in these proceedings, and the Commission incorrectly assumes that ROE incentives applied to specific transmission projects are rates or charges because NETOs base charges on the rolled-in cost of all transmission assets under a formula rate.[886]

420. CAPs dispute NETOs' claim that the Commission cannot cap project-specific adders because formula rates can provide an unreasonable overall return if there is unreasonable total return on any base component of the rate. Stated differently, CAPs

---

[882] NETOs Initial Br. (I) at 52.

[883] *Id.* at 52-53.

[884] *Id.* at 53-55.

[885] *Id.* at 55-56 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 145).

[886] *Id.* at 56.

explain that a formulaic charge that exceeds a range of potentially reasonable returns would be unreasonable. CAPs state that the Commission has previously found an improper incentive adder equated to unreasonable rates.[887] CAPs argue that NETOs want to protect returns above the ROE incentive cap by offsetting them against other below-ceiling returns on projects with fewer incentives, but such an offset would apply to projects to which the Commission has not granted incentive adders.[888] CAPs agree that Opinion No. 531-B correctly determined incentive adders attach to specific projects.[889]

421. In their Brief on Exceptions, NETOs argue that the Presiding Judge erred by suggesting that the maximum ROE would apply to transmission incentive projects in the Second Complaint because project specific rates are not at issue in the Second Complaint and Third Complaint, given formula rates are at issue. NETOs reiterate their argument that the Commission can only change a component of a rate under FPA section 206 if it has determined the results are unjust and unreasonable, and nothing in Order No. 679, the Energy Policy Act of 2005, or orders granting NETOs' ROE incentives support a conclusion that the Commission's intended to apply FPA section 206 applied to project-specific ROEs.[890]

422. In their Brief on Exceptions, CAPs argue that the Initial Decision (II, III) erred by recommending base ROE and total ROE increase from levels currently effective to 10.9% and 12.19%, respectively, either for the EL14-86 period or prospectively. CAPs argue that this would establish ROEs above those charged for time periods prior to the Commission's determination of exceptions, which would violate statutory limits on retrospective surcharges and would be inappropriate because these proceedings were limited to rate decreases.[891] CAPs argue that Initial Decision (II, III) erred by identifying a total ROE for the EL14-86 period and placing base ROE within each complaint period's range.[892]

423. CAPs argue that allowing a rate increase by affirming the Initial Decision's reset of base ROE and ROE incentives at 10.9% and 12.19% would be beyond statutory

---

[887] CAPs Principal Reply Br. at 56-57 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004).

[888] *Id.* at 57.

[889] *Id.*

[890] NETOs Br. on Exceptions (II, III) at 55-56.

[891] CAPs Br. on Exceptions (II, III) at 5-6.

[892] *Id.* at 28.

authority. CAPs argue that the Commission does not have the authority under a FPA section 206 proceeding to impose a rate increase retroactively, as section 206 only permits retroactive rate decreases and refunds.[893] CAPs argue that the appropriate rate to be effective prospectively is a 10.57% base ROE and 11.74% total ROE established in Opinion No. 531. CAPs argue that the order setting the EL14-86 docket for hearing defined its scope to the request from complainants seeking to reduce the ROE used in formula rates, and increasing rates prospectively is beyond the scope of EL14-86 docket. CAPs argue that increasing rates in this case would be contrary to Congress' intent that FPA section 206 be utilized to curb higher prices.[894] CAPs argue that the Commission lacks authority to reduce rates under FPA section 205 without consent of the filing utility, and it similarly should not increase them in response to FPA section 206 without the complainants consent.[895]

424. CAPs argue that, if the Commission upholds the Initial Decision (II, III), it cannot order refunds for amounts paid after Opinion No. 531-A that were in excess of the just and reasonable rate. Therefore, CAPs state that, if the Commission affirms Initial Decision (II, III), it would have to order that refunds reflecting ROE reductions for July 31 – October 16, 2014, from 11.14% base ROE and 13.5% total ROE, to 10.9% base ROE and 12.9% total ROE. In addition, CAPs argue for October 17, 2014, through October 31, 2015, the Commission would have to order no refunds using the then-effective base ROE of 10.57% and 11.74% total ROE.[896] CAPs state that the Commission should conduct a *de novo* review of the Initial Decision and reduce both the base ROE and total ROE that includes incentive adders for the EL13 and EL14 periods. CAPs state that the Commission should ensure, in placing base an ROE within the DCF zone of reasonableness, that ROE determinations reasonably reflect year-to-year capital cost trends.[897]

425. CAPs and EMCOS both conclude that the Commission appropriately applied FPA section 206 to project-specific ROEs. CAPs state this is an argument which NETOs have raised previously in the Second and Third Complaint that the Commission rejected in

---

[893] CAPs state this is affirmed by the D.C. Circuit under the *City of Anaheim*. *Id.* at 95, 97.

[894] *Id.* at 97 (citing *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 773 (2016)).

[895] *Id.* at 97-98 (citing *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir 1984); *see also PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,066, at P 17 (2015)).

[896] *Id.* at 96.

[897] *Id.* at 98.

Opinion No. 531-B as inconsistent with Commission precedent on project-specific ROE incentives. CAPs state that the Commission has held, under Opinion No. 531-B, that a utility's total ROE cannot exceed the zone of reasonableness, and EMCOS agree that this is a correct application of Opinion No. 531, Order No. 679 and FPA section 219.[898] Specifically, EMCOS state that each of these prior determinations conclude any adder that is approved applies to a specific project and the total ROE that include incentives must be within the zone of reasonableness.[899] CAPs explain that the Commission has found that a transmission owner that has been awarded ROE incentive adders for portions of its rate base, each rate base portion is limited by the top of the zone of reasonableness, not the average allowed ROE.[900] CAPs explain that NETOs implemented the Commission's finding on project-specific ROEs through an amended compliance finding, and offer no basis to reverse the Commission's earlier finding. Finally, EMCOS state that Initial Decision (II, III) correctly rejects NETOs argument that FPA section 206 prohibits caps to NETOs' project specific incentives absent a finding that the end result rate is unjust and unreasonable. EMCOS state this argument is without merit and the Initial Decision concludes that any ROE incentive adders that were established earlier are now capped at the upper bound of the new zone of reasonableness.[901]

### 3. Notice

426. NETOs state there was no reason to expect ROE incentives would change anytime the Commission established a new high end for the zone of reasonableness, especially in section 206 proceedings limited to the base ROE.[902] NETOs argue that ROE incentives were not included the First Complaint and the order setting the First Complaint to hearing; thus, reducing ROE incentives would deprive NETOs from due process and adequate notice of such changes. NETOs state the hearing procedures did not expand the scope of the First Complaint to include issues that were not the subject of the First Complaint nor involved evidence submitted by hearing parties relating to NETOs' ROE incentives, and the Presiding Judge did not discuss ROE incentives in Initial Decision

---

[898] CAPs Br. Opposing Exceptions (II, III) at 45 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 146); EMCOS Br. Opposing Exceptions (II, III) at 12-13.

[899] EMCOS Br. Opposing Exceptions (II, III) at 12-13.

[900] CAPs Br. Opposing Exceptions (II, III) at 46 (citing *Pacific Gas & Electric Co.,* 141 FERC ¶ 61,168 (2012)).

[901] EMCOS Br. Opposing Exceptions (II, III) at 14-15.

[902] NETOs Initial Br. (I) at 57.

(I).[903] NETOs argue that, even if ROE incentives have been incorporated into proceedings regarding base ROEs in the past, NETOs are justified in believing these proceedings would not incorporate ROE incentives.[904]

427. CAPs dispute NETOs' claim that ROE incentives are beyond the scope of these proceedings and argue that NETOs have ample notice that ROE incentive caps are at issue. CAPs argue that the First Complaint that initiated this case was clear a new zone of reasonableness would cap NETOs incentive adders and indicated that the upper bound of the zone of reasonableness if the cap to total ROE.[905] CAPs also argue that the Second through Fourth Complaints raised arguments that put NETOs on notice that the upper bound of a zone of reasonableness would be reset and total ROE would be unjust and reasonable if it were higher than the upper bound of a zone of reasonableness. CAPs argue that the Briefing Order sought briefing and evidence on how to set and apply a cap on base ROE plus incentive adders.[906]

428. In their brief on exceptions, NETOs contend that the Presiding Judge erred by ruling on transmission incentive issues in the Second Complaint, as the complaint stated it only challenged base ROEs and did not address incentive adders and when the Second Complaint was set for hearing, it did not reference ROE incentives, adders or otherwise. NETOs aver that the law clearly requires that FPA section 206 proceedings identify specific challenges to the Commission's jurisdictional rates, and issues not raised in an initial complaint are outside of the scope of the proceedings.[907] NETOs argue that the D.C. Circuit has required the Commission provide adequate notice when modifying ROE incentives, which was an obligation in these proceedings, thus the Presiding Judge's determination on ROE incentives are impermissible.[908]

429. CAPs assert that the Commission should reject NETOs' argument, as it did for the Second and Third Complaints, that Initial Decision (II, III) failed to provide notice to NETOs that transmission incentive issues would be acted upon in this proceeding. CAPs state that NETOs' argument is based on a false premise because the initial decision does not make a finding on any previously-approved transmission incentive, but instead

---

[903] *Id.* at 59.

[904] *Id.* at 60.

[905] CAPs Principal Reply Br. at 58.

[906] *Id.* at 59-60 (citing Briefing Order, 165 FERC ¶ 61,030 at PP 1, 17, 21).

[907] NETOs Br. on Exceptions (II, III) at 54.

[908] *Id.* at 55 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1011-12).

modifies the cap that applies to NETOs' implementation of ROE incentive adders. CAPs argue that the upper bound that serves as a cap is one of the conditions in which the ROE incentive adders were originally accepted. CAPs state Opinion No. 531-B provides ROE incentive adders may only be recovered if the base ROE and ROE incentive adders combined fall below the top of the DCF range. CAPs state the findings under Opinion No. 531-B apply to this proceeding, specifically that NETOs had notice to present evidence regarding the zone of reasonableness and that the ROE incentive adder cannot exceed the high end of that zone.[909]

### C. <u>Commission Determination</u>

430. Our existing policy is to cap a utility's total ROE—i.e., base ROE in addition to all incentive adders— at the top of the zone of reasonableness.[910] Consistent with the Commission's finding in Opinion No. 569, we conclude that we must now incorporate our new methodology of calculating the overall composite zone of reasonableness into our existing policy. As discussed above, we find that calculating the zone of reasonableness using the DCF model and CAPM will more accurately reflect a utility's cost of equity, because it will better represent how investors make their investment decisions. Accordingly, we find that it is appropriate to use the upper end of the composite zone of reasonableness as produced by the revised base ROE methodology to cap total ROE rather than only the upper end of the zone of reasonableness produced by the DCF methodology, as CAPs argue.[911]

431. CAPs argue that the Commission has not justified using multiple models, instead of only the DCF, to calculate the zone of reasonableness. In section IV, we explain why we find that it is no longer appropriate to use only the DCF model to calculate the zone of reasonableness. We find that the logical interpretation of the Commission's policy is that the ROE must be capped at the top of the zone of reasonableness, which at the time of Order No. 679 was calculated using the DCF model. In this order, we decide that the

---

[909] CAPs Br. Opposing Exceptions (II, III) at 42-43 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 142).

[910] *See, e.g.*, Order No. 679, 116 FERC ¶ 61,057 at P 93. We note that in the Transmission Incentives NOPR, which is currently pending before the Commission, the Commission proposed to modify this requirement by finding that cumulative ROE incentives may not exceed 250 basis points irrespective of whether the cumulative ROE exceeds the top of the zone of reasonableness. *See* 170 FERC ¶ 61,204 at PP 10, 80.

[911] Opinion No. 569, 169 FERC ¶ 61,129 at P 452; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 260.

zone of reasonableness should be determined by a new method.[912] There is no logical link between the results of the DCF model itself and incentive caps when the overall zone of reasonableness is calculated by incorporating additional models. For those reasons, CAPs' argument on this point is unavailing.

432. In addition, CAPs and EMCOS contend that, even if the Commission could support its approach, the total ROE cap at the top of the DCF range was established by rulemaking procedures and should continue to apply, unless and until it is changed through a subsequent formal rulemaking.[913] We are not persuaded by this argument. We are not amending or repealing our current policy of using the top of the overall zone of reasonableness to cap total ROE. We are continuing that policy but amending our previous approach to calculating the overall zone of reasonableness. As NETOs note, nothing in Order No. 679 or the 2005 Energy Policy Act—the statutory basis for Order No. 679—provides that total ROE inclusive of incentives must be capped at the top of a zone of reasonableness produced by a DCF analysis. Here, we are merely continuing to use the top of zone of reasonableness as the total ROE cap but altering the way in which the zone is produced, and no rulemaking is required to implement this change.

433. Moreover, we find that, even if this determination constituted a change to our policy of capping total ROE, we could do so in this proceeding. The Commission "has substantial discretion to establish rules of general application by adjudication and need not necessarily employ a separate generic proceeding."[914] We have similarly explained

---

[912] *See supra* PP 52-61.

[913] CAPs Principal Initial Br. at 86-87; EMCOS Initial Br. (I) at 65.

[914] Order No. 675, 114 FERC ¶ 61,178 at P 32; *see also NLRB v. Bell Aerospace Corp.*, 416 U.S. at 294 ("[A]djudicative cases may and do serve as vehicles for the formulation of agency policies."); *SEC v. Chenery Corp.*, 332 U.S. at 203 ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."); *Michigan-Wisconsin Pipeline Co. v. FPC*, 520 F.2d at 89 ("[T]here is no question that the Commission may attach precedential and even controlling weight to principles developed in one proceeding and then apply them under appropriate circumstances in a stare decisis manner."); *Pacific Gas and Electric Co. v. FPC*, 506 F.2d at 38 ("[A]gency may establish binding policy through rulemaking procedures . . . or through adjudications which constitute binding precedents."); *AEP Power Mktg., Inc.*, 108 FERC ¶ 61,026 at P 187 ("Our decision to establish new policy in the context of case-specific proceedings is clearly within our authority."); *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, 103 FERC ¶ 61,349 at P 51 ("The Commission, moreover, is not limited to notice and comment rulemaking to develop policy. Agencies generally are permitted considerable discretion to choose whether to proceed by

that "[o]ur decision to establish new policy in the context of case-specific proceedings is clearly within our authority."[915] Moreover, we stated in the Briefing Order that "we [did] not make any final determinations with respect to the proposed new methodology,"[916] which included our proposal to cap total ROE with the top of the overall zone of reasonableness,[917] and that we would consider briefing regarding "the justness and reasonableness of any aspect of the proposed methodology."[918]

434. We disagree with NETOs' assertions that maximum total ROE was not at issue in this proceeding and that Initial Decision (II, III) failed to provide notice that transmission incentive issues would be at issue. In the Briefing Order, which was issued after all of the initial decisions in these proceedings, the Commission proposed to continue to use the top of the zone of the reasonableness as the cap on a utility's total ROE—i.e., its base ROE plus incentive ROE adders—and directed the participants in these proceedings to submit briefs addressing the Commission's proposals, which included that proposal to continue to use the top of the zone of reasonableness as the cap on total ROE inclusive of ROE incentive adders.[919] Moreover, the Commission clarified that its proposal on this issue was preliminary, subsequently explaining that "the Commission [in the Briefing Order] did not reach any final conclusions or make any final determinations with respect to the proposed new ROE methodology in the Briefing Order,"[920] which included the

---

rulemaking or by adjudication.").

[915] *AEP Power Mktg.*, 107 FERC ¶ 61,018 at P 199.

[916] MISO Briefing Order, 165 FERC ¶ 61,118 at P 10.

[917] *Id.* PP 18, 57.

[918] *Id.* P 20.

[919] Briefing Order, 165 FERC ¶ 61,030 at P 17 ("Because our current policy is to cap a utility's total ROE, i.e., its base ROE plus incentive ROE adders, at the top of the zone of reasonableness, we propose to use the composite zone of reasonableness . . . to establish the cap on a utility's total ROE."); *see also id.* P 56 ("[W]e determine that the composite zone of reasonableness is 7.51 percent to 13.08 percent. The top of this new composite zone of reasonableness would also determine the cap for the total ROE, i.e., the base ROE plus any ROE incentives."); *id.* P 59 ("[W]e would cap any preexisting incentive-based total ROE above 13.08 percent at 13.08 percent."). *See generally id.* P 61 ("[W]e are directing the participants to these proceedings to submit briefs regarding the proposed approaches to the FPA section 206 inquiry and how to apply them to the First, Second, Third, and Fourth Complaints.").

[920] *Coakley v. Bangor Hydro-Elec. Co.*, 166 FERC ¶ 61,013 at P 11; *see* Briefing Order, 165 FERC ¶ 61,030 at P 18 ("[T]he cap on NETOs' total ROE is 13.08 percent.

Commission's proposal to continue capping total ROE with the top of the overall zone of reasonableness.[921] Accordingly, all participants have had ample notice of, and opportunity to address, the Commission's proposal to continue with its existing policy of capping total ROE at the top of the overall zone of reasonableness.

435. We also disagree with NETOs that, because the rates at issue are not project-specific but rather the rolled-in rates from all transmission assets, the Commission cannot modify the incentives for specific projects in this proceeding. As has been Commission policy since 2006, the incentives provided under section 219, per Order No. 679, are capped at the upper end of the zone of reasonableness.[922] And as explained above, the Commission is not changing any incentives here but how the zone of reasonableness is determined.

## XV. Applicable Risk-Based Presumptively Just and Reasonable Range

### A. Background

436. In Opinion No. 531, the Commission set NETOs' base ROE at 10.57%, halfway between the midpoint and the top of the zone of reasonableness of the DCF model. The Commission found that market conditions at the time indicated that the midpoint of the zone of reasonableness might not have been sufficient to meet the capital attraction standards of *Hope* and *Bluefield*.[923] In the Briefing Order, the Commission proposed to divide the composite zone of reasonableness into risk-based quartiles where each quartile would represent a range of ROEs that would be presumptively just and reasonable for utilities of the applicable risk profile. The Briefing Order proposed that the applicable quartile for utilities of average risk would be the one centered on the midpoint of the composite zone of reasonableness. The Commission also stated that "[i]t is undisputed that NETOs are of average risk."[924] In Opinion No. 569, the Commission adopted the Briefing Order's proposed methodology of calculating ranges of presumptively just and

However, these findings are merely preliminary.").

[921] Briefing Order, 165 FERC ¶ 61,030 at PP 17, 56.

[922] *See* Order No. 679, 116 FERC ¶ 61,057 at P 2. As noted above, in the currently pending Transmission Incentives NOPR, the Commission has proposed to modify this requirement by finding that cumulative ROE incentives may not exceed 250 basis points irrespective of whether the cumulative ROE exceeds the top of the zone of reasonableness. *See* 170 FERC ¶ 61,204 at PP 10, 80.

[923] Opinion No. 531, 147 FERC ¶ 61,234 at PP 142-44.

[924] Briefing Order, 165 FERC ¶ 61,030 at P 26, 57.

reasonable ROEs, but in Opinion No. 569-A the Commission revised its methodology for calculating the ranges to divide the overall composite zone of reasonableness into thirds, instead of using the quartile approach adopted in Opinion No. 569.[925] The Commission illustrated how these presumptively just and reasonable ranges would be divided as follows:[926]

Figure 1: Ranges of Presumptively Just and Reasonable Base ROEs




437. In Opinion No. 569-B, the Commission continued to find that it is appropriate to determine the ranges of presumptively just and reasonable base ROEs by dividing the overall composite zone of reasonableness into three equal portions.[927] In *MISO TOs v. FERC*, the D.C. Circuit considered and affirmed the Commission's use of presumptively just and reasonable ranges.[928]

### B. Briefs

438. EMCOS argue that NETOs are not of average risk, contrary to the Commission's assertion in the Briefing Order. EMCOS state that NETOs' use of formula rates with cost-plus equity return and income tax allowances, use of equity-heavy capital structures,

---

[925] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 190.

[926] *See id.* P 194.

[927] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 60-66.

[928] *MISO TOs v. FERC*, 45 F.4th at 261-263.

and limited exposure to customer challenges to cost recovery under formula rates make NETOs' business and financial risk below average.[929]

439. CAPs also contend that the Commission erred in asserting that NETOs are of average risk, stating that the Commission mischaracterized CAPs' willingness to accept a base ROE set at the midpoint of a properly-constructed DCF distribution. CAPs explain that this willingness refers to the comments made prior to the Briefing Order and, furthermore, should not be applied to the use of non-DCF models or other proposals first raised in the Briefing Order. CAPs argue that, because (i) transmission is inherently less risky than generation and (ii) many NETOs have substantially divested their generation assets, NETOs should be considered relatively low-risk. Additionally, CAPs support EMCOS' assertion that NETOs' higher equity levels in their capital structures reduce their risk levels.[930]

440. In support of CAPs' assertion that NETOs are of below-average risk, Dr. Woolridge provides credit rating analyses of NETOs and the national proxy group for each complaint, using ratings from both S&P and Moody's. Dr. Woolridge finds that NETOs are, on average, one notch less risky than the national proxy group in all four complaints.[931]

441. In response to Dr. Woolridge's analyses, NETOs witness Ms. Lapson presents alternative credit rating analyses. Ms. Lapson argues that Dr. Woolridge overstated NETOs' credit ratings by not properly accounting for NETOs that lacked a credit rating. Ms. Lapson explains that, when accounting for the unrated NETOs, NETOs cannot be considered less risky than the proxy group. Additionally, NETOs' witness Mr. McKenzie asserts that Dr. Woolridge's analyses improperly rely on an average rating, which, he asserts, does not properly consider the full range of risk for a diverse group of transmission owners. NETOs also refute CAPs' argument that transmission investment is less risky than distribution, which, they state, is contrary to Commission precedent. NETOs state that, because CAPs did not challenge this finding on appeal in Opinion No. 531, they cannot do so now.[932]

442. NETOs contend that EMCOS' claim that formula rates make NETOs less risky is also contrary to Commission precedent. NETOs note that the Presiding Judge rejected this assertion in Initial Decision (I) and that the Commission did so in Opinion No. 551,

---

[929] EMCOS Initial Br. (I) at 12.

[930] CAPs Principal Initial Br. at 64-67.

[931] CAPs Initial Br. (I, II, III, IV) at 2-3.

[932] *See* NETOs Reply Br. (I) at 124-25.

affirming "the determination that the use of formula rate does not warrant a lower based ROE." Similarly, NETOs refute claims that capital structure can be used to evaluate risk and assert that doing so is contrary to Commission precedent, including Opinion No. 551. Furthermore, NETOs assert that it is unnecessary to consider capital structure in risk evaluations because credit ratings already account for capital structure.[933]

## C. Commission Determination

443. We find that NETOs should be considered of average risk for purposes of determining the applicable range of presumptively just and reasonable base ROEs. NETOs' average credit rating is generally one notch higher than the average credit rating of the proxy group, which does not indicate that NETOs are demonstrably less risky than the proxy group companies.[934] Furthermore, we agree with NETOs' witness Mr. McKenzie that an analysis based on the average credit rating does not represent the full range of risks faced by a diverse group of utilities. Though some NETOs have relatively strong credit ratings, not all do, and as Ms. Lapson notes, some NETOs do not have a credit rating.[935] Given these issues, we do not find persuasive arguments that the average credit rating of those NETOs that do have a credit rating is dispositive of whether the NETOs should be considered below average risk.

444. We are not persuaded by arguments that NETOs' high level of equity in their capital structure demonstrates that NETOs' have a lower risk level for purposes of determining the applicable range of presumptively just and reasonable base ROEs. As the Commission explained in Opinion No. 551, the Commission uses credit rating screens in selecting companies as proxy group members in order to ensure that the proxy group contains companies with a similar risk profile to the utility being analyzed. To the extent that a higher percentage equity in the capital structure reduces a utility's risk, such risk would be reflected in a higher credit rating.[936] Similarly, we disagree with arguments that NETOs' use of formula rates warrants a lower base ROE. In Opinion No. 551, the

---

[933] *See id.* at 126.

[934] *See* Order No. 569, 169 FERC ¶ 61,129, at P 519 ("Moreover, CAPs' evidence indicates that MISO TOs' average credit ratings are comparable to the averages for the proxy group. As MISO TOs point out, the average credit ratings that CAPs' witness Dr. Berry reports for the MISO TOs are within one notch of the average ratings for the proxy group, which does not indicate that MISO TOs are demonstrably less risky than the proxy group companies." (citations omitted)).

[935] *See, e.g.,* Ex. No. NET-303 (showing credit ratings for NETOs ranging from BBB to A-, with some lacking credit ratings).

[936] Opinion No. 551, 156 FERC ¶ 61,234, at P 288.

Commission found that, similar to the use of more equity in the capital structure, to the extent that formula rates reduce risk, this would be reflected in an improved utility credit rating.[937] Furthermore, the vast majority of proxy group companies also feature formula rates including UIL Holdings, parent of United Illuminating, and Otter Tail Power, which set the high-end of the zones of reasonableness for the First Complaint DCF and CAPM analyses respectively.

## XVI. Complaint Specific Results: First Complaint

445. As discussed above, the Commission has established a revised methodology to better enable it to identify whether an existing ROE is unjust and unreasonable and, if so, what is a just and reasonable ROE. Applying this methodology to the First Complaint, we continue to find that NETOs' existing 11.14% ROE for purposes of the First Complaint is unjust and unreasonable. Having addressed the first prong of the Commission's dual burden under FPA section 206 and thus satisfied the "condition precedent"[938] to exercising our authority to change a rate under section 206, we find that a just and reasonable replacement ROE for NETOs in the First Complaint is 9.57% under the second prong of the Commission's dual burden under FPA section 206.

446. Below we address the "specific findings"[939] as to the "'particular circumstances'"[940] of the First Complaint proceeding that establish "'a rational connection'"[941] between the record evidence in that proceeding and our decisions under both prongs of section 206 herein to establish that we have "'made a principled and reasoned decision supported by the evidentiary record.'"[942] Because the Commission bases its decisions concerning just and reasonable ROEs for public utilities on the most recent information in the record regarding market cost of equity, the starting point for determining whether NETOs' existing ROE has become unjust and unreasonable must be a consideration of whether the current market cost of equity has changed since NETOs' existing ROE was established. Accordingly, we begin by determining a composite zone of reasonableness using the most recent financial information in the record of the First

[937] *Id.* P 297.

[938] *Emera Maine*, 854 F.3d at 25 (citing *FPC v. Sierra Pac. Power*, 350 U.S. 348, 353 (1956)).

[939] *Id.* at 30.

[940] *Id.* at 27 (citing *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. at 586).

[941] *Id.* at 28 (citing *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. at 782).

[942] *Id.* at 30 (citing *S. Cal. Edison v. FERC*, 717 F.3d at 181).

Complaint proceeding, i.e., data for a six-month study period from October 2012 through March 2013.

### A. Composition of Starting Proxy Group

447. As discussed above, in the Briefing Order,[943] the Commission stated that it intends to continue to use the same screens for developing a proxy group as the Commission has used in recent cases, including Opinion Nos. 531[944] and 551.[945] Those five screens are: (1) the use of a national group of companies considered electric utilities by *Value Line*;[946] (2) the inclusion of companies with credit ratings no more than one notch above or below the utility or utilities whose ROE is at issue;[947] (3) the inclusion of companies that pay dividends and have neither made nor announced a dividend cut during the six month study period;[948] (4) the inclusion of companies with no merger activity during the six-month study period that is significant enough to distort the study inputs;[949] and (5) companies whose ROE results pass threshold tests of economic logic, including the low-end outlier test and high-end outlier test. The first four screens listed above evaluate particular characteristics of the companies in question that do not vary depending upon the results of the DCF or CAPM analyses. Accordingly, those screens may be used to develop a starting group of proxy companies eligible for inclusion in the proxy group to be used for the purposes of both the DCF and CAPM models. The low-end and high-end outlier tests must then be applied separately to the results of the DCF and CAPM models to determine the final DCF and CAPM proxy groups. Below, we first address issues concerning the determination of the starting proxy group in the First Complaint proceeding. We then apply the low-end and high-end outlier tests to the results of the DCF and CAPM analyses in order to determine the DCF and CAPM zones of reasonableness.

---

[943] Briefing Order, 165 FERC ¶ 61,030 at P 51.

[944] Opinion No. 531, 147 FERC ¶ 61,234 at P 97.

[945] Opinion No. 551, 156 FERC ¶ 61,234 at P 20.

[946] Opinion No. 531, 147 FERC ¶ 61,234 at PP 96, 100-02.

[947] The Commission requires use of both S&P corporate credit ratings and Moody's issuer ratings when both are available. *Id.* P 107.

[948] *Id.* P 112.

[949] *Id.* P 114; Opinion No. 551, 156 FERC ¶ 61,234 at PP 37-43.

### 1. **Opinion No. 531**

448. The Presiding Judge found that a separate, higher ROE is appropriate for the "locked in/refund period" from October 2011 through December 2012,[950] and therefore established two separate ROEs: one for the refund period and one to apply prospectively.[951] However, in Opinion No. 531, the Commission disagreed, finding that it is inappropriate to establish two base ROEs in the proceeding. The Commission explained that its long-standing practice is to establish one base ROE in a proceeding, using one zone of reasonableness.[952] The Commission stated that it has only established different ROEs for different time periods in a proceeding based on post-hearing adjustments to reflect post-hearing changes in U.S. Treasury bond yields, but those adjustments must remain within the single zone of reasonableness established in the proceeding. The Commission also explained that its general policy has been to base the zone of reasonableness on the most recent financial data in the record, and with regard to the First Complaint, the most recent data in the record are the data for a six-month study period from October 2012 through March 2013. The Commission found that this data is reasonably representative of the refund period, as it includes the last three months of that period.[953]

449. In order to establish a proxy group, the Presiding Judge reviewed the DCF-determined cost of equity for 49 companies. The Presiding Judge determined that 42 of those companies should be included in the proxy group, before application of any low or high-end outlier test. The Presiding Judge found it appropriate to use a national proxy group, rather than a regional proxy group, explaining that "the current financial and market conditions are better served by use of a more diverse national proxy group."[954] The Presiding Judge adopted the national proxy group produced by NETOs' DCF

---

[950] The refund period is the 15-month period commencing on the refund effective date established in an FPA section 206 proceeding. In this case, the refund period for the First Complaint is October 1, 2011, (i.e., the refund effective date) through December 31, 2012.

[951] Initial Decision (I), 144 FERC ¶ 63,012 at P 585. The Presiding Judge adopted NETOs' values for both time periods, establishing base ROEs of 10.6% for the refund period and 9.7% for the prospective period. *Id.*

[952] Opinion No. 531, 147 FERC ¶ 61,234 at P 64 (citing Opinion No. 510, 134 FERC ¶ 61,129, *order on reh'g*, 142 FERC ¶ 61,198; *Sw. Pub. Serv. Co.*, 53 FERC at 61,240, *reh'g denied*, 53 FERC ¶ 61,406).

[953] *Id.*

[954] Initial Decision (I), 144 FERC ¶ 63,012 at P 551 n.49.

analysis. The Presiding Judge also found that NETOs' use of *Value Line*'s electric utilities list as a proxy screen is consistent with Commission policy.[955] In addition, the Presiding Judge found that it was appropriate for NETOs to screen their proxy group to exclude public utilities with corporate credit ratings more than one notch above and below the subject utilities to be appropriate for use in this case, because the Commission has used this as screening criterion in previous cases.[956] The Presiding Judge further found that NETOs appropriately screened from their proxy group any company that has not paid six months of dividends without a dividend cut, as well as companies with ongoing M&A activity.[957]

450. In Opinion No. 531, the Commission affirmed Initial Decision (I)'s adoption of NETOs' national proxy group. The Commission identified a national proxy group of 41 companies listed as Electric Utilities by *Value Line* and that had credit ratings within one notch above or below NETOs' credit ratings (referred to as the "credit rating screen"), had paid six months of dividend yields without making or announcing a dividend cut, and were not involved in M&A activity significant enough to distort the DCF results.[958]

451. In using the national proxy group, rather than a regional proxy group, the Commission explained that "widening the geographic range of the proxy group allows for the application of more stringent screening criteria, to refine the proxy group to a level of risk more comparable, while maintaining a group of proxy companies that is sufficiently large and diverse to reliably capture the range of reasonable returns."[959] In applying the credit rating screen, the Commission explained that "the purpose of the credit rating band screen is to include in the proxy group only those companies whose credit ratings approximate those of the utilities whose rates are at issue."[960] The Commission found that, because investors rely on credit ratings from both S&P and Moody's, "basing the credit rating screen on data only from S&P does not necessarily provide an accurate

[955] *Id.* P 552 (citing *Atl. PATH*, 122 FERC ¶ 61,135 at P 20, *order on reh'g*, 133 FERC ¶ 61,153 (2010); *S. Cal. Edison*, 131 FERC ¶ 61,020 at PP 32, 51).

[956] *Id.* P 552 n.51 (citing *RITELine Ill., LLC*, 137 FERC ¶ 61,039, at P 68 (2011) (using corporate credit ratings one notch above and below target); *N. Pass Transmission, LLC*, 134 FERC ¶ 61,095, at P 46 (2011); *S. Cal. Edison*, 131 FERC ¶ 61,020 at P 51).

[957] *Id.*

[958] Opinion No. 531, 147 FERC ¶ 61,234 at PP 124-25.

[959] *Id.* P 96.

[960] *Id.* P 106.

estimate of NETOs' risk."[961] Therefore, the Commission found that "in applying the credit rating proxy group screen to exclude companies more than one notch above or below NETOs' credit ratings, it is appropriate to use both the S&P corporate credit ratings and the Moody's issuer ratings *when both are available*."[962] Because NETOs' S&P credit ratings ranged from A- to BBB and Moody's credit ratings ranged from A2 to Baa2, the Commission excluded companies from the proxy group that were more than one notch above or below either of those credit rating bands.[963]

### 2. Briefs

452. No party raised objections to the inclusion of any specific company in the starting proxy group identified in Opinion No. 531.

### 3. Commission Determination

453. We adopt the starting proxy group identified in Opinion No. 531. This group of proxy companies is eligible for inclusion in the proxy group to be used for the purposes of both the DCF and CAPM models.[964]

## B. DCF Analysis

454. As discussed above, we hold that: (1) only the IBES short-term growth projection should be used for calculating the (1+.5g) adjustment to the dividend yield instead of a

---

[961] *Id.* P 107.

[962] *Id.*

[963] *Id.* P 108.

[964] The 41 companies in the starting proxy group, before the application of any low or high end outlier test, are as follows: ALLETE, Inc.; Alliant Energy Corp.; Ameren Corp. (Ameren); American Electric Power Co., Inc.; Avista Corp.; Black Hills Corp.; CenterPoint Energy, Inc.; Cleco Corp.; CMS Energy Corp.; Consolidated Edison, Inc.; Dominion Resources, Inc.; DTE Energy Co.; Duke Energy Corp.; Edison International (Edison); El Paso Electric Co.; Empire District Electric Co.; FirstEnergy Corp.; Great Plains Energy Inc.; Hawaiian Electric Industries, Inc.; IDACORP, Inc.; Integrys Energy Group, Inc.; NextEra Energy, Inc.; Northeast Utilities; NorthWestern Corp.; OGE Energy Corp.; Otter Tail Corp.; Pepco Holdings, Inc.; PG&E Corp.; Pinnacle West Capital Corp.; Portland General Electric Co.; PPL Corp. (PPL); Public Service Enterprise Group Inc. (PSEG); SCANA Corp.; Sempra Energy; Southern Company; TECO Energy; UIL Holdings Corp.; Vectren Corp.; Westar Energy, Inc.; Wisconsin Energy Corp.; Xcel Energy, Inc.

composite growth rate; (2) a revised low-end outlier test applies under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the Risk Premium from the CAPM analysis; (3) a revised high-end outlier test applies under which we treat any proxy company as high-end outlier if its cost of equity estimated under the model in question is more than 200% of the median result of all of the potential proxy group members in that model before any high or low-end outlier test is applied, subject to a "natural break" analysis; and (4) the long-term growth rate should be given 20% weighting and the short-term growth rate 80% weighting in the two-step DCF model.

455. We now turn to the issue of whether, for purposes of determining the DCF zone of reasonableness, any company in the starting proxy group should be excluded as a low- or high-end outlier. In Opinion No. 531, the Commission excluded Ameren and Edison International from the First Complaint DCF proxy group because their ROEs were less than 5.61%, which is 100 basis points above the average yield for public utility bonds rated Baa by Moody's. In addition, the Commission excluded PSEG because its 5.62% ROE was "an insignificant single basis point above the 100 basis point threshold."[965] We apply the revised low-end outlier test used in Opinion No. 569-A under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the Risk Premium from the CAPM analysis, subject to a natural break analysis. In the First Complaint proceeding, the Risk Premium from the CAPM analysis is 9.43%**.** Twenty percent of that Risk Premium is 189 basis points. Adding 189 basis points to the 4.61% Baa bond yield produces a low-end outlier threshold in the First Complaint proceeding of 6.49%, which results in no additional exclusions. We still exclude PSEG, Ameren, and Edison International, which feature ROEs of 4.85%, 4.38%, and 2.20%, respectively. Consolidated Edison has the lowest DCF ROE of any company included in the proxy group at 6.74%.

456. Under the high-end outlier test we have adopted in this order, we would, subject to the natural break analysis, exclude any DCF ROE that is more than 200% of the median of the starting proxy group DCF ROEs. In this case, the median of the starting proxy group DCF ROEs is 8.97%. Two hundred percent of that median is 17.95%. The company with the highest DCF ROE in the starting proxy group, UIL Holdings, has an ROE of 12.27%, well below the 17.95% high-end outlier threshold. Accordingly, we do not exclude any company from the DCF proxy group as a high end-outlier.

457. Having conducted the high-end outlier test, we now assess whether the natural break analysis warrants further revisions to the DCF proxy group. Typically, application of the natural break analysis "involves examining the distance between that proxy group company and the next closest proxy group company, and comparing that to the dispersion

---

[965] *See* Opinion No. 531, 147 FERC ¶ 61,234 at P 123.

of other proxy group companies."[966] The Commission has repeatedly explained that it is not enumerating a rigid formula for application of the natural break analysis, and that it is appropriate to develop its approach on a case-by-case basis.[967]

458. In this case, we exclude UIL Holdings from the DCF proxy group following the natural break test. We find that this adjustment is warranted based on the record before us. Specifically, we find that the distance between UIL Holdings and the next highest company in the DCF proxy group (130 bps), as well as the relatively smaller size of gaps between other proxy members (maximum of 43 bps) merits removal of UIL Holdings from the proxy group. The company with the next highest DCF ROE is Pinnacle West Capital Corp. with a DCF ROE of 10.97%.

459. Our DCF analysis in the First Complaint proceeding reflecting these findings is shown in Appendix A to this order. Based on these determinations, we conclude that the DCF zone of reasonableness is 6.74% to 10.97%.

### C. <u>CAPM Analysis</u>

460. In applying the revised ROE methodology to the CAPM, companies with growth rates of less than or equal to zero or greater than or equal to 20% are excluded from the CAPM analysis, and we use a one-step DCF model without any long-term growth projection for the DCF analysis within the CAPM.

461. We now turn to the issue of whether, for purposes of determining the CAPM zone of reasonableness, any company in the starting proxy group should be excluded from the CAPM proxy group as a low- or high-end outlier. As discussed in the preceding section, we have determined that the low-end outlier threshold in the First Complaint proceeding is 6.49%. The company in the starting proxy group with the lowest ROE is PG&E Corp., with an ROE of 7.35%. Because that ROE is well above the 6.49% low-end outlier threshold, we do not exclude any company from the CAPM proxy group as a low-end outlier.

462. Under the high-end outlier test that we have adopted in this order, we would exclude from the CAPM proxy group any ROE that is more than 200 percent of the median of the starting proxy group CAPM ROEs. In this case, the median of the starting proxy group CAPM ROEs is 10.83%. Two hundred percent of that median is 21.67%. The company with the highest CAPM ROE in the starting proxy group, Otter Tail Corp.,

---

[966] *Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019, *order on reh'g*, 177 FERC ¶ 61,106 (2021), *order on reh'g*, 178 FERC ¶ 61,116, at P 20 (2022) (citing Opinion No. 569, 169 FERC ¶ 61,129 at P 395).

[967] *See, e.g., id.* (citing Opinion No. 569, 169 FERC ¶ 61,129 at PP 391, 397).

has an ROE of 13.22%, well below the 21.67% high-end outlier threshold. Accordingly, we do not exclude any company from the CAPM proxy group as a high end-outlier.

463. Our CAPM analysis in the First Complaint proceeding reflecting these findings is shown in Appendix A to this order. Based on these determinations, we conclude that the CAPM zone of reasonableness is 7.35% to 13.22%.

### D. Composite Zone of Reasonableness and FPA Section 206 Findings

464. Averaging the top and bottom of the DCF and CAPM zones of reasonableness determined above based on financial data for October 2012 through March 2013 produces a composite zone of reasonableness in the First Complaint proceeding of 7.04% to 12.09%. The midpoint of that zone of reasonableness is 9.57%.

465. Having determined the composite zone of reasonableness based on financial data for October 2012 through March 2013, we now turn to considering whether NETOs' 11.14% ROE, which was determined based on financial data for the period July to December 2004, with an update based on the monthly yields of ten-year constant maturity U.S. Treasury bonds for the period March through August 2006, may be found unjust and unreasonable pursuant to the first prong of section 206. As discussed above, we calculate the ranges of presumptively just and reasonable ROEs that are used in our ROE analysis under FPA section 206 by dividing the overall composite zone of reasonableness into thirds.

466. Also as discussed above, we find that, for purposes of determining the range of presumptively just and reasonable ROEs, NETOs should be treated as average risk. We recognize that, because the various NETOs have a relatively wide range of credit ratings, the proxy group in this case contains companies with a similarly wide range of credit ratings. However, as discussed in section XI.C of this order, the Commission has held that NETOs' ROE should be set at the midpoint of the zone of reasonableness, for the very reason that they are a diverse group with a variety of risk profiles, and the court has recently affirmed that policy as applied to the MISO TOs.[968] The midpoint fully considers the range of reasonable returns, because it is derived directly from the endpoints of the range. Given that Commission policy is to set an RTO-wide ROE at the midpoint of the zone of reasonableness and the other record evidence regarding NETOs' risk profile, we conclude that NETOs must be treated as of average risk and that the range of presumptively reasonable ROEs for consideration in determining whether NETOs 11.14% base ROE is unjust and unreasonable should be the be the middle third of

[968] 2004 Remand Order, 106 FERC ¶ 61,302 at PP 9-10; *MISO TOs. v. FERC*, 45 F.4th at 262-263.

the composite zone of reasonableness. In the First Complaint proceeding, that range is from 8.72% to 10.41%.[969]

467. NETOs' 11.14% base ROE is 73 basis points above the range of presumptively just and reasonable ROEs for NETOs. Accordingly, we find that it is presumptively unjust and unreasonable. In order to rebut the presumption that the ROE is unjust and unreasonable, we would look at other evidence, such as state ROEs, ROEs of non-utility companies, ROEs produced by other methodologies, non-utility stock prices, investor expectations for non-utility stocks, various types of bond yields and their relation to stock prices, investor and other expert testimony, or testimony regarding the effects of rates on customers that would indicate that this is not the case. Here, the record lacks such evidence sufficient to rebut the presumption. We see no evidence in the record, such as state ROEs, ROEs of non-utility companies, and other methodologies, serving to rebut this presumption. In these circumstances, we find, under the first prong of section 206, that NETOs' 11.14% base ROE that is the subject of the First Complaint proceeding has become unjust and unreasonable.

468. Having found that NETOs' existing ROE is unjust and unreasonable, we turn to the establishment of a just and reasonable replacement ROE under the second prong of section 206. As discussed above, we find that the midpoint of the composite zone of reasonable ROEs based on the most recent financial information in the record of the First Complaint proceeding is 9.57%. In addition, as discussed above, we find that NETOs are of average risk. Our policy is to set an RTO-wide ROE at the midpoint of the zone of reasonableness when the transmission owners receiving the RTO-wide ROE are of average risk. Accordingly, we find that the just and reasonable replacement ROE for the NETOs in the First Complaint proceeding is 9.57%. We therefore require NETOs to adopt a 9.57% ROE effective October 16, 2014, the date of Opinion No. 531-A, and provide refunds, with interest for the First Complaint's October 1, 2011 to December 31, 2012 refund period.

### E. <u>Other Issues</u>

469. On October 6, 2017, the Commission addressed a request by NETOs to reinstate their previous Commission-allowed base ROE of 11.14%,[970] which was lowered to 10.57% pursuant to now-vacated Commission Opinion Nos. 531, 531-A and 531-B. The Commission rejected NETOs' filing and required NETOs to continue collecting their ROEs currently on file, subject to a future Commission order.[971] The Commission stated

---

[969] *See* Appendix A.

[970] October 2017 Order, 161 FERC ¶ 61,031.

[971] *See id.* P 36.

that on remand, it would exercise its broad remedial authority to make whatever ROE the Commission determined to be just and reasonable effective for the refund period and the entire period between Opinion No. 531-A and the date of the order on remand.[972] On November 6, 2017, NETOs requested rehearing of the October 2017 Order, arguing that the Commission erred by not restoring their transmission rates to the *status quo ante*, i.e., the rate in effect prior to Opinion No. 531 following the D.C. Circuit's decision in *Emera Maine*.[973] We find that NETOs' request for rehearing is moot and therefore dismiss it. As discussed in this order, we are granting the First Complaint and establishing a new base ROE for NETOs in that proceeding as a result. Accordingly, that 9.57% base ROE will be NETOs' base ROE effective as of the date that Opinion No. 531-A required NETOs to adopt a 10.57% ROE and, therefore, NETOs' rehearing request seeking to reinstate its previous base ROE of 11.14% is moot.

470. On October 5, 2017, NETOs filed a motion to dismiss the four complaints in these proceedings because of the effects of the *Emera Maine* decision. In the alternative, NETOs asked the Commission to consolidate the four complaints for decision and to stay the evidentiary hearing in the Fourth Complaint proceeding.[974] NETOs contend that the four complaints were based on the assumption, which was rejected in *Emera Maine*, that the complainants only had to show that a new DCF study would produce a lower midpoint ROE than the most recently Commission-approved ROE.[975] NETOs argue that the Second Complaint, Third Complaint, and Fourth Complaint should be dismissed because they violate the fifteen-month refund period in FPA section 206.[976] NETOs assert that, under *Emera Maine*, a complainant must first demonstrate that the existing ROE is unjust and unreasonable, which means that a new section 206 complaint cannot be filed at least until after the Commission issues an order on the merits of the prior complaint, in which it establishes the existing ROE that would be superseded by the subsequent complaint.[977] In the alternative, NETOs request that the Commission consolidate the four complaints and decide them simultaneously, including, if necessary, using paper hearing procedures to assist in deciding the outcome, and that the

---

[972] *Id.* P 24.

[973] Pursuant to *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc), NETOs' request for rehearing of the October 2017 Order may be deemed denied by operation of law. However, we are dismissing the rehearing request as moot.

[974] NETOs October 5 Motion to Dismiss at 4-6.

[975] *Id.* at 14-15.

[976] *Id.* at 22-26.

[977] *Id.* at 24-25.

Commission reassume direct jurisdiction over the Fourth Complaint and stay the evidentiary hearing in that proceeding.[978]

471. We reject NETOs' motion. As an initial matter, the Presiding Judge in the Fourth Complaint proceeding denied a request to hold that proceeding in abeyance;[979] the evidentiary hearing has since concluded and an initial decision has been issued. Accordingly, NETOs' request that the Commission reassume direct jurisdiction over the Fourth Complaint and stay the evidentiary hearing in that proceeding are moot. In addition, while the four complaints were filed before the issuance of *Emera Maine* and therefore focused on satisfying the Commission's section 206 methodology that predated *Emera Maine*, we have now reviewed all four complaints in light of the *Emera Maine* decision and the subsequent developments in our methodology for analyzing base ROEs under FPA section 206 and find that they justify the Commission addressing their merits and substantive arguments, as we do in this order. The Briefing Order allowed the complainants to submit additional evidence and arguments regarding a proposed methodology for analyzing base ROEs under section 206 in light of the *Emera Maine* decision. We find that the additional evidence and arguments submitted provide the Commission with sufficient record evidence to consider the merits of the complaints and not dismiss them. We therefore find that NETOs' arguments on this point are moot.

472. We disagree that the Second Complaint, Third Complaint, and Fourth Complaint should be dismissed because they violate the 15-month refund period in FPA section 206. As discussed herein and as the Commission explained in Opinion Nos. 569[980] and 569-A,[981] in the context of successive, or pancaked, complaints we must assess whether the public utility's currently effective rate is unjust and unreasonable, not some earlier rate that may have been in effect when the complaint was filed but has now been superseded. The Commission explained that, if the Commission's analysis in the successive complaint analyzed some earlier rate that may have been in effect when the complaint was filed but has since been superseded, it would permit the Commission to order refunds for a period beyond the 15-month statutory refund period based on a single decision in the preceding complaint decision.[982] However, the Commission did not find that a new section 206 complaint cannot be filed until after the Commission issues an order on the merits of the preceding complaint. On the contrary, "the Commission has consistently

[978] *Id.* at 4-5, 33.

[979] Initial Decision (IV), 162 FERC ¶ 63,026 at P 15.

[980] Opinion No. 569, 169 FERC ¶ 61,129 at PP 566-73.

[981] Opinion No. 569-A, 169 FERC ¶ 61,129 at PP 260-67.

[982] *Id.* P 260.

interpreted the Regulatory Fairness Act—in the specific context of public utility ROE cases—to allow subsequent complaints."[983] In addition, "the Commission has allowed multiple complaints regarding the same ROE, where the subsequent complaints are based on 'new, more current data,' explaining that '[t]his is particularly critical given that what is at issue is return on equity[,]' which, 'in contrast to other cost of service issues . . . can be particularly volatile.'"[984] The Commission explained that "in such cases, it is not 'instituting a duplicative proceeding intended solely to expand the amount of refund protection beyond 15 months, but rather [is] initiating an entirely new proceeding, based on an entirely separate factual record, that may or may not reach the same conclusions as those reached in the earlier ROE proceeding.'"[985] Moreover, in *MISO TOs v. FERC*, the court affirmed the Commission's decision to use the base ROE established in the first complaint proceeding as the rate to be analyzed in the second complaint proceeding, noting that "[t]his should not be read to endorse the transmission owners' argument that customers cannot file successive complaints. FERC has an explanation for allowing successive complaints."[986]

473. Under the facts and circumstances of these proceedings, the mere fact that the Second Complaint, Third Complaint, and Fourth Complaint were filed before the issuance of an order on the merits in the applicable preceding complaint does not warrant their dismissal. The Commission allowed these complaints because they were based on new, more current data, consistent with applicable precedent. Moreover, in issuing the Briefing Order and providing parties an additional opportunity to submit evidence and arguments in a paper hearing relating to all four complaint proceedings, the Commission has effectively granted NETOs' alternative request for the Commission to consolidate the four complaints and decide them simultaneously, including using paper hearing procedures to assist in deciding the outcome if necessary. For these reasons, we reject NETOs' motion.

474. NETOs state that they do not agree with the scope of the remedial authority asserted by the Commission in making the ROE established in the First Complaint effective prospectively from October 16, 2014. NETOs contend that the Commission does not have the authority to mandate retroactive reductions in rates outside the 15-month refund period established in response to a complaint and that the Commission's authority is limited to fixing a new rate that will be effective prospectively from the date

[983] *Ark. Elec. Coop. Corp. v. ALLETE, Inc.*, 156 FERC ¶ 61,061, at P 33 (2016).

[984] *Id.* (citing *Consumer Advoc. Div. of the Pub. Serv. Comm'n of W. Va. v. Allegheny Generating Co.*, 68 FERC ¶ 61,207, at 61,998 (1994)).

[985] *Id.* (citing *S. Co. Servs., Inc.*, 83 FERC ¶ 61,079, at 61,386 (1998)).

[986] *MISO TOs v. FERC*, 45 F.4th at 262 n.10.

of post-briefing order, not October 16, 2014.[987] We disagree and find that the 9.57% ROE established as the just and reasonable base ROE for the First Complaint proceeding is effective prospectively from October 16, 2014—the date of Opinion No. 531-A. As discussed above, the *Emera Maine* decision vacated and remanded Opinion No. 531-A. In this order, we are acting in response to that remand and therefore are modifying the determinations in Opinion No. 531-A. Accordingly, the base ROE that was set in Opinion No. 531-A, and which is being modified in this order, is effective as of the date of the original decision that is being modified (i.e., the date of Opinion No. 531-A).

475. Moreover, in this order, the Commission is acting to correct a legal error identified by *Emera Maine*. The *Emera Maine* court found that the Commission's ROE determinations in Opinion No. 531 *et seq.* were arbitrary and capricious because the single ROE analysis failed to include an actual finding as to the lawfulness of the existing base ROE at issue. The Commission is acting to correct that legal error in this order. In addition, the Commission indicated previously in this proceeding that it will exercise its "broad remedial authority" to correct its legal error in order to make whatever ROE it sets on remand effective as of October 16, 2014 – the date of Opinion No. 531-A.[988]

476. In addressing similar arguments from the MISO TOs, the Commission explained that the decision to make the base ROE established in the MISO Remand Order effective prospectively from the date of the original decision that was modified "is a separate and distinct matter from the refunds that were ordered for the fifteen-month refund period."[989] The Commission explained that its decision was "necessary to give effect to the prospective ROE change resulting from granting the [complaint],"[990] and "[t]hus, the Commission's decision is not rooted in the fifteen-month refund authority under section 206, but instead on the requirement to give effect to the [complaint's] replacement ROE as of the appropriate prospective effective date."[991] Consistent with this, we disagree with NETOs that section 206 of the FPA prohibits the Commission from making the ROE established in the First Complaint effective prospectively from October 16, 2014. In this order, we establish a different replacement base ROE under section 206 than was set previously, meaning that the amount that NETOs have collected from October 16, 2014 until the date of this order is not the same as what they would have collected if the 9.57% replacement rate in this order was in effect prospectively from October 16, 2014.

---

[987] NETOs Initial Br. (I) at 24-26.

[988] October 2017 Order, 161 FERC ¶ 61,031 at PP 24, 34.

[989] MISO Remand Rehearing Order, 190 FERC ¶ 61,184 at P 67.

[990] *Id.*

[991] *Id.*

In making the 9.57% rate effective prospectively from October 16, 2014 and requiring refunds to reflect that rate, the Commission is only requiring NETOs to reconcile this difference. The 9.57% replacement base ROE is the relief granted from the First Complaint, and it therefore is effective prospectively from October 16, 2014, and NETOs are required to revise their rates to reflect the 9.57% base ROE being effective prospectively from October 16, 2014. Nothing in this decision is inconsistent with the fifteen month-limitation on the Commission's refund authority in section 206.

## XVII. Complaint Specific Results: Second Complaint

### A. Existing ROE for Purposes of Second Complaint

477. In the Briefing Order, the Commission stated that the issue to be addressed in the Second Complaint proceeding is whether the ROE established in the First Complaint remained just and reasonable based on financial data for the six month period September 2013 to February 2014 presented by the participants at the hearing on the Second Complaint.[992] As the Commission explained in Opinion No. 569-A, the base ROE established in the First Complaint proceeding is the existing rate to be reviewed for purposes of the Second Complaint proceeding because that is the rate which we would have to find unjust and unreasonable under the first prong of FPA section 206, before we could require a new ROE "to be thereafter observed" pursuant to the second prong of section 206.[993] In Opinion No. 569, the Commission further explained that any new just and reasonable rate that it requires "to be thereafter observed" pursuant to section 206(a) will replace the currently effective rate, not some previously effective rate.[994] In *MISO TOs v. FERC*, the D.C. Circuit affirmed this approach, finding that the Commission was correct to use the just and reasonable replacement ROE that it had set in the First Complaint proceeding in order to adjudicate the Second Complaint.[995] The court explained that two aspects of section 206 confirmed that the Commission was correct in this approach: "First, the statute uses the present-tense verb 'is,' which means that [the Commission] must look to the current Return at the time of decision . . . Second, the statute commands that [the Commission] set a Return 'to be thereafter observed and in force.' Once [the Commission] sets a new Return in the first proceeding, it must observe and enforce that Return until it lawfully changes, including in ongoing proceedings."[996]

---

[992] Briefing Order, 165 FERC ¶ 61,030 at P 60.

[993] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 219.

[994] Opinion No. 569, 169 FERC ¶ 61,129 at P 529.

[995] *MISO TOs v. FERC*, 45 F.4th at 261-262.

[996] *Id.* at 262.

Accordingly, in order to determine a new rate to be thereafter observed, we must examine the currently effective rate because that is the rate that will need to be replaced if it is unjust and unreasonable. The 9.57% base ROE established in the First Complaint proceeding is effective prospectively from October 16, 2014 and is therefore the currently effective rate for purposes of the Second Complaint. Accordingly, the base ROE to be analyzed for purposes of the Second Complaint is the 9.57% base ROE established in the First Complaint proceeding.

## B. Composition of Starting Proxy Group

### 1. Background

478. As discussed above in paragraph 447, the Commission uses five screens for developing a proxy group. The first four screens listed above evaluate particular characteristics of the companies in question that do not vary depending upon the results of the DCF or CAPM analyses. Accordingly, those screens may be used to develop a starting group of proxy companies eligible for inclusion in the proxy group to be used for the purposes of the DCF and CAPM models. The low-end and high-end outlier tests described in this order must then be applied separately to the results of the DCF and CAPM models to determine the final DCF and CAPM proxy groups. First, we address the determination of the composition of the starting proxy group in the Second Complaint proceeding. We then apply the low-end and high-end outlier tests to the results of the DCF and CAPM analyses in order to determine the DCF and CAPM zones of reasonableness.

479. In order to establish a proxy group for the Second Complaint period, the Presiding Judge accepted Trial Staff's proxy group of 29 companies, and excluded ITC as a proxy due to its M&A activity.[997] As the Presiding Judge explained, it is the Commission's practice to eliminate from the proxy group any company engaged in M&A activity significant enough to distort the DCF inputs. Consistent with this Commission policy, the Presiding Judge found that ITC's M&A activities with Entergy were significant enough to affect ITC's stock price[998] and earnings per share growth rate projections[999] during the relevant DCF study period.[1000]

---

[997] Initial Decision (II, III), 154 FERC ¶ 63,024 at PP 283, 629.

[998] *Id.* P 602.

[999] *Id.* P 600.

[1000] *Id.* P 603 (citing Ex. S-1 at 32).

480. The parties' briefs on exceptions address whether ITC should have been excluded from the DCF proxy group for the Second Complaint due to merger negotiations. We address this issue below.

### 2. **Exclusion of ITC**

481. In Opinion No. 531, the Commission explained that its practice is to "eliminate from the proxy group any company engaged in M&A activity significant enough to distort the [company's] DCF inputs—i.e., the company's "stock prices, dividends, or growth rates."[1001] We first summarize ITC's M&A activity before turning to Initial Decision (II, III), the briefs on and opposing exceptions, and our decision whether to include ITC in the proxy group.

482. On December 11, 2011, ITC announced its intention to acquire the entire transmission assets of Entergy Corporation. Thereafter, on December 13, 2013, during the fourth month of the six-month DCF study period,[1002] ITC announced that it had failed to reach an agreement with Entergy and the merger negotiations terminated. Following this announcement, the S&P raised ITC's credit rating to A- and commenting that the proposed merger would have doubled ITC's "size in terms of asset scale and market capitalization and further diversifying cash flow and broadening the customer base."[1003] *Value Line* discussed large projected fluctuations in earnings and costs associated with the proposed merger and its ultimate termination. Moreover, ITC's stock price fell when it appeared that the merger negotiations were ending and thereafter, once the termination of the negotiations was announced, ITC's stock price increased by 17%, in contrast to a nine percent increase in the Dow Jones Utility Average.[1004] Over the course of the six-month DCF study period, ITC's stock price increased 12.4%, whereas the S&P increased only 6.6%.[1005]

---

[1001] Opinion No. 531, 147 FERC ¶ 61,234 at P 114.

[1002] The DCF study period for the Second Complaint, based upon the Second Complaint refund period of December 27, 2012 through March 26, 2014, "should be based on the most recent financial data available during that period, i.e., the last six months of that period." Initial Decision (II, III), 154 FERC ¶ 63,024 at P 581 (quoting Third Complaint Hearing Order, 149 FERC ¶ 61,156, at P 2).

[1003] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 601.

[1004] *Id.* P 602.

[1005] *Id.*

483. With respect to determining the composition of the proxy group, the Presiding Judge rejected the arguments of NETOs that ITC should be included in the DCF proxy group for the Second Complaint, and agreed with other expert witnesses that including ITC was consistent with the Commission's practice to eliminate from the proxy group any company engaged in M&A activity significant enough to distort the DCF inputs.[1006] The Presiding Judge observed that in Opinion No. 531, the Commission eliminated ITC from the proxy group due to its "*ongoing* merger activity" during its DCF study period. In the instant proceeding, the Presiding Judge explained that the inclusion of ITC by NETO's expert Dr. Avera was significant because it formed the top of Dr. Avera's *Yahoo! Finance* IBES range of reasonableness. As explained below, the Presiding Judge found that ITC engaged in M&A activity during the DCF study period and that this M&A activity was "significant enough to distort the DCF inputs."[1007] Accordingly, the Presiding Judge removed ITC from the Second Complaint DCF proxy group.[1008]

484. The Presiding Judge did not agree with the NETO's witness, Dr. Avera, who commented that the merger activity did not affect the IBES earnings per share growth rates because the merger negotiations terminated in December 2013. The Presiding Judge found that Dr. Avera's focus on earnings per share growth rates improperly ignored the Commission's standard for exclusion due to M&A activity based on any one of three inputs of stock price, dividends, and growth rates.[1009] The Presiding Judge also disagreed with Dr. Avera's comments regarding *Value Line*'s evaluation of the impact of merger activity upon ITC's growth rates. The Presiding Judge cited the December 20, 2013 *Value Line* report's statements that "ITC has incurred significant costs associated with the Entergy deal,"[1010] and that following the termination of the merger negotiations, *Value Line* was forecasting a 32 percent earnings increase. The Presiding Judge also noted that Dr. Avera admitted that *Value Line* switched its earnings per share growth

---

[1006] *Id.* P 598.

[1007] *Id.* P 610 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at PP 92, 114).

[1008] The Presiding Judge determined that, in addition to ITC, other companies engaged in M&A activities that significantly affected their stock prices, dividend yields, or growth rates during the six-month study of the Second Complaint period. These companies include: Entergy Corporation; Northwestern; TECO Energy; UIL Holdings; and UNS Energy. *See id.* P 598. The Presiding Judge explained that aside from ITC, the other companies do not constitute the boundaries of each participant's proxy group and, therefore, he did not need to address the impact of M&A activity upon them. *See id.* P 599.

[1009] *Id.* P 603.

[1010] *Id.* P 604 (quoting *Value Line Investment Survey* (December 2013)).

estimate solely because of the merger termination in 2013 and that it was one reason for the 32% increase in 2014.[1011] The Presiding Judge found that Dr. Avera was incorrect in his claim that Opinion No. 531 requires a "concrete showing" that the transaction results in a distortion of the DCF and the Presiding Judge determined that the Commission has not set such a standard of proof.[1012]

485. Further, the Presiding Judge was not persuaded by Dr. Avera's exhibit (Figure NET-1), a compressed visual depiction of a comparison of the ITC stock and the Dow Jones Utility Average, which Dr. Avera asserted that his exhibit showed that there was not a significant difference in the price of ITC stock as compared to the Dow Jones Utility Average for September 1, 2013 through March 24, 2014. The Presiding Judge determined that the actual underlying data showed a marked decline in the ITC stock price of 4.3% before the merger termination, more than double the decline of the Dow Jones Utility Average, and then the subsequent rise of the ITC stock price to 17.4% for the three months after the merger termination.[1013] Moreover, the Presiding Judge did not accept Dr. Avera's explanation that ITC experienced a large drop in stock price due to the filing on November 12, 2013 of a FPA section 206 complaint before the Commission against the MISO transmission owners' base ROE, including ITC, and, instead, noted that as the complaint was pending, the ITC stock price rebounded through 2014 and reached a 52-week high on January 23, 2015. The Presiding Judge also found that NETOs failed to put forth sufficient probative evidence to support the theory that the pending MISO ROE complaint created concern from equity analysts.[1014]

486. The Presiding Judge concluded that ITC was engaged in "major merger activity" during the DCF study period and that the merger activity was "significant enough to distort the DCF inputs."[1015] Consequently, the Presiding Judge excluded ITC from the DCF proxy group. Once the Presiding Judge removed ITC from the DCF proxy group, Portland General set the top of Dr. Avera's proxy group, with a corrected growth rate of 6.6%. The Presiding Judge determined that when applying the corrected growth rate for Portland General, it lowered its cost of equity/DCF result to 9.7%,[1016] which had the effect of lowering Portland General below the top of the zone of reasonableness. The

[1011] *Id.*

[1012] *Id.* P 605.

[1013] *Id.* PP 607-09 (citing Ex. NET-1500 at 43-44).

[1014] *Id.* P 609.

[1015] *Id.* 610 (citing Opinion No. 531, 147 FERC ¶ 61,234 at PP 92, 114).

[1016] *Id.* P 613 (citing Ex. S-33 at Schedule 1).

Presiding Judge found that PG&E, with a cost of equity/DCF result of 10.41%, set the top of the proxy group and the top of the range of reasonableness.[1017]

**a. <u>Briefs</u>**

487. NETOs argue that the Presiding Judge erred by excluding ITC from the Second Complaint proxy group due to its M&A activity. NETOs assert that the threshold question is whether the company is involved in "major merger activity during the six-month study period"[1018] such that the M&A activity is "significant enough to distort the DCF inputs."[1019] NETOs argue that record evidence does not support the Presiding Judge's determination that two of the three DCF inputs, stock prices and earnings growth projections, were distorted by the proposed merger.[1020] Further, NETOs explain that they consider ITC a particularly important company to include in the DCF proxy group because ITC is the only publicly-traded transmission-only company in the United States and, thus, NETOs contend that ITC provides the most directly comparable proxy for setting the ROE for its transmission assets.[1021]

488. NETOs state that the proposed merger of transmission assets between Entergy and ITC was first announced in 2011 and had been pending for almost two years before the start of the Second Complaint DCF study period. NETOs comment that ITC was excluded in Opinion No. 531 because, in December 2011, at the time of the announcement of the merger, the proposed merger was a major transaction for ITC and the six-month study period in that case began less than a year after the announcement.[1022] In contrast, NETOs contend that, by the time of the study period for the Second Complaint, the investment community was well-aware of state-level regulatory resistance to the proposed merger and, therefore, when the merger was officially abandoned on December 13, 2013, the investment community had already anticipated that the merger was not viable and the ITC stock price reflected this outcome. Consequently, NETOs

---

[1017] *Id.*

[1018] NETOs Br. on Exceptions (II, III) at 11 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at P 92).

[1019] *Id.* (quoting Opinion No. 531, 147 FERC ¶ 61,234 at PP 92, 114).

[1020] *Id.*

[1021] *Id.* at 5, 10-11.

[1022] *Id.* at 12.

assert that the abandonment of the merger did not distort the ITC's stock price during the Second Complaint DCF study period.[1023]

489. NETOs also assert that, although Trial Staff witness Ms. Joe's testimony recommending exclusion of ITC was supported by the Presiding Judge, she did not provide appropriate comparisons or support for either her conclusion about changes to the ITC stock price or that the ITC stock price was linked to the termination of the ITC-Entergy merger.[1024] NETOs also comment that no evidence was presented from any investment analyst or advisor that the ITC's stock price was affected by the proposed merger during the six-month DCF analysis period.[1025] Moreover, NETOs comment that *Value Line* attributed the 5.8% decline in ITC's stock price on November 13, 2013, to the filing the previous day of a complaint before the Commission against the ROE of the MISO transmission owners, including ITC. NETOs argue that this *Value Line* report explanation is the only evidence in the record of movement in ITC's stock price during the DCF analysis period that any investment analyst or advisor attributed to a specific event.[1026] NETOs argue that, even though their witness, Dr. Avera, provided this explanation for the stock price decline, the Presiding Judge erred by rejecting it and, instead, mistakenly attributed the stock price decline to the abandonment of ITC's proposed merger with Energy.[1027]

490. Further, NETOs argue that the Presiding Judge erred when he saw a change in the stock price that occurred contemporaneously with the abandonment of the merger, wrongly attributed that change to this event, and concluded that the abandonment of the merger distorted the stock price. NETOs assert that a witness is required to explain such a cause and effect; otherwise it is without basis, as it was here.[1028] Also, NETOs argue that participants seeking to exclude ITC from the DCF proxy group argued that the proposed merger both depressed the ITC stock price when observers anticipated its termination and increased ITC's stock price after the merger termination took place.

---

[1023] *Id.* at 5-6, 12-13.

[1024] *Id.* at 13.

[1025] *Id.*

[1026] *Id.*

[1027] *Id.* at 13-14.

[1028] *Id.* at 14.

NETOs argue that the witnesses offered no reason why the merger termination cause these disparate movements.[1029]

491. NETOs assert that the ITC stock price data and testimony provided by Trial Staff witness Ms. Joe and relied upon by the Presiding Judge do not support the Judge's finding that the stock price was distorted. NETOs argue that the stock prices presented by Ms. Joe as the prices for the first business day of the month for December 2011 through February 2015 are actually the prices from the last business day of each month as reported by *Yahoo! Finance*.[1030] NETOs comment that the time periods before and after the December 13, 2013, merger do not line up with the time periods represented by Ms. Joe's data. NETOs assert that one of the Presiding Judge's key findings, that there was a 4.3% decline in ITC's stock price between October 2013, when the merger appeared likely to fail, and December 2013, when the merger termination was announced, actually represents the change in the adjusted closing price from October 1, 2013, through December 31, 2013.[1031] NETOs note that this time period is two weeks after the merger termination and argue that the change in ITC's stock price from October 1, 2013, through December 13, 2013, was actually a positive 0.3% and, while this small difference over a 2 ½ month period is unremarkable, it is exactly the opposite pattern from what the Presiding Judge observed. NETOs assert that, aside from the reaction to the MISO ROE complaint when it was filed, the change in ITC's stock price during the DCF study period was consistent with industry trends.[1032]

492. NETOs also argue that ITC's stock price after the December 13, 2013, merger termination was consistent with industry trends. They comment that the Presiding Judge concluded that ITC's stock price rose 17% in the three months following the merger termination, but NETOs assert that this finding is inconsistent with the Presiding Judge's other finding that investors reacted negatively to the merger termination. NETOs also argue that from December 13, 2013, through February 28, 2014, the end of the DCF study period, the ITC stock price closely tracked the Dow Jones Utility Average. NETOs assert that, during the portion of the DCF study period prior to the merger termination the ITC stock was largely stable, and in the portion of the DCF study period after the merger termination, the ITC stock price was consistent with industry trends. NETOs argue that, for these two DCF study periods, the proposed merger with Entergy did not result in any

---

[1029] *Id.* at 14-15.

[1030] *Id.* at 15-16.

[1031] *Id.* at 17; *see* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 619 (citing Ex. S-4 at 121).

[1032] *Id.* at 18.

distortion to ITC's stock price.[1033] Finally, with respect to the two-month period in the middle of the six-month study period, NETOs comment that, although Ms. Joe's data shows a 4.3% decline in ITC's adjusted close prices, from October 31, 2013, to December 31, 2013, they argue that the price change was the result of the ROE complaint against MISO filed at the Commission. Specifically, they state that on November 12, 2013, ITC's stock fell 2.4%, the day the complaint was filed, and on November 13, 2013, it fell an additional 5.8%, a cumulative decline of 8.0% over two days. NETOs assert that the Presiding Judge erred by rejecting Dr. Avera's attribution of the 8.0% two-day price decline to the filing of the MISO ROE complaint.[1034] NETOs also assert that *Value Line* reports connected the filing of the ROE complaint against MISO to the ITC stock price drop,[1035] and that there is no evidence contradicting Dr. Avera's testimony and the conclusions of *Value Line* reports attributing investors' concerns stemming from the filing of the ROE complaint against MISO. Further, NETOs argue that investors' concerns about the ROE complaint account for the entirety of the two-month 4.3% drop in ITC stock price. From October 31, 2013, until the two-day period of November 12 and 13, 2013, which coincides with the filing of the ROE complaint against MISO, ITC's stock price rose. NETOs also assert that ITC's stock price rose during the portion of the two-month period following the two-day selloff.[1036]

493. NETOs argue that the Presiding Judge erred when he did not accept Dr. Avera's comparison of ITC's stock price with the Dow Jones Utility Average. NETOs contend that Dr. Avera showed a steady relationship between ITC's share price and the Dow Jones Utility Average throughout the DCF analysis period, with only a slight deviation for the two-day decrease in stock price that NETOs argue is attributable to the filing of the ROE complaint against MISO.[1037] Instead, the Presiding Judge relied upon Ms. Joe's price data,[1038] showing a 4.3% decline in ITC's stock price, that the Presiding Judge attributed to the failed merger. NETOs argue that Ms. Joe's exhibit mirrored the Dow

---

[1033] *Id.* at 20.

[1034] *See* Ex. NET-1504 at 249-50.

[1035] NETOs Br. on Exceptions (II, III) at 22-23 (citing Ex. S-4 at 119, *Value Line Investment Survey* (Dec. 20, 2013); Ex. S-4 at 120, *Value Line Investment Survey* Mar. 21, 2014)).

[1036] *Id.* at 23-24.

[1037] *Id.* at 24 (citing Ex. NETO-1300 at 59, Figure NET-1 (ITC Stock Price v. DJUA, Sept. 1, 2013-Mar. 26, 2014)).

[1038] Ex. S-4 at 121.

Jones Utility Average.[1039] NETOs also argue that ITC's stock price trend identified by Ms. Joe is consistent with stock price trends for other companies in Ms. Joe's proxy group. Further, five of the companies in the proxy group experienced greater declines in their stock prices than ITC did, but none of these companies were involved in significant M&A activity during the study period. NETOs comment that what distinguishes ITC from these companies is that it sets the top end of the DCF range.[1040]

494. NETOs contend that the Presiding Judge should not have dismissed the testimony of their expert, Dr. Avera, regarding the stock price movements of companies in the proxy group. First, they comment that, although the Presiding Judge concluded that only five of the 29 members of Ms. Joe's proxy group had larger price declines than ITC, NETOs assert that ITC's price change was attributable to the complaint against MISO transmission owners. Also, NETOs comment that the ITC stock price remained within the range of change for other utilities and that companies with M&A activity that had price decreases larger than ITC's remained in Ms. Joe's DCF proxy group, although those companies did not set the top end of the DCF range.[1041]

495. Second, with respect to the Presiding Judge's finding that the average decline for Ms. Joe's proxy group of 29 members was 1.3%, less than one-third of the ITC price decline, NETOs assert that Dr. Avera testified that, although individual members of a group may move more or less than the average, "the average tends to smooth things out."[1042] According to Dr. Avera, the important factor is "directionality" and here ITC and the average were directionally consistent. NETOs also assert that five companies in Ms. Joe's proxy group experienced greater price declines than ITC even though ITC's rate of decrease would be expected to be greater than the average given its exposure to the MISO ROE complaint.[1043]

496. Third, NETOs argue that the Presiding Judge was incorrect in his determination that the ITC's stock price fluctuated substantially during the six month DCF study period, with a decline of 4.3% in the three months before the merger termination.[1044] NETOs assert that this stock price decline occurred October 31, 2013, to December 31, 2013,

---

[1039] NETOs Br. on Exceptions (II, III) at 25-26.

[1040] *Id.* at 27.

[1041] *Id.*

[1042] *Id.* (quoting Dr. Avera at Tr. 979:25-980:2).

[1043] *Id.*

[1044] *Id.* at 26-28.

which post-dated the December 13, 2013, merger termination.[1045] NETOs also comment that the Presiding Judge's reference to the 17% increase in ITC's stock price did not occur in the three months after the merger termination. Instead, they contend that this price increase occurred in the three-month period December 31, 2013, through March 31, 2014, the last month of which extended beyond the DCF analysis period. Further, they argue that after the merger termination, ITC's stock price rose 8.8% within the DCF study period, in line with the Dow Jones Utility Average rise of 8.6%.[1046] NETOs conclude that the Presiding Judge should have relied upon its exhibit to find that ITC's stock price was not distorted by a proposed merger.[1047]

497. NETOs explain that, although the Presiding Judge did not rely upon Dr. Woodridge's testimony in support of CAPs' position that the ITC merger proposal impacted its stock price, NETOs address his testimony here in anticipation that CAPs will submits comments relying upon it. First, NETOs comment that Dr. Woolridge testified that changes in the ITC stock price from December 6, 2013, to December 16, 2013, showed that ITC's price deviated from the Dow Jones Utility Average for the period immediately following the Mississippi Public Service Commission's decision rejecting the merger. NETOs comment that Dr. Woolridge contradicted his testimony when he conceded that the ITC stock price already reflected the anticipated rejection of the merger.[1048] Further, NETOs assert that Dr. Woolridge showed data on a cumulative rather than daily basis, creating an improper comparison of price changes.[1049] NETOs also assert that the price movements for the ITC stock price for the six trading days between December 6, 2013, and December 16, 2013, were typical of the price movements throughout the last quarter of 2012. NETOs comment that, on December 13, 2013, the day that the ITC merger transaction was formally terminated, the ITC stock price rose seven-tenths of one percent. Thereafter, NETOs comment that, aside from the period immediately following the filing of the ROE complaint against MISO, the ITC stock price continued to track the overall utility averages. NETOs argue that Dr. Woolridge did not provide any evidence of movement of the ITC stock price during December 6 through December 16 affecting the low or high ITC stock price during the month, which NETOs argue is the only way in which the ITC dividend yield for

---

[1045] *Id.* at 28.

[1046] *Id.* at 29.

[1047] *Id.* (citing Figure NET-1).

[1048] *Id.* at 30.

[1049] *Id.* at 31 (citing CAP-19).

December 2013 would be affected by the ITC stock price.[1050] Rather, NETOs argue that stock price changes continued to track the overall utility averages.[1051] NETOs argue that Dr. Woolridge failed to show affirmative evidence of an impact on the low or high ITC stock price during December 2013, which is necessary to support a showing of distortion of ITC's stock price. They also assert that Dr. Woolridge's data actually shows an increase in ITC's stock price, which would decrease the ITC dividend yield. NETOs conclude that the Presiding Judge correctly disregarded Dr. Woodridge's testimony.[1052]

498. With respect to growth rate projections, NETOs assert that the Presiding Judge improperly relied upon Ms. Joe's testimony that *Value Line* projected for ITC a 32% increase in earnings per share from 2013 to 2014, in part because of merger-related costs that ITC incurred in 2013, but which would not incur in 2014.[1053] Specifically, NETOs argue that Ms. Joe used *Value Line*'s growth projections instead of IBES' projections to determine that growth rates were affected by the merger. However, NETOs argue that there is no evidence that merger-related costs that *Value Line* stated affects its earnings per share projections also affected the IBES earnings per share projections that were used in the DCF analyses. NETOs comment that the Presiding Judge rejected the use of *Value Line*'s earnings projections on other grounds.[1054]

499. Second, NETOs argue that the growth rate projections by *Value Line* and IBES involve entirely different time periods. They contend that the *Value Line* growth rate projections, which Ms. Joe used and the Presiding Judge referenced, were for one year ending in 2014, while the growth rate projections used by IBES were for five years beginning in 2014. NETOs comment that there is no record evidence showing that at the end of 2013 the *Value Line* projection of a 32% increase in ITC earnings from 2013 to 2014 (an increase from $4.05/share in 2013 to $5.35/share in 2014) had any effect on the forward-looking earnings projections that IBES published in the Spring of 2014.

500. Third, NETOs argue that the Commission does not exclude companies from a proxy group based upon historical costs. NETOs assert that both Duke and PG&E, which have high historical costs, were adopted by the Presiding Judge for inclusion in the proxy

---

[1050] *Id.* at 32.

[1051] *Id.* at 31 (citing Ex. NET-1300 at 59 & Figure NET-1).

[1052] *Id.* at 32-33.

[1053] *Id.* at 33-34.

[1054] *Id.* at 34 (citing Initial Decision (II, III), 154 FERC ¶ 63,024 at P 639).

group.[1055] NETOs also assert that historical earnings of all companies in the proxy group can be affected by a variety of factors, and that the cost of mergers and acquisitions is just one such cost. Accordingly, NETOs argue that using historical costs to include or exclude companies from a proxy group would not make any sense because securities analysts routinely normalize past and future results to develop their estimate of future growth rates. Further, NETOs argue that excluding companies due to merger activity is based on the distortion of DCF inputs due to merger activity itself, not merger costs, such as those incurred by ITC, which are transparent and are reported to investors.[1056]

501. In finding that ITC's IBES growth rates were affected by merger negotiations, The Presiding Judge observed that *Value Line*'s December 20, 2013, report states that such costs in 2011-2013 for ITC were significant and were reflected in ITC's earnings numbers.[1057] NETOs also state that the Presiding Judge noted that *Value Line* switched its estimates for 2014 once the merger negotiations were terminated. NETOs argue that ITC's merger negotiations did affect *Value Line*'s projections from 2013, but that *Value Line*'s projections from 2014 to the future were unaffected by the merger negotiation costs. Finally, NETOs emphasize that what is at issue is IBES' 2014 through 2018 projections. They assert that neither the *Value Line* nor IBES projections for 2014 through 2018 were distorted by the merger costs.[1058]

502. NETOs agree with the Presiding Judge's decision not to rely upon Dr. Woolridge's position that ITC's merger negotiations had an effect on the earnings per share projections for ITC. NETOs comment that IBES earnings per share projections used in the DCF analyses were published in the Spring of 2014 and, therefore, NETOs assert that there is no basis for assuming that the forward-looking growth forecasts used in these DCF analyses were somehow distorted by the termination in the prior year of the ITC merger negotiations.[1059]

503. NETOs assert that, even though S&P increased ITC's bond rating on December 6, 2013, the Presiding Judge did not state that the increase in the S&P bond rating altered any of the DCF inputs. Rather, NETOs comment that the Presiding Judge took note of the S&P report, including its discussion that the merger would double the size of ITC and diversify its cash flow, but also would likely weaken its cash flow in the short term

---

[1055] *Id.* at 36.

[1056] *Id.* at 37.

[1057] *Id.* (citing Initial Decision (II, III), 154 FERC ¶ 63,024 at P 621).

[1058] *Id.* at 37-38.

[1059] *Id.* at 38-39 (citing Ex. NET-15000 at 40).

following the merger.[1060] NETOs argue that S&P did not report that it increased its bond rating for ITC because of the pending merger and that the bond rating change had nothing do to with the M&A negotiations.[1061]

504. Trial Staff and EMCOS support the Presiding Judge's finding that Trial Staff's proxy group should be used for the Second Complaint study period.[1062]

505. With respect to the Presiding Judge's finding of merger activity, Trial Staff argues that there is substantial evidence in the record demonstrating that merger activity was significant enough to distort the DCF inputs during the study period. Trial Staff asserts that large fluctuations in earnings associated with transaction costs distorted the growth rates during the study period. Additionally, Trial Staff argues that the significance of the merger itself is reflected in the fact that it led to a change in ITC's credit rating. Trial Staff asserts that these factors independently support a finding that the DCF inputs for ITC may have been distorted.[1063]

506. Trial Staff comments that NETOs raise for the first time in their brief on exceptions that the Trial Staff workpaper did not associate the correct dates for stock prices. Trial Staff agrees that, due to *Yahoo! Finance* mislabeling, the dates in an exhibit were likely incorrect. However, Trial Staff asserts that the record shows significant merger activity affecting ITC's bond rating and distorted its growth rates, and that with a large proxy group of 27 companies, there is no need to relax stands to include a company with longstanding, ongoing merger activity that distorted the DCF inputs.[1064]

507. Trial Staff disagrees with NETOs' assertion that the Presiding Judge erred in his finding that M&A activity affected the earnings per share growth rate projections for ITC used in the DCF analysis. Trial Staff comments that NETOs argue that the Presiding judge relied on growth rage projection reported in *Value Line*, while the growth rate inputs to the DCF analysis are from IBES.[1065] Trial Staff explains that NETOs would have the Commission ignore substantial evidence of growth rate impacts of the ITC

---

[1060] *Id.* at 39 (citing Ex. S-4 at 113).

[1061] *Id.*

[1062] Trial Staff Br. on Exceptions (II, III) at 14; EMCOS Br. on Exceptions (II, III) at 10.

[1063] Trial Staff Br. on Exceptions (II, III) at 6.

[1064] Trial Staff Br. Opposing Exceptions (II, III) at 7.

[1065] *Id.* at 17.

merger activity, as reported in *Value Line*, on December 20, 2013, and March 21, 2014, or the actual cost per share of the merger activity. Trial Staff contends that it is immaterial that these earnings fluctuations that affect growth rates were reported by *Value Line* rather than by IBES.[1066]

508. Trial Staff comments that NETOs incorrectly attribute different time periods to the *Value Line* growth rate projections because *Value Line* refers to the one-year period ending in 2014 rather than the five-year period used by IBES that begins in 2014.[1067] Trial Staff contends that the salient point of the *Value Line* analysis from December 2013 is that ITC incurred significant costs associated with the Entergy merger in 2012 and the first nine months of 2013. Trial Staff argues that the starting point from which growth is to be measured is March 2014 and that growth rates were affected from the beginning of 2014 due to the earlier suppression of ITC due to the Entergy transaction.[1068] Further, although NETOs claim that the increase in growth rates was reflected in 2014 base as reported by *Value Line*, Trial Staff disputes this point. Trial Staff explains that the IBES growth rates extend from March 26, 2014, through March 2019 and that the increase reported by *Value Line* extends from December 2013 through 2014. The significant change in earnings between March 2014 and December 2014 drives up the IBES growth rate projections because the base earnings for ITC in March 2014 were suppressed due to the merger.[1069] Accordingly, Trial Staff argues that it is misleading for NETOs to claim that Dr. Avera's conclusions that the IBES estimates from 2014 are not affected by this cost. *Value Line* indicated that earnings during 2014 were affected. Trial Staff concludes that the suppressed starting point for projecting the growth rate distorted the overall growth rate input into the DCF model and likely contributed to ITC having a larger growth rate and higher DCF result than all of the 35 other companies in Dr. Avera's proxy group. Trial Staff concludes that ITC's M&A activity meets the Commission's standard for exclusion.[1070]

509. Trial Staff contends that NETOs incorrectly claim that DCF inputs were not impacted because the merger activities were "in the rear mirror" and analysts knew about it. Trial Staff argues that those analysts would have been aware that earnings were suppressed as of March 31, 2014, basis for the IBES growth rate and that earnings per share growth rates are always used as of the end of the study period. Trial Staff attributes

---

[1066] *Id.* at 18.

[1067] *Id.*

[1068] *Id.* at 18-19.

[1069] *Id.* at 19.

[1070] *Id.* at 19-20.

*Value Line*'s switch of its earnings per share growth estimates to the merger termination in December, one reason for a 32% increase in earnings projected for 2014.[1071]

510. Trial Staff disagrees with NETOs' argument that Trial Staff used a *Value Line* report from November 21, 2014, treated a Duke write-off inconsistently with how Trial Staff treated the ITC merger. Trial Staff asserts that the *Value Line* report was dated after the end of the Second Complaint study period. Trial Staff also asserts that *Value Line* attributed a much larger loss for the failed Entergy transaction.[1072] Further, Trial Staff disagrees with NETOs' implication that the impact of the merger on ITC's historic earning area is not grounds for excluding companies from the proxy group. According to Trial Staff, *Value Line* clearly considered the impact of the ITC merger activities to be significant to investors during the study period. Trial Staff explains that *Value Line* noted in its December 13, 2013, report that because the merger costs were excluded from its 2014 forecast it projected a 32% increase in earnings for 2014, thereby affecting the company's earnings per share growth rates between March 2014 and March 2019.[1073]

511. Trial Staff contests NETOs' comment that the change in ITC's bond rating did not remove it from the comparable risk band and had no impact on any of the DCF analysis. The Presiding Judge commented that the S&P raised ITC's credit rating to A- in anticipation of the merger. Trial Staff asserts that this shows that the merger activity was consequential and significant enough to investors that it affected the company's credit rating and provides another basis for the Commission to exclude ITC from the proxy group.[1074]

512. CAPs state in their Brief Opposing Exceptions that the Presiding Judge correctly removed ITC from the proxy group. CAPs comment that the simple fact that ITC was engaged within the study period in transaction that would double the company's asset scale and market capitalization is sufficient to show that the transaction was "significant enough" to distort the DCF inputs and justify ITC's exclusion from the proxy group.[1075] Further, CAPs assert that the Commission regularly excludes companies from proxy groups without tracing whether the DCF inputs were actually distorted.[1076]

---

[1071] *Id.* at 20-21.

[1072] *Id.* at 21.

[1073] *Id.* at 21-22.

[1074] *Id.* at 22.

[1075] CAPs Br. Opposing Exceptions (II, III) at 9-12.

[1076] *Id.* at 9 (citing *Tallgrass Transmission, LLC*, 150 FERC ¶ 61,224, at P 70

513. CAPs assert that NETOs' argument that ITC should have been included in the proxy group relies upon premises that are both legally and factually flawed. The Commission's test is whether the company is engaged in major merger activity, not whether the investment community perceives the proposed merger to be viable.[1077] Further, CAPs argue that it is not reasonable to attempt to infer when investors may determine that a proposed merger is no longer viable and, even under such as standard, ITC would still be excluded.[1078] Further, CAPs comment that NETOs base their claim that the ITC merger was no longer perceived as viable because Dr. Avera misleading commented that Entergy withdrew its application before the Texas Public Utility Commission in August 2013. CAPs assert that the Entergy application was withdrawn for technical reasons and refiled the following month. They note that the application remained pending until December 13, 2013, the same day a notice of termination was filed with this Commission.[1079] CAPs conclude that the Presiding Judge correctly relied on the Commission's findings in Opinion No. 531 as a basis for excluding ITC from the proxy group.[1080]

514. CAPs comment that the record in this proceeding contains ample evidence that the ITC merger activity was significant enough to distort the stock price during the study period. CAPs contend that the Presiding Judge did not need to find that the merger activity did distort ITC's stock price; he only had to find that the merger activity was significant enough that it could have distorted ITC's stock price or one of the other DCF inputs. Although NETOs argue that a witness has to explain why the merger activity caused a distortion in stock price, CAPs assert that this showing is not required by Commission precedent. [1081] CAPs also assert that NETOs mistake the rationale for the proxy screen when they argue that witnesses took the incongruous position that first ITC's stock prices were depressed prior to the merger termination and then increased after the merger was terminated. CAPs argue that the Commission excludes companies with major merger activity that "can distort share prices by creating uncertainty (positive

(2015); Opinion No. 486-B, 126 FERC ¶ 61,034 at PP 79-81, *order on reh'g*, Opinion No. 486-C, 129 FERC ¶ 61,240 (2009), *order on reh'g*, Opinion No. 486-D, 133 FERC ¶ 61,162 (2010)).

[1077] *Id.* at 10.

[1078] *Id.* at 10-11.

[1079] *Id.* at 11.

[1080] *Id.* at 12.

[1081] *Id.* (citing NETO's Br. on Exceptions (II, III) at 14).

and negative) about the impact of change."[1082] They argue that this record demonstrates precisely this kind of stock price uncertainty.

515. CAPs assert that, while NETOs take exception to the Presiding Judge's acceptance of Ms. Joe's stock price data, even with inadvertent errors, NETOs did not rebut this testimony in their answering testimony or during trial. Moreover, CAPs comment that there is ample evidence in the record, including from CAPs' witness, Dr. Woolridge, to show that the merger distorted ITC's stock price.[1083] In fact, CAPs argue that NETOs' Brief on Exceptions includes a chart depicting the price divergence between the Dow Jones Utility Average and ITC's stock price following the merger termination[1084]

516. In response to NETOs' claim that the argument that ITC's stock price changed immediately following the merger termination is inconsistent with Dr. Woolridge's claim that expectation of the merger termination were already "baked in" to the stock price, CAPs point out that the diverging stock prices following the merger termination were more significant because the stock price reflected the effect of the merger negotiations "moving from improbable to terminated."[1085] Further, although NETOs contend that the stock price movement was small in comparison to price movements over the last quarter of 2013, Dr. Woolridge commented that, when viewed accurately, the termination of the merger did materially affect ITC's stock price during the study period and the dividend yields. CAPs also comment that the contrast between ITC's stock price and the Dow Jones Utility Average during the business week of the merger termination supports the inference that the merger had been impacting the stock price all along.[1086]

517. CAPs defend their witness, Dr. Woolridge, regarding both his explanation that ITC's stock price was materially affected by the termination of the merger negotiations and his observation that the expectation of the merger termination was already "baked in" to the stock price.[1087] CAPs comment that Dr. Woolridge explained that the diverging stock prices following the termination of the merger negotiations was more significant

---

[1082] *Id.* at 12-13 (quoting *Chevron Prods. Co. v. SFPP, L.P.,* 127 FERC ¶ 63,024, at P 153 (2009).

[1083] *Id.* at 13-14 (citing Ex. CAP-19 at 41-42).

[1084] *Id.* at 14 (citing NETOs Br. on Exceptions (II, III) at 30).

[1085] *Id.* at 14-15 (quoting Ex. CAP-19 at 42:10-12).

[1086] *Id.* at 15.

[1087] *Id.* at 14 (citing NETOs Br. on Exceptions (II, III) at 30).

because it reflected the effect of the termination.[1088] CAPs also argue that the contrast between ITC's stock price and the Dow Jones Utility Average during the week of the merger termination lends credibility to the inference that the merger had been impacting the stock price all along.[1089]

518. CAPs assert that, although NETOs try to explain the price volatility of ITC's stock during the study period as attributable to the filing of a FPA section 206 complaint against MISO TOs, which included NETOs, the Presiding Judge rejected this explanation as unsupported. Further, CAPs contend that, even if evidence had been presented to support this position, it would not have disproven that the proposed ITC's merger was a significant transaction that could have distorted the stock price.[1090]

519. CAPs respond to NETOs' exception to the Presiding Judge's findings regarding the use of *Value Line* rather than IBES to assess the impact of the merger upon ICT's projected earnings for 2014. CAPs assert that the Presiding Judge only needed to find that the merger activity could have affected the earnings per share projections and evidence that the merger did affect the *Value Line* projections is sufficient evidence of the transaction's significance.[1091] CAPs also comment that Dr. Woolridge had available an October 2012 UBS report that made clear that post-merger opportunities for ITC was central to analyst expectations for the company's growth past 2016. Without merger-related growth, UBS expected by 2017 and 2018 ITC's earnings growth would turn negative.[1092] CAPs explain that NETOs speculate that subsequent analysis assumed no merger, but no such reports were provided at trial.

520. Also, CAPs argue that NETOs incorrectly claim that *Value Line* earnings projections and IBES earnings per share growth rate projections were for different time periods. CAPs contend that growth rate projections that factored in the March IBES average were multi-year projections starting from 2012 or 2013, both years in which ITC incurred significant costs associated with the merger negotiations.[1093] And, regardless of

---

[1088] *Id.* at 14-15 (citing Ex. CAPs-19 at 42:10-12).

[1089] *Id.*

[1090] CAPs Br. on Exceptions (II, III) at 15.

[1091] *Id.* at 16.

[1092] *Id.* at 17 (citing Ex. CAP-19 at 43:16-44:7; Ex. CAP-33 at 10, 39)

[1093] *Id.* at 18.

which years were used by used, CAPs argue that there is a sufficient basis for finding that the merger distorted the growth rate DCF input.

521. CAPs assert that NETOs misstate the Commission rule in their argument that the Presiding Judge erred when he relied upon *Value Line*'s analysis of the effects of the merger because including companies due to M&A activity is based on distortion of the DCF inputs to the activities themselves, not merger transaction costs.[1094] CAPs argue that it is not possible to require parties to not only trace the effects of the merger activities and the actual effects on DCF inputs, but also to make a distinction between the effects of the transaction itself and the effects of the transaction costs.[1095] Finally, CAPs assert that it is possible that the merger activity distorted some of the analyst estimates that make up the IBES growth rate. CAPs comment that Dr. Avera admitted that he could only speculate that the IBES forecast as of February 2014 might have taken into account the merger termination.[1096] CAPs comment that, because the ITC's merger activity could have distorted the IBES growth rate, the Presiding Judge was correct to exclude ITC from the proxy group. CAPs also comment that given the large number of other suitable proxies, there is no need to contaminate the DCF sample pool with suspect data[1097]

522. CAPs assert that, when ITC is added to the proxy group, there is a 7.9% jump between ITC and the next proxy. For this reason, they argue that including ITC would result in an egregious distortion of the midpoint or top quarter.

523. In their opposition to NETOs' exceptions, EMCOS state that the Presiding Judge correctly excluded ITC from the Second Complaint proxy group and explains that the Commission applies this M&A screen to the proxy group because it recognizes that investors' short-term expectations of what will happen between the announcement and completion of a merger skew the DCF inputs.[1098] EMCOS further state that including a utility whose DCF results is distorted by merger activity clouds the Commission's ability to identify a return that properly balances the needs of NETOs' investors against the Commission's obligation to protect the New England consumer from excessive rates.

524. EMCOS contend that, even after correcting for Ms. Joe's errors, as alleged by NETOs, and fully accepting *arguendo* NETOs' presentation of the facts, the record

---

[1094] *Id.* (citing NETOs Br. on Exceptions (II, III) 36-37).

[1095] *Id.*

[1096] *Id.* at 19 (citing Tr. 900:19-901:14).

[1097] *Id.*

[1098] EMCOS Br. Opposing Exceptions (II, III) at 15.

evidence supports the Presiding Judge's exclusion of ITC. Further, EMCOS respond to NETOs' arguments about whether ITC's stock declined or increased by asserting that their argument misses the point of the Commission's screen.[1099] EMCOS argue that the Commission only cares that the merger related activity distorted the vital data the Commission needs to identify a proxy group of utilities of comparable risk to the utility whose ROE is being determined.[1100] EMCOS comment that the stock price is the only observable input into the DCF, which makes it all the more critical that the Commission only include utilities whose stock prices are not distorted by merger related volatility, regardless of which direction the distortion goes.

525. EMCOS assert that NETOs also fail to recognize that their own presentation of ITC's illustrates that the merger did impact the stock price. EMCOS comment that, as NETOs explain, first, the stock price increased by 0.3% in contrast to the Dow Jones Utility Average, which NETOs acknowledge fell 1.3% during the same period.[1101] EMCOS assert that NETOs try to characterize this divergence as "unremarkable" and that ITC's stock price was following industry trends. Further, EMCOS comment that NETOs own data show that ITC's stock price increased 6.7% from the start of the study period to the termination of the merger, during which time the Dow Jones Utility Average only rose one percent. EMCOS also observe that during the time period in question, ITC's stock price followed industry trends only after the merger terminated. EMCOS argue that the record evidence shows that the stock price exhibited merger related volatility and the Presiding Judge properly excluded it from the proxy group.[1102]

526. EMCOS argue that the Presiding Judge correctly determined that the merger activity significantly distorted ITC's earnings per share growth rates. EMCOS comment that *Value Line* reported significant costs associated with the merger negotiations that amounted to $0.61 a share in the first nine months of 2013 and $0.38 a share in all of 2012. Once the merger negotiations ended, *Value Line* assumed a 32% earnings increase in its 2014 earnings per share forecast based on the ending of merger related expenses.[1103] EMCOS assert that, once the merger negotiations ended and investors were no longer speculating on the outcome of the transaction, ITC's stock price followed industry trends. EMCOS assert that NETOs' Brief on Exceptions raise three objections to the Presiding Judge's finding that ITC's growth rates were affected by the merger negotiations.

---

[1099] *Id.* at 17 (citing Opinion No. 486-B, 126 FERC ¶ 61,034 at PP 79, 81).

[1100] *Id.* at 17-18.

[1101] *Id.* at 18 (citing NETOs Br. on Exceptions (II, III) at 18).

[1102] *Id.* at 19.

[1103] *Id.* at 20 (citing Ex. S-4 at 119).

NETOs contend that the Presiding Judge improperly relied upon *Value Line*'s projections, but EMCOS argue that NETOs do not provide any arguments to counter the fact that *Value Line* amended its earnings per share growth rate projections during the study period to reflect the merger-related distortion. Second, NETOs argue that *Value Line* cannot be relied upon because its reporting period is for one year ending in 2014, while IBES projections are a five-year period starting in 2014.[1104] EMCOS respond that the complaint period is for a locked-in refund period, running from December 27, 2012, to March 26, 2014, with a study period from September 1, 2013, to February 28, 2014. EMCOS argue that, even if *Value Line* growth rates are only for one year, ending in 2014, the data demonstrates that ITC's growth rates were impacted during the study period.[1105] EMCOS comment that the IBES growth rates do not contradict *Value Line*'s analysis of the impact of the merger on ITC's growth rates.[1106]

527. EMCOS also take exception to NETOs' argument that the Commission does not exclude companies based on historical costs and point out that both Duke and PG&E were included by experts in the proxy group. EMCOS respond that the merger impacted both ITC's stock price and growth rate, and therefore were properly excluded from the proxy group.[1107]

**b. <u>Commission Determination</u>**

528. As explained in Opinion No. 531, the Commission's practice is "to eliminate from the proxy group any company engaged in M&A activity significant enough to distort the [company's] DCF inputs" — i.e., the company's "stock prices, dividends, or growth rates.[1108] The Commission has also found that it does not exclude a company simply because it has engaged in any M&A activity or that activity may cause changes in the DCF inputs. Rather, we exclude a company if the M&A activity may cause temporary changes in DCF inputs that are not sustainable or representative of longer-term investor expectations for the company.[1109]

---

[1104] *Id.* at 21.

[1105] *Id.* at 22.

[1106] *Id.*

[1107] *Id.* at 22-23.

[1108] Opinion No. 531, 147 FERC ¶ 61,234 at P 114.

[1109] MISO Initial Decision (I), 153 FERC ¶ 63,027 at P 37.

529. We affirm the Presiding Judge's exclusion of ITC from the proxy group for the Second Complaint because ITC was engaged in major merger activity during the DCF study period and that activity was "significant enough to distort the DCF inputs."[1110] As an initial matter, we agree with the Presiding Judge that Dr. Avera erred in claiming that Opinion No. 531 requires a "concrete showing" that a transaction results in a distortion of the DCF inputs in order for the entity involved in the transaction to be eliminated from the proxy group. As the Presiding Judge stated, the Commission has not set such a standard of proof.[1111] Moreover, as CAPs note, the Commission has excluded entities from proxy groups without tracing the actual effects of transactions on any of the DCF inputs.[1112]

530. As proposed, the merger between ITC and Entergy, two major multi-billion dollar corporations, involved ITC acquiring the entire transmission assets of Entergy.[1113] As the Presiding Judge noted, S&P stated that the transaction would "'approximately double ITC Holdings' size in terms of asset scale and market capitalization.'"[1114] These negotiations remained active for the first four months of the Second Complaint study period.[1115] The Commission's practice to screen for merger activity is required in those instances where the activity is significant enough to distort the DCF inputs. Here, we agree with the Presiding Judge that the record supports that this proposed merger was significant enough to distort DCF inputs. We disagree with NETOs' arguments to the contrary. Rather, where the merger activity is as significant as this transaction was proposed to be and the record evidence indicates that it was "significant enough to distort

---

[1110] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 610 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at PP 92, 114 (citing *Bangor Hydro-Elec. Co.*, 111 FERC ¶ 63,048, at PP 67-68 (2005), *aff'd in relevant part*, Opinion No. 489, 117 FERC ¶ 61,129 (2006), *reh'g granted in part*, 122 FERC ¶ 61,265 (2008), *clarified*, 124 FERC ¶ 61,136 (2008))).

[1111] *See* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 605.

[1112] *See* CAPs Br. Opposing Exceptions (II, III) at 9 (citing *Tallgrass Transmission, LLC*, 150 FERC ¶ 61,224 at P 70; Opinion No. 486-B, 126 FERC ¶ 61,034 at PP 79-81, *order on reh'g*, Opinion No. 486-C, 129 FERC ¶ 61,240 (2009), *order on reh'g*, Opinion No. 486-D, 133 FERC ¶ 61,162 (2010)).

[1113] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 598.

[1114] *Id.* P 601 (citing EMCOS July 29, 2015 Initial Br. at 22).

[1115] The Presiding Judge determined the study period for the Second Complaint to be from September 1, 2013 to February 28, 2014. *See id.* PP 581, 598-599, 603.

the DCF inputs," the Presiding Judge correctly applied this screen and eliminated ITC from the proxy group.

531. In fact, the Presiding Judge found evidence that ITC's stock prices and growth rates showed actual merger-related distortions. Specifically, the Presiding Judge determined that ITC's stock price decreased by 4.3% when the ITC-Entergy merger deal appeared likely to fail, between October 2013 and the merger termination announcement in December 2013, as compared to a decline of 1.9% in the Dow Jones Utility Average over the same period.[1116] The Presiding Judge also determined that, after the termination of the merger negotiations, ITC's stock price increased by 17%, in contrast to a 9% increase in the Dow Jones Utility Average.[1117] And, for the six-month period ending March 31, 2014, ITC's stock price increased 12.4% at the same time that the S&P 500 Index increased by only 6.6%.[1118] Although NETOs argue that the stock price fluctuations are attributable, not to the merger negotiations, but rather to a complaint filed before the Commission against MISO, of which ITC is a member, we are not persuaded that the weight of the record evidence supports this alternative explanation. As the Presiding Judge noted, this theory was refuted by the fact that, although that complaint was still pending, ITC's stock rebounded through 2014 and reached a 52-week high on January 23, 2015.[1119] Accordingly, we agree with CAPs that ample record evidence demonstrates that ITC's potential merger activity over the study period was significant enough to distort the company's stock price. Furthermore, we agree that these distortions were not sustainable, as evidenced by the commensurate changes in ITC's stock price after the termination of its merger activity.

532. In their brief on exceptions, NETOs argue that the Presiding Judge incorrectly attributed the changes in ITC's stock price to the proposed transaction with Entergy. NETOs assert that Ms. Joe's stock price data, which the Presiding Judge cited, was mislabeled and that this fact undercuts the Presiding Judge's reasoning that ITC's stock price decline of 4.3% between October 2013 and the merger termination announcement in December 2013, as compared to the 1.9% decline of the Dow Jones Utility Average over the same period, was evidence that the transaction was significant enough to distort stock prices.[1120] We agree with CAPs that, even if Ms. Joe's data contained errors, other evidence in the record was sufficient to allow the Presiding Judge to find that the ITC-

---

[1116] *Id.* P 602.

[1117] *Id.* (citing Tr. 913-915).

[1118] *Id.*

[1119] *Id.* P 609.

[1120] *See* NETOs Br. on Exceptions (II, III) at 15-24.

Entergy merger was significant enough to distort ITC's stock price. For example, in addition to the other stock price data cited by the Presiding Judge and discussed above, "CAPs witness Dr. Woolridge testified that '[o]ver the relevant business week [December 9 – 13], ITC's share price rose 2.5% from its December 9 level, while the [Dow Jones Utility Average] declined 2%.'"[1121]

533. NETOs further criticize the Presiding Judge's decision for taking the "incongruous position" that stock prices were depressed prior to the merger termination based on investor expectations of whether the merger would be completed and then stock prices increased after the merger was actually terminated.[1122] We find that NETOs' exception to this rationale from the Presiding Judge is not sufficient grounds on which to reverse the Presiding Judge on this issue. As CAPs note, the Commission excludes companies engaged in major M&A activity because "'[s]uch large scale activity can distort share prices by creating uncertainty (positive and negative) about the impact of change.'"[1123] The record evidence cited by the Presiding Judge indicates that, while this proposed merger, which would have doubled ITC's size in terms of asset scale and market capitalization, was ongoing, changes in ITC's stock price, whether positive or negative, diverged from the changes in the broader market, which indicates that the proposed merger may have created this type of uncertainty. The Presiding Judge found that this evidence supported the conclusion that the proposed merger was significant enough to distort DCF inputs. NETOs have not presented sufficient evidence for us to reverse this finding.

534. For example, with respect to growth rate projections, the record shows that *Value Line* assumed a 32% earnings increase in its 2014 earnings per share forecast due to the elimination of merger related expenses.[1124] The Presiding Judge noted that *Value Line* reports for ITC dated December 20, 2013, and March 21, 2014, discussed large projected fluctuations in earnings and costs associated with the proposed merger and its ultimate termination during the study period.[1125] As Trial Staff states, on December 20, 2013, *Value Line* reported that "ITC has incurred significant costs associated with the Entergy

---

[1121] CAPs Br. Opposing Exceptions (II, III) at 13 (citing Ex. CAP-19 (II, III) at 41-42).

[1122] *See* NETOs Br. on Exceptions (II, III) at 14-15.

[1123] CAPs Br. Opposing Exceptions (II, III) at 13 (citing *Chevron Prods. Co. v. SFPP, L.P.*, 127 FERC ¶ 63,024 at P 153 (citing Op. No. 486-B, 126 FERC ¶ 61,034 at P 79)).

[1124] Ex. S-4 (II, III) at 119.

[1125] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 601.

deal" when projecting a 32% earnings increase for its 2014 earnings per share forecast.[1126] The record also includes an October 2012 UBS report that made clear that post-merger opportunities for ITC was central to analyst expectations for the company's growth past 2016. Without merger-related growth, UBS expected by 2017 and 2018 ITC's earnings growth would turn negative.[1127] CAPs assert that NETOs speculated that subsequent analyst reports assumed no merger, but no such reports were provided at hearing.[1128]

535. NETOs argue that the Presiding Judge improperly relied on growth rate projections that were reported in *Value Line* because the growth rate inputs to the DCF analysis are those reported by IBES.[1129] We agree with CAPs that the Presiding Judge did not have to find that the merger activity did affect the IBES earnings per share projections, only that it was significant enough that it could have,[1130] and we agree with Trial Staff that the evidence demonstrating that *Value Line* growth projections were influenced by the proposed ITC-Entergy transaction is sufficient to demonstrate that transaction was significant enough that it could have influenced IBES projections.[1131] NETOs also take exception to the Presiding Judge's findings regarding the transaction's potential effects on growth rates because the *Value Line* growth rate projections that were cited reflect different time periods than the IBES projections used in the DCF model. Specifically, NETOs state, the *Value Line* growth rate projections reflect the one-year period ending in 2014 rather than to the five-year period beginning in 2014 applicable to IBES projections.[1132] We agree with Trial Staff that this is insufficient to reverse the Presiding Judge's finding because the evidence demonstrates that *Value Line* projections for 2014 (i.e., through December 2014) were affected by the proposed merger, and therefore it was appropriate for the Presiding Judge to find that the merger was significant enough to affect IBES projections beginning in 2014.[1133] NETOs also take exception to

---

[1126] Trial Staff Br. Opposing Exceptions (II, III) at 18.

[1127] CAPs Br. Opposing Exceptions (II, III) at 17 (citing Ex. CAP-19 (II, III) at 43:16-44:7; Ex. CAP-33 (II, III) at 10, 39)

[1128] *Id.*

[1129] *See* NETOs Br. on Exceptions (II, III) at 34.

[1130] *See* CAPs Br. Opposing Exceptions (II, III) at 16.

[1131] *See* Trial Staff Br. Opposing Exceptions (II, III) at 18.

[1132] NETOs Br. on Exceptions (II, III) at 34-36.

[1133] Trial Staff Br. Opposing Exceptions (II, III) at 17-18.

the Presiding Judge's reliance on *Value Line*'s analysis of the effects of the merger because "[t]he exclusion of companies due to M&A activity is based on distortions of the DCF inputs due to the M&A transaction itself, not merger transaction costs."[1134] We disagree. There is no requirement to distinguish between the effects of the transaction itself and the effects of the transaction's costs when determining if the transaction is significant enough to distort DCF inputs.

536. The Presiding Judge also found that ITC's credit rating improved during the study period based on the fact that the proposed merger would "approximately double ITC Holdings' size in terms of asset scale and market capitalization, further diversifying cash flow and broadening the customer base."[1135] We disagree with NETOs' contention that the change in ITC's bond rating did not remove it from the comparable risk band and had no impact on any of the DCF analysis. Even if this credit rating change did not remove ITC from the comparable risk band, it demonstrates that the proposed merger was significant enough that it resulted in a change to a measure of ITC's credit risk. This is further record evidence to support the Presiding Judge's finding that the merger negotiations were "significant enough to distort the [company's] DCF inputs."[1136]

537. In sum, we are not persuaded by arguments that ITC should be included in the proxy group, given the scale of the proposed merger, which would have approximately doubled ITC's size in asset scale and market capitalization, and the ample record evidence indicating that it was significant enough to distort DCF model inputs. Accordingly, we affirm the Presiding Judge's exclusion of ITC from the proxy group.

### C. DCF Analysis

538. Trial Staff takes exception to Initial Decision (II, III) finding that the use of dividend yields and IBES growth rate data for the six months ending March 31, 2014, for the Second Complaint period, was improper.[1137] For the Second Complaint study period, the Presiding Judge directed the use of revised calculations which Trial Staff argues improperly excluded a month of dividend yield data from the study period. Trial Staff

---

[1134] NETOs Br. on Exceptions (II, III) at 36-37.

[1135] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 618 (citing Ex. S-4 at 11-113).

[1136] Opinion No. 531, 147 FERC ¶ 61,234 at P 114.

[1137] Trial Staff Br. on Exceptions at 11.

argues that the Presiding Judge should have adopted the calculations prepared by Ms. Joe, which incorporated dividend yields for the full study period.[1138]

539. NETOs argue that Trial Staff's argument with respect to dividend yields for the six months ending March 31, 2014 should be rejected, arguing the Commission directed the parties to use the most recent month-end data available, and to draw that data from within the refund period.[1139] NETOs contend that Trial Staff's use of data through the end of March 2014 uses data beyond the end of the Second Complaint refund period, in clear violation of the Third Complaint hearing order.[1140] NETOs assert that, in addition to using different dividend yields and growth rates from those authorized by the Commission, Trial Staff admitted in its Initial Brief that its March 31, 2014 cut-off date brought into its proxy group an additional utility that was not listed in *Value Line* until March 28, 2014, after the end of the Second Complaint refund period.[1141]

540. We affirm the Presiding Judge's DCF analysis in Initial Decision (II, III) for the Second Complaint proceeding, with certain exceptions. As an initial matter, we affirm the Presiding Judge's decision to reject Trial Staff's request to use dividend yields for the period ending March 31, 2014 and find that this includes out-of-period data. However, as discussed above, we have found that: (1) only the IBES short-term growth projections should be used for calculating the (1+.5g) adjustment to the dividend yield, instead of the composite growth rate used by the Presiding Judge; (2) a revised low-end outlier test applies under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the Risk Premium from the CAPM analysis; (3) the high-end outlier test should be calculated using 200% of the median of the proxy group before any outlier tests are applied; and (4) the long-term growth rate should be given 20% weighting and the short-term growth rate 80% weighting in the two-step DCF model.

541. We now turn to the issue of whether, for purposes of determining the DCF zone of reasonableness, any company in the starting proxy group should be excluded as a low- or high-end outlier. In Initial Decision (II, III), the Presiding Judge excluded Edison International and Exelon Corporation (Exelon) from the Second Complaint DCF proxy group because their ROEs were less than 6.18%, which was 100 basis points above the average yield for public utility bonds rated Baa by Moody's.[1142] Here, we apply the

---

[1138] *Id.* at 15.

[1139] NETOs Br. Opposing Exceptions at 94.

[1140] *Id.*

[1141] *Id.*

[1142] *See* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 629; Ex. S-33 (II, III) at

revised low-end outlier test used in Opinion No. 569-A under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the Risk Premium from the CAPM analysis. In the Second Complaint proceeding, the Risk Premium from the CAPM analysis is 8.58%. Twenty percent of that Risk Premium is 172 basis points. Adding 172 basis points to the 5.18% Baa bond yield produces a low-end outlier threshold in the Second Complaint proceeding of 6.89%. We exclude PSEG, Edison International, and Exelon, which feature ROEs of 6.77%, 4.58%, and 1.25%, respectively, all of which are less than the revised 6.89% low-end outlier threshold. Consolidated Edison, with an ROE of 7.22%, has the lowest DCF ROE of any company included in the proxy group.

542. Under the high-end outlier test that we have adopted in this order, we would, subject to the natural break analysis, exclude any DCF ROE that is more than 200% of the median of the starting proxy group DCF ROEs. In this case, the median of the starting proxy group DCF ROEs is 8.70%. Two hundred percent of that median is 17.41%. The company with the highest DCF ROE in the starting proxy group has an ROE of 10.74%, below the 17.41% high-end outlier threshold. Accordingly, we do not exclude any company from the DCF proxy group as a high end-outlier.

543. Appendix B to this order shows the DCF analysis in the Second Complaint proceeding reflecting these findings. Based on these determinations, we conclude that the DCF zone of reasonableness is 7.22% to 10.74%.

### D. <u>CAPM Analysis</u>

544. We affirm the Presiding Judge's CAPM analysis in Initial Decision (II, III) for the Second Complaint Proceeding, with certain exceptions. As discussed above, we have found that companies with growth rates of less than or equal to zero or greater than or equal to 20% should be excluded from the one-step DCF analysis of the dividend-paying members of the S&P 500. In addition, we will apply the same low-end and high-end outlier tests to the CAPM analysis as those that are applied in the DCF analysis.

545. We now turn to the issue of whether, for purposes of determining the CAPM zone of reasonableness, any company in the starting proxy group should be excluded from the CAPM proxy group as a low- or high-end outlier. The Presiding Judge did not exclude any company from the proxy group on these grounds, nor does any participant contend that any company is a low or high-end outlier. As discussed in the preceding section, we have determined that the low-end outlier threshold in the Second Complaint proceeding is 6.89%. The company in the starting proxy group with the lowest ROE is Southern Company, with an ROE of 8.59%. Because that ROE is well above the 6.89% low-end

---

Schedule 1.

outlier threshold, we do not exclude any company from the CAPM proxy group as a low-end outlier.

546. Under the high-end outlier test that we have adopted in this order, we would exclude from the CAPM proxy group any ROE that is more than 200% of the median of the starting proxy group CAPM ROEs. In this case, the median of the starting proxy group CAPM ROEs is 11.14%. Two hundred percent of that median is 22.27%. The company with the highest CAPM ROE in the starting proxy group has an ROE of 13.21%, well below the 22.27% high-end outlier thresholds. Accordingly, we do not exclude any company from the CAPM proxy group as a high end-outlier.

547. The CAPM analysis in the Second Complaint proceeding reflecting these findings is shown in Appendix B to this order. Based on these determinations, we conclude that the CAPM zone of reasonableness is 8.59% to 13.21%.

### E. Composite Zone of Reasonableness and FPA Section 206 Findings

548. Based on the findings above concerning the DCF and CAPM zones of reasonableness in the Second Complaint proceeding, we find that the composite zone of reasonableness, based on the most recent financial data in the record of the Second Complaint proceeding, is from 7.90% to 11.98%. As discussed above, we find that NETOs are of average risk. Given that Commission policy is to set an RTO-wide ROE at the midpoint of the zone of reasonableness and the other record evidence regarding NETOs risk profile, we conclude that NETOs must be treated as of average risk and that the range of presumptively reasonable ROEs for consideration in determining whether NETOs 9.57% base ROE is unjust and unreasonable should be the middle third of the composite zone of reasonableness. In the Second Complaint proceeding, that range is from 9.26% to 10.62%.

549. As discussed above, the issue to be addressed in the Second Complaint is whether the ROE established in the First Complaint remained just and reasonable during the applicable test period of September 2013 to February 2014 as addressed by the evidence presented by the participants in the Second Complaint.[1143] NETOs' 9.57% ROE established upon resolution of the First Complaint proceeding falls within the range of presumptively just and reasonable ROEs that applies in the Second Complaint. We find that this presumption has not been rebutted by the evidence in the Second Complaint proceeding. We see no evidence in the record, such as state ROEs, ROEs of non-utility companies, and other methodologies, serving to rebut this presumption. Accordingly, we find that NETOs' ROE established in the First Complaint proceeding and in effect as of the date of this order has not been shown to be unjust and unreasonable under the first prong of FPA section 206. For that reason, we do not establish a new just and reasonable

[1143] MISO Briefing Order, 165 FERC ¶ 61,118 at P 60.

ROE in the Second Complaint proceeding to be in effect prospectively and we therefore dismiss the Second Complaint.

550. Below, in section XX, we address the issue of whether refunds should be ordered in light of our decision to dismiss the Second Complaint.

## XVIII. Complaint Specific Results: Third Complaint

### A. Existing ROE for Purposes of Third Complaint

551. In the Briefing Order, the Commission stated that the issue to be addressed in the Third Complaint proceeding is whether the ROE established in the immediately preceding complaint proceeding remained just and reasonable based on financial data for the six month period November 2014 to April 2015 presented by the participants at the hearing on the Third Complaint.[1144] As discussed above, in Opinion Nos. 569 and 569-A, the Commission further explained why this is the appropriate base ROE to be analyzed for purposes of the Third Complaint. In *MISO TOs v. FERC*, the D.C. Circuit affirmed this approach for determining the existing rate to be analyzed in a subsequent base ROE complaint.[1145] Because we do not establish a new base ROE in Second Complaint proceeding and dismiss that complaint, as discussed above, the base ROE to be analyzed for purposes of the Third Complaint is the 9.57% base ROE established in the First Complaint proceeding.

### B. Composition of Starting Proxy Group

552. As discussed below, Trial Staff, EMCOS, and CAPs except to the Presiding Judge's inclusion of TECO Energy in the proxy group.[1146] CAPs point out that TECO Energy's IBES growth rate briefly rose to 9.2% from March to June 2015. It was 7.08% in February and 7.68% in July. The Presiding Judge in the Third Complaint Proceeding used the 9.2% figure. The Presiding Judge in the first complaint concerning the MISO TOs' ROE in Docket No. EL14-12 (MISO I) used the 7.68% figure from July 2015.[1147]

---

[1144] Briefing Order, 165 FERC ¶ 61,030 at P 60.

[1145] *MISO TOs v. FERC*, 45 F.4th at 261-262.

[1146] Trial Staff Br. on Exceptions (II, III) at 54-66; EMCOS Br. on Exceptions (II, III) at 32-37; CAPs Br. on Exceptions (II, III) at 28-45.

[1147] CAPs Br. on Exceptions (II, III) at 28-37.

CAPs argue that this shows Commission's approach is too unstable. NETOs oppose these exceptions.[1148]

553. Trial Staff excepts to the Presiding Judge's exclusion of PPL from proxy group.[1149] NETOs oppose this exception, arguing that the Presiding Judge correctly accepted its proxy group excluding PPL based on mergers and acquisitions activity.[1150] NETOs assert that the Presiding Judge correctly adopted their proxy group.[1151]

### 1. Background

#### a. TECO Energy – IBES Growth Rate

554. CAPs argued for exclusion of TECO Energy from the proxy group on the grounds that its IBES growth rate is based on the views of a single analyst. Initial Decision (II, III) disagreed with CAPs' argument with respect to the Third Complaint for the same reasons as it denied their argument with respect to the Second Complaint period.[1152] Initial Decision (II, III) reiterated its conclusion concerning the Second Complaint period, citing the Commission's decision in Opinion No. 531 that the number of analysts representing the *Yahoo! Finance* IBES growth rate is irrelevant and that the Commission relies upon the IBES growth rate from *Yahoo! Finance* because it represents a source relied on by investors.[1153] Moreover, Initial Decision (II, III) agreed with NETOs that CAPs' conclusion about the number of analysts was a supposition of counsel derived from documents presented to Dr. Avera in cross-examination that was not supported by Dr. Avera or any other expert testimony.[1154]

#### b. TECO Energy's M&A Activity

555. In MISO I, the Commission issued Opinion No. 551 while this proceeding was pending. In Opinion No. 551, the Commission also addressed whether to exclude TECO

---

[1148] NETOs Br. Opposing Exceptions (II, III) at 14-43.

[1149] Trial Staff Br. on Exceptions (II, III) at 69-70.

[1150] NETOs Br. Opposing Exceptions (II, III) at 96-97.

[1151] *Id.* at 96.

[1152] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 849.

[1153] *Id.* P 901.

[1154] *Id.*

Energy from the proxy group, based on mergers and acquisition activity during the study period.[1155] Here, we first summarize TECO Energy's mergers and acquisition activity before turning to Initial Decision (II, III), the briefs on and opposing exceptions, and our decision whether to include TECO Energy in the proxy group in this case, applying the criteria that we applied in Opinion Nos. 551 and 569.

556. As summarized in Opinion No. 551, TECO Energy engaged in two mergers and acquisition activities that could potentially require its exclusion from the proxy group. First, on September 2, 2014, nearly three months before the beginning of the updated the study period in the Third Complaint, TECO Energy completed its acquisition of New Mexico Gas Company (New Mexico Gas). The record revealed that, several months later, during the January 2015 to June 2015 study period at issued in Opinion No. 551, analysts were still assessing the impact of the New Mexico Gas acquisition on TECO Energy earnings. For example, the May 22, 2015 issue of *Value Line* noted that the acquisition should increase TECO Energy's earnings, although the acquisition was just one of several factors, including strong customer growth and impending rate increases, that *Value Line* identified to support the projected increase in TECO Energy's earnings for 2015 and 2016.[1156]

557. Second, on October 20, 2014, roughly a month after closing the New Mexico Gas acquisition, TECO Energy announced an agreement to sell its coal mining subsidiary, TECO Coal Corporation (TECO Coal) to Cambrian Coal Corp. (Cambrian) for $120 million and a contingent payment of up to $50 million, depending on coal prices.[1157] TECO Energy's stock price rose approximately eight percent in the month following news of the sale. A few months later, in February 2015, TECO Energy announced an amendment to the terms of the agreement that lowered the purchase price to $80 million, but increased the maximum contingent payment to $60 million.[1158] Later in February, a securities analyst at UBS upgraded TECO Energy from "neutral" to "buy," noting the potential sale of TECO Coal as one of the reasons for the upgrade. Throughout this period in early 2015, IBES' growth projections for TECO Energy increased from 6.43% in January to 7.08% in February and all the way up to 9.2% by March 2015, even as at

---

[1155] In the MISO I proceeding, the study period was January 2015 – June 2015. In this proceeding, the study period was November 2014 – April 2015.

[1156] Initial Decision (II, III), 154 FERC ¶ 63,024 at P 24.

[1157] *Id.* P 25.

[1158] *Id.* The terms of the sale were amended again in mid-April 2015. *Id.* P 25 n.50.

least one analyst expressed skepticism that TECO Energy would complete the sale of TECO Coal.[1159]

558. In April 2015, TECO Energy announced that it was considering selling TECO Coal to other potential buyers in the event that the deal with Cambrian fell through.[1160] As it happened, TECO Energy announced in June 2015, the last month of the study period, that the deal with Cambrian had not closed as scheduled, but that it had received a non-binding offer for TECO Coal from an undisclosed buyer. The IBES growth projections remained steady at 9.2% throughout April, May, and June, notwithstanding the multiple reports casting doubt on TECO Energy's ability to complete the sale of TECO Coal.[1161] In early July 2015, TECO Energy announced that it had failed to reach an agreement with the undisclosed buyer, but that a sale of TECO Coal to Cambrian remained a possibility. A week later, on July 13, 2015, IBES' growth projection for TECO Energy declined to 7.68%.[1162]

**(a) <u>TECO Energy's Acquisition of New Mexico Gas Company</u>**

559. Initial Decision (II, III) rejected participants' assertion that TECO Energy completed a significant acquisition with New Mexico Gas Company and expanded TECO Energy's customer base by 50% and therefore TECO Energy should be excluded from NETOs' proxy group for the Third Complaint DCF study period of November 1, 2014, through April 30, 2015. Initial Decision (II, III) found that "the acquisition was completed *before* the beginning of the study period used to calculate the updated DCFs for the Third Complaint periods and conclude[d] that TECO [Energy] should not be excluded from the proxy group *on that reason alone*."[1163]

---

[1159] *Id.*

[1160] *Id.* P 26.

[1161] *Id.*

[1162] *Id.* The Presiding Judge's Order Establishing Procedural Schedule provided that the cut-off date for data to be used by any party in updates of ROE studies would be July 13, 2015.

[1163] *Id.* P 879 (emphasis in original).

**(b) <u>TECO Energy's Announced Sale of TECO Coal</u>**

560. With respect to TECO Energy's announcement of the sale of TECO Coal, in Initial Decision (II, III) the Presiding Judge noted that NETOs contended that this was a minor transaction because the initial $120 million cash sale price comprised only about two percent of TECO Energy's assets. Moreover, the Presiding Judge pointed out, the October 2014 sale announcement predated the November 2014 onset of the six-month study period.[1164]

561. In Initial Decision (II, III), the Presiding Judge examined NETOs' witness Dr. Avera's change in his position from excluding TECO Energy from the proxy group in his original testimony to including TECO Energy in the proxy group in his May 2015 updated testimony. The Presiding Judge cited NETOs' argument that *Value Line*'s November 21 report for TECO Energy noted an eight percent stock price increase since the time of the coal sale announcement. The Presiding Judge noted that, while *Value Line* did not attribute causality, Dr. Avera's February 2, 2015, DCF analysis for the Third Complaint removed TECO Energy from his proxy group in an abundance of caution. The Presiding Judge noted that Dr. Avera testified that in making that decision, he relied exclusively on *Value Line*'s report and that had he done further analysis, he would *not* have eliminated TECO Energy from his February 2, 2015, proxy group based on information available at that time. And, Dr. Avera had added that during the time period referred to by *Value Line*, the industry uniformly went up, many of the companies more than at TECO Energy.[1165]

562. The Presiding Judge determined in Initial Decision (II, III) that Dr. Avera's, February 2015 DCF study is superseded by his May 29, 2015, update. The Initial Decision found Dr. Avera's May update and relevant testimony to be persuasive and determined that TECO Energy should not be removed from NETOs' proxy group.[1166]

563. The Presiding Judge noted NETOs' contention that TECO Energy's closing price on October 31, 2014, was $19.61 and that on November 21, the day of the *Value Line* report, the closing price was exactly the same at $19.61. Thus, the Presiding Judge found that the price rise to which the November 21, 2014, *Value Line* report referred occurred entirely in October 2014, prior to the DCF analysis period. In addition, the Presiding Judge found that the price change for TECO Energy between October 17 and October 31 was in line with that of other utilities, utility industry trends, and overall market trends.

---

[1164] *Id.* P 881.

[1165] *Id.* P 883.

[1166] *Id.* P 884.

The Presiding Judge found that the record supported NETOs' contention that TECO Energy's closing price on October 31, 2014, was the same as November 21, 2014. The Presiding Judge found that the eight percent price rise that occurred after TECO Energy's announcement of its coal subsidiary spin off predated the six-month study period.[1167]

564. Initial Decision (II, III) also found that the increase in TECO Energy's stock price paralleled the broad market and the Dow Jones Utility Average. The Initial Decision adopted NETOs' evidence that from October 17, 2014, to October 31, 2014, TECO Energy's stock price rose 7.2%, and, during that same period, the S&P 500 index rose seven percent. The Presiding Judge concluded that TECO Energy's stock price increase, which predated the six-month study period, also paralleled the increase in the S&P 500.[1168]

565. With respect to the comparison of the rise in TECO Energy's stock with that of the Dow Jones Utility Average, Initial Decision (II, III) noted Dr. Avera's opinion that changes in TECO Energy's stock price since the announced sale of TECO Energy's coal mining subsidiary were in line with other utilities and the utility industry generally, both during the period shortly after the announcement of the transaction and to the present time. The Presiding Judge also noted Dr. Avera's opinion that individual stocks are more volatile than averages, so the very slight difference between the Dow Jones Utility Average and TECO Energy's stock prior to the DCF analysis period was unremarkable. The Presiding Judge further noted NETOs' conclusion that most of the divergence between TECO Energy's stock price and the Dow Jones Utility Average occurred before the October 20, 2014 coal sale announcement. The Presiding Judge found that NETOs' arguments and Dr. Avera's opinion were supported by the record and that the participants did not put forth sufficient contrary and persuasive evidence to persuasively demonstrate that NETOs' arguments were infirm.[1169]

566. Initial Decision (II, III) found persuasive NETOs' argument that TECO Energy's February 6, 2015, announcement of the $80 million decline in TECO Coal's sale price is less than 1.5% of TECO Energy's roughly $6 billion in book capitalization and a one-time event that has no recurring effect on the company and, thus, was unlikely to be material to investors or distort the inputs to the DCF.[1170]

---

[1167] *Id.* P 885.

[1168] *Id.* P 886.

[1169] *Id.* P 887.

[1170] *Id.* P 888.

567. The Presiding Judge declined to review testimony from another Trial Staff witness in a contemporaneous but separate Commission proceeding as it was outside this proceeding and was not subject to cross-examination.[1171]

568. Initial Decision (II, III) found that, contrary to CAPs' and other parties' arguments, it would have been inappropriate to truncate Dr. Avera's analysis of the New Mexico Gas acquisition and the TECO Coal sale transactions in the middle of February 2015. The Presiding Judge noted that NETOs pointed out that Dr. Avera convincingly testified that a more appropriate comparison would have been over the full DCF analysis period; when the entire period was considered, that comparison showed no price distortion.[1172] NETOs noted that Dr. Avera testified that it was inappropriate to subdivide the DCF analysis period in this manner, and that when the entire period is considered, the stock price change closely mirrored the change in the Dow Jones Utility Average and did not demonstrate any stock price distortion due to the coal transaction. Dr. Avera further testified that the February 6, 2015, dividing point for this comparison was inappropriate because the change in the coal transaction that day was minor. The Presiding Judge found that NETOs' arguments were supported by the record and were persuasive. The Presiding Judge found and concluded that it would have been inappropriate to stop or divide the analysis at February 6, 2015, instead of using the entire DCF analysis period.[1173]

569. Initial Decision (II, III) further disagreed with arguments to use the SNL index because the index is comprised of electric, gas, diversified, and merchant companies. The Presiding Judge stated that none of the participants pointed to any expert witness testimony opining that the SNL index is an appropriate index against which to measure TECO Energy's stock price performance for purposes of determining whether the TECO Coal announcement distorted TECO Energy's stock price. The Presiding Judge adopted and relied upon the testimony of Dr. Avera wherein he opined that the most appropriate index for comparison purposes was the Dow Jones Utility Average.[1174]

570. Initial Decision (II, III) rejected the participants' assertion that Dr. Avera's testimony that whether to include TECO Energy in NETOs' proxy group was a "close call" evidences that Dr. Avera equivocated. Rather, the Presiding Judge found that it

---

[1171] *Id.* P 889.

[1172] *Id.* P 890.

[1173] *Id.* PP 891-92.

[1174] *Id.* P 893.

showed the witness's veracity and detailed his deliberative process as the landscape surrounding the TECO Energy transactions changed through the passage of time.[1175]

**2. Briefs**

**a. Whether to Include TECO Energy as a Proxy Group Member**

**i. Reliance on One Analyst's Growth Rate**

571. CAPs argue that Initial Decision (II, III) erred by letting one analyst's transient 9.2% growth rate for TECO Energy distort the study period Base ROE and Ceiling ROE recommendations. CAPs assert that the fluctuation of TECO Energy's IBES-reported growth rate reflects the fact that only two analyst firms forwarded to IBES their TECO Energy growth rate forecast as of the start of the study period, and only one did so in the May 2015 snapshot on which the Initial Decision rests. CAPs contend that by elementary statistics, an IBES growth rate that aggregates only one or two analyst(s) will be much less stable than an IBES growth rate that aggregates a larger number of analysts.[1176]

572. CAPs further note that the analyst's growth estimate spans only three years (2014-2017) and looks ahead less than two years from the issuance of Initial Decision (II, III) whereas management and analyst growth forecasts that looked out a full five years—and thus aligned with the understanding of the IBES horizon relied upon in Opinion No. 531, and with the IBES policy that analyst growth rates should look ahead over a full business cycle—produced growth rates that were both more consistent and lower.[1177] CAPs claim that in this case, the May 22 IBES growth rate on which the Initial Decision relied was a one-analyst sample that distorted "the different analyst estimates" available to study-period investors. CAPs state that in Opinion No. 531, the Commission accepted NETOs' invitation to consider the individual analyst growth rates extant during the six-month study period rather than only the contemporaneous IBES average and that the Commission should accord CAPs comparable treatment in this case.[1178]

---

[1175] *Id.* PP 895-97.

[1176] CAPs Br. on Exceptions (II, III) at 35.

[1177] *Id.* at 36.

[1178] *Id.* at 37.

### ii. Transience of TECO Energy Spike

573. CAPs note that Opinion No. 531 found that, as of a study period ending in March 2013, the appropriate base ROE was 10.57%. In response to the consolidated complaints, Initial Decision (II, III) recommends that the subsequent base ROE take an erratic path, dropping by 98 basis points for rates based on a study period that ended in February 2014, and then rising by 131 basis points for rates based on a third study period that ended in April 2015. CAPs argue that Initial Decision (II, III) cannot be affirmed absent a satisfactory explanation for that zig-zag. CAPs argue that no participant in this proceeding believes that the actual cost of equity has been following such an erratic path. To the contrary, CAPs argue, each of the alternative benchmarks on which the Initial Decision relies (state ROEs, Risk Premium, CAPM, Expected Earnings and average change) indicates that over those fourteen months, the cost of equity held steady or declined. CAPs claim that the same is true for the set of additional metrics presented by NETOs on which Initial Decision (II, III) did not rely.[1179]

574. CAPs further assert that capital costs, as indicated by bond yield trends also held fairly steady or declined over those fourteen months. CAPs assert that this background of steady or declining capital cost indicators contradicts Initial Decision (II, III)'s finding of a dramatic rise in the appropriate Base ROE, from 9.59% to 10.9%, over those same fourteen months. CAPs state that this contradiction does not, however, indicate that the Opinion No. 531 DCF methodology for estimating each proxy group member's cost of equity is malfunctioning in current capital market conditions. The problems with the application of the Opinion No. 531 DCF methodology in this case, according to CAPs, are limited to the case-specific application of proxy group criteria and the metric used to distill the proxy results to a single point value; the methodology itself is working well.[1180]

575. CAPs state that, among the several empirical measures relied on by Initial Decision (II, III), the only ones that increased dramatically from September 2013 to February 2014 to November 2014 to April 2015 were the midpoint and top quarter of the DCF range. But CAPs assert that this increase was unrelated to changes in the market for utility equities. Rather, it was attributable to Initial Decision (II, III)'s reliance upon a single DCF result, for TECO Energy, which was high due to a transient spike in its earnings growth rate forecast by the only one of the several covering analysts who happened to participate in IBES data aggregation. CAPs argue that the transience of the TECO Energy spike is evident when Initial Decision (II, III) is compared with the contemporaneous MISO ROE Initial Decision, based on virtually identical testimony by the same transmission owner witnesses, for a mostly-overlapping study period, with the

---

[1179] CAPs Br. on Exceptions (II, III) at 27-28.

[1180] *Id.* at 29.

same two proxies forming the DCF range.[1181] Yet, they note, Initial Decision (II, III) in this proceeding recommends a base ROE 58 basis points above the recommendation in the MISO ROE Initial Decision. CAPs contend that the difference between the recommendations in the two Initial Decisions is due entirely to the happenstance of the period when each Presiding Judge happened to sample TECO Energy's wildly fluctuating growth rate.[1182]

576. Trial Staff similarly argues that substantial evidence in the record supports a finding that TECO Energy's stock prices fluctuated widely in comparison with the Dow Jones Utility Average stock price within the Third Complaint study period. Trial Staff asserts that its initial stock price increase and subsequent decline during that period tracked the fortunes of its unconsummated spin-off negotiations. Trial Staff disputes the finding in Initial Decision (II, III) in response to the documented fluctuations that it is not appropriate to "truncate" or "divide" the analysis in February 2015 (i.e., in light of TECO Energy's February 6, 2015, announcement of the $80 million decline in TECO Coal's sale price) and that the more appropriate comparison would have been over the full DCF analysis period. Trial Staff contends that review of Dr. Avera's testimony reveals that Dr. Avera advocates comparing changes in the stock prices at the beginning and end of the study period with changes in the Dow Jones Utility Average over that same entire period, as if interim price fluctuations are of no importance whatsoever. Trial Staff contends that a comparison of prices at the beginning and end of the study period is not and should not be the appropriate measure of whether the mergers and acquisition activity may distort inputs to the DCF analysis. Rather, Trial Staff argues, the Commission excludes companies for which the DCF inputs, dividends, stock prices, and growth rates, are distorted during the study period.[1183] Further, Trial Staff states that comparing stock prices at the beginning and end of the study period without a consideration of monthly fluctuations during each of the intervening months fails to capture the speculative uncertainty of mergers and acquisition negotiations and the changes in monthly dividend yields.[1184] And, Trial Staff asserts that Initial Decision (II, III) is contrary to Opinion No. 531 and controlling precedents, none of which require

[1181] *Id.* at 29-30.

[1182] *Id.* at 30-31.

[1183] Trial Staff Br. on Exceptions (II, III) at 63-64 (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 114).

[1184] *Id.* at 64-65.

exclusion of companies only if M&A activity or its impacts commence during the study period.[1185]

### iii. TECO Energy M&A Activity

577. According to CAPs, the question is not whether the transaction is known concretely to have affected the DCF inputs in any given six-month study period, but rather whether it is so significant that it may have done so. CAPs argue that, once a transaction is determined to have been sufficiently significant to affect a candidate proxy's DCF inputs during one month, it retains the potential to have such an effect the next month, and the effect may not be easily distinguished from other ongoing market changes. EMCOS argue that the Commission excludes utilities regardless of whether their M&A activity preceded the DCF study period.[1186] Even though TECO Energy announced its intentions to sell its coal subsidiary prior to the study period, EMCOS argue that TECO Energy's stock price increased significantly following the October 20, 2014, announcement and maintained that boost well into the study period., distorting the DCF inputs for the Third Complaint refund period.[1187]

578. CAPs and EMCOs assert that TECO Energy's M&A activity continued to have distortive effects during the six-month study period. First, the parties cite the movement in TECO Energy's stock price following announcements by TECO Energy. For example, EMCOS assert that, in comparing the movement of TECO Energy's stock price to stock price trends for the electric utility industry as a whole during the relevant time frame, TECO Energy's stock showed spinoff-related price volatility. EMCOS cite an eight percent increase in TECO Energy's stock price during the month following the divestiture announcement, and a continued rise in TECO Energy's stock price into December 2014, with its stock price reflecting a total increase of 15% since the announcement, followed by a two percent decline in TECO Energy's stock price after its announcement of a revision and reduction in its sales price. EMCOS argue that these fluctuations, based on short-term investor expectations, significantly affected the DCF inputs.[1188] CAPs also cite the MISO ROE Initial Decision's finding that "a credible case

---

[1185] *Id.* at 66.

[1186] EMCOS Br. on Exceptions (II, III) at 33 (citing *Enbridge Pipelines (KPC)*, 100 FERC ¶ 61,260, at P 237 (2002); Opinion No. 531, 147 FERC ¶ 61,234 at P 113 (excluding Entergy Corp and ITC whose merger was announced prior to the study period); *N. Pass Transmission, LLC*, 134 FERC ¶ 61,095 at P 52 (excluding Allegheny and FirstEnergy for merger activity that was announced prior to the study period.)).

[1187] *Id.* at 33-34.

[1188] *Id.* at 34-35; *see also* CAPs Br. on Exceptions (II, III) at 41 (citing TECO Energy's stock price change following the announcement that the sale price would be

that TECO Energy's very public attempts to sell TECO Coal caused a spike in TECO Energy's stock price that may have distorted the company's dividend yield downward during the study period."[1189]

579. Trial Staff asserts that the distorting fluctuations in TECO Energy's stock prices during the six month study period are corroborated by comparisons with the SNL Energy Index, which shows that starting at the same level in October 2014 when the coal sale was announced, the percentage changes in TECO Energy stock prices diverged from those in the index, and that the divergence grows wider with time.[1190] Trial Staff disagrees with the Presiding Judge's determination in Initial Decision (II, III) to exclude that evidence.[1191] Trial Staff argues that there is no perfect comparison index, Dr. Avera admitted that the Dow Jones Utility Average was his own comparison tool and includes water and gas utilities, and only 15 of the 47 *Value Line* entities are electric utilities, a fact acknowledged in Initial Decision (II, III) in rejecting Dr. Avera's proxy group for the Second Complaint period.[1192]

580. CAPs also argue that the TECO Coal sale materially affected analysts' growth forecasts, which the Commission has found supports excluding candidate proxies. CAPs assert that Barclays' forecast of 2014-2017 TECO Energy earnings growth exceeding every other comparable analyst forecast was attributable, in substantial part, to TECO Energy's M&A activity. Further, CAPs argue that the sale of TECO Coal affected TECO Energy's risk profile, citing the testimony of Dr. Avera that Fitch Ratings was aligned with the investment community's because of anticipation that TECO Energy would sell its volatile coal business. CAPs also cite Eversource's view that historically, the coal business accounted for the majority of TECO Energy stock volatility and that, if the company was not able to close on its sale, the stock would revert to being riskier.[1193] CAPs further argue that merger-related distortion of TECO Energy's DCF result is further indicated by the simple fact that that result is such an outlier, citing Dr.

---

reduce by a third).

[1189] CAPs Br. on Exceptions (II, III) at 40.

[1190] Trial Staff Br. on Exceptions (II, III) at 67.

[1191] *Id.* at 67-68 (noting the Judge's finding that the index was inappropriate as a comparison tool, because it includes electric, gas, diversified and merchant companies and included stock changes from the date of the coal sale announcement prior to the commencement of the six-month study period).

[1192] *Id.* at 68.

[1193] CAPs Br. on Exceptions (II, III) at 41-42.

Woolridge's testimony that with dozens of proxies, a gap between the highest and next-highest proxy results that exceeded 100 basis points would be a tell-tale sign of input distortion.[1194] CAPs argue that Commission precedent supports this test.[1195]

581. The parties also contend that Initial Decision (II, III) incorrectly dismissed all of this evidence, accepting instead NETOs' claim that the TECO Coal transaction was small compared to TECO Energy's book capitalization. For example, EMCOS argue that Initial Decision (II, III) additionally erred in holding that the coal subsidiary is so small that its spinoff cannot be considered a "major" transaction. EMCOS argue that the Commission's M&A screen is concerned with the transaction's impact on DCF inputs rather than the overall size of the transaction. Additionally, EMCOS assert that the evidence in this proceeding shows that the market was intrigued by TECO Energy exiting the coal industry irrespective of the sales price.[1196] CAPs argue that substantial evidence that a transaction did distort DCF inputs cannot be ignored just because a transaction was relatively small.[1197] Trial Staff argues that the Commission's M&A screening criterion does not require that the activity reflect a large or minimum percentage of book capitalization.[1198]

582. CAPs also assert that Initial Decision (II, III)'s characterization of this transaction as "small" rests on an invalid comparison. CAPs state that the Initial Decision compared the recent *market* value of TECO Coal to the *book* capitalization of TECO Energy. According to CAPs, TECO Coal's *book* value represented a larger share of TECO Energy's book value and that is why the decision to divest TECO Coal resulted in a substantial restatement of TECO Energy's 2014 financials and baseline earnings. CAPs state that the sale of TECO Coal represented the sale of a subsidiary that had recently accounted for more than 10% of TECO Energy's total value, for a salvage price. The

---

[1194] *Id.* at 42 (citing Ex. CAP-1 at 33:23-34:8).

[1195] *Id.* (citing *Va. Elec. & Power Co.*, 123 FERC ¶ 61,098, at P 61 (2008); *Va. Elec. & Power Co.*, 124 FERC ¶ 61,207, at P 121 (2008), *reh'g denied*, 139 FERC ¶ 61,143 (2012), *aff'd sub nom. N.C. Utils. Comm'n v. FERC*, 741 F.3d 439 (4th Cir. 2014)).

[1196] EMCOS Br. on Exceptions (II, III) at 36 (citing Avera testimony that the investment community "really like[s] the idea" that TECO Energy is leaving the coal business).

[1197] CAPs Br. on Exceptions (II, III) at 42.

[1198] Trial Staff Br. on Exceptions (II, III) at 60.

parties argue that the record's analyst reports demonstrate that the announced sale of TECO Coal was significant to investors.[1199]

583. EMCOS argue that Initial Decision (II, III) further erred by uncritically accepting Dr. Avera's rationalization of his shifting position (Dr. Avera originally excluded TECO Energy from the proxy group) concerning the pricing impact of the spinoff. EMCOS assert that Dr. Avera's research is directly contradicted by *Value Line* as well as other respected financial publications. Further, EMCOS assert that, while the Initial Decision ignored *Value Line* to embrace Dr. Avera's convenient change of position, it holds elsewhere "that [because] investors consult *Value Line*, and *Value Line* provides a well-accepted data point" the Commission should not go beyond the *Value Line* Report.[1200]

584. EMCOS further assert that, because Initial Decision (II, III) only rejects Trial Staff's DCF analysis for the study period for excluding TECO Energy, the Initial Decision should additionally be modified to adopt Trial Staff's DCF analysis for the Third Complaint period, as it does for the Second Complaint period. EMCOS state that adopting Trial Staff's DCF analysis results in a zone of reasonableness for the Third Complaint period of 6.33% to 11.15%.[1201]

585. NETOs argue that not all M&A activity is grounds for exclusion from the proxy group under Commission precedent. Rather, NETOs argue, the threshold question is whether the company is involved in "*major* merger activity during the six-month study period" and that NETOs state that a company is excluded only if M&A activity is "significant enough to distort the DCF inputs."[1202]

586. NETOs argue that CAPs' and EMCOS' arguments were never based on testimony from their own witnesses, while Trial Staff's witness Ms. Joe's testimony was rejected by the Judge and Trial Staff in its brief no longer relies on its witness Ms. Joe's 15% TECO Energy vs. four percent S&P 500 stock price comparison that was the sole basis for Ms. Joe's conclusion that TECO Energy's stock price was distorted by the sale of TECO

---

[1199] CAPs Br. on Exceptions (II, III) at 42-43; Trial Staff Br. on Exceptions (II, III) at 61-62.

[1200] EMCOS Br. on Exceptions (II, III) at 37 (citing Initial Decision (II, III), 154 FERC ¶ 63,024 at P 796 (rejecting EMCOS' arguments that Dr. Avera should use actual state commission ROE determinations rather than *Value Line*'s compilation of state commission ROEs)).

[1201] EMCOS Br. on Exceptions (II, III) at 37-38.

[1202] NETOs Br. Opposing Exceptions (II, III) at 15 (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 92 (emphasis added by NETOs)).

Coal. NETOs state that TECO Energy's stock price increase paralleled the broader market as well as the Dow Jones Utility Average, directly the opposite of what Ms. Joe asserted.[1203] NETOs argue that Dr. Avera provided a persuasive explanation that the TECO coal asset sale did not distort TECO Energy's stock price during the Third Complaint DCF analysis period – evidence that the Judge properly credited.

587. NETOs argue that the Initial Decision properly found that the announced sale of TECO Coal was not a significant transaction, noting that the initial $120 million cash sale price comprised only about two percent of TECO Energy's assets. NETOs contend that, when he prepared his May 29, 2015, update testimony, Dr. Avera determined based on then-current information that there was no rationale to remove TECO Energy from the proxy group for the updated study period November 2014 through April 2015. NETOs state that, by that time, both the September 2014 New Mexico Gas Company acquisition and the October 2014 coal sale announcement fell outside the six-month DCF study period, as did the stock price increase to which the November 21, 2014, *Value Line* report had referred – a stock price increase that mirrored that of industry in general. Moreover, NETOs note, the Initial Decision found that this small transaction became even smaller by the time Dr. Avera filed his update testimony as on February 6, 2015, news services announced that the cash sale price had declined by a third, to $80 million (less than 1.5% of TECO Energy's book capitalization), with $60 million in possible contingencies.[1204]

588. NETOs further argue that Initial Decision (II, III) did not retain TECO Energy in the proxy group solely because of the small size of the pending coal asset sale. They state that the Initial Decision also examined whether the sale distorted TECO Energy's stock price, as CAPs, EMCOS and Trial Staff alleged, and he found that it did not. NETOs argue that the small size of the TECO Energy transaction is relevant because, as the Commission stated in Opinion No. 531it will exclude a company that is engaged in "major merger activity" if that activity is significant enough to distort the DCF inputs.[1205] NETOs state that this is the same standard used by Dr. Avera as well as other parties' witnesses. NETOs argue that the Initial Decision's conclusion that TECO Energy was not involved in major or significant M&A activity provides an independent ground for including TECO Energy in the proxy group, additional to its conclusion that there is no evidence that the coal asset sale distorted the DCF inputs for TECO Energy.[1206]

---

[1203] *Id.* at 16-17.

[1204] *Id.* at 17-18.

[1205] *Id.* at 20 (citing Opinion No. 531, 147 FERC ¶ 61,234 at PP 92, 114).

[1206] *Id.* at 21.

589. NETOs dispute CAPs' and Trial Staff's contentions that Initial Decision (II, III) erred in finding that the TECO Coal transaction was not a major or significant one. In response to Trial Staff's assertion that the transaction represented a "major restructuring of the company's core business operations," citing the company's CEO, NETOs assert that, rather, the company's CEO said the company was exiting the coal business to "*return*[] *to* its core utility businesses," specifically distinguishing the coal assets from its core operations.[1207] Further, NETOs assert that the fact that the pending sale was covered by investment analysts and addressed in TECO Energy reports is hardly surprising as that is their job.

590. NETOs contend that Initial Decision (II, III) properly determined that the TECO Coal sale did not distort TECO Energy's stock price and that the changes in TECO Energy's stock price during the study period mirrored those of the industry. In response to Trial Staff's criticism that Dr. Avera failed to show the details of stock prices in a Figure in his testimony (Ex. NET-1700, Figure 1), NETOs argue that Dr. Avera also provided (and relied upon) the daily stock prices that were used to create that Figure, and those prices, like the Figure that depicts them, substantiate his conclusions.[1208]

591. NETOs dispute Trial Staff's and CAPs' assertions that TECO Energy's stock prices "fluctuated widely" in comparison with the Dow Jones Utility Average during the six-month DCF analysis period. NETOs argue that Initial Decision (II, III) properly rejected Trial Staff's position that February 6, 2015, should be the dividing point for a comparison of TECO Energy's stock price before and after the initial announcement of the sale of TECO Coal. Regarding Trial Staff's theory that TECO Energy's stock price rose in response to the initial announcement that its coal subsidiary was to be sold, but then fell after the February 6, 2015, announcement that TECO Energy was reducing the sales price for its coal assets, NETOs argue that the change in TECO Energy's stock price following the announcement of the coal sale, and prior to the DCF study period (October 17, 2014, to October 31, 2014), closely tracked the Dow Jones Utility Average. Thus, NETOs dispute Trial Staff's premise that announcement of the coal sale drove TECO Energy's stock price higher. Regarding the February 6, 2015 announcement, NETOs assert that TECO Energy's stock price closely tracked and actually fared better than the utility average, directly at odds with Trial Staff's theory that the decline in TECO Energy's stock price was attributable to the coal price announcement. According to NETOs, the decline in TECO Energy's stock price following TECO Energy's announcement of a reduced price for the sale of TECO Coal coincided with a decline in utility stocks across the board that day and even more so than TECO Energy (with the Dow Jones Utility Average suffering its worst one-day loss during the entire DCF

---

[1207] *Id.* (citing Ex. S-7 at 78 (emphasis added by NETOs)).

[1208] *Id.*

analysis period).[1209] Further, NETOs argue that TECO Energy's stock price tracked the Dow Jones Utility Average during the full study period and that no participant provided any testimony or evidence from any investment analyst that suggested that the decline in TECO Energy's stock price after February 6, 2015, was related to the reduction in the price of the sale of TECO Coal on that date. And, they state that Dr. Avera was the only witness that testified on the subject and testified that in his opinion it was not related.[1210]

592. NETOs dispute Trial Staff's contention that Initial Decision (II, III) imposed a new distortion test by only focusing on the beginning and ending stock prices. NETOs argue that the Initial Decision reviewed the evidence to analyze whether there was a demonstrable link between the M&A activity within the DCF study period (the reduction in the sales price for TECO Energy's coal subsidiary) and the stock price changes within that period, found that the M&A activity was minor, and properly credited Dr. Avera's testimony that the stock price changes during the period had nothing to do with the coal asset price reduction.[1211]

593. NETOs disagree with CAPs' assertion that the impact of the TECO Coal sale was confirmed in the MISO ROE Initial Decision. NETOs state that the MISO ROE Initial Decision merely stated that there was a "credible case" that the TECO Coal sale "may" have increased TECO Energy's stock price during the DCF study period. Further, NETOs argue that the gravamen of the parties' argument here is that the TECO Coal sale increased TECO Energy's stock price compared to its peer group. But, NETOs argue, that alleged distortion would decrease TECO Energy's dividend yield, meaning that the DCF result that Dr. Avera obtained for TECO Energy understated its cost of equity, and that the top end of the range of reasonableness is already too low.[1212]

594. NETOs dispute the parties' assertion that Initial Decision (II, III)'s focus on only the DCF study period improperly ignored that stock price distortion can occur prior to the commencement of the DCF study period, and thus be "baked into" the stock price during the DCF study period. NETOs contend that this argument is based on a factual inaccuracy, arguing that the Initial Decision evaluated the October 17, 2014, through October 31, 2014, period as well as the DCF analysis period itself and found that no price distortion occurred in either period.[1213] NETOs also note that Initial Decision (II, III)

---

[1209] *Id.* at 22-24.

[1210] *Id.* at 24-25.

[1211] *Id.* at 26.

[1212] *Id.* at 26-27.

[1213] *Id.* at 27-28 (citing Initial Decision (II, III), 154 FERC ¶ 63,024 at P 903).

also compared the change in TECO Energy's stock price during the last two weeks in October 2014 with the change in the Dow Jones Utility Average during this period and agreed with Dr. Avera's testimony that the change in TECO Energy's stock price was in line with other utilities and the utility industry generally.[1214]

595. NETOs contend that Initial Decision (II, III) properly rejected the parties' SNL Energy Index comparisons. NETOs contend that the Dow Jones Utility Average, a widely followed utility stock index, despite not containing all electric utilities, remains a valid representation of the electric utility industry generally, as Dr. Avera concluded. In addition, NETOs argue that the SNL Energy Index includes "all publicly traded (NYSE, NYSE MKT, NASDAQ, OTC) Electric, Gas, Diversified, and Merchant companies in SNL's coverage universe."[1215] NETOs assert that the SNL index is an energy stock index, not a utility stock index, and during the Third Complaint DCF analysis period, there was a significant drop in oil and gas prices that hurt energy producers. Thus, NETOs argue, it is not surprising that, while both the Dow Jones Utility Average and TECO Energy's stock price climbed in the first half of the DCF study period, only to give up those gains in the second half, the SNL Energy Index steadily declined in both halves of this period. NETOs argue that it is not an appropriate basis for comparison with an electric utility stock during that period.[1216] NETOs further argue that Trial Staff's SNL Energy Index comparison was keyed to percentage changes in price rather than prices, whereas Dr. Avera's comparison between the Dow Jones Utility Average and TECO Energy's stock price compared prices to prices. NETOs argue that Trial Staff's chart was confusing and did not help elucidate that TECO Energy and the Dow Jones Utility Average moved largely together during the study period.[1217]

596. NETOs argue that Dr. Avera properly interpreted *Value Line*'s report. NETOs dispute EMCOS' argument that Initial Decision (II, III) was inconsistent in accepting Dr. Avera's statement that he looked beyond *Value Line*'s November 21, 2014, report in assessing whether the coal transaction announcement affected TECO Energy's stock price, while at the same time concluding that *Value Line*'s earnings per share growth rate estimates used in a DCF analysis be taken at face value. NETOs note that by the time that Dr. Avera's May 29, 2015 Supplemental Testimony was prepared, the then-current *Value Line* report made no mention of any impact of the pending coal asset sale on TECO Energy's stock price, with the prior *Value Line* report noting that "TECO [Energy] is a pure utility, now that its coal-mining operation is reported as discontinued," and

---

[1214] *Id.* at 28.

[1215] *Id.* at 29 (quoting Ex. S-25 at 3).

[1216] *Id.* at 29-30.

[1217] *Id.* at 30.

attributing future growth prospects to TECO Energy's ongoing utility operations. NETOs argue that there is no inconsistency in Initial Decision (II, III)'s analysis on this point.[1218]

597. NETOs contend that Initial Decision (II, III) properly determined that the TECO Coal sale did not distort analysts' growth rate projections for TECO Energy. In response to CAPs' assertion that the TECO Energy coal sale materially affected analysts' growth forecasts, NETOs state that the only witness who testified on this subject is Dr. Avera, and he concluded that the transaction would be unlikely to have any significant influence in the expectations of future growth reflected in analysts' estimates.[1219]

598. Further, NETOs assert that CAPs' argument is based on a series of documents that they introduced during cross-examination but that no expert witnesses analyzed those documents or testified that the information presented in these documents led the witness to conclude that, considering all of the information available – including stock prices that tracked industry averages – TECO Energy should be excluded from the proxy group due to the TECO Coal sale. NETOs argue that the Commission should not reverse Initial Decision (II, III)'s findings based on the nonexpert interpretation of these documents by counsel. NETOs also argue that CAPs' discussion of these documents is highly selective and ignores contrary evidence, criticizing CAPs' characterizations of the Barclays report (Ex. CAP-110) as having omissions and misstatements, for example, asserting that CAPs skip over Barclays' note that the initial sale amount represents "a relatively modest sum for a company of [TECO Energy's] size," and that the cash flow implications should be manageable.[1220]

599. NETOs assert that CAPs provide no support for their assertion that the analyst who prepared the Barclays report viewed the TECO Coal sale as highly material to TECO Energy's future earnings prospects. In addition, NETOs assert that CAPs' statement that the reasons that the Barclays 9.2% earnings per share forecast exceeds every other comparable forecast relate in substantial part to TECO Energy's M&A activity is counsel's opinion, unsupported by the record. Further, NETOs assert that there is also no verification that the Barclays report is the source of the 9.2% IBES growth rate for TECO Energy. NETOs also assert that there is no evidence that the Barclays' forecast exceeds every other growth rate forecast for TECO Energy; according to

---

[1218] *Id.* at 30-31.

[1219] *Id.* at 31.

[1220] *Id.* at 31-32.

NETOs, it merely exceeds the cherry-picked forecasts that CAPs introduced on cross-examination.[1221]

600. NETOs argue that Initial Decision (II, III) properly credited Dr. Avera's explanation of why he initially excluded TECO Energy from the proxy group and then later included it. NETOs state that under cross-examination, Dr. Avera explained that his prior position was based on *Value Line*'s report of an eight percent price increase, but that additional analysis showed this increase was consistent with increases across the industry for this same period. And, NETOs assert, he further testified that the circumstances had changed since his earlier testimony, including the fact that the announcement now fell outside his updated DCF analysis period, and that this minor transaction had become even smaller. Further, NETOs state that Dr. Avera's statement about it being a "close call" was in reference to his initial assessment of whether to include TECO Energy.[1222]

601. NETOs argue that CAPs' argument regarding TECO Energy's risk profile should be rejected. NETOs state that no party presented evidence to indicate that the sale of TECO Energy's minor coal subsidiary was expected to result in a revision to its S&P or Moody's credit ratings, which remained stable at BBB+/Baa1 throughout the pendency of the study periods used in this proceeding. Moreover, they contend that, contrary to CAPs' assertion, *Kern River Gas*[1223] does not stand for the proposition that M&A activity that affects a proxy candidate's financial profile is grounds for exclusion. NETOs state that, in *Kern River Gas*, the proxy group member was eliminated from the proxy group because M&A activity resulted in the company losing its investment grade rating, and it therefore no longer qualified for the proxy group. NETOs argue that, while the company's M&A activity was a cause of the loss of the investment grade rating, it was the loss of that rating (coupled with the fact that the company was not primarily a gas transmission firm) that mattered. TECO Energy's bond ratings, in contrast, qualify it for the proxy group, according to NETOs.[1224]

602. NETOs contend that CAPs cite no authority for their argument that the test for excluding a company from the proxy group is whether M&A activity may have distorted the DCF inputs. NETOs further state that the Commission has expressly rejected

---

[1221] *Id.* at 32.

[1222] *Id.* at 33-34.

[1223] Opinion No. 486-B, 126 FERC ¶ 61,034.

[1224] NETOs Br. Opposing Exceptions (II, III) at 35-36.

arguments made by members of CAPs in a prior proceeding that any utility engaged in M&A activity should be excluded from a proxy group in every instance.[1225]

603. NETOs dispute CAPs' assertion that TECO Energy's DCF result is more than 100 basis points higher than the next highest DCF result indicates merger-related distortion. NETOs argue that the Commission requires evidence of distortion, not supposition. NETOs argue that cases cited by CAPs have nothing to do with M&A exclusions, nor do those cases support a 100-basis point gap test.[1226]

604. NETOs state that Initial Decision (II, III) utilization of the most current IBES earnings per share growth rate for TECO Energy should be affirmed. NETOs state that in Opinion No. 531, the Commission rejected CAPs' attempt to replace the IBES growth rate for the proxy group member with the highest DCF result with a lower, non-IBES number. NETOs assert that CAPs make a similar argument in this proceeding but that Commission has decided this issue.[1227]

**b. <u>Whether to Include PPL as a Proxy Group Member</u>**

605. Trial Staff argues that Initial Decision (II, III) erroneously excludes PPL from the proxy group. Trial Staff argues that the Initial Decision does not address, and presumably rejects, the unrebutted record evidence that PPL should form the low end of the Third Complaint proxy group if data after April 30, 2015, is considered.[1228] Trial Staff states that PPL should be included because its credit rating was upgraded on May 11, 2015, and Initial Decision (II, III) provides no reason why it should be excluded from an analysis that includes data through or after May 11, 2015. According to Trial Staff, exclusion of PPL from the proxy group significantly affects the zone of reasonableness. Trial Staff states that the DCF result for PPL of 6.33% forms the low end of Trial Staff witness Ms. Joe's zone of reasonableness and the resulting midpoint and top quarter calculations for the Third Complaint period. If PPL is excluded, the next higher proxy

---

[1225] *Id.* at 36 (citing Opinion No. 489, 117 FERC ¶ 61,129 at P 68).

[1226] *Id.* at 37.

[1227] *Id.* at 37-40.

[1228] Trial Staff Br. on Exceptions at 70 & n.36 (citing Initial Decision (II, III), 154 FERC ¶ 63,024 at P 955 (holding that any arguments or portions of the record raised by participants but omitted from the Initial Decision were considered and evaluated but found to either lack merit or significance)).

company becomes PSEG, which forms the low end of Dr. Avera's range of reasonableness at 7.04%.[1229]

606. In response to Trial Staff, NETOs argue that Initial Decision (II, III) properly adopted Dr. Avera's updated Third Complaint proxy group, which excluded PPL. NETOs state that Dr. Avera provided work papers that transparently show all 46 *Value Line* electric utilities, and the reason for each exclusion from the proxy group. According to NETOs, that exhibit shows that PPL was excluded from Dr. Avera's proxy group because it fell outside the comparable risk band for Moody's bond rating at the time Dr. Avera obtained his bond rating data (May 5, 2015), and because it was involved in significant M&A activity involving more than $10 billion of assets when PPL was planning to spin off its entire 10,000 MW unregulated energy supply business, which comprised 22% of its capitalization. NETOs note that Dr. Avera testified that in view of the large size of the transaction and its significance to PPL, and following his review of *Value Line*'s discussion of the transaction, it was appropriate to exclude PPL from the proxy group. Further, NETOs state that the spinoff was significant enough to cause *Value Line* to suspend its timeliness rating for PPL's stock on May 22, 2015, since the transaction was expected to affect PPL's share price.[1230]

### 3. <u>Commission Determination</u>

#### a. <u>Whether to Include TECO Energy as a Proxy Group Member</u>

607. In Opinion No. 551 in the MISO I proceeding, the Commission addressed whether the same TECO Energy M&A activity at issue here—i.e., TECO Energy's acquisition of New Mexico Gas and TECO Energy's announced sale of TECO Coal—warranted the exclusion of TECO Energy from the proxy group at issue in that proceeding. In MISO I, the relevant study period was the most recent six-month period for which there was financial data in the record, January to June 2015.[1231] As noted above, in this proceeding, the relevant six-month study period is November 2014 – April 2015.

608. In Opinion No. 551, the Commission affirmed the Presiding Judge's decision to include TECO Energy in the proxy group. The Commission explained that it is the Commission's "practice . . . to eliminate from the proxy group any company engaged in

---

[1229] *Id.* at 70-71.

[1230] *Id.* at 89-90.

[1231] Opinion No. 551, 156 FERC ¶ 61,234 at P 19 (citing MISO Initial Decision (I), 153 FERC ¶ 63,027 at PP 56, 61).

M&A activity significant enough to *distort* the DCF inputs."[1232] The Commission does not exclude a company simply because it has engaged in any M&A activity or that activity may cause changes in the DCF inputs.[1233] Rather, it excludes a company if the M&A activity may cause temporary changes in DCF inputs that are not sustainable or representative of longer-term investor expectations for the company.[1234]

609. In Opinion No. 569, the Commission agreed with Opinion No. 551's findings on these issues.[1235] Consistent with these findings, we conclude that TECO Energy should not be excluded from the proxy group.

#### i. <u>Single Analyst for IBES Growth Rate</u>

610. We affirm Initial Decision (II, III) on this issue for the reasons stated therein and summarized above with respect to the Commission's longstanding practice of using IBES growth rates as a reliable source of short-term growth rate data for the DCF model,[1236] and Initial Decision (II, III)'s findings that CAPs and Trial Staff had not put forth any compelling evidence or legal argument to justify ignoring the Commission's prior holding that it has "'never required that there be two or more analysts' long-term growth rates for a company in order for it to be included in a proxy group.'"[1237] Further, while the Commission, in Opinion No. 569, identified a consensus of opinions rather than reliance upon a single opinion as a quality of IBES growth estimates, that discussion does not reverse the Commission's determination in Opinion No. 531 that the number of

---

[1232] *Id.* P 37 (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 114 (emphasis added in Opinion No. 551)).

[1233] *Id.* (citing Opinion No. 489, 117 FERC ¶ 61,129 at PP 67-68 ("We also reject [the] . . . argument that Commission precedent supports, in every instance, the exclusion from a proxy group of any utility engaged in merger activity.")).

[1234] *Id.*

[1235] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 501, 507.

[1236] *See also* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 55 ("We will maintain the longstanding practice of using IBES short-term growth rates for the DCF model, absent compelling reasons for using an alternative source."). The Commission added that, although IBES short-term growth rates should be used for the DCF model, the Commission will consider the use of *Value Line* in future proceedings for the CAPM model. *Id.*

[1237] *See* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 555 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at P 90); *see also id.* P 849.

analysts' opinions producing earnings growth estimates reflected in the IBES growth rate is not dispositive of whether it may be relied upon for a proxy group analysis. Accordingly, we continue to find that utilities with one IBES analyst growth rate should be included in the proxy group.

### ii. Acquisition of New Mexico Gas

611. We affirm Initial Decision (II, III) on this issue, for the reasons given by the Commission in reaching the same conclusion concerning the same transaction in Opinion No. 551 and Opinion No. 569.

612. In Opinion No. 551, the Commission noted that TECO Energy's acquisition of New Mexico Gas was completed on September 2, 2014, nearly four months before the beginning of the study period (January-June 2015). As such, the Commission determined, speculation about whether the acquisition would be completed could not have affected, much less distorted, the stock price or the other DCF inputs during the updated study period.[1238] Similarly, in Initial Decision (II, III), the Presiding Judge found that it was proper to include TECO Energy in the Third Complaint proxy group, noting that TECO Energy's New Mexico Gas Company acquisition was completed before the beginning of the Third Complaint study period and concluding that TECO Energy should not be excluded on that reason alone.[1239]

613. In Opinion No. 551, the Commission also disagreed with complainant's argument that TECO Energy should be excluded on the grounds that the acquisition of New Mexico Gas created a temporary and unsustainable increase in TECO Energy's expected earnings. The Commission found that the IBES growth estimates increased 125 basis points (from 6.43% to 7.68%) over the course of the study period.[1240] In Opinion No. 551, the Commission found no evidence in the record suggesting that the New Mexico Gas acquisition caused a significant and unsustainable increase in TECO Energy's earnings expectations during the updated study period.

614. In Opinion No. 569, responding to arguments on rehearing of Opinion No. 551, the Commission determined that Opinion No. 551 properly considered whether TECO Energy's M&A activity "may cause temporary changes in DCF inputs that are not sustainable or representative of longer-term investor expectations for the company."[1241]

---

[1238] Opinion No. 551, 156 FERC ¶ 61,234 at P 38.

[1239] Initial Decision (II, III), 154 FERC ¶ 63,024 at PP 879-80.

[1240] *Id.*

[1241] Opinion No. 569, 169 FERC ¶ 61,129 at P 494 (quoting Opinion No. 551, 156

In Opinion No. 569, the Commission held that the DCF inputs are "distorted" if they are not representative of longer-term investor expectations for the company, for example because the M&A activity has caused a temporary jump in stock price or an unsustainable growth projection. However, it held that, if a completed M&A activity has caused a sustainable change in a DCF input, as the Commission found with respect to TECO Energy's purchase of New Mexico Gas, then the DCF inputs are representative of longer-term investor expectations and the company is properly included in the proxy group.[1242] The Commission cited Opinion No. 531 in which the Commission similarly analyzed whether the M&A activity was significant enough to distort the DCF inputs, based on the facts and circumstances of that case. In Opinion No. 531, the Commission affirmed an initial decision's approval of the elimination of two utilities from the proxy group based on their recent M&A activity, as well as finding that the record did not indicate that a third utility's recent M&A activity was significant enough to distort the DCF inputs.[1243]

615. In Opinion No. 569, the Commission found that sustainability of the impact of M&A activity on growth was not at issue in Opinion No. 531.[1244] By contrast, the Commission opined that the record relied upon by the Commission in Opinion No. 551 did include evidence of the sustainability of the impact of the M&A activity, specifically the purchase of New Mexico Gas, on growth, and nothing in Opinion No. 531 restricted the Commission from considering such record evidence in making its determination in Opinion No. 551.

616. In Opinion No. 569, in response to briefing arguments, the Commission noted that the Presiding Judge, relying on a May 22, 2015 *Value Line* report which forecast continued bottom-line growth in 2016, found that there were additional reasons beyond the New Mexico Gas purchase for TECO Energy's growth rate to increase. That report found that TECO Energy's Tampa Electric and Peoples Gas utilities in Florida were experiencing strong customer growth as the Florida economy expands, and Tampa Electric was benefitting from a rate hike that took effect in November 2014. Also, TECO Energy was planning to replace maturing high-cost debt with borrowings that had a much lower interest rate. Further, the Commission determined that the Presiding Judge reasonably found that *Value Line* did not expect any one-time effects of the New Mexico Gas purchase to extend beyond 2015 into 2016. Rather, the Commission determined, New Mexico Gas's contribution to TECO Energy's growth after 2015 would derive not

FERC ¶ 61,234 at P 37).

[1242] *Id.*

[1243] *Id.* P 497.

[1244] *Id.*

from the two companies' combination of earnings, but from New Mexico Gas' own modest increase in earnings. In these circumstances, the Commission continued to find that the July 13, 2015 IBES projection of TECO Energy's growth over the next three to five years may be treated as representative of longer-term investor expectations of sustainable growth and not significantly affected by any one-time effects of the New Mexico Gas purchase, which was completed over 10 months earlier.[1245]

**iii. <u>TECO Energy's Announced Sale of TECO Coal</u>**

617. We affirm Initial Decision (II, III) on this issue. The excepting parties' arguments on this issue have generally been addressed and rejected by the Commission in Opinion Nos. 551 and 569, as discussed below.

618. Opinion No. 569 addressed rehearing and further briefing arguments concerning its determination in Order No. 551 in the MISO I proceeding.[1246] Although the instant proceeding has a different study period of November 2014 – April 2015, four of the six months of the study period in this proceeding overlap with the study period in MISO I. Further, the MISO I proceeding examined the same evidence as examined in this proceeding, and we see no evidence in the record as it pertains to the November – December 2014 portion of the study period to cause us to reach a different conclusion than we recently reached concerning the analysis of the same facts—TECO Energy's announced sale of TECO Coal—for January – June 2015 of the MISO I study period, as discussed below.

619. In Opinion No. 569, the Commission was not persuaded by CAPs' argument that TECO Energy's October 20, 2014, announcement of the TECO Coal sale distorted its DCF inputs during the January to June 2015 study period applicable to the MISO I proceeding. In the MISO I proceeding, CAPs cited various *Value Line* reports from before the October 20, 2014, announcement noting that the coal mining business had depressed TECO Energy's value, and a November 21, 2014, *Value Line* report stating that TECO Energy's stock had increased by eight percent since the announcement. CAPs also relied on a graph comparing the price of TECO Energy stock during the July 1, 2014, to July 13, 2015, to the SNL Energy stock index. CAPs asserted that its graph showed that the October 20, 2014, announcement of the agreement to sell TECO Coal had the effect of increasing TECO Energy's price relative to the SNL Energy stock index and it subsequently maintained that higher relative price throughout the study period,

---

[1245] *Id.* P 501.

[1246] The Commission determined that CAPs' briefing arguments regarding whether to exclude TECO Energy from the starting proxy group were outside the scope of the Briefing Order. However, the Commission determined that even if those arguments were properly within the scope of the Briefing Order, they were unpersuasive. *Id.* P 498.

Document Accession #: 20260319-3098 Filed Date: 03/19/2026
USCA Case #26-1150 Document #2177335 Filed: 06/05/2026 Page 303 of 372


demonstrating the continuing effect of the expected sale of TECO Coal on TECO Energy's stock price.[1247]

620. In Opinion No. 569, the Commission continued to disagree with CAPs' contentions. The Commission determined that, although the October 20, 2014, announcement of the sale of TECO Coal had an immediate effect on the price of TECO Energy stock, there was insufficient evidence that the announcement continued to have a sufficient effect on TECO Energy's stock during the January to June 2015 study period to justify excluding TECO Energy from the proxy group. In so doing, the Commission determined that there was no evidence that the average risk profile of the companies reflected in the SNL Energy stock index is comparable to TECO Energy's risk profile and, in turn, there was no showing that a comparison of how TECO Energy stock performed versus the SNL Energy stock index provides any meaningful information as to how the announcement of the sale of TECO Coal may have affected TECO Energy's stock price during the first half of 2015.[1248]

621. In Opinion No. 569, the Commission cited graphs provided at the hearing by MISO TOs comparing the price of TECO Energy's stock with the Dow Jones Utility Average from November 1, 2014, to June 30, 2015, finding that the graph showed "TECO [Energy]'s stock moving in virtual lockstep with the Dow Jones Utility Index."[1249] Moreover, the Commission reiterated its finding in Opinion No. 551 that TECO Coal represents less than 1.5% of TECO Energy's total market capitalization. The Commission continued to find that the attempted sale of TECO Coal appeared too small relative to the size of the company to be responsible for significant changes in TECO Energy's stock price.[1250]

622. In addition, in Opinion No. 569, the Commission reaffirmed the Commission's determination in Opinion No. 551 that affirmed the MISO I Initial Decision's finding that TECO Energy's potential sale of TECO Coal had little impact on its projected growth rates. Opinion No. 551 pointed out that IBES' projected growth rates for TECO Energy steadily increased throughout the first five months of the MISO I January-June 2015 six-month study period, even as the prospects for selling TECO Coal steadily deteriorated. The Commission stated that if the potential sale of TECO Coal was a significant factor affecting TECO Energy's DCF inputs, it would anticipate at least some decline in the expected growth rate as the prospects for a sale deteriorated between February and June

[1247] *Id.* P 502.

[1248] *Id.* P 503.

[1249] *Id.* P 504.

[1250] *Id.* P 505.

2015. Instead, the Commission noted, TECO Energy's expected growth rate first increased from 6.43% in January 2015, to 7.08% in February, and to 9.2% in March, and held steady through June. CAPs pointed out that TECO Energy's IBES growth projection fell to 7.68% in July, which was 152 basis points below the 9.2% growth projection in March, and the Commission used the 7.68% growth projection in its DCF analysis. CAPs suggested that the declining prospects for the sale of TECO Coal contributed to this decline. However, the Commission found that the 7.68 IBES growth projection in July was still above the January IBES growth projection of 6.43% and the February IBES growth projection of 7.08%, and thus simply returned TECO Energy's growth projection to approximately the same level as at the start of the January to June 2015 study period. The Commission determined that the record simply did not suggest that the potential sale of TECO Coal had much, if any, effect on the growth rate used in the DCF analysis and that CAPs' witness proffered no new evidence to the contrary.[1251]

623. In Opinion No. 569, the Commission held that its merger screen seeks to exclude companies that are engaging in major mergers and acquisition activity. The Commission's concluded that the sale of TECO Coal did not reach that standard and appeared to be the type of minor activity that occurs regularly in the course of business for utility holding companies. Accordingly, the Commission continued to find, as the Commission did in Opinion No. 551, that TECO Energy should be included in the proxy group.[1252]

624. The parties' arguments before us in this proceeding, which concern the same M&A activity by TECO Energy addressed in the MISO I proceeding, do not persuade us to reach a different conclusion here. As was the case in MISO I, the M&A activity at issue (i.e., TECO Energy's announcement of the sale of TECO Coal) and resulting increase in stock price here occurred prior to the study period. And, as the parties argued in MISO I, the parties here argue that notwithstanding that the price increase occurred prior to the study period, the effect of the M&A activity was sustained during the study period and, in turn, was significant enough to distort TECO Energy's stock price. However, as noted above, the Commission was not persuaded by that sustainability argument in Opinion Nos. 551 and Opinion No. 569. Indeed, the Commission found TECO Energy's stock price to have moved "in virtual lockstep" with the Dow Jones Utility Average from November 1, 2014, through June 30, 2015, which overlaps the entire study period in this case.

625. In addition, Trial Staff's argument that TECO Energy's stock price fell two percent following the February 6, 2015 announcement of a revision and reduction in the

---

[1251] *Id.* P 506.

[1252] *Id.* P 507.

sale price of TECO Coal was also raised in MISO I. However, as noted above, in Opinion No. 569, the Commission reiterated its finding in Opinion No. 551 that TECO Coal represents less than 1.5% of TECO Energy's total market capitalization and that the transaction was too small to have a significant effect. We continue to find that the size of the sale, both relative to the size of TECO Energy and based on observed impact on TECO Energy's financial metrics, does not rise to the level of significant M&A activity for which the merger screen was intended. Major utilities with numerous affiliates and operating companies routinely engage in small-scale purchase or sales of assets. Unless such sales or purchases are significant enough to fundamentally alter the businesses enough to materially impact their financial metrics, such activity does not warrant exclusion of the utilities from a proxy group.

#### b. Whether to Include PPL as a Proxy Group Member

626. Trial Staff argues that if the study period is extended beyond April 30, 2015, to include data up to May 11, 2015, PPL should not be excluded from the proxy group. As discussed above, the relevant study period is November 1, 2014 – April 30, 2015. Therefore, Trial Staff's argument is moot.

### C. DCF Analysis

627. We affirm the Presiding Judge's DCF analysis in Initial Decision (II, III) for the Third Complaint proceeding, with certain exceptions. As discussed above, we have found that: (1) only the IBES short-term growth projections should be used for calculating the (1+.5g) adjustment to the dividend yield, instead of the composite growth rate used by the Presiding Judge; (2) a revised low-end outlier test applies under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the risk premium from the CAPM analysis; (3) the high-end outlier test should be calculated using 200% of the median of the proxy group before any outlier tests are applied; and (4) the long-term growth rate should be given 20% weighting and the short-term growth rate 80% weighting in the two-step DCF model.

628. We now turn to the issue of whether, for purposes of determining the DCF zone of reasonableness, any company in the starting proxy group should be excluded as a low- or high-end outlier. In Initial Decision (II, III), the Presiding Judge excluded Edison International from the Third Complaint DCF proxy group, which NETOs' witness Dr. Avera excluded because its ROE was 4.40%, which was lower than the average yield for public utility bonds rated Baa by Moody's.[1253] Here, we apply the revised low-end outlier test used in Opinion No. 569-A under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the risk

[1253] *See* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 909; Ex. NET-2000 (II, III) at 6; Ex. NET-2400 (II, III).

premium from the CAPM analysis, subject to a natural break analysis. In the Third Complaint proceeding, the risk premium from the CAPM analysis is 9.12%. Twenty percent of that risk premium is 182 basis points. Adding 182 basis points to the 4.55% Baa bond yield produces a low-end outlier threshold in the Third Complaint proceeding of 6.37%. We exclude Edison International, which features an ROE of 3.90%, which is less than the revised 6.37% low-end outlier threshold. CenterPoint Energy, with an ROE of 6.80%, has the lowest DCF ROE of any company included in the proxy group.

629. Under the high-end outlier test we have adopted in this order, we would, subject to the natural break analysis, exclude any DCF ROE that is more than 200% of the median of the starting proxy group DCF ROEs. In this case, the median of the starting DCF proxy group ROEs is 8.64%. Two hundred percent of that median is 17.29%. The company with the highest ROE in the starting proxy group has an ROE of 12.87%, well below the 17.29% high-end outlier threshold. Accordingly, we do not exclude any company from the DCF proxy group as a high end-outlier.

630. Appendix C to this order shows the DCF analysis in the Third Complaint proceeding reflecting these findings. Based on these determinations, we conclude that the DCF zone of reasonableness is 6.80% to 12.87%.

### D. <u>CAPM Analysis</u>

631. We affirm the Presiding Judge's CAPM analysis in Initial Decision (II, III) for the Third Complaint proceeding with certain exceptions. As discussed above, we have found that companies with growth rates of less than or equal to zero or greater than or equal to 20% should be excluded from the one-step DCF analysis of the dividend-paying members of the S&P 500. In addition, we apply the same low-end and high-end outlier tests to the CAPM analysis as those that are applied in the DCF analysis.

632. We now turn to the issue of whether, for purposes of determining the CAPM zone of reasonableness, any company in the starting proxy group should be excluded from the CAPM proxy group as a low- or high-end outliers. As discussed in the preceding section, we have determined that the low-end outlier threshold in the Third Complaint proceeding is 6.37%. The companies in the starting proxy group with the lowest ROE are Southern Company and Duke, both with ROEs of 7.80%. Because those ROEs are well above the 6.37% low-end outlier threshold, we do not exclude any company from the CAPM proxy group as a low-end outlier.

633. Under the high-end outlier test we have adopted in this order, we would, subject to a natural break analysis, exclude from the CAPM proxy group any ROE that is more than 200% of the median of the starting proxy group CAPM ROEs. In this case, the median of the starting proxy group CAPM ROEs is 10.44%. Two hundred percent of that median is 20.88%. The company with the highest CAPM ROE in the starting proxy group has an ROE of 13.09%, below the 20.88% high-end outlier threshold.

Accordingly, we do not exclude any company from the CAPM proxy group as a high end-outlier.

634. The CAPM analysis in the Third Complaint proceeding reflecting these findings is shown in Appendix C to this order. Based on these determinations, we conclude that the CAPM zone of reasonableness is 7.80% to 13.09%.

### E. Composite Zone of Reasonableness and FPA Section 206 Findings

635. Based on the findings above concerning the DCF model and CAPM zones of reasonableness in the Third Complaint proceeding, we find that the composite zone of reasonableness based on the most recent financial data in the record of the Third Complaint proceeding is from 7.30% to 12.98%. As discussed above, we find that NETOs are of average risk. Given that Commission policy is to set an RTO-wide ROE at the midpoint of the zone of reasonableness and the other record evidence regarding NETOs risk profile, we conclude that NETOs must be treated as of average risk and that the range of presumptively reasonable ROEs for consideration in determining whether NETOs 9.57% base ROE is unjust and unreasonable should be the be the middle third of the composite zone of reasonableness. In the Third Complaint proceeding, that range is from 9.19% to 11.09%.

636. As discussed above, the issue to be addressed in the Third Complaint is whether the ROE established in the Second Complaint remained just and reasonable during the applicable test period of November 1, 2014, to April 30, 2015, as addressed by the evidence presented by the participants in the Third Complaint.[1254] NETOs' 9.57% ROE established upon resolution of the First Complaint, and which was not changed upon resolution of the Second Complaint, falls within the range of presumptively just and reasonable ROEs that applies in the Third Complaint proceeding. We find that this presumption has not been rebutted by the evidence in the Third Complaint proceeding. We see no evidence in the record, such as state ROEs, ROEs of non-utility companies, and other methodologies, serving to rebut this presumption. Accordingly, we find that the NETOs' ROE established in the First Complaint proceeding has not been shown to be unjust and unreasonable under the first prong of FPA section 206. For that reason, we do not establish a new just and reasonable ROE in the Third Complaint proceeding to be in effect prospectively, and we therefore dismiss the Third Complaint.

637. Below, in section XX, we address the issue of whether refunds should be ordered in light of our decision to dismiss the Third Complaint.

---

[1254] MISO Briefing Order, 165 FERC ¶ 61,118 at P 60.

## XIX. Complaint Specific Results: Fourth Complaint

### A. Existing ROE for Purposes of Fourth Complaint

638. In the Briefing Order, the Commission stated that the issued to be addressed in the Fourth Complaint proceeding is whether the ROE established in the immediately preceding complaint proceeding remained just and reasonable based on financial data for the six month period May 2017 to October 2017 presented by the participants at the hearing on the Fourth Complaint.[1255] As discussed above, in Opinion Nos. 569 and 569-A, the Commission further explained why this is the appropriate base ROE to be analyzed for purposes of the Fourth Complaint. In *MISO TOs v. FERC*, the D.C. Circuit affirmed this approach for determining the existing rate to be analyzed in a subsequent base ROE complaint.[1256] Because we do not establish a new base ROE in Second Complaint or Third Complaint proceedings and dismiss those complaints, as discussed above, the base ROE to be analyzed for purposes of the Fourth Complaint is the 9.57% base ROE established in the First Complaint proceeding.

### B. Composition of Starting Proxy Group

#### 1. Background

639. The Commission screens proxy group companies based on the use of a national group of companies considered electric utilities by *Value Line*. As discussed below, the Presiding Judge found that Algonquin should be included in the DCF proxy group, despite not being included as an electric utility by *Value Line*.

640. The Presiding Judge also included Algonquin as a proxy group member by rejecting arguments that Algonquin's DCF result and growth rate were high-end outliers. The Presiding Judge found that any alleged M&A activity by Algonquin was not sufficient to exclude it from the proxy group.

641. The Presiding Judge in addition determined that Algonquin was within the comparable risk band of NETOs. The Presiding Judge determined Algonquin's credit rating was within one notch of NETOs Fitchburg Gas & Electric and parent Emera, both of which were deemed proper for use in setting the comparable risk band.

---

[1255] Briefing Order, 165 FERC ¶ 61,030 at P 60.

[1256] *MISO TOs v. FERC*, 45 F.4th at 261-262.

### 2. Whether to Include Algonquin as a Proxy Group Member

#### a. Whether a Proxy Group Company Must be a Member of *Value Line* Electric Utility List

642. CAPs, EMCOS, and Trial Staff argue that the Commission requires that companies be members of the *Value Line* electric utilities list and that, since Algonquin was not listed there, the Presiding Judge wrongly included Algonquin as a proxy group member.[1257]

643. CAPs argue that, in determining whether a company should be included in the DCF proxy group, the foremost consideration should be whether the company has business and financial risk comparable to that of NETOs.[1258] CAPs claim that the Commission has consistently only used electric utilities listed in the *Value Line* Investment Survey and, until now, in allowing inclusion of Algonquin and Emera, had not previously included such a company in a utility's DCF proxy group.[1259] CAPs therefore assert that the Commission should uphold what it argues has been a longstanding, bright-line criterion.[1260] CAPs note that the Commission has adopted relaxed criteria where the number of eligible proxy companies would drop below four but that even there the Commission still required that proxy companies be "listed among the *Value Line* group of diversified natural gas companies that own FERC-regulated natural gas pipelines."[1261]

---

[1257] CAPs Br. on Exceptions (IV) at 20-26; EMCOS Br. on Exceptions (IV) at 23-26; Trial Staff Br. on Exceptions (IV) at 12-17.

[1258] CAPs Br. on Exceptions (IV) at 20.

[1259] *Id.* at 20-21.

[1260] *Id.* at 21.

[1261] *Id.* at 21 & n.45 (citing *Petal Gas Storage, L.L.C.*, 106 FERC ¶ 61,325, at PP 26-27 (2004), *vacated in part sub nom. Petal Gas Storage, L.L.C. v. FERC*, 469 F.3d 695 (D.C. Cir. 2007); *Williston Basin Interstate Pipeline Co.*, 104 FERC ¶ 61,036 at P 43, *reh'g granted in part*, 107 FERC ¶ 61,164 (2004); *see also S. Cal. Edison Co.*, Opinion No. 445, 92 FERC ¶ 61,070 (2000) (adopting proxy criteria for an electric utility that resulted in four proxy companies)).

644. CAPs state that using *Zacks Investment Research*, *Yahoo! Finance*, or iA Securities reports as a basis for including certain companies into the DCF proxy group as NETOs did is inappropriate because they are not analogous to *Value Line*.[1262]

645. CAPs state that, contrary to the Presiding Judge's finding in Initial Decision (IV), finding that Algonquin acquired a regulated electric utility does not mean that it actually assumed the profile of a regulated electric utility.[1263] CAPs state that many companies that own electric utility subsidiaries and are covered by *Value Line* are not classified by *Value Line* as electric utilities and that "a parent company with diverse subsidiaries includes a regulated electric utility among those subsidiaries simply does not establish the parent's risk comparability to NETOs."[1264]

646. CAPs state that rationalizing the inclusion of Algonquin on the basis that it may one day soon be classified by *Value Line* as an electric utility is inappropriate.[1265] CAPs argue that the Presiding Judge's supporting example, pointing to the fact that *Value Line* classified Avangrid as an electric utility eleven months after it was created, constitutes an overbroad generalization. CAPs provide, as a counterexample, the fact that *Value Line* continues to classify Emera as a merchant generator rather than an electric utility, long after its acquisition of Bangor Hydro.

647. CAPs state that abandoning Commission precedent of the bright-line, objective *Value Line* electric utility test for inclusion into DCF proxy results will only invite a subjective dispute among parties with self-interested choices in which witnesses and methodologies they present.[1266]

648. EMCOS argue that Algonquin should not be included in the proxy group because *Value Line* does not provide analysis of Algonquin, let alone list it as an electric utility. EMCOS contend that, though Initial Decision (IV) notes that other publications classify Algonquin as a utility, it does not verify whether Algonquin is an electric utility specifically. Furthermore, EMCOS refute the premise that the alternative analysis

---

[1262] *Id.* at 22-23.

[1263] *Id.* at 24.

[1264] *Id.* (stating that under this test allowing the inclusion of Algonquin other companies, like National Grid, should be included but are not, which, CAPs assert, indicates a level of arbitrariness).

[1265] *Id.* at 25.

[1266] *Id.* at 25-26.

provided by NETOs witness Dr. McKenzie, which EMCOS characterize as highly subjective, is comparable to *Value Line*'s analysis.[1267]

649. Trial Staff states that the Commission, in Opinion Nos. 531 and 551, have required proxy group members to be included in *Value Line*'s electric utility industry group.[1268] Trial Staff states that NETOs' own witness, Mr. McKenzie, has testified that proxy group members must meet this criterion.[1269]

650. Trial Staff disputes NETOs' characterization of what the Commission meant in Opinion No. 531 by the *Value Line* list being "the appropriate starting point" for proxy group inclusion: Trial Staff argues that, in contrast to NETOs' interpretation that this means companies beyond the *Value Line* list may be added, the Commission meant that the *Value Line* list is the appropriate starting point before thinning out companies with screening criteria.[1270] Trial Staff therefore states that the Presiding Judge improperly added companies on a subjective opinion with no foundation in Opinion No. 531.[1271]

651. Trial Staff argues that the Commission in Opinion No. 531 only meant for one other possible proxy group screen, *AUS Utility Reports*, and that pointing to any others based on the Commission expressing willingness to consider other sources is a misinterpretation of precedent.[1272] Trial Staff states that use of any other source instead of *Value Line* would require analysis to determine if it is an appropriate substitute and assert that the Presiding Judge and the record failed to conduct any such analysis. Trial Staff explains that *Zacks* and *Yahoo! Finance* are not analogous to *Value Line* and are therefore inappropriate to use as an initial proxy group screen.[1273]

652. NETOs assert that Algonquin's acquisition of Empire District, a utility included in *Value Line*'s electric utility group and a member of the proxy groups approved by the Commission in Opinion Nos. 531 and 551, caused Algonquin to share the same risks and

---

[1267] EMCOS Br. on Exceptions (IV) at 23-26.

[1268] Trial Staff Br. on Exceptions (IV) at 12-13 (citing Opinion No. 531, 147 FERC ¶ 61,234 at PP 96-100; Opinion No. 551, 156 FERC ¶ 61,234 at PP 9, 17, 20).

[1269] *Id.* at 13.

[1270] *Id.* at 13-14.

[1271] *Id.* at 14.

[1272] *Id.* at 15 (citing Opinion No. 531, 147 FERC ¶ 61,234 at PP 100, 102, 199).

[1273] *Id.* at 16-17.

adversities as NETOs, especially considering the portion of revenues, income, and assets Algonquin derived from its utilities group.[1274]

653. NETOs argue that the fact that Algonquin may have a higher risk business profile than regulated utilities within *Value Line*'s electric utility group is immaterial to establishing the initial pool of proxy group members, as such risk and the consequent appropriateness of inclusion is directly addressed by the later-applied Commission credit rating screens.[1275] Furthermore, NETOs state that Algonquin's S&P rating of BBB qualifies Algonquin to be included as part of the proxy group.[1276]

654. NETOs state that, on the other hand, the three companies identified by CAPs that own electric and non-electric assets not included as electric utilities in *Value Line* is irrelevant because there is no evidence these companies are comparable to Algonquin.[1277] NETOs add that many companies classified as electric utilities by *Value Line* own electric and non-electric assets, including gas utility assets just like Algonquin's acquired Empire District, and, therefore, that such features do not warrant Algonquin's exclusion from the proxy group.[1278]

655. NETOs argue that CAPs failed to adequately support their claim that financial services like *Zacks*, Wells Fargo, iA Securities, Reuters, and *Yahoo! Finance* are not analogous to *Value Line*.[1279] NETOs moreover state that—contrary to the assertions of CAPs, Trial Staff, and EMCOS—*Zacks*' placement of Algonquin in the Electric Power group is meaningful because every other proxy group company is classified in the exact same utility sector.[1280]

656. NETOs dispute CAPs' assertion that the iA Securities report's classification of Algonquin as part of the Power & Utilities is not meaningful because the exhibit explaining this does not show what other companies are in the classification: NETOs state that this exhibit was introduced on cross-examination by CAPs themselves and

---

[1274] NETOs Br. Opposing Exceptions (IV) at 13.

[1275] *Id.* at 14.

[1276] *Id.*

[1277] *Id.* at 14-15.

[1278] *Id.* at 15-16.

[1279] *Id.* at 16.

[1280] *Id.*

presumably would have been accompanied by such information had it been favorable to CAPs' argument.[1281]

657. NETOs state that CAPs' Brief on Exceptions argument discounting *Yahoo! Finance*'s classification system and treatment of two specific listings is non-record information and must be disregarded.[1282]

658. NETOs state that, now that the Commission no longer uses the one-step DCF methodology and therefore is no longer dependent on *Value Line* for its "br + sv" growth rate components, a company no longer must be included in *Value Line* to be included as a proxy group member.[1283] NETOs state that the Presiding Judge therefore determined that inclusion within *Value Line* is a sufficient but not necessary condition for proxy group membership.[1284]

659. NETOs refute Trial Staff's and CAPs' characterization that the Commission's assertion that the inclusion as an electric utility in *Value Line* is the "starting point" is meant to mean that companies could only be subtracted but not added from the eligible pool of *Value Line* companies.[1285] NETOs state that this interpretation fails to comport with the meaning of "starting point" and would restrict the Commission's ability to identify and include all of the publicly-traded companies that investors would view as opportunities with comparable risk to NETOs.[1286] NETOs state that exclusion of Algonquin for these reasons would violate *Hope* and *Bluefield* and the Commission's admonition to maintain a proxy group "that is sufficiently large and diverse enough to reliably capture the range of reasonable returns" because the DCF results would no longer reflect the full range of returns that investors require for companies with comparable risk to NETOs.[1287]

660. NETOs dispute Trial Staff's, EMCOS', and CAPs' assertions that including proxy companies not listed in *Value Line* turns the process of proxy group selection into a

---

[1281] *Id.* at 17-18.

[1282] *Id.* at 17.

[1283] *Id.* at 18-19.

[1284] *Id.* at 19 (citing Initial Decision (IV), 162 FERC ¶ 63,026 at P 197).

[1285] *Id.* at 19-20.

[1286] *Id.*

[1287] *Id.* at 21-22 (quoting Opinion No. 531-B, 150 FERC ¶ 61,165 at P 96).

subjective one and state that it is up to the Commission and the Presiding Judge's judgment on how best to construct a proxy group that meets the ultimate goal of reflecting what investors would consider comparable in risk.[1288]

661. NETOs dispute Trial Staff's suggestions that NETOs' witness Mr. McKenzie's testified that proxy group companies must be listed by *Value Line*, and, instead, state that Mr. McKenzie actually supports inclusion of companies in the proxy group if they are appropriate.[1289] NETOs point to an example where, in comparable circumstances, witness Mr. McKenzie included Avangrid in the proxy group even though *Value Line* had not yet listed it.[1290]

### b. <u>Whether Algonquin's DCF Result Should Exclude it from Proxy Group Membership</u>

662. CAPs, EMCOS, and Trial Staff state that its projected growth and cash flow are high-end outliers compared to the rest of the DCF proxy group members.[1291]

663. CAPs state that, if properly applied, even NETOs' witness McKenzie's outlier test would exclude Algonquin from the DCF proxy group.[1292] CAPs state that pointing to a 17.7% DCF result value that the Commission found to always be an outlier in a 2006 decision and adjusting it based on the risk-premium-to-interest-rate ratio is incorrect.[1293] CAPs argue that, rather, using a midpoint between the rejected 17.7% and the simultaneously accepted 15.5% DCF results would be more appropriate, or, at most, would urge use of the midpoint between the rejected 17.7% and the 16.9% highest DCF result accepted by the Commission (as dicta) in 2008.[1294] CAPs argue that the midpoint would be more appropriate because it's likely that the exact DCF result that will always be an outlier isn't necessarily as high as 17.7% and the midpoint is "an obvious place to

---

[1288] *Id.* at 22.

[1289] *Id.* at 23.

[1290] *Id.*

[1291] CAPs Br. on Exceptions (IV) at 47; EMCOS Br. on Exceptions (IV) at 26-31.

[1292] CAPs Br. on Exceptions (IV) at 47.

[1293] *Id.*

[1294] *Id.* (citing *Tallgrass*, 125 FERC ¶ 61,248, at P 78 (2008); *ISO New Eng., Inc.*, 109 FERC ¶ 61,147 at P 205, *petition for review denied sub nom. Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278 (D.C. Cir. 2006)).

begin."[1295] CAPs state that, if applying their latter proposed methodology and adjusting it based on the risk-premium-to-interest-rate ratio, the final result for an outlier cutoff would be 15.5% and Algonquin would therefore be excluded from the DCF proxy group.

664. EMCOS assert that Algonquin's 15% short-term growth rate is greater than other levels previously rejected by the Commission as unsustainable and failing to meet thresholds of economic logic. EMCOS contend that Initial Decision (IV), misconstruing Opinion No. 531, concludes that Algonquin's short-term growth rate does not raise outlier concerns because its long-term growth rate is assumed to equal GDP. EMCOS argue that Opinion No. 531 does not preclude scrutinizing whether or not a short-term growth rate is sustainable. Furthermore, EMCOS assert that Algonquin's short-term growth rate is a reflection of its M&A activity. According to EMCOS, Algonquin's inclusion in the proxy group creates "an untenable skew to the zone of reasonableness," as evidenced by that Algonquin's DCF value is a 42.85% increase from the next highest value in Mr. McKenzie's proxy group.[1296]

665. Trial Staff states that Algonquin is an extreme high-end outlier and that the Commission must address this issue on the merits based on the record, as the Commission, after adopting the two-step methodology, had done in Opinion No. 531 and has done for decades in natural gas and oil pipeline cases.[1297]

666. Trial Staff disputes the Presiding Judge's finding that the Commission in 2004 adopted the midpoint, as opposed to the median, "without regard to the skew of the mean value or the proximity of the plurality of data points to the middle of the group."[1298] Trial Staff instead asserts that the Commission there made a finding that the midpoint was "appropriate in this case" and that the Commission concluded, based on the particular facts of the case, that the distribution of the DCF results featured no high-end extreme outliers and were not substantially skewed.[1299] Trial Staff states that the Commission there concluded that there could be circumstances where there exists "egregious

---

[1295] *Id.* (quoting *Emera Maine*, 854 F.3d at 30 (quoting *Tenn. Gas Pipeline v. FERC*, 926 F.2d at 1213)).

[1296] EMCOS Br. on Exceptions (IV) at 26-31.

[1297] Trial Staff Br. on Exceptions (IV) at 17-18 (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 118; *Proxy Group Pol'y Statement*, 123 FERC ¶ 61,048 at P 79).

[1298] *Id.* at 18-19 (citing Initial Decision (IV), 162 FERC ¶ 63,026 at P 216 (quoting 2004 Remand Order, 106 FERC ¶ 61,302 at P 11)).

[1299] *Id.* at 19 (quoting 2004 Remand Order, 106 FERC ¶ 61,302 at P 11).

distortion by the lowest or highest number" and argues that the Presiding Judge should have but did not make a similar finding.[1300]

667. Trial Staff summarizes its data in Appendices A and B to the instant brief to explain that the inclusion of Algonquin skews the distribution, because it results in a midpoint that does not bracket the middle of the data and results in unreasonable jumps in the upper end of the range and to explain, and to explain that Algonquin's 15% short-term growth rate is anomalous and unsustainable.[1301]

668. Trial Staff adds that the Commission, in Opinion No. 531-B, held that the midpoint ROE in questioning was "illogical" in comparison to that of state ROEs, and Trial Staff argues that the facts here provide a significantly greater indication of unlawfulness compared to then.[1302]

669. NETOs state that the Presiding Judge properly rejected arguments that Algonquin should be rejected from the proxy group because its DCF results were too far from other DCF results.[1303] NETOs state, however, that the Commission has never excluded a company from the proxy company on such a basis as doing so would be duplicative with the Commission's high-end outlier test.[1304]

670. NETOs state that only CAPs proposed a specific test for deeming what DCF results are too far above the rest—Dr. Lesser's standard deviations test—and that even Dr. Lesser abandoned this approach as the test's deficiencies were exposed.[1305] NETOs state that the test proposed by Trial Staff's witness, Mr. Keyton, is invalid because he declared 202 basis points to be a cutoff, citing a Commission decision, despite the fact that the Commission elsewhere has approved inclusion of a proxy group company whose DCF results exceeded the next highest result by 250 basis points.[1306]

---

[1300] *Id.* (quoting 2004 Remand Order, 106 FERC ¶ 61,302 at P 12).

[1301] *Id.* at 19-21.

[1302] *Id.* at 21-22 (Opinion No. 531-B, 150 FERC ¶ 61,165 at P 88).

[1303] NETOs Br. Opposing Exceptions (IV) at 27.

[1304] *Id.*

[1305] *Id.* at 28.

[1306] *Id.* (citing *N. Pass Transmission LLC*, 134 FERC ¶ 61,095).

671. NETOs add that the Commission has already rejected use of the "natural break" test, declining to exclude the high-end value based on the difference between it and the next highest result.[1307]

**c. Whether Algonquin's Growth Rate Should Exclude it from Proxy Group Membership**

672. CAPs argue that including Algonquin as part of the DCF proxy group drastically skews the data because Algonquin's ROE is 528 basis points higher than the top of the DCF range, while the entire DCF range otherwise would have only a 462 basis point spread.[1308] CAPs use data to argue that Algonquin stands out as a stark upper-end outlier.[1309] CAPs assert that Algonquin stands so far outside the distribution of proxy group members that it does not correspond to the individual equity cost of an owner of substantial New England transmission.[1310] CAPs further state that the entire distribution of DCF results meaningfully indicates the cost of equity, not the extreme growth of any single proxy company, and that only when the distribution is tested for skew can the low and high end DCF results gain credibility for use in the midpoint.[1311]

673. CAPs state that most DCF proxy distributions have at least some skew and that distributions should not be shoehorned into a normal Gaussian distribution but that some distributions are simply too skewed to use the midpoint.[1312] CAPs state that, even though the D.C. Circuit has acknowledged the Commission is not required to use any particular model for determining when a distribution is too skewed, it is clear that Algonquin should be excluded under any reasonable method.[1313]

674. CAPs argue that changing from a one-step to a two-step DCF model does not address the concern of having a distribution with extreme skew and the use of a central

---

[1307] *Id.* at 29 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 79).

[1308] CAPs Br. on Exceptions (IV) at 26.

[1309] *Id.* at 26-29.

[1310] *Id.* at 30.

[1311] *Id.*

[1312] *Id.* at 31.

[1313] *Id.* (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1008).

tendency metric like the midpoint that is even more susceptible to skew than the median.[1314]

675. CAPs further argue that Algonquin's *Yahoo! Finance* short-term growth rate estimate of 15% was not a true consensus but rather consisted of estimates from only one investment bank, Wells Fargo.[1315] CAPs state that, in fact, Wells Fargo relied on a 5-year earnings per share growth prospects of six percent, not a 15% forward-looking earnings per share, the exercise that DCF analysis seeks to reverse-engineer.[1316] CAPs state that other investment analysts that published forecasts on Algonquin, but happened not to submit their results to IBES, projected much lower growth rates, indicating that Wells Fargo's 15% forecast "was a transient artifact of that analyst's 2016 baseline."[1317] CAPs state that the purpose of pointing this out is to inform the policy decision about how to handle such anomalies and to demonstrate that "Algonquin's transient short-term growth rate was *the single determinative factor* in the ID's outcome, and that number was produced by just one analyst."[1318]

676. NETOs state that the Presiding Judge properly rejected arguments that Algonquin should be excluded from the proxy group because its growth rate should be deemed a high-end outlier.[1319] NETOs reject EMCOS' and Trial Staff's argument that Algonquin's IBES growth rate is 15% and exceeds the 13.3% cutoff previously applied by the Commission. NETOs state that this is because the 13.3% cutoff was applied to a one-step DCF, whereas here the Commission is using a two-step DCF which lowers the weighted average growth rate for Algonquin to 11.4% (well below the 13.3% cutoff).[1320]

677. NETOs argue that CAPs' assertion that *Yahoo! Finance*'s IBES growth rates are based on only one source's estimation is unsubstantiated because *Yahoo! Finance* does not report this information.[1321] NETOs argue that, even assuming CAPs is correct that

---

[1314] *Id.* at 32-33.

[1315] *Id.* at 33, 36.

[1316] *Id.* at 34.

[1317] *Id.* at 35.

[1318] *Id.* at 36 (emphasis in original).

[1319] NETOs Br. Opposing Exceptions (IV) at 29-30.

[1320] *Id.*

[1321] *Id.* at 32, 34.

only Wells Fargo contributed, CAPs still miscalculates the underlying data.[1322] NETOs state that such arguments by CAPs are not record evidence and amount to nothing more the suppositions by counsel.[1323] NETOs further state that the investment analysts' projections pointed to by CAPs to support their claims that Algonquin's growth rate is unsustainable are not relied upon by investors and are not consensus forecasts like the Commission uses.[1324]

#### d. Whether Algonquin's M&A Activity Should Exclude it from Proxy Group Membership

678. CAPs and EMCOS argue that the Presiding Judge should have excluded Algonquin from the proxy group due to recent M&A activity.[1325] CAPs state that, during the study period, investors were aware of Algonquin's plans to acquire a 25% stake in Atlantica Yield.[1326] CAPs argue that this constitutes M&A activity and should disqualify the company from proxy group inclusion. CAPs state that the Presiding Judge applied the wrong standard in requiring CAPs and EMCOS to offer conclusive proof that Algonquin's DCF inputs were distorted by the Atlantica Yield purchase announcement; CAPs state that instead, the standard for proxy group exclusion should be whether the announcement *could* distort the results.[1327] CAPs state that, under this more appropriate standard, the Presiding Judge should have found in CAPs favor but that the Presiding Judge misunderstood CAPs' supporting graph that showed Algonquin's announcement could have distorted one of the DCF inputs.[1328]

679. EMCOS state that Initial Decision (IV) erred in finding M&A activity did not impact Algonquin's DCF inputs. EMCOS note that, on July 21, 2017, trade press

---

[1322] *Id.* at 32-34.

[1323] *Id.* at 34-36.

[1324] *Id.* at 36 (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 89). NETOs add that the five consensus forecasts provided by NETOs witness Mr. McKenzie are all relied upon by investors and averaged a forecast about the same as *Yahoo! Finance* IBES figures.

[1325] CAPs Br. on Exceptions (IV) at 37-38; EMCOS Br. on Exceptions (IV) at 31-34.

[1326] CAPs Br. on Exceptions (IV) at 37.

[1327] *Id.* at 38.

[1328] *Id.*

reported that Algonquin was engaged in negotiations to purchase Atlantica Yield, plc., coinciding with a fall in Algonquin's stock price, even as the Dow Jones Utility Average was rising. EMCOS argue that "the Initial Decision's insistence on direct empirical proof of an impact on Algonquin's stock price . . . is untenably and unrealistically rigorous."[1329]

680. NETOs state that the Presiding Judge properly rejected arguments that Algonquin should be excluded from the proxy group because M&A activity distorted the DCF inputs for Algonquin.[1330]

681. NETOs state that no witness testified that Algonquin should be excluded for this reason.[1331] NETOs argue that parties' specific arguments calling Algonquin's IBES growth rates into question, as a result of this activity, should be rejected because the Commission has held that investors rely on IBES growth rates.[1332]

682. NETOs state that the Presiding Judge properly rejected arguments that Algonquin should be excluded from the proxy group due to distortion of Algonquin's DCF inputs following Algonquin's rumored acquisition of Atlantica.[1333]

683. NETOs state that the Commission will not even consider transactions that are announced after the end of the study period like here and that this transaction is relatively small anyway.[1334] NETOs state that despite this, NETOs witness, Mr. McKenzie, performed an analysis indicating that Algonquin's stock price was not affected in any unusual way and claim that even CAPs' counsel's own results did not show any stock price distortion.[1335]

684. NETOs dispute CAPs' assertion that the Presiding Judge placed a burden of showing conclusive proof on this matter; rather, NETOs claim, the Presiding Judge following the same standard as the Commission has consistently required.[1336] NETOs

---

[1329] EMCOS Br. on Exceptions (IV) at 31-34.

[1330] NETOs Br. Opposing Exceptions (IV) at 31.

[1331] *Id.*

[1332] *Id.* at 31, 35.

[1333] *Id.* at 37.

[1334] *Id.*

[1335] *Id.* at 38.

[1336] *Id.* (citing Opinion No. 531, 147 FERC ¶ 61,234 at PP 92, 114; Opinion No.

point out that CAPs claims the standard for exclusion should be whether a transaction *could* affect DCF inputs but dispute that characterization of Commission precedent and state that such cases involved major transactions where the impact was clear, unlike here.[1337] NETOs state that no witnesses testified that this would be a reasonable standard for excluding proxy group members.[1338]

685. NETOs dispute CAPs' assertion that the Presiding Judge misinterpreted a graph at trial comparing Algonquin's stock price to the Dow Jones Utility Average. NETOs state that, while CAPs claim that Algonquin's stock price and the Dow Jones Utility Average were moving in different directions, these are merely CAPs' counsel's interpretations, these interpretations are wrong, and, even if correct, CAPs never demonstrated such divergence is attributable to the merger activity.[1339]

**e. <u>Whether Algonquin was Within the Comparable Risk Band of NETOs</u>**

686. CAPs state that Algonquin should be excluded from the DCF proxy group because it has too low a credit rating and is an outlier.[1340] CAPs state that Algonquin's credit rating is one notch below that of the single lowest respondent NETO and has a rating at least two notches below that of each NETO that owns substantial amounts of transmission.[1341] CAPs state that the analysis must include the well-established practice of using a comparable risk band screening criteria that includes companies in the DCF proxy group when they are one notch above and below the Moody's and S&P ratings of the utilities whose rates are at issue.[1342] CAPs state that, in addition and in accordance with precedent, the credit ratings of NETOs themselves, not their parents, should be used to establish the comparable risk band.[1343]

---

489, 117 FERC ¶ 61,129 at PP 67-68; *Atl. Grid Operations A, LLC*, 135 FERC ¶ 61,144, at P 88 n.55 (2011)).

[1337] *Id.* at 38-39.

[1338] *Id.* at 39.

[1339] *Id.* at 39-40.

[1340] CAPs Br. on Exceptions (IV) at 39.

[1341] *Id.*

[1342] *Id.* (citing Opinion No. 531, 147 FERC ¶ 61,234 at P 107).

[1343] *Id.* at 39-41 (citing, e.g., *Midcontinent Indep. Sys. Operator, Inc.*, Opinion No.

687. CAPs acknowledge that if one mechanically applies the one notch bond rating screen, Algonquin (BBB rating from S&P) is included because it is within one notch of Fitchburg Gas & Electric (BBB+ rating from S&P).[1344] CAPs, however, state that Fitchburg Gas & Electric is such an insubstantial owner of New England transmission that it should be set aside for these purposes.[1345] If one sets aside Fitchburg Gas & Electric, no other Respondent NETO has an S&P rating below A-, and therefore Algonquin would be excluded.[1346]

688. CAPs state that, on a separate but similar note, NETO Emera Maine's parent, Emera, Inc., should not have replaced Emera Maine for constructing the risk band.[1347] CAPs state that Emera, Inc. has a low-outlier Baa3 rating that lowers the bottom of the comparable risk band more so than it should have, as NETO Emera Maine is less risky and would potentially have a higher credit rating.[1348] CAPs claim therefore that the distribution of the proxy companies' credit ratings are impermissibly lower than the distribution of NETOs' credit ratings.[1349]

689. NETOs state that the Presiding Judge properly rejected arguments that Algonquin should be excluded from the proxy group due to concerns regarding whether the company was within the comparable risk band of NETOs.[1350] NETOs state that the test is whether a company is within one notch of the credit ratings of all of the utilities whose ROE is being determined and that Algonquin, with an S&P rating of BBB, is within one notch of two NETOs and one NETO parent.[1351]

556, 161 FERC ¶ 61,059 (2017); *N. Pass Transmission, LLC*, 134 FERC ¶ 61,095 at PP 45-46, 52, *reh'g denied*, 136 FERC ¶ 61,090 (2011)).

[1344] *Id.* at 43.

[1345] *Id.* at 43-44.

[1346] *Id.* at 44.

[1347] *Id.*

[1348] *Id.* at 44-46.

[1349] *Id.* at 45.

[1350] NETOs Br. Opposing Exceptions (IV) at 40.

[1351] *Id.*

690. NETOs dispute CAPs' dismissal that Algonquin is a credit ratings outlier that squeaks through; NETOs state that no witness offered testimony to support this theory, that it is contrary to Commission precedent, and that Algonquin's exclusion would lead to failure of the proxy group to represent the range of risks faced by NETOs.[1352]

691. NETOs state that any arguments suggesting Fitchburg Gas & Electric Company is too small a company to compare its credit rating the Algonquin are invalid because size has nothing to do with the comparable risk band.[1353] NETOs state that, in fact, the proxy group is meant to capture companies ranging from small to large, in order to more accurately estimate risks and business profiles across the board.

692. NETOs state that any arguments suggesting Emera Maine should not count for comparable risk band analysis, due to the fact that its parent company Emera's bond rating was used rather than its own, are invalid because the Commission has for decades used the parent's rating for the subsidiary when a subsidiary lacks a credit rating.[1354]

693. NETOs dispute CAPs' and Trial Staff's argument that the Commission, in Opinion No. 531, found that only a subsidiary's credit rating can be used in determining if a company can be included in the proxy group and state that Opinion No. 531 does not overturn decades of precedent on this matter.[1355] NETOs further dispute CAPs' argument that since, here, Emera Maine sets the top of the comparable risk band, subsidiary Emera Maine's credit rating must be used and not parent Emera's.[1356] NETOs distinguish from the instant case the Commission's decision in *Northern Pass Transmission* not to impute the parent's rating to the subsidiary by explaining that the subsidiary there had a target credit rating, while no witness established that Emera Maine does.[1357] NETOs add that the Commission cited to *PATH* to support its decision in *Northern Pass Transmission*, which indicates the Commission never meant to newly declare that parent companies'

---

[1352] *Id.* at 41.

[1353] *Id.* at 41-42.

[1354] *Id.* at 42-43.

[1355] *Id.* at 43.

[1356] *Id.* at 43-44.

[1357] *Id.* at 44 (citing *N. Pass Transmission, LLC*, 134 FERC ¶ 61,095 at PP 45, 52).

credit ratings may not be used for comparable risk band purposes because the Commission in *PATH* upheld and implemented the practice of using them.[1358]

694. NETOs dispute CAPs' argument that differences in capital structure between Emera and Emera Maine equate to a necessary difference in credit rating by stating that other factors go into the process for assigning a credit rating.[1359] NETOs also dispute CAPs' analogy of Avangrid and its subsidiaries to Emera and its subsidiary, Emera Maine; NETOs state that no evidence indicates the two have any bearing on one another.[1360]

695. NETOs dispute CAPs' table presenting the relative riskiness of NETOs and the proxy group by explaining that the goal of the credit ratings analysis is not to produce a proxy group with a ratings distribution that proportionally matches that of NETOs and, furthermore, that no witness presented any evidence that this should be a basis for Algonquin's exclusion.[1361]

### 3. **Whether to Include Emera as a Proxy Group Member**

696. EMCOS also take exception to Initial Decision (IV)'s inclusion of Emera in the proxy group, noting that *Value Line* does not classify Emera as an electric utility. EMCOS assert that the Initial Decision "ventured well beyond the 'objective' realm of investor analysis" in accepting NETOs witness McKenzie's argument that Emera warranted inclusion in the proxy group because 90% of its earnings are from regulated business. EMCOS contend that Initial Decision (IV) made no finding as to what extent Emera's business is in electric transmission and distribution and, accordingly, cannot be considered comparable to NETOs.[1362]

697. NETOs state that the Presiding Judge properly included Emera as a proxy group member, despite being listed by *Value Line* under the "Power Group," rather than the "Electric Utility Group."[1363] NETOs argue that Commission precedent supports the conclusion that inclusion by *Value Line* in the electric utility group list is a sufficient but

---

[1358] *Id.* at 45 (citing *PATH*, 122 FERC ¶ 61,188 at PP 95-98).

[1359] *Id.* at 47-48.

[1360] *Id.* at 48.

[1361] *Id.* at 48-49.

[1362] EMCOS Br. on Exceptions (IV) at 37-38.

[1363] NETOs Br. Opposing Exceptions at 55.

not necessary condition for inclusion in the proxy group. NETOs state that the Presiding Judge properly found that Emera would be regarded by investors as being comparable to NETOs (because Emera is primarily engaged in traditional utility activities and 90% of its earnings are derived from regulated business) and that therefore Emera's inclusion as a proxy group member is appropriate.[1364]

### 4. Whether to Include Avangrid as a Proxy Group Member

698. EMCOS oppose Initial Decision (IV)'s inclusion of Avangrid in the proxy group, arguing that its ownership structure distorts its stock price. EMCOS explain that 81.5% of Avangrid's stock is owned by its parent, Iberdrola, S.A., and assert that investors speculate that the remaining 18.5% of shares will be subject to a future buyout effort by the parent, creating a premium. EMCOS witness Mr. Brodsky contends that a controlled company, such as Avangrid, should be valued differently than an uncontrolled company. EMCOS dispute Initial Decision (IV)'s finding that there is little record evidence that these factors may distort Avangrid's stock price.[1365]

699. NETOs argue that Avangrid should be included as a proxy group member and that, by doing so, the Presiding Judge properly applied Commission precedent.[1366] NETOs state that no basis in Commission precedent or the record supports the exclusion of Avangrid.[1367]

700. NETOs state that Avangrid meets all criteria for inclusion and that arguments by EMCOS to exclude it essentially constitute the creation of a new sixth proxy group screening criterion.[1368] In fact, NETOs state that EMCOS' newly created criterion excluding Avangrid—that Avangrid is a "controlled company" because of Iberdrola S.A.'s ownership interest in Avangrid—has no basis in Commission precedent and fails to demonstrate any distorting impact on Avangrid's DCF inputs.[1369]

701. NETOs state that the Presiding Judge properly relied on the March 2016 Investor Responsibility Research Center Institute study indicating that "controlled companies"

---

[1364] *Id.* at 56-57.

[1365] EMCOS Br. on Exceptions (IV) at 34-37.

[1366] NETOs Br. Opposing Exceptions (IV) at 49-54.

[1367] *Id.* at 49.

[1368] *Id.* at 51.

[1369] *Id.* at 51-53.

exhibit no particular characteristics making it unreliable and that Avangrid is viewed very favorably by the financial industry.[1370]

### 5. Whether to Include Fortis, PNM Resources, and SCANA Corp. as Proxy Group Members

702. Trial Staff argues that Fortis, PNM Resources, and SCANA Corp. should be excluded from the proxy group because, if one excludes parent Emera from the comparable risk band analysis, as Trial Staff argues above the Commission should do, then Fortis, PNM Resources, and SCANA Corp. would no longer pass the Commission's credit rating screen.[1371]

### 6. Commission Determination

#### a. Whether to Include Algonquin as a Proxy Group Member

703. We affirm the determination in Initial Decision (IV) to include Algonquin as a DCF proxy group member.

704. The Commission employs the *Value Line* electric utility screen to ensure that proxy group companies share common attributes and risks with the companies whose ROEs they inform. If a company is not included as an electric utility by *Value Line*, we presume that it should not be included as a proxy group member. However, where a company is not a *Value Line* electric utility, the Commission can examine evidence demonstrating that the preponderance of a company's business activities is in the sale of electricity, such as what percentage of a company's earnings or revenue is derived from regulated electric utilities. The purpose of this test is to ensure that proxy group companies are similar in business and risk profile to the utilities at issue.[1372] Evidence in this proceeding indicates that the majority of Algonquin's revenues are from regulated electric companies. As the Presiding Judge noted, "[a]s of September 30, 2017,

---

[1370] *Id.* at 53-54 (citing Initial Decision (IV), 162 FERC ¶ 63,026 at PP 189-90).

[1371] Trial Staff Br. on Exceptions (IV) at 29.

[1372] *See, e.g.,* Opinion No. 531, 147 FERC ¶ 61,234 at P 102 ("We therefore find that the appropriate starting point for the two-step DCF methodology will be the 49 companies, from across the United States, that *Value Line* classifies as being in the electric utility industry. We accept the *Value Line* industry classifications because *Value Line* is a widely-followed, independent investor service; as there may be other reliable sources that investors rely upon, we will not mandate the use of *Value Line* in all cases, and will consider the use of other sources shown to be reliable and commonly relied upon by investors." (citations omitted)).

Algonquin derived 76% of its revenues, 68% of its income, and 66% of its assets from its utilities group."[1373] The Commission may also, though need not in this instance, consider categorization by services other than *Value Line,* provided that the record contains evidence that such lists exclusively include companies that are principally regulated electric utilities operating in the United States or locales with similar regulatory frameworks, electricity sector risk, and ownership. Consequently, we conclude that NETOs have successfully demonstrated that Algonquin should be included in the proxy group despite not being listed as an electric utility by *Value Line*. Specifically, as the Presiding Judge observed, Wells Fargo classified Algonquin in its "Regulated Electric Utilities" group in addition to other similar categorizations by other financial entities.[1374]

705. Furthermore, now that we are implementing a two-step DCF, our analysis no longer relies on *Value Line* for the DCF's "br + sv" growth rate. Therefore, we affirm the Presiding Judge's determination that inclusion in *Value Line*'s electric utility list is sufficient but not necessary for inclusion as a DCF proxy group member.

706. We are not persuaded by CAPs', EMCOS', and Trial Staff's arguments that Algonquin's DCF result is too high for Algonquin's inclusion as a proxy group member. Under the Commission's proxy group screens before outlier tests, Algonquin meets the standards for inclusion. However, as shown in Appendix D, Algonquin features a DCF ROE of 17.58%, which exceeds the high-end outlier test of 16.11% such that it is excluded from the proxy group anyway and does not affect the DCF ROE. Being 564 basis points higher than the next highest DCF proxy group ROE, Algonquin also fails the natural break analysis. Moreover, there is no beta in the record for Algonquin, so it does not affect the CAPM results.

707. We disagree with CAPs' assertion that Algonquin should be excluded from the proxy group on the basis that only one analyst contributed to its IBES short-term growth rate. As discussed above in section XVIII.B.3.a.i, the Commission has "'never required that there be two or more analysts' long-term growth rates for a company in order for it to be included in a proxy group.'"[1375]

708. We are not persuaded by CAPs' arguments concerning Algonquin's alleged unsustainable growth rates. The Commission has implemented a two-step DCF analysis

---

[1373] Initial Decision (IV), 162 FERC ¶ 63,026 at P 201 (citing Ex. NET-03420).

[1374] Initial Decision (IV), 162 FERC ¶ 63,026 at PP 199-200 (citing Ex. NET-03423).

[1375] *See* Initial Decision (II, III), 154 FERC ¶ 63,024 at P 555 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at P 90); *see also id.* P 849.

to address such concerns and ensure the model is weighted so that estimates for growth appropriately reflect a company's long-term growth.

709. We disagree with CAPs that it was inappropriate for NETO Emera Maine's parent, Emera, Inc., to replace Emera Maine in constructing the comparable risk band for Algonquin. As the Presiding Judge in Initial Decision (IV) explained, NETOs that have no subsidiary ratings, but do have parent ratings, are properly included in the comparable risk band, and the credit rating of the parent is applied to the unrated subsidiary.[1376] We are not persuaded by CAPs' citation to *Northern Pass Transmission* because, as NETOs note, the Commission in that case decided to not impute the parent's credit rating to a subsidiary where the subsidiary had a target credit rating, while in this case, no witness established that Emera Maine has a target credit rating.[1377] Accordingly, we find that it is appropriate to use NETO Emera Maine's parent, Emera, Inc., in constructing the comparable risk band for Algonquin.

710. We agree with the Presiding Judge that Algonquin passes the M&A screen. As NETOs observe, the transaction in question occurred after the study period, and the record does not demonstrate any major effects on Algonquin's DCF inputs within the study period. We also agree with the Presiding Judge that Algonquin passes the credit rating screen. As CAPs acknowledge, if the credit screen is mechanically applied, Algonquin passes. We disagree with CAPs' argument that Fitchburg Gas & Electric should be set aside for screening purposes because it is a small company. Fitchburg Gas & Electric's exclusion would have the nonsensical result of determining which utilities have similar risk to Fitchburg Gas & Electric without actually being able to compare the utilities' risks to Fitchburg Gas & Electric. The full range of companies whose ROE is the subject of this proceeding must be considered to properly establish the proxy group. The Commission has not previously established a minimum size for inclusion in the proxy group and we decline to do so here.

### b. <u>Whether to Include Emera as a Proxy Group Member</u>

711. We affirm the Presiding Judge's decision to use parent company Emera, rather than subsidiary Emera Maine, in constructing the comparable risk band. The Commission has long used the parent company's credit rating when the subsidiary's target credit rating has not been included by witnesses as part of the record. Furthermore, the Commission has used a parent company's credit rating to construct the comparable

---

[1376] Initial Decision (IV), 162 FERC ¶ 63,026, at P 160; *see also Green Power Express LP*, 127 FERC ¶ 61,031 at P 90 (2009) ("Green Power uses its parent company's (ITC Holdings) [corporate credit rating] which is BBB.")

[1377] *See N. Pass Transmission, LLC*, 134 FERC ¶ 61,095 at PP 45, 52.

risk band.[1378] In addition, the parent company's capital structure or perceived riskiness need not perfectly match that of the subsidiary for use of the parent company's credit rating—the Commission has never before required that, as other factors go into the formation of a company's credit rating.

712. We find that the Presiding Judge properly included Emera as a proxy group member. Even though Emera is listed as a power group company, rather than an electric utility, by *Value Line*, the record shows that Emera is nevertheless regarded by investors as a comparable company to NETOs. The Presiding Judge properly held that inclusion as an electric utility by *Value Line* is a sufficient but not necessary condition and properly relied on the characteristics of Emera to determine it would be regarded by investors as comparable to NETOs. As discussed with respect to Algonquin, we presume that companies that are not categorized as electric utilities by *Value Line* should be excluded from the proxy group. However, evidence in the record demonstrates that the vast majority of Emera's revenues come from regulated electric utilities, such that its risk characteristics render it similar enough to NETOs to include in the proxy group.

#### c. **Whether to Include Avangrid as a Proxy Group Member**

713. We disagree with the Presiding Judge and find that Avangrid is properly excluded from the proxy group. The Commission has previously found that Iberdrola, S.A.'s controlling stake in Avangrid creates a distortionary effect on Avangrid's stock price similar to the effect that M&A activity can have.[1379]

#### d. **Whether to Include Fortis, PNM Resources, and SCANA Corp. as a Proxy Group Member**

714. We find that the Presiding Judge properly included Fortis, PNM Resources, and SCANA Corp. as proxy group members. We are not persuaded by any arguments that they should be excluded due to the fact that Emera's exclusion would cause them to be screened out, because the Presiding Judge properly included Emera.

---

[1378] *PATH*, 122 FERC ¶ 61,188 at PP 95-98.

[1379] *See Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019, at P 156 (2021) ("Normally, the Commission excludes from the proxy group any company that, during the study period, was involved in M&A activity significant enough to distort the company's estimated ROE model inputs. Avangrid's status as a controlled company is not M&A activity. Nevertheless, we find that its effect on Avangrid's ROE model inputs was significant and comparable to that of M&A activity." (citations omitted)).

## C. <u>DCF Analysis</u>

715. As an initial matter, we note that, in Initial Decision (IV), the Presiding Judge found that, because of the defects and deficiencies in the DCF analyses presented by EMCOS and Trial Staff, they had failed to meet their burden of proof under the first prong of FPA section 206 to show that the existing ROE was unjust and unreasonable by means of a DCF analysis that they properly specified and applied to the facts of the case. The Presiding Judge therefore found that neither EMCOS nor Trial Staff had demonstrated under the first prong of FPA section 206 that NETOs' challenged base ROE was unjust and unreasonable.[1380] In response to the Briefing Order, parties, including CAPs, EMCOS, and Trial Staff, submitted new DCF analyses. In light of this additional evidence, we find that the DCF analyses submitted by EMCOS and Trial Staff are not deficient such that they have failed to meet their burden of proof under the first prong of FPA section 206. As a result, we find that the Fourth Complaint cannot be resolved on the grounds identified by the Presiding Judge in Initial Decision (IV). Below, we address the merits of the Fourth Complaint in light of this finding.

716. As discussed above, we have found that: (1) only the IBES short-term growth projections should be used for calculating the (1+.5g) adjustment to the dividend yield, instead of the composite growth rate used by the Presiding Judge; (2) a revised low-end outlier test applies under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the risk premium from the CAPM analysis; (3) the high-end outlier test should be calculated using 200% of the median of the proxy group before any outlier tests are applied; and (4) the long-term growth rate should be given 20% weighting and the short-term growth rate 80% weighting in the two-step DCF model.

717. We now turn to the issue of whether, for purposes of determining the DCF zone of reasonableness, any company in the starting proxy group should be excluded as a low- or high-end outlier. In Initial Decision (IV), the Presiding Judge explained that Dr. Lesser's application of the low-end outlier test was the "proper approach"[1381] and his application of the test resulted in the exclusion of Entergy, Exelon, and PPL from the DCF proxy group.[1382] Here, we apply the revised low-end outlier test under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the risk premium from the CAPM analysis, subject to a natural break analysis. In the Fourth Complaint proceeding, the risk premium from the CAPM analysis is 9.34%. Twenty percent of that risk premium is 187 basis points. Adding 187 basis points to the

---

[1380] Initial Decision (IV), 162 FERC ¶ 63,026 at PP 227-28.

[1381] *Id.* P 170.

[1382] *Id.* P 165.

4.32% Baa bond yield produces a low-end outlier threshold in the Fourth Complaint proceeding of 6.19%. We exclude PG&E, PSEG, Exelon, PPL, and Entergy, which feature ROEs of 5.69%, 5.11%, 4.98%, 4.83%, and -3.56%, respectively, all of which are less than the revised 6.19% low-end outlier threshold. AEP, with an ROE of 6.34%, has the lowest DCF ROE of any company included in the proxy group.

718. Under the high-end outlier test we have adopted in this order, we would, subject to the natural break analysis, exclude any DCF ROE that is more than 200% of the median of the starting proxy group DCF ROEs. In this case, the median of the starting proxy group DCF ROEs is 8.06%. Two hundred percent of that median is 16.11%. We will exclude Algonquin, which features an ROE of 17.58%. The company with the highest DCF ROE in the starting proxy group has an ROE of 11.33%, below the 16.11% high-end outlier threshold.

719. Our DCF analysis in the Fourth Complaint proceeding reflecting these findings is shown in Appendix D to this order. Based on these determinations, we conclude that the DCF zone of reasonableness is 6.34% to 11.33%.

## D. CAPM Analysis

720. As discussed above, we have found that: (1) companies with growth rates of less than or equal to zero or greater than or equal to 20% should be excluded from the one-step DCF analysis of the dividend-paying members of the S&P 500, and (2) parties may propose to use *Value Line* earnings per share growth rates in the one-step DCF analysis. In addition, we apply the same low-end and high-end outlier tests to the CAPM analysis as those that are applied in the DCF analysis.

721. We now turn to the issue of whether, for purposes of determining the CAPM zone of reasonableness, any company in the starting proxy group should be excluded from the CAPM proxy group as a low- or high-end outlier. As discussed in the preceding section, we have determined that the low-end outlier threshold in the Fourth Complaint proceeding is 6.19%. The company in the starting proxy group with the lowest ROE is Consolidated Edison, with an ROE of 7.17%. Because that ROE is above the 6.19% low-end outlier threshold, we do not exclude any company from the CAPM proxy group as a low-end outlier.

722. Under the high-end outlier test that we have adopted in this order, we would exclude from the CAPM proxy group any ROE that is more than 200% of the median of the starting proxy group CAPM ROEs, subject to a natural break analysis. In this case, the median of the starting proxy group CAPM ROEs is 9.53%. Two hundred percent of that median is 19.06%. The company with the highest CAPM ROE in the starting proxy group has an ROE of 12.92%, well below the 19.06% high-end outlier threshold. Accordingly, we do not exclude any company from the CAPM proxy group as a high end-outlier.

723. The CAPM analysis in the Fourth Complaint proceeding reflecting these findings is shown in Appendix D to this order. Based on these determinations, we conclude that the CAPM zone of reasonableness is 7.17% to 12.92%.

### E. Composite Zone of Reasonableness and FPA Section 206 Findings

724. Based on the findings above concerning the DCF model and CAPM zones of reasonableness in the Fourth Complaint proceeding, we find that the composite zone of reasonableness based on the most recent financial data in the record of the Fourth Complaint proceeding is from 6.76% to 12.12%. As discussed above, we find that NETOs are of average risk. Given that Commission policy is to set an RTO-wide ROE at the midpoint of the zone of reasonableness and the other record evidence regarding NETOs' risk profile, we conclude that NETOs must be treated as of average risk and that the range of presumptively reasonable ROEs for consideration in determining whether NETOs 9.57% base ROE is unjust and unreasonable should be the middle third of the composite zone of reasonableness. In the Fourth Complaint proceeding, that range is from 8.55% to 10.33%.

725. As discussed above, the issue to be addressed in the Fourth Complaint is whether the ROE established in the immediately preceding complaint proceeding remained just and reasonable during the applicable test period of May 2017 to October 2017 as addressed by the evidence presented by the participants in the Fourth Complaint.[1383] NETOs' 9.57% ROE established upon resolution of the First Complaint, and which was not changed upon resolution of the Second Complaint or Third Complaint, falls within the range of presumptively just and reasonable ROEs that applies in the Fourth Complaint. We find that this presumption has not been rebutted by the evidence in the Fourth Complaint proceeding. We see no evidence in the record, such as state ROEs, ROEs of non-utility companies, and other methodologies demonstrating serving to rebut this presumption. Accordingly, we find that NETOs' ROE established in the First Complaint proceeding has not been shown to be unjust and unreasonable under the first prong of FPA section 206. For that reason, we do not establish a new just and reasonable ROE in the Fourth Complaint proceeding to be in effect prospectively, and we therefore dismiss the Fourth Complaint.

726. Below, in section XX we address the issue of whether refunds should be ordered in light of our decision to dismiss the Fourth Complaint.

### F. Other Issues

727. On April 26, 2018, CAPs filed a motion for limited reopening of the record to submit additional evidence relating to the DCF analysis that the Presiding Judge found

---

[1383] MISO Briefing Order, 165 FERC ¶ 61,118 at P 60.

was not sufficiently reliable to prove that NETOs' challenged base ROE was unjust and unreasonable. On May 23, 2018, NETOs filed an answer opposing CAPs' motion. As noted above, we find that the Fourth Complaint cannot be resolved on the grounds identified by the Presiding Judge in Initial Decision (IV)—namely that EMCOS and Trial Staff had failed to meet their burden of proof under the first prong of FPA section 206 because of the defects and deficiencies in their DCF analyses—because, in response to the Briefing Order, parties, including CAPs, EMCOS, and Trial Staff, submitted new DCF analyses. In light of this, we find that CAPs' motion for limited reopening of the record is moot and deny it. CAPs' motion seeks to submit additional evidence in support of the DCF analyses that the Presiding Judge found deficient, but new DCF analyses have been submitted in response to the Briefing Order supersede the DCF analysis that CAPs' motion seeks to supplement. We consider those new DCF analyses in this order and, accordingly, find that CAPs' motion to supplement the superseded DCF analysis on which the Presiding Judge relied in Initial Decision (IV) is moot.

## XX. <u>Refunds in the Second through Fourth Complaint Proceedings</u>

728. The 15-month refund period in the Second Complaint proceeding runs from December 27, 2012, to March 27, 2014. Thus, the entire Second Complaint refund period precedes the October 16, 2014, date when the 9.57% ROE established in the First Complaint proceeding took effect. The 15-month refund period in the Third Complaint proceeding runs from July 31, 2014, to October 31, 2015. Thus, the pre-October 16, 2014, portion of the Third Complaint refund period also precedes the October 16, 2014, date when the 9.57% ROE established in the First Complaint proceeding took effect. Therefore, during the entire Second Complaint refund period and the pre-October 16, 2014, portion of the Third Complaint refund period, the pre-existing 11.14% ROE was in effect.[1384] Our holdings above that we do not establish a new just and reasonable ROE in the Second or Third Complaint proceedings to be effective prospectively thus raise the question of whether we can nevertheless order refunds for the 15-month refund period in the Second Complaint proceeding and the pre-October 16, 2014, portion of the third Complaint refund period during which the preexisting 11.14% ROE was in effect.

729. Because we have ordered that the 9.57% ROE established in the First Complaint proceeding takes effect on October 16, 2014, that ROE is effective during the post-October 16, 2014, portion of the Third Complaint refund period and during the entire April 29, 2016, to July 29, 2017, refund period in the Fourth Complaint proceeding. Therefore, because we have found that the records in both the Third and Fourth

---

[1384] The First Complaint refund period continued until December 31, 2012, four days after the Second Complaint refund period began. Accordingly, NETOs must make refunds in the First Complaint proceeding for those four days of the Second Complaint refund period.

Complaint proceedings do not justify finding that 9.57% is an unjust and unreasonable ROE, there is no basis to order any refunds for the post-October 16, 2014 portion of the Third Complaint proceeding or the Fourth Complaint refund period beyond the refunds already taking place as a result of our resolution of the First Complaint proceeding.

730. Below, we address the participants' contentions with respect to the Second Complaint refund period and the pre-October 16, 2014, portion of the Third Complaint refund period.

### A. Whether the Commission can Order Refunds for the Second Complaint Refund Period and the Pre-October 16, 2014 Portion of the Third Complaint Refund Period

731. For the Second and Third Complaint refund periods, CAPs contend that a replacement just and reasonable ROE should apply to those remediable days that will not already have been remedied to a lower ROE pursuant to the First Complaint or the Second Complaint.[1385]

732. CAPs assert that the Commission erroneously contemplates using its broad remedial authority to correct "legal error" only with respect to the First Complaint outcome that will apply from October 16, 2014, going forward and not with respect to the Second, Third, and Fourth Complaints. They argue that, to the extent that resolution of the Second, Third, and Fourth Complaints result in a reduced ROE, the finally-determined ROE should be given effect from the date that the Commission would have been able to resolve the Second, Third, and Fourth Complaints had Opinion No. 531 been properly decided. CAPs submit that, in each case, the fair estimate of that date is the one estimated for that event in the order setting the relevant docket for hearing, with two extending adjustments: one for the period when hearing procedures were held in abeyance for settlement judge mediation, and another to recognize that the consolidation of the Second Complaint and Third Complaint was not legal error. On that basis, CAPs contend that the prospective outcome of the Second and Third Complaints should be effective from September 30, 2016 forward and the outcome of the Fourth Complaint should be effective from September 30, 2018 forward. CAPs contend that the "legal error" doctrine should apply to the Second, Third, and Fourth Complaints because their resolution was delayed by the legal errors in the vacated Opinion No. 531 and the time that the Commission has subsequently taken to process the remand and related proceedings.[1386]

---

[1385] CAPs Initial Br. (II) at 10; CAPs Initial Br. (III) at 9-10.

[1386] CAPs Principal Initial Br. at 23-26.

733. NETOs assert that the Second, Third, and Fourth Complaints should be dismissed. Once dismissed, NETOs state that they would accept a base ROE of 10.41% for all periods, including "gap periods" between the 15-month refund periods for each complaint, as of October 16, 2014. NETOs commit to work with ISO New England Inc. to undertake the re-settlements necessary to issue refunds and surcharges to ensure that, during the applicable periods, customers effectively pay and NETOs effectively receive a final rate adopted by the Commission that is not materially different from the rate identified in the Briefing Order.[1387]

734. NETOs contend there is no basis for CAPs' claim that the Commission's authority to put parties in the position they would have been in had the Commission not committed legal error in Opinion No. 531 includes the authority to order retroactive ROE reductions from the date the Commission would have issued orders on the Second, Third, and Fourth Complaints if there was no error. NETOs further assert that, even if the Commission did have this type of vast authority to order retroactive rate reductions, there would be no way to reliably determine when the Commission would have issued orders on the Second, Third, and Fourth Complaints if Opinion No. 531 did not contain legal errors.[1388]

735. EMCOS assert that NETOs misunderstand the scope of the Commission's remedial authority to correct its errors by making the ROE set in this order effective prospectively as of October 16, 2014. According to EMCOS, NETOs' attempt to negotiate a *quid pro quo* with the Commission by agreeing to "accept" the Commission's grant of refund relief on the condition that the Commission ultimately adopts the Briefing Order's proposed framework and dismisses the Second, Third, and Fourth Complaints is unworthy of the Commission's consideration.[1389]

### B. <u>Commission Determination</u>

736. As discussed above, the question on this issue is whether the Commission can order refunds during the 15-month Second Complaint refund period and the pre-October 16, 2014, portion of the Third Complaint refund period, despite the fact that the Commission is not granting any prospective relief in the Second or Third Complaints.

---

[1387] NETOs Initial Br. (I) at 27; NETOs Initial Br. (II) at 38-39; NETOs Initial Br. (III) at 28; NETOs Initial Br. (IV) at 31-32.

[1388] NETOs Reply Br. (I, II, III, IV) at 25-27.

[1389] EMCOS Reply Br. (I, II, III, IV) at 33-34.

737. Resolution of this issue requires the Commission to determine the extent of the refund authority granted the Commission by the following language of FPA section 206(b):

> At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding.[1390]

738. As discussed below, and consistent with the Commission's findings in Opinion Nos. 569, 569-A, and 569-B[1391] we find that the Commission cannot order refunds in the Second and Third Complaint proceedings because of the limits of our statutory authority under FPA section 206. The language of section 206(b) states that "[a]t the conclusion of any proceeding under this section" the Commission may order refunds for amounts paid during the 15-month refund period in excess of "what would have been paid under" the just and reasonable rate that "the Commission orders to be thereafter observed and in force." We interpret this language to mean that refunds may be ordered in a complaint proceeding only when the Commission grants prospective relief in that proceeding—i.e., the Commission sets a new just and reasonable rate which it "orders to be thereafter observed and in force." Here, as discussed above, we cannot find the 9.57% ROE in effect as of the date we are acting on the Second and Third Complaints to be unjust and unreasonable and therefore we are not ordering any new just and reasonable rate "to be thereafter observed and in force." Having not ordered a new just and reasonable rate to be thereafter observed, there are no "amounts paid . . . in excess of" that rate that the Commission can order to be refunded.

---

[1390] 16 U.S.C. § 824e(b).

[1391] Opinion No. 569, 169 FERC ¶ 61,129 at P 568; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 260; Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 169-182.

739. In addition, we find that ordering refunds in the Second and Third Complaint proceedings despite the fact that we are granting no prospective relief would exceed the statutory authority granted to us in FPA section 206 because it would effectively extend the 15-month refund period for the First Complaint.[1392] Section 206 explicitly limits the length of time that public utilities may be subject to potential refunds as a result of a Commission determination in a proceeding to 15 months after the refund effective date in that proceeding. Moreover, Congress indicated that the 15-month refund period was intended to limit the refund exposure of public utilities.[1393] The court in *MISO TOs v. FERC* agreed with this reasoning, rejecting arguments that the presumptively just and reasonable zones created an "irrebuttable presumption" and finding that the Commission was correct to use the base ROE established in preceding complaint proceeding as the rate to be analyzed in the Second Complaint proceeding.[1394] The court explained that not doing so would "upend the strict fifteen-month refund limit that Congress placed on Section 206 proceedings."[1395] The court declined to reach arguments "that [the Commission] could not order a refund for the Second Complaint's refund period . . . to the extent that any of that argument survives our earlier rejection of the customers' statutory basis for their 'irrebuttable presumption' argument."[1396]

740. Here, in the First Complaint proceeding, we have found NETOs' pre-existing 11.14% ROE unjust and unreasonable and ordered that ROE reduced to 9.57% effective October 16, 2014, and ordered refunds for the October 1, 2011, to December 31, 2012, 15-month refund period in the First Complaint proceeding. In the Second and Third Complaint proceedings, we are not granting any prospective relief and not changing the effective 9.57% ROE determined in the First Complaint proceeding. Accordingly, we find that ordering refunds in the Second and Third Complaint proceedings on the basis of our ROE determination in the First Complaint proceeding, would exceed our statutory authority under FPA section 206 because it would effectively extend the refund period in the First Complaint proceeding beyond the statutory 15-month limit.

---

[1392] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 569.

[1393] S. Rep. No. 100-491, at 6 (1988) (describing the fifteen-month refund period as a limit on "the time period during which refund liability can accrue").

[1394] *MISO TOs v. FERC*, 45 F.4th at 263.

[1395] *Id.*

[1396] *Id.*

741. Moreover, as we found in Opinion No. 569,[1397] section 206(b) indicates that Congress contemplated the possibility that the Commission could order refunds for periods outside of a proceeding's 15-month refund period, but only provided for that possibility in one instance that is not applicable here. Specifically, section 206(b) provides that, if a proceeding is not concluded within 15 months after the refund effective date, the Commission may order refunds for periods beyond the 15-month period if "the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility." The statute provides only this one exception to the 15-month refund period limitation and that exception does not apply to the Second and Third Complaints. Accordingly, because any refunds that would be ordered in the Second and Third Complaint proceedings would be refunds that were triggered by the Commission's determination in the First Complaint proceeding, the 15-month refund period in that First Complaint proceeding would apply, and there is no exception in the statute that would allow the Commission to order refunds beyond the 15-month refund period in that proceeding, there having been no dilatory behavior by NETOs in either proceeding. The existence of this single explicit exception to the 15-month refund period limitation also indicates that Congress contemplated the possibility that a complainant may not necessarily receive refunds to make it completely whole if the 15-month refund period has expired (e.g., if conclusion of a complaint proceeding takes longer than 15 months but the delay is not primarily because of dilatory behavior by the public utility). Accordingly, while it may appear unusual at first glance to evaluate a complaint on the basis of whether an existing base ROE remains just and reasonable, but then deny the refunds that would be owed if that ROE actually was in effect, the statute explicitly contemplates that even successful complainants may not be made completely whole by refunds.

742. In addition, the legislative history indicates that Congress was aware that section 206 proceedings typically required two years to resolve but nonetheless adopted only a 15-month refund period.[1398] This further indicates that Congress was aware that even successful complainants may not be made completely whole by the refunds provided for in section 206. This is also consistent with other language in the legislative history which provides that the 15-month period is intended to limit a respondent's refund liability, without reference to the success or merits of a complaint. Specifically, the Senate Report on the Regulatory Fairness Act states:

> While giving FERC the discretionary authority to grant refunds, the Committee amendment in several respects limits

---

[1397] Opinion No. 569, 169 FERC ¶ 61,129 at P 570.

[1398] *See id.* ("Resolution of section 206 proceedings requires two years on average.").

> the time period during which refund liability can accrue. In general, refunds may only be ordered for amounts paid in excess of lawful rates during the period within 15 months of the refund effective date.[1399]

743. This approach is consistent with Commission precedent. In *San Diego Gas & Electric*,[1400] the Commission stated, "Under FPA section 206, as amended by the Regulatory Fairness Act, upon instituting a proceeding under section 206, the Commission establishes a refund effective date and *may order refunds*, commencing with the refund effective date and for up to 15 months thereafter, *if it finds an existing rate to be unjust, unreasonable or unduly discriminatory or preferential*."[1401] As described in that case, the Commission can order refunds only if it finds an existing rate to be unjust, unreasonable or unduly discriminatory or preferential. We are not finding an existing rate to be unjust, unreasonable or unduly discriminatory or preferential in the Second and Third Complaint proceedings and we cannot order refunds in those proceedings.[1402]

744. As a result, we dismiss the Second and Third Complaints and will not order NETOs to make any refunds for the applicable 15-month refund periods in those proceedings. We also dismiss the Fourth Complaint without ordering NETOs to make any refund for the applicable 15-month refund period in that proceeding. In light of these determinations, we find that CAPs' request that any relief that is granted in the Second and Third Complaints be granted effective as of September 30, 2016, and any relief that is granted in the Fourth Complaint be granted effective as of September 30, 2018, because of the legal error doctrine is moot. The ROE established in the First Complaint will be effective as of October 16, 2014, with refunds due for the 15-month refund period established in the First Complaint, and the Second, Third, and Fourth Complaints will be dismissed; therefore, no relief will be granted in the Second, Third, or Fourth Complaint proceedings. In other words, dismissal of the Second, Third, and Fourth Complaints means that there will be no refund obligation associated with the Second, Third, or Fourth Complaints, thus the Commission need not determine the time period applicable to that refund obligation, and the legal error doctrine is inapplicable.

---

[1399] *Id.*

[1400] *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 127 FERC ¶ 61,191 (2009).

[1401] *Id.* P 17 (emphasis added).

[1402] *See also* Opinion No. 569, 169 FERC ¶ 61,129 at P 572.

The Commission orders:

(A) NETOs' base ROE is set at 9.57% with a total or maximum ROE including incentives not to exceed 12.09%, effective as of October 16, 2014, as discussed in the body of this order.

(B) ISO-NE and NETOs are directed to provide refunds, with interest calculated pursuant to 18 C.F.R. § 35.19a (2025), within thirty (30) days of the date of this order, for the 15-month refund period for the First Complaint from October 1, 2011, to December 31, 2012 and for the period from October 16, 2014 to the date of this order, as discussed in the body of this order.

(C) ISO-NE and NETOs are directed to file a refund report detailing the principal amounts plus interest paid to each of their customers within forty-five (45) days of the date of this order.

(D) Initial Decision (II, III) in the Second Complaint and Third Complaint proceedings, and Initial Decision (IV) in the Fourth Complaint proceeding are affirmed in part and reversed in part, as discussed in the body of this order.

(E) The Second Complaint, Third Complaint, and Fourth Complaint are dismissed, as discussed in the body of this order.

(F) NETOs' rehearing request filed in Docket Nos. EL11-66-005 and ER15-414-004 is hereby dismissed as moot, as discussed in the body of this order.

By the Commission.

( S E A L )

Carlos D. Clay,
Deputy Secretary.

# Appendix A

| EL11-66 (October 2012 to March 2013) | Lower Bound | Upper Bound | Midpoint |
|---|---|---|---|
| DCF | 6.74% | 10.97% | 8.85% |
| CAPM | 7.35% | 13.22% | 10.28% |
| **Composite Zone** | **7.04%** | **12.09%** | **9.57%** |
| | | | |
| Third - Below Average Risk | 7.04% | 8.72% | 7.88% |
| Third - Average Risk | 8.72% | 10.41% | 9.57% |
| Third - Above Average Risk | 10.41% | 12.09% | 11.25% |

## Complaint I – DCF

| Line | Company | Unadjusted Dividend Yield | Short-term IBES | Long-term GDP | Composite Growth | Adjusted Dividend Yield | DCF Results | Outliers |
|---|---|---|---|---|---|---|---|---|
| 1 | UIL Holdings Corp. | 4.72% | 8.10% | 4.39% | 7.36% | 4.91% | 12.27% | NB |
| 2 | Pinnacle West Capital Corp. | 4.10% | 7.30% | 4.39% | 6.72% | 4.25% | 10.97% | |
| 3 | Northeast Utilities | 3.50% | 8.04% | 4.39% | 7.31% | 3.65% | 10.96% | |
| 4 | Dominion Resources, Inc. | 4.04% | 7.27% | 4.39% | 6.69% | 4.19% | 10.89% | |
| 5 | Westar Energy, Inc. | 4.42% | 6.50% | 4.39% | 6.08% | 4.56% | 10.64% | |
| 6 | Cleco Corp. | 3.20% | 8.00% | 4.39% | 7.28% | 3.32% | 10.60% | |
| 7 | Integrys Energy Group, Inc. | 5.02% | 5.67% | 4.39% | 5.41% | 5.16% | 10.57% | |
| 8 | Great Plains Energy Inc. | 4.03% | 6.55% | 4.39% | 6.12% | 4.16% | 10.28% | |
| 9 | ALLETE, Inc. | 4.30% | 6.00% | 4.39% | 5.68% | 4.43% | 10.11% | |
| 10 | FirstEnergy Corp. | 5.26% | 4.60% | 4.39% | 4.56% | 5.38% | 9.94% | |
| 11 | Alliant Energy Corp. | 4.05% | 5.87% | 4.39% | 5.57% | 4.17% | 9.74% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12 | Black Hills Corp. | 3.93% | 6.00% | 4.39% | 5.68% | 4.04% | 9.72% | |
| 13 | CMS Energy Corp. | 3.92% | 5.90% | 4.39% | 5.60% | 4.04% | 9.64% | |
| 14 | Vectren Corp. | 4.63% | 5.00% | 4.39% | 4.88% | 4.75% | 9.62% | |
| 15 | Otter Tail Corp. | 4.60% | 5.00% | 4.39% | 4.88% | 4.72% | 9.59% | |
| 16 | NextEra Energy, Inc. | 3.49% | 6.20% | 4.39% | 5.84% | 3.59% | 9.43% | |
| 17 | Pepco Holdings, Inc. | 5.46% | 3.63% | 4.39% | 3.78% | 5.56% | 9.34% | |
| 18 | Portland General Electric Co. | 3.86% | 5.58% | 4.39% | 5.34% | 3.97% | 9.31% | |
| 19 | Southern Company | 4.40% | 4.80% | 4.39% | 4.72% | 4.50% | 9.22% | |
| 20 | NorthWestern Corp. | 4.09% | 5.00% | 4.39% | 4.88% | 4.19% | 9.07% | |
| 21 | Xcel Energy, Inc. | 3.90% | 5.12% | 4.39% | 4.97% | 4.00% | 8.97% | |
| 22 | Duke Energy Corp. | 4.62% | 4.20% | 4.39% | 4.24% | 4.72% | 8.96% | |
| 23 | CenterPoint Energy, Inc. | 3.94% | 5.00% | 4.39% | 4.88% | 4.04% | 8.92% | |
| 24 | Sempra Energy | 3.36% | 5.65% | 4.39% | 5.40% | 3.45% | 8.85% | |
| 25 | Avista Corp. | 4.67% | 4.00% | 4.39% | 4.08% | 4.77% | 8.85% | |
| 26 | SCANA Corp. | 4.18% | 4.43% | 4.39% | 4.42% | 4.27% | 8.69% | |
| 27 | Wisconsin Energy Corp. | 3.22% | 5.37% | 4.39% | 5.17% | 3.31% | 8.48% | |
| 28 | DTE Energy Co. | 3.97% | 4.42% | 4.39% | 4.41% | 4.06% | 8.47% | |
| 29 | TECO Energy, Inc. | 5.09% | 2.90% | 4.39% | 3.20% | 5.17% | 8.37% | |
| 30 | Hawaiian Electric Industries, Inc. | 4.75% | 3.30% | 4.39% | 3.52% | 4.83% | 8.35% | |
| 31 | Empire District Electric Co. | 4.73% | 3.00% | 4.39% | 3.28% | 4.80% | 8.08% | |
| 32 | PPL Corp. | 4.96% | 2.70% | 4.39% | 3.04% | 5.03% | 8.07% | |
| 33 | American Electric Power Co., Inc. | 4.23% | 3.60% | 4.39% | 3.76% | 4.30% | 8.06% | |
| 34 | PG&E Corp. | 4.34% | 3.10% | 4.39% | 3.36% | 4.40% | 7.76% | |
| 35 | IDACORP, Inc. | 3.54% | 4.00% | 4.39% | 4.08% | 3.61% | 7.69% | |
| 36 | OGE Energy Corp. | 2.78% | 4.55% | 4.39% | 4.52% | 2.85% | 7.36% | |
| 37 | El Paso Electric Co. | 3.04% | 3.70% | 4.39% | 3.84% | 3.10% | 6.93% | |
| 38 | Consolidated Edison, Inc. | 4.22% | 2.00% | 4.39% | 2.48% | 4.26% | 6.74% | |
| 39 | Public Service Enterprise Group Inc. | 4.53% | -0.68% | 4.39% | 0.33% | 4.52% | 4.85% | Low |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 40 | Ameren Corp. | 4.99% | -1.80% | 4.39% | -0.56% | 4.95% | 4.38% | Low |
| 41 | Edison International | 2.87% | -1.90% | 4.39% | -0.64% | 2.84% | 2.20% | Low |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.61% |
| CAPM Risk Premium | 9.43% |
| Low-End Outlier Test | 6.49% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 8.97% |
| High-End Outlier Test | 17.95% |

| | |
|---|---|
| Low with Outlier Test | 6.74% |
| High with Outlier Test | 10.97% |
| Midpoint | 8.85% |

## Complaint I – CAPM

| Line | Company | Market Return (Rm) | | | Risk-free Rate | Risk Premium | Beta | Unadjusted ROE | Market Cap. | Size Adjustment | Implied Cost of Equity | Outliers |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Div. Yield | Projected Growth (IBES) | Cost of Equity | | | | | | | | |
| 1 | Otter Tail Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.9 | 11.49% | $1,126 | 1.73% | 13.22% | |
| 2 | Integrys Energy Group, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.9 | 11.49% | $4,531 | 0.92% | 12.41% | |
| 3 | Black Hills Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.8 | 10.54% | $1,947 | 1.70% | 12.24% | |
| 4 | TECO Energy, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.85 | 11.02% | $3,860 | 1.14% | 12.16% | |
| 5 | Portland General Electric Co. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $2,291 | 1.70% | 11.77% | |
| 6 | Avista Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $1,639 | 1.72% | 11.32% | |
| 7 | El Paso Electric Co. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $1,350 | 1.72% | 11.32% | |
| 8 | NorthWestern Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $1,483 | 1.72% | 11.32% | |
| 9 | Ameren Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.8 | 10.54% | $8,496 | 0.76% | 11.30% | |
| 10 | CenterPoint Energy, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.8 | 10.54% | $10,242 | 0.76% | 11.30% | |
| 11 | ALLETE, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $1,931 | 1.70% | 11.30% | |
| 12 | Hawaiian Electric Industries, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $2,714 | 1.70% | 11.30% | |
| 13 | IDACORP, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $2,421 | 1.70% | 11.30% | |
| 14 | UIL Holdings Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $2,011 | 1.70% | 11.30% | |
| 15 | Great Plains Energy Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $3,560 | 1.14% | 11.21% | |
| 16 | CMS Energy Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $7,373 | 0.92% | 10.99% | |
| 17 | OGE Energy Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $6,914 | 0.92% | 10.99% | |
| 18 | Pepco Holdings, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $4,910 | 0.92% | 10.99% | |
| 19 | Empire District Electric Co. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.65 | 9.13% | $952 | 1.73% | 10.86% | |
| 20 | DTE Energy Co. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $11,778 | 0.76% | 10.83% | |
| 21 | Edison International | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $16,395 | 0.76% | 10.83% | |
| 22 | Public Service Enterprise Group Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $17,372 | 0.76% | 10.83% | |
| 23 | Vectren Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $2,912 | 1.14% | 10.74% | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | Westar Energy, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $4,197 | 1.14% | 10.74% | |
| 25 | Alliant Energy Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $5,569 | 0.92% | 10.52% | |
| 26 | Pinnacle West Capital Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $6,353 | 0.92% | 10.52% | |
| 27 | Northeast Utilities | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $13,642 | 0.76% | 10.36% | |
| 28 | Cleco Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.65 | 9.13% | $2,839 | 1.14% | 10.27% | |
| 29 | Sempra Energy | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.8 | 10.54% | $19,321 | -0.37% | 10.17% | |
| 30 | SCANA Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.65 | 9.13% | $6,753 | 0.92% | 10.05% | |
| 31 | FirstEnergy Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.75 | 10.07% | $17,649 | -0.37% | 9.70% | |
| 32 | Wisconsin Energy Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.6 | 8.66% | $9,823 | 0.76% | 9.42% | |
| 33 | Xcel Energy, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.6 | 8.66% | $14,482 | 0.76% | 9.42% | |
| 34 | NextEra Energy, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.7 | 9.60% | $32,875 | -0.37% | 9.23% | |
| 35 | American Electric Power Co., Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.65 | 9.13% | $23,618 | -0.37% | 8.76% | |
| 36 | Dominion Resources, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.65 | 9.13% | $33,431 | -0.37% | 8.76% | |
| 37 | PPL Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.65 | 9.13% | $18,190 | -0.37% | 8.76% | |
| 38 | Consolidated Edison, Inc. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.6 | 8.66% | $17,874 | -0.37% | 8.29% | |
| 39 | Duke Energy Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.6 | 8.66% | $51,103 | -0.37% | 8.29% | |
| 40 | Southern Company | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.55 | 8.19% | $41,013 | -0.37% | 7.82% | |
| 41 | PG&E Corp. | 2.46% | 9.97% | 12.43% | 3.00% | 9.43% | 0.5 | 7.72% | $19,059 | -0.37% | 7.35% | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.61% |
| CAPM Risk Premium | 9.43% |
| Low-End Outlier Test | 6.49% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 10.83% |
| High-End Outlier Test | 21.67% |

| | |
|---|---|
| Low with Outlier Test | 7.35% |

| | |
|---|---|
| High with Outlier Test | 13.22% |
| Midpoint | 10.28% |

## Appendix B

| EL13-33 (September 2013 to February 2014) | Lower Bound | Upper Bound | Midpoint |
|---|---|---|---|
| DCF | 7.22% | 10.74% | 8.98% |
| CAPM | 8.59% | 13.21% | 10.90% |
| **Composite Zone** | **7.90%** | **11.98%** | **9.94%** |
| | | | |
| Third - Below Average Risk | 7.90% | 9.26% | 8.58% |
| Third - Average Risk | 9.26% | 10.62% | 9.94% |
| Third - Above Average Risk | 10.62% | 11.98% | 11.30% |

## Complaint II – DCF

| Line | Company | Unadjusted Dividend Yield | Short-term IBES | Long-term GDP | Composite Growth | Adjusted Dividend Yield | DCF Results | Outliers |
|---|---|---|---|---|---|---|---|---|
| 1 | PG&E Corp. | 4.40% | 6.65% | 4.38% | 6.20% | 4.55% | 10.74% | |
| 2 | Cleco Corp. | 3.13% | 8.00% | 4.38% | 7.28% | 3.26% | 10.53% | |
| 3 | Portland General Elec. | 3.75% | 6.60% | 4.38% | 6.16% | 3.87% | 10.03% | |
| 4 | Dominion Resources | 3.56% | 6.77% | 4.38% | 6.29% | 3.68% | 9.97% | |
| 5 | CMS Energy Corp. | 3.82% | 6.24% | 4.38% | 5.87% | 3.94% | 9.81% | |
| 6 | Black Hills Corp. | 2.95% | 7.00% | 4.38% | 6.48% | 3.06% | 9.53% | |
| 7 | Northeast Utilities | 3.48% | 6.28% | 4.38% | 5.90% | 3.59% | 9.49% | |
| 8 | Ameren Corp. | 4.42% | 5.00% | 4.38% | 4.88% | 4.53% | 9.41% | |
| 9 | NextEra Energy, Inc. | 3.08% | 6.48% | 4.38% | 6.06% | 3.18% | 9.24% | |
| 10 | Hawaiian Elec. | 4.82% | 4.20% | 4.38% | 4.24% | 4.92% | 9.16% | |
| 11 | DTE Energy Co. | 3.88% | 5.21% | 4.38% | 5.04% | 3.98% | 9.03% | |
| 12 | Alliant Energy | 3.72% | 5.40% | 4.38% | 5.20% | 3.82% | 9.02% | |
| 13 | Great Plains Energy | 3.81% | 5.17% | 4.38% | 5.01% | 3.91% | 8.92% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14 | Sempra Energy | 2.82% | 6.28% | 4.38% | 5.90% | 2.91% | 8.81% | |
| 15 | Southern Company | 4.90% | 3.55% | 4.38% | 3.72% | 4.99% | 8.70% | |
| 16 | Vectren Corp. | 4.12% | 4.50% | 4.38% | 4.48% | 4.21% | 8.69% | |
| 17 | American Elec Pwr | 4.29% | 4.23% | 4.38% | 4.26% | 4.38% | 8.64% | |
| 18 | Xcel Energy, Inc. | 3.96% | 4.62% | 4.38% | 4.57% | 4.05% | 8.62% | |
| 19 | Duke Energy Corp. | 4.50% | 3.92% | 4.38% | 4.01% | 4.59% | 8.60% | |
| 20 | Wisconsin Energy | 3.70% | 4.86% | 4.38% | 4.76% | 3.79% | 8.55% | |
| 21 | Pinnacle West Capital | 4.13% | 4.13% | 4.38% | 4.18% | 4.22% | 8.40% | |
| 22 | Empire District Elec | 4.51% | 3.00% | 4.38% | 3.28% | 4.58% | 7.85% | |
| 23 | CenterPoint Energy | 3.59% | 3.77% | 4.38% | 3.89% | 3.66% | 7.55% | |
| 24 | Westar Energy | 4.26% | 2.80% | 4.38% | 3.12% | 4.32% | 7.44% | |
| 25 | IDACORP, Inc. | 3.24% | 4.00% | 4.38% | 4.08% | 3.30% | 7.38% | |
| 26 | Consolidated Edison | 4.44% | 2.31% | 4.38% | 2.72% | 4.49% | 7.22% | |
| 27 | Pub Sv Enterprise Grp | 4.33% | 1.90% | 4.38% | 2.40% | 4.37% | 6.77% | Low |
| 28 | Edison International | 2.93% | 0.95% | 4.38% | 1.64% | 2.94% | 4.58% | Low |
| 29 | Exelon Corporation | 4.32% | -4.80% | 4.38% | -2.96% | 4.22% | 1.25% | Low |
| 30 | ITC Holdings | Merger | | | | | | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 5.18% |
| CAPM Risk Premium | 8.58% |
| Low-End Outlier Test | 6.89% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 8.70% |
| High-End Outlier Test | 17.41% |

| | |
|---|---|
| Low with Outlier Test | 7.22% |
| High with Outlier Test | 10.74% |
| Midpoint | 8.98% |

## Complaint II – CAPM

| Line | Company | Market Return (Rm) | | | Risk-free Rate | Risk Premium | Beta | Unadjusted ROE | Market Cap. | Size Adjustment | Implied Cost of Equity | Outliers |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Div. Yield | Projected Growth (IBES) | Cost of Equity | | | | | | | | |
| 1 | Black Hills Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.9 | 11.49% | $2,506 | 1.72% | 13.21% | |
| 2 | Empire District Elec | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $1,010 | 2.48% | 12.69% | |
| 3 | Great Plains Energy | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.9 | 11.49% | $3,972 | 1.19% | 12.68% | |
| 4 | Hawaiian Elec. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.8 | 10.63% | $2,530 | 1.72% | 12.35% | |
| 5 | IDACORP, Inc. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $2,795 | 1.72% | 11.93% | |
| 6 | Portland General Elec. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $2,470 | 1.72% | 11.93% | |
| 7 | Vectren Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $3,152 | 1.72% | 11.93% | |
| 8 | Ameren Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.85 | 11.06% | $9,740 | 0.80% | 11.86% | |
| 9 | CenterPoint Energy | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.85 | 11.06% | $10,099 | 0.80% | 11.86% | |
| 10 | DTE Energy Co. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.85 | 11.06% | $12,595 | 0.80% | 11.86% | |
| 11 | Westar Energy | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.8 | 10.63% | $4,361 | 1.19% | 11.82% | |
| 12 | Alliant Energy | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.8 | 10.63% | $5,953 | 0.93% | 11.56% | |
| 13 | Cleco Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.7 | 9.78% | $2,990 | 1.72% | 11.50% | |
| 14 | Pub Sv Enterprise Grp | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.8 | 10.63% | $18,439 | 0.80% | 11.43% | |
| 15 | Pinnacle West Capital | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $6,082 | 0.93% | 11.14% | |
| 16 | Edison International | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $16,965 | 0.80% | 11.01% | |
| 17 | Northeast Utilities | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $13,864 | 0.80% | 11.01% | |
| 18 | CMS Energy Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.7 | 9.78% | $7,515 | 0.93% | 10.71% | |
| 19 | Consolidated Edison | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.65 | 9.35% | $16,278 | 0.80% | 10.15% | |
| 20 | Wisconsin Energy | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.65 | 9.35% | $9,860 | 0.80% | 10.15% | |
| 21 | Xcel Energy, Inc. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.65 | 9.35% | $14,894 | 0.80% | 10.15% | |
| 22 | Dominion Resources | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $40,387 | -0.33% | 9.88% | |
| 23 | Exelon Corporation | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $25,853 | -0.33% | 9.88% | |
| 24 | NextEra Energy, Inc. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $39,011 | -0.33% | 9.88% | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | Sempra Energy | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.75 | 10.21% | $22,974 | -0.33% | 9.88% | |
| 26 | PG&E Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.6 | 8.92% | $19,464 | 0.80% | 9.72% | |
| 27 | American Elec Pwr | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.7 | 9.78% | $24,265 | -0.33% | 9.45% | |
| 28 | Duke Energy Corp. | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.7 | 9.78% | $49,724 | -0.33% | 9.45% | |
| 29 | Southern Company | 2.32% | 10.03% | 12.35% | 3.77% | 8.58% | 0.6 | 8.92% | $37,042 | -0.33% | 8.59% | |
| 30 | ITC Holdings | Merger | | | | | | | | | | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 5.18% |
| CAPM Risk Premium | 8.58% |
| Low-End Outlier Test | 6.89% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 11.14% |
| High-End Outlier Test | 22.27% |

| | |
|---|---|
| Low with Outlier Test | 8.59% |
| High with Outlier Test | 13.21% |
| Midpoint | 10.90% |

## Appendix C

| EL14-86 (November 2014 to April 2015) | Lower Bound | Upper Bound | Midpoint |
|---|---|---|---|
| DCF | 6.80% | 12.87% | 9.83% |
| CAPM | 7.80% | 13.09% | 10.45% |
| **Composite Zone** | **7.30%** | **12.98%** | **10.14%** |
| | | | |
| Third - Below Average Risk | 7.30% | 9.19% | 8.25% |
| Third - Average Risk | 9.19% | 11.09% | 10.14% |
| Third - Above Average Risk | 11.09% | 12.98% | 12.03% |

## Complaint III – DCF

| Line | Company | Unadjusted Dividend Yield | Short-term IBES | Long-term GDP | Composite Growth | Adjusted Dividend Yield | DCF Results | Outliers |
|---|---|---|---|---|---|---|---|---|
| 1 | TECO Energy | 4.43% | 9.20% | 4.36% | 8.23% | 4.63% | 12.87% | |
| 2 | ITC Holdings Corp. | 1.67% | 11.93% | 4.36% | 10.42% | 1.77% | 12.19% | |
| 3 | Great Plains Energy | 3.54% | 6.90% | 4.36% | 6.39% | 3.66% | 10.05% | |
| 4 | Sempra Energy | 2.42% | 7.93% | 4.36% | 7.22% | 2.52% | 9.73% | |
| 5 | Otter Tail Corp. | 3.91% | 6.00% | 4.36% | 5.67% | 4.03% | 9.70% | |
| 6 | Black Hills Corp. | 3.07% | 7.00% | 4.36% | 6.47% | 3.18% | 9.65% | |
| 7 | CMS Energy Corp. | 3.21% | 6.73% | 4.36% | 6.26% | 3.32% | 9.57% | |
| 8 | ALLETE | 3.71% | 6.00% | 4.36% | 5.67% | 3.82% | 9.49% | |
| 9 | El Paso Electric | 2.89% | 7.00% | 4.36% | 6.47% | 2.99% | 9.46% | |
| 10 | Ameren Corp. | 3.76% | 5.85% | 4.36% | 5.55% | 3.87% | 9.42% | |
| 11 | Eversource Energy | 3.09% | 6.60% | 4.36% | 6.15% | 3.19% | 9.34% | |
| 12 | Dominion Resources | 3.33% | 5.89% | 4.36% | 5.58% | 3.43% | 9.01% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 13 | NextEra Energy, Inc. | 2.82% | 6.44% | 4.36% | 6.02% | 2.91% | 8.93% | |
| 14 | Empire District Elec | 3.81% | 5.00% | 4.36% | 4.87% | 3.91% | 8.78% | |
| 15 | Vectren Corp. | 3.36% | 5.50% | 4.36% | 5.27% | 3.45% | 8.72% | |
| 16 | Avista Corp. | 3.73% | 5.00% | 4.36% | 4.87% | 3.82% | 8.70% | |
| 17 | American Elec Pwr | 3.60% | 5.10% | 4.36% | 4.95% | 3.69% | 8.64% | |
| 18 | Alliant Energy | 3.30% | 5.45% | 4.36% | 5.23% | 3.39% | 8.62% | |
| 19 | Duke Energy Corp. | 3.92% | 4.49% | 4.36% | 4.46% | 4.01% | 8.47% | |
| 20 | NorthWestern Corp. | 3.42% | 5.00% | 4.36% | 4.87% | 3.51% | 8.38% | |
| 21 | Pinnacle West Capital | 3.64% | 4.70% | 4.36% | 4.63% | 3.73% | 8.36% | |
| 22 | Xcel Energy Inc. | 3.57% | 4.58% | 4.36% | 4.54% | 3.65% | 8.19% | |
| 23 | PG&E Corp. | 3.40% | 4.71% | 4.36% | 4.64% | 3.48% | 8.12% | |
| 24 | Southern Company | 4.43% | 3.32% | 4.36% | 3.53% | 4.50% | 8.03% | |
| 25 | DTE Energy Co. | 3.29% | 4.51% | 4.36% | 4.48% | 3.36% | 7.84% | |
| 26 | Portland General Elec. | 2.99% | 4.72% | 4.36% | 4.65% | 3.06% | 7.71% | |
| 27 | Westar Energy | 3.56% | 3.40% | 4.36% | 3.59% | 3.62% | 7.21% | |
| 28 | IDACORP, Inc. | 2.95% | 4.00% | 4.36% | 4.07% | 3.01% | 7.08% | |
| 29 | OGE Energy Corp. | 2.94% | 4.00% | 4.36% | 4.07% | 3.00% | 7.07% | |
| 30 | Consolidated Edison | 3.99% | 2.48% | 4.36% | 2.86% | 4.04% | 6.90% | |
| 31 | Pub Sv Enterprise Grp | 3.63% | 2.85% | 4.36% | 3.15% | 3.68% | 6.83% | |
| 32 | CenterPoint Energy | 4.36% | 1.91% | 4.36% | 2.40% | 4.40% | 6.80% | |
| 33 | Edison International | 2.46% | 0.70% | 4.36% | 1.43% | 2.47% | 3.90% | Low |
| 34 | PPL | Merger | | | | | | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.55% |
| CAPM Risk Premium (IBES) | 9.12% |
| Low-End Outlier Test (CAPM IBES) | 6.37% |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.55% |
| CAPM Risk Premium (*Value Line*) | 8.84% |
| Low-End Outlier Test CAPM (*Value Line*) | 6.32% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 8.64% |
| High-End Outlier Test | 17.29% |

| | |
|---|---|
| Low with Outlier Test | 6.80% |
| High with Outlier Test | 12.87% |
| Midpoint | 9.83% |

**Complaint III – CAPM**

| | | Market Return (Rm) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Company | Div. Yield | Projected Growth (IBES) | Cost of Equity | Risk-free Rate | Risk Premium | Beta | Unadjusted ROE | Market Cap. | Size Adjustment | Implied Cost of Equity | Outliers |
| 1 | Black Hills Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.95 | 11.35% | $2,107 | 1.74% | 13.09% | |
| 2 | Otter Tail Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.9 | 10.90% | $1,012 | 1.71% | 12.61% | |
| 3 | OGE Energy Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.9 | 10.90% | $6,330 | 0.91% | 11.81% | |
| 4 | ALLETE | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $2,267 | 1.74% | 11.73% | |
| 5 | Avista Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $2,003 | 1.74% | 11.73% | |
| 6 | IDACORP, Inc. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $2,975 | 1.60% | 11.59% | |
| 7 | Portland General Elec. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $2,717 | 1.60% | 11.59% | |
| 8 | Vectren Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $3,462 | 1.60% | 11.59% | |
| 9 | Great Plains Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.85 | 10.44% | $3,966 | 1.06% | 11.50% | |
| 10 | TECO Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.85 | 10.44% | $4,344 | 1.06% | 11.50% | |
| 11 | Alliant Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $6,809 | 0.91% | 10.90% | |
| 12 | CenterPoint Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $8,666 | 0.91% | 10.90% | |
| 13 | NorthWestern Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.7 | 9.07% | $2,436 | 1.74% | 10.81% | |
| 14 | El Paso Electric | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.7 | 9.07% | $1,442 | 1.71% | 10.78% | |
| 15 | Empire District Elec | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.7 | 9.07% | $1,017 | 1.71% | 10.78% | |
| 16 | Westar Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $4,747 | 1.06% | 10.59% | |
| 17 | Ameren Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $9,767 | 0.91% | 10.44% | |
| 18 | CMS Energy Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $9,205 | 0.91% | 10.44% | |
| 19 | DTE Energy Co. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $14,004 | 0.63% | 10.16% | |
| 20 | Edison International | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $19,467 | 0.63% | 10.16% | |
| 21 | Eversource Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $15,410 | 0.63% | 10.16% | |
| 22 | Pub Sv Enterprise Grp | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $21,386 | 0.63% | 10.16% | |
| 23 | Pinnacle West Capital | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.7 | 9.07% | $6,576 | 0.91% | 9.98% | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | ITC Holdings Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.65 | 8.62% | $5,486 | 1.06% | 9.68% | |
| 25 | Sempra Energy | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.8 | 9.99% | $26,120 | -0.36% | 9.63% | |
| 26 | Xcel Energy Inc. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.65 | 8.62% | $16,963 | 0.63% | 9.25% | |
| 27 | NextEra Energy, Inc. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.75 | 9.53% | $44,892 | -0.36% | 9.17% | |
| 28 | Consolidated Edison | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.6 | 8.16% | $17,895 | 0.63% | 8.79% | |
| 29 | American Elec Pwr | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.7 | 9.07% | $26,995 | -0.36% | 8.71% | |
| 30 | Dominion Resources | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.7 | 9.07% | $42,196 | -0.36% | 8.71% | |
| 31 | PG&E Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.65 | 8.62% | $24,660 | -0.36% | 8.26% | |
| 32 | Duke Energy Corp. | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.6 | 8.16% | $53,447 | -0.36% | 7.80% | |
| 33 | Southern Company | 2.35% | 9.46% | 11.81% | 2.69% | 9.12% | 0.6 | 8.16% | $39,219 | -0.36% | 7.80% | |
| 34 | PPL | Merger | | | | | | | | | | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.55% |
| CAPM Risk Premium | 9.12% |
| Low-End Outlier Test | 6.37% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 10.44% |
| High-End Outlier Test | 20.88% |

| | |
|---|---|
| Low with Outlier Test | 7.80% |
| High with Outlier Test | 13.09% |
| Midpoint | 10.45% |

# Appendix D

| EL16-64 (May 2017 to October 2017) | Lower Bound | Upper Bound | Midpoint |
|---|---|---|---|
| DCF | 6.34% | 11.33% | 8.84% |
| CAPM | 7.17% | 12.92% | 10.04% |
| **Composite Zone** | **6.76%** | **12.12%** | **9.44%** |
| | | | |
| Third - Below Average Risk | 6.76% | 8.55% | 7.65% |
| Third - Average Risk | 8.55% | 10.33% | 9.44% |
| Third - Above Average Risk | 10.33% | 12.12% | 11.23% |

## Complaint IV – DCF

| Line | Company | Unadjusted Dividend Yield | Short-term IBES | Long-term GDP | Composite Growth | Adjusted Dividend Yield | DCF Results | Outliers |
|---|---|---|---|---|---|---|---|---|
| 1 | Algonquin | 4.41% | 15.00% | 4.21% | 12.84% | 4.74% | 17.58% | High |
| 2 | OGE Energy Corp. | 3.46% | 8.60% | 4.21% | 7.72% | 3.61% | 11.33% | |
| 3 | Emera | 4.45% | 7.23% | 4.21% | 6.63% | 4.61% | 11.24% | |
| 4 | CenterPoint Energy | 3.75% | 7.41% | 4.21% | 6.77% | 3.89% | 10.66% | |
| 5 | CMS Energy Corp. | 2.84% | 7.57% | 4.21% | 6.90% | 2.95% | 9.85% | |
| 6 | Alliant Energy | 3.04% | 6.90% | 4.21% | 6.36% | 3.14% | 9.51% | |
| 7 | SCANA Corp. | 4.11% | 5.50% | 4.21% | 5.24% | 4.22% | 9.47% | |
| 8 | NextEra Energy, Inc. | 2.72% | 7.17% | 4.21% | 6.58% | 2.82% | 9.40% | |
| 9 | Black Hills Corp. | 2.59% | 7.19% | 4.21% | 6.59% | 2.68% | 9.28% | |
| 10 | Fortis Inc. | 3.54% | 5.62% | 4.21% | 5.34% | 3.64% | 8.98% | |
| 11 | PNM Resources | 2.44% | 7.00% | 4.21% | 6.44% | 2.53% | 8.97% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12 | Ameren Corp. | 3.09% | 6.10% | 4.21% | 5.72% | 3.18% | 8.91% | |
| 13 | Eversource Energy | 3.10% | 6.02% | 4.21% | 5.66% | 3.19% | 8.85% | |
| 14 | Pinnacle West Capital | 3.02% | 6.10% | 4.21% | 5.72% | 3.11% | 8.83% | |
| 15 | WEC Energy Group | 3.28% | 5.37% | 4.21% | 5.14% | 3.37% | 8.51% | |
| 16 | Otter Tail Corp. | 3.10% | 5.20% | 4.21% | 5.00% | 3.18% | 8.18% | |
| 17 | El Paso Electric Co. | 2.46% | 5.70% | 4.21% | 5.40% | 2.53% | 7.93% | |
| 18 | Portland General Elec. | 2.94% | 5.00% | 4.21% | 4.84% | 3.01% | 7.86% | |
| 19 | Dominion Energy | 3.87% | 3.80% | 4.21% | 3.88% | 3.94% | 7.83% | |
| 20 | ALLETE | 2.88% | 5.00% | 4.21% | 4.84% | 2.95% | 7.79% | |
| 21 | Edison International | 2.74% | 5.03% | 4.21% | 4.87% | 2.81% | 7.67% | |
| 22 | Southern Company | 4.70% | 2.45% | 4.21% | 2.80% | 4.76% | 7.56% | |
| 23 | DTE Energy Co. | 3.05% | 4.49% | 4.21% | 4.43% | 3.12% | 7.55% | |
| 24 | Consolidated Edison | 3.35% | 3.85% | 4.21% | 3.92% | 3.41% | 7.34% | |
| 25 | Duke Energy Corp. | 4.12% | 2.80% | 4.21% | 3.08% | 4.18% | 7.26% | |
| 26 | IDACORP, Inc. | 2.51% | 4.00% | 4.21% | 4.04% | 2.56% | 6.60% | |
| 27 | NorthWestern Corp. | 3.51% | 2.57% | 4.21% | 2.90% | 3.56% | 6.45% | |
| 28 | American Elec Pwr | 3.32% | 2.67% | 4.21% | 2.98% | 3.36% | 6.34% | |
| 29 | PG&E Corp. | 3.15% | 2.08% | 4.21% | 2.51% | 3.18% | 5.69% | Low |
| 30 | Pub Sv Enterprise Grp. | 3.80% | 0.57% | 4.21% | 1.30% | 3.81% | 5.11% | Low |
| 31 | Exelon Corp. | 3.52% | 0.76% | 4.21% | 1.45% | 3.53% | 4.98% | Low |
| 32 | PPL Corp. | 4.09% | -0.12% | 4.21% | 0.75% | 4.09% | 4.83% | Low |
| 33 | Entergy Corp. | 4.45% | -10.76% | 4.21% | -7.77% | 4.21% | -3.56% | Low |
| 34 | AVANGRID, Inc. | Merger | | | | | | |
| 35 | Xcel Energy Inc. | 3.03% | n/a | 4.21% | | | | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.32% |
| CAPM Risk Premium (IBES) | 9.34% |
| Low-End Outlier Test (CAPM IBES) | 6.19% |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.32% |
| CAPM Risk Premium (*Value Line*) | 7.97% |
| Low-End Outlier Test (CAPM *Value Line*) | 5.91% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 8.06% |
| High-End Outlier Test | 16.11% |

| | |
|---|---|
| Low with Outlier Test | 6.34% |
| High with Outlier Test | 11.94% |
| Midpoint | 9.14% |

**Complaint IV – CAPM**

| Line | Company | Market Return (Rm) | | | Risk-free Rate | Risk Premium | Beta | Unadjusted Ke | Market Cap. | Size Adjustment | Implied Cost of Equity | Outliers |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Div. Yield | Projected Growth (IBES) | Cost of Equity | | | | | | | | |
| 1 | Otter Tail Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.9 | 11.26% | $1,847 | 1.66% | 12.92% | |
| 2 | Black Hills Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.9 | 11.26% | $3,409 | 1.51% | 12.77% | |
| 3 | OGE Energy Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.95 | 11.72% | $7,201 | 0.89% | 12.61% | |
| 4 | El Paso Electric Co. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.8 | 10.32% | $2,339 | 1.66% | 11.98% | |
| 5 | CenterPoint Energy | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.9 | 11.26% | $12,819 | 0.61% | 11.87% | |
| 6 | PNM Resources | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.75 | 9.86% | $3,405 | 1.51% | 11.37% | |
| 7 | NorthWestern Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $3,092 | 1.51% | 10.90% | |
| 8 | ALLETE | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.75 | 9.86% | $3,982 | 0.98% | 10.84% | |
| 9 | IDACORP, Inc. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $4,666 | 0.98% | 10.37% | |
| 10 | Portland General Elec. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $4,259 | 0.98% | 10.37% | |
| 11 | Alliant Energy | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $9,950 | 0.89% | 10.28% | |
| 12 | Pinnacle West Capital | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $9,814 | 0.89% | 10.28% | |
| 13 | Fortis Inc. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $18,802 | 0.61% | 10.00% | |
| 14 | SCANA Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $6,003 | 0.89% | 9.81% | |
| 15 | Ameren Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $15,119 | 0.61% | 9.53% | |
| 16 | CMS Energy Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $13,551 | 0.61% | 9.53% | |
| 17 | DTE Energy Co. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $19,876 | 0.61% | 9.53% | |
| 18 | Entergy Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $15,554 | 0.61% | 9.53% | |
| 19 | Eversource Energy | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $20,037 | 0.61% | 9.53% | |
| 35 | Emera | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.6 | 8.45% | $10,091 | 0.89% | 9.34% | |
| 20 | PPL Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.75 | 9.86% | $25,392 | -0.35% | 9.51% | |
| 21 | WEC Energy Group | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.6 | 8.45% | $21,336 | 0.61% | 9.06% | |
| 22 | Exelon Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $39,126 | -0.35% | 9.04% | |
| 23 | Pub Sv Enterprise Grp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.7 | 9.39% | $25,144 | -0.35% | 9.04% | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | American Elec Pwr | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $36,259 | -0.35% | 8.57% | |
| 25 | Dominion Energy | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $50,929 | -0.35% | 8.57% | |
| 26 | Edison International | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $25,762 | -0.35% | 8.57% | |
| 27 | NextEra Energy, Inc. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $70,494 | -0.35% | 8.57% | |
| 28 | PG&E Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.65 | 8.92% | $29,105 | -0.35% | 8.57% | |
| 29 | Duke Energy Corp. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.6 | 8.45% | $61,992 | -0.35% | 8.10% | |
| 30 | Xcel Energy Inc. | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.6 | 8.45% | $25,012 | -0.35% | 8.10% | |
| 31 | Southern Company | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.55 | 7.99% | $53,443 | -0.35% | 7.64% | |
| 32 | Consolidated Edison | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | 0.5 | 7.52% | $26,561 | -0.35% | 7.17% | |
| 33 | AVANGRID, Inc. | Merger | | | | | | | | | | |
| 34 | Algonquin | 2.29% | 9.90% | 12.19% | 2.85% | 9.34% | n/a | | | | | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.32% |
| CAPM Risk Premium | 9.34% |
| Low-End Outlier Test | 6.19% |

| | |
|---|---|
| Median Including Utilities Excluded with Outlier Test | 9.53% |
| High-End Outlier Test | 19.06% |

| | |
|---|---|
| Low with Outlier Test | 7.17% |
| High with Outlier Test | 12.92% |
| Midpoint | 10.04% |

# Appendix E

## Moody's Baa Utility Bond Yields

| Month | Moody's Baa Utility Bond Yield (Monthly Average) | 6-Month Average |
|---|---|---|
| Jan-04 | 6.47% | |
| Feb-04 | 6.28% | |
| Mar-04 | 6.12% | |
| Apr-04 | 6.46% | |
| May-04 | 6.75% | |
| Jun-04 | 6.84% | 6.49% |
| Jul-04 | 6.67% | 6.52% |
| Aug-04 | 6.45% | 6.55% |
| Sep-04 | 6.27% | 6.57% |
| Oct-04 | 6.17% | 6.53% |
| Nov-04 | 6.16% | 6.43% |
| Dec-04 | 6.10% | 6.30% |
| Jan-05 | 5.95% | 6.18% |
| Feb-05 | 5.76% | 6.07% |
| Mar-05 | 6.01% | 6.02% |
| Apr-05 | 5.95% | 5.99% |
| May-05 | 5.88% | 5.94% |
| Jun-05 | 5.70% | 5.87% |
| Jul-05 | 5.81% | 5.85% |
| Aug-05 | 5.80% | 5.86% |
| Sep-05 | 5.83% | 5.83% |
| Oct-05 | 6.08% | 5.85% |
| Nov-05 | 6.19% | 5.90% |
| Dec-05 | 6.14% | 5.97% |
| Jan-06 | 6.06% | 6.02% |
| Feb-06 | 6.11% | 6.07% |
| Mar-06 | 6.26% | 6.14% |
| Apr-06 | 6.54% | 6.22% |
| May-06 | 6.59% | 6.28% |
| Jun-06 | 6.61% | 6.36% |
| Jul-06 | 6.61% | 6.45% |
| Aug-06 | 6.43% | 6.51% |
| Sep-06 | 6.26% | 6.51% |
| Oct-06 | 6.24% | 6.46% |
| Nov-06 | 6.04% | 6.37% |
| Dec-06 | 6.05% | 6.27% |

| | | |
|---|---|---|
| Jan-07 | 6.16% | 6.20% |
| Feb-07 | 6.10% | 6.14% |
| Mar-07 | 6.10% | 6.12% |
| Apr-07 | 6.24% | 6.12% |
| May-07 | 6.23% | 6.15% |
| Jun-07 | 6.54% | 6.23% |
| Jul-07 | 6.49% | 6.28% |
| Aug-07 | 6.51% | 6.35% |
| Sep-07 | 6.45% | 6.41% |
| Oct-07 | 6.36% | 6.43% |
| Nov-07 | 6.27% | 6.44% |
| Dec-07 | 6.51% | 6.43% |
| Jan-08 | 6.35% | 6.41% |
| Feb-08 | 6.60% | 6.42% |
| Mar-08 | 6.68% | 6.46% |
| Apr-08 | 6.81% | 6.54% |
| May-08 | 6.79% | 6.62% |
| Jun-08 | 6.93% | 6.69% |
| Jul-08 | 6.97% | 6.80% |
| Aug-08 | 6.98% | 6.86% |
| Sep-08 | 7.15% | 6.94% |
| Oct-08 | 8.58% | 7.23% |
| Nov-08 | 8.98% | 7.60% |
| Dec-08 | 8.13% | 7.80% |
| Jan-09 | 7.90% | 7.95% |
| Feb-09 | 7.74% | 8.08% |
| Mar-09 | 8.00% | 8.22% |
| Apr-09 | 8.03% | 8.13% |
| May-09 | 7.76% | 7.93% |
| Jun-09 | 7.30% | 7.79% |
| Jul-09 | 6.89% | 7.62% |
| Aug-09 | 6.36% | 7.39% |
| Sep-09 | 6.12% | 7.08% |
| Oct-09 | 6.14% | 6.76% |
| Nov-09 | 6.18% | 6.50% |
| Dec-09 | 6.26% | 6.33% |
| Jan-10 | 6.16% | 6.20% |
| Feb-10 | 6.25% | 6.19% |
| Mar-10 | 6.22% | 6.20% |
| Apr-10 | 6.19% | 6.21% |
| May-10 | 6.15% | 6.21% |

| | | |
|---|---|---|
| Jun-10 | 6.18% | 6.19% |
| Jul-10 | 5.98% | 6.16% |
| Aug-10 | 5.55% | 6.05% |
| Sep-10 | 5.53% | 5.93% |
| Oct-10 | 5.62% | 5.84% |
| Nov-10 | 5.85% | 5.79% |
| Dec-10 | 6.04% | 5.76% |
| Jan-11 | 6.06% | 5.78% |
| Feb-11 | 6.10% | 5.87% |
| Mar-11 | 5.97% | 5.94% |
| Apr-11 | 5.98% | 6.00% |
| May-11 | 5.74% | 5.98% |
| Jun-11 | 5.67% | 5.92% |
| Jul-11 | 5.70% | 5.86% |
| Aug-11 | 5.22% | 5.71% |
| Sep-11 | 5.11% | 5.57% |
| Oct-11 | 5.24% | 5.45% |
| Nov-11 | 4.93% | 5.31% |
| Dec-11 | 5.07% | 5.21% |
| Jan-12 | 5.06% | 5.11% |
| Feb-12 | 5.02% | 5.07% |
| Mar-12 | 5.13% | 5.08% |
| Apr-12 | 5.11% | 5.05% |
| May-12 | 4.97% | 5.06% |
| Jun-12 | 4.91% | 5.03% |
| Jul-12 | 4.85% | 5.00% |
| Aug-12 | 4.88% | 4.98% |
| Sep-12 | 4.81% | 4.92% |
| Oct-12 | 4.54% | 4.83% |
| Nov-12 | 4.42% | 4.74% |
| Dec-12 | 4.56% | 4.68% |
| Jan-13 | 4.66% | 4.65% |
| Feb-13 | 4.74% | 4.62% |
| Mar-13 | 4.72% | 4.61% |
| Apr-13 | 4.49% | 4.60% |
| May-13 | 4.65% | 4.64% |
| Jun-13 | 5.08% | 4.72% |
| Jul-13 | 5.21% | 4.82% |
| Aug-13 | 5.28% | 4.91% |
| Sep-13 | 5.31% | 5.00% |
| Oct-13 | 5.17% | 5.12% |

| | | |
|---|---|---|
| Nov-13 | 5.24% | 5.22% |
| Dec-13 | 5.25% | 5.24% |
| Jan-14 | 5.09% | 5.22% |
| Feb-14 | 5.01% | 5.18% |
| Mar-14 | 5.00% | 5.13% |
| Apr-14 | 4.85% | 5.07% |
| May-14 | 4.69% | 4.98% |
| Jun-14 | 4.73% | 4.90% |
| Jul-14 | 4.66% | 4.82% |
| Aug-14 | 4.65% | 4.76% |
| Sep-14 | 4.79% | 4.73% |
| Oct-14 | 4.67% | 4.70% |
| Nov-14 | 4.75% | 4.71% |
| Dec-14 | 4.70% | 4.70% |
| Jan-15 | 4.39% | 4.66% |
| Feb-15 | 4.44% | 4.62% |
| Mar-15 | 4.51% | 4.58% |
| Apr-15 | 4.51% | 4.55% |
| May-15 | 4.91% | 4.58% |
| Jun-15 | 5.13% | 4.65% |
| Jul-15 | 5.22% | 4.79% |
| Aug-15 | 5.23% | 4.92% |
| Sep-15 | 5.42% | 5.07% |
| Oct-15 | 5.47% | 5.23% |
| Nov-15 | 5.57% | 5.34% |
| Dec-15 | 5.55% | 5.41% |
| Jan-16 | 5.49% | 5.46% |
| Feb-16 | 5.28% | 5.46% |
| Mar-16 | 5.12% | 5.41% |
| Apr-16 | 4.75% | 5.29% |
| May-16 | 4.60% | 5.13% |
| Jun-16 | 4.47% | 4.95% |
| Jul-16 | 4.16% | 4.73% |
| Aug-16 | 4.20% | 4.55% |
| Sep-16 | 4.27% | 4.41% |
| Oct-16 | 4.34% | 4.34% |
| Nov-16 | 4.64% | 4.35% |
| Dec-16 | 4.79% | 4.40% |
| Jan-17 | 4.62% | 4.48% |
| Feb-17 | 4.58% | 4.54% |
| Mar-17 | 4.62% | 4.60% |

| | | |
|---|---|---|
| Apr-17 | 4.51% | 4.63% |
| May-17 | 4.50% | 4.60% |
| Jun-17 | 4.32% | 4.53% |
| Jul-17 | 4.36% | 4.48% |
| Aug-17 | 4.23% | 4.42% |
| Sep-17 | 4.24% | 4.36% |
| Oct-17 | 4.26% | 4.32% |
| Nov-17 | 4.16% | 4.26% |
| Dec-17 | 4.14% | 4.23% |
| Jan-18 | 4.18% | 4.20% |
| Feb-18 | 4.42% | 4.23% |
| Mar-18 | 4.52% | 4.28% |
| Apr-18 | 4.58% | 4.33% |
| May-18 | 4.71% | 4.43% |
| Jun-18 | 4.71% | 4.52% |
| Jul-18 | 4.67% | 4.60% |
| Aug-18 | 4.64% | 4.64% |
| Sep-18 | 4.74% | 4.68% |
| Oct-18 | 4.91% | 4.73% |
| Nov-18 | 5.03% | 4.78% |
| Dec-18 | 4.92% | 4.82% |
| Jan-19 | 4.92% | 4.86% |
| Feb-19 | 4.76% | 4.88% |
| Mar-19 | 4.65% | 4.86% |
| Apr-19 | 4.55% | 4.80% |
| May-19 | 4.47% | 4.71% |
| Jun-19 | 4.31% | 4.61% |
| Jul-19 | 4.13% | 4.48% |
| Aug-19 | 3.63% | 4.29% |
| Sep-19 | 3.71% | 4.13% |
| Oct-19 | 3.76% | 4.00% |
| Nov-19 | 3.76% | 3.88% |
| Dec-19 | 3.71% | 3.78% |
| Jan-20 | 3.60% | 3.70% |
| Feb-20 | 3.42% | 3.66% |
| Mar-20 | 3.96% | 3.70% |
| Apr-20 | 3.82% | 3.71% |
| May-20 | 3.63% | 3.69% |
| Jun-20 | 3.44% | 3.65% |
| Jul-20 | 3.09% | 3.56% |

Document Content(s)

EL11-66-001.docx....................................................1

# Exhibit B

\

195 FERC ¶ 62,112
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Martha Coakley, Attorney General of the Commonwealth of Massachusetts
Connecticut Public Utilities Regulatory Authority
Massachusetts Department of Public Utilities
New Hampshire Public Utilities Commission
George Jepsen, Attorney General of the State of Connecticut
Connecticut Office of Consumer Counsel
Maine Office of the Public Advocate
New Hampshire Office of the Consumer Advocate
Rhode Island Division of Public Utilities and Carriers
Vermont Department of Public Service
Massachusetts Municipal Wholesale Electric Company
Associated Industries of Massachusetts
The Energy Consortium
Power Options, Inc.
Industrial Energy Consumer Group

v.

Bangor Hydro-Electric Company
Central Maine Power Company
New England Power Company
New Hampshire Transmission LLC
Northeast Utilities Service Company, on behalf of its operating company affiliates: The Connecticut Light and Power Company, Western Massachusetts Electric Company, and Public Service Company of New Hampshire
NSTAR Electric & Gas Corporation
The United Illuminating Company
Unitil Energy Systems, Inc.
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC
ISO New England Inc.

Docket No. EL11-66-006

ENE (Environment Northeast)
Greater Boston Real Estate Board
National Consumer Law Center
NEPOOL Industrial Customer Coalition

v.

Docket No. EL13-33-004

Bangor Hydro-Electric Company
Central Maine Power Company
New England Power Company
New Hampshire Transmission LLC
NSTAR Electric Company
Northeast Utilities Service Company
The United Illuminating Company
Unitil Energy Systems, Inc.
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC

Attorney General of the Commonwealth of Massachusetts — Docket No. EL14-86-002
Connecticut Public Utilities Regulatory Authority
Massachusetts Municipal Wholesale Electric Company
New Hampshire Electric Cooperative, Inc.
Massachusetts Department of Public Utilities
New Hampshire Public Utilities Commission
George Jepsen, Attorney General of the State of Connecticut
Connecticut Office of Consumer Counsel
Maine Office of the Public Advocate
New Hampshire Office of the Consumer Advocate
Rhode Island Division of Public Utilities and Carriers
Vermont Department of Public Service
Associated Industries of Massachusetts
The Energy Consortium
Power Options, Inc.
Western Massachusetts Industrial Group
Environment Northeast
National Consumer Law Center
Greater Boston Real Estate Board
Industrial Energy Consumer Group

v.

Bangor Hydro-Electric Company
Central Maine Power Company
New England Power Company
New Hampshire Transmission LLC
Northeast Utilities Service Company, on behalf of its operating company affiliates: The Connecticut Light and Power Company, Western Massachusetts Electric Company, and Public

Service Company of New Hampshire
NSTAR Electric Company
The United Illuminating Company
Unitil Energy Systems, Inc.
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC

Belmont Municipal Light Department — Docket No. EL16-64-004
Braintree Electric Light Department
Concord Municipal Light Plant
Georgetown Municipal Light Department
Groveland Electric Light Department
Hingham Municipal Lighting Plant
Littleton Electric Light & Water Department
Middleborough Gas & Electric Department
Middleton Electric Light Department
Reading Municipal Light Department
Rowley Municipal Lighting Plant
Taunton Municipal Lighting Plant
Wellesley Municipal Light Plant

v.

Central Maine Power Company
Emera Maine (formerly known as Bangor Hydro-Electric Company)
Eversource Energy Service Company and its operating company affiliates: The Connecticut Light and Power Company, Western Massachusetts Electric Company, Public Service Company of New Hampshire, and NSTAR Electric Company
New England Power Company
New Hampshire Transmission LLC
The United Illuminating Company
Fitchburg Gas and Electric Light Company
Vermont Transco, LLC

ISO New England Inc. — Docket No. ER15-414-005

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION

(May 21, 2026)

Rehearing has been timely requested of the Commission's order issued on March 19, 2026, in this proceeding. *Coakley v. Bangor Hydro-Elec. Co.*, Opinion No. 594, 194 FERC ¶ 61,208 (2026). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2025); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the requests for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Secretary.

Document Content(s)

EL11-66-006.docx....................................................1